```
 1                IN THE UNITED STATES DISTRICT COURT FOR

 2                   THE EASTERN DISTRICT OF LOUISIANA

 3                            AT NEW ORLEANS

 4

 5   ROY FERRAND, LUTHER SCOTT, JR., and      )
     LOUISIANA STATE CONFERENCE OF THE        )
 6   NAACP, for themselves and all other      )
     persons similarly situated,              )
 7                                            )
                         Plaintiffs,          )
 8                                            )
               v.                             ) Case No. 11-926 "H"
 9                                            ) October 15, 2012
     TOM SCHEDLER in his official capacity as ) Bench Trial
10   the Louisiana Secretary of State, RUTH   ) Day One
     JOHNSON, in her official capacity as     )
11   Secretary of the Louisiana Department of )
     Children & Family Services, and BRUCE D. )
12   GREENSTEIN, in his official capacity as  )
     Secretary of the Louisiana Department of )
13   Health & Hospitals,                      )
                                              )
14                       Defendants.          )
     _____)
15

16

17                     TRANSCRIPT OF PROCEEDINGS

18          BEFORE THE HONORABLE JANE TRICHE MILAZZO

19               UNITED STATES DISTRICT JUDGE

20

21   SUSAN A. ZIELIE, RMR, FCRR
     Official Court Reporter
22   HB 406
     500 Poydras Street
23   New Orleans, Louisiana 70130
     susan_zielie@laed.uscourts.gov
24   504.589.7781

25   Proceedings Recorded by Computer-aided Stenography.
```

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs:       DALE HO, ESQ.
                               NATASHA KORGAONKAR, ESQ.
 4                             NAACP Legal Defense
                                  & Educational Fund, Inc.
 5                             99 Hudson Street
                               Suite 1600
 6                             New York NY 10013
                               212.965.2200
 7                             dho@naacpldf.org

 8                             RONALD LAWRENCE WILSON, ESQ.
                               Ronald L. Wilson, Atty at Law
 9                             909 Poydras Street
                               Suite 2556
10                             New Orleans LA 70112
                               504.525.4361
11                             Cabra12@aol.com

12                             MICHAEL B. DeLEEUW, ESQ.
                               ERICA SOLLIE, ESQ.
13                             DAVID YELLIN, ESQ.
                               JESSE RYAN LOFFLER, ESQ.
14                             Fried, Frank, Harris, Schriver
                                  & Jacobson, LLP
15                             One New York Plaza
                               New York NY 10004
16                             212.859.8247
                               michael.deleeuw@friedfrank.com
17
                               MICHELLE RUPP, ESQ.
18                             SARAH BRANNON, ESQ.
                               Project Vote
19                             1350 Eye Street NW
                               Suite 1250
20                             Washington DC 20005
                               202.546.4173
21                             mrupp@projectvote.org

22
                               NIYATI SHAH, ESQ.
23                             Project Vote
                               737 1/2 8th Street SE
24                             Washington DC 20003
                               202.546.4173
25                             nshah@projectvote.org
```

```
1    APPEARANCES - 2

2

3    For Defendant              CELIA R. CANGELOSI, ESQ.
     Schedler:                  Celia R. Cangelosi, Atty at Law
4                               PO Box 3036
                                918 Government Street
5                               Suite 101
                                Baton Rouge LA 70821
6                               225.387.0511
                                ceciacan@bellsouth.net
7
                                CAREY JONES, ESQ.
8                               Carey T. Jones, Atty at Law
                                PO Box 700
9                               Denham Springs LA 7072-0700
                                225.664.0077
10                              tjones@tomoneslaw.com

11   For Defendant              CELIA MARIE WILLIAMS-ALEXANDER, ESQ.
     Sonnier:                   EBONI TOWNSEND, ESQ.
12                              State of Louisiana
                                (Dpt of Children & Family Services)
13                              627 North 4th Street
                                PO Box 1887
14                              Baton Rouge LA 70821
                                225.342.1125
15                              celia.alexander@la.gov

16                              HARRY JOSEPH PHILIPS, JR., ESQ.
                                AMY COLLIER LAMBERT, ESQ.
17                              Taylor Porter Brooks & Philips, LLP
                                451 Florida Street
18                              8th Floor
                                PO Box 2471
19                              Baton Rouge LA 70821
                                225.387.3221
20                              amy.lambert@taylorporter.com

21

22

23

24

25
```

```
 1    APPEARANCES - 3

 2    For Defendant            DOUGLAS CADE, ESQ.
      Greenstein:              REBECCA C. CLEMENT, ESQ.
 3                             DAVID L. McCAY, ESQ.
                               Louisiana Dpt. Of Health & Hospitals
 4                             Bureau of Legal Services
                               Bienville Building
 5                             628 N. 4th Street
                               PO Box 3836
 6                             Baton Rouge LA 70821-3836
                               225.342.9939
 7                             rebecca.clement.la.gov
                               douglas.cade@la.gov
 8                             david.mccay@la.gov

 9
                               HARRY JOSEPH PHILIPS, JR., ESQ.
10                             AMY COLLIER LAMBERT, ESQ.
                               Taylor Porter Brooks & Philips, LLP
11                             451 Florida Street
                               8th Floor
12                             PO Box 2471
                               Baton Rouge LA 70821
13                             225.387.3221
                               amy.lambert@taylorporter.com
14
                               BRANDON JAMES BABINEAUX, ESQ.
15                             Louisiana Dpt. Of Health & Hospitals.
                               Bureau of Legal Services
16                             Bienville Building
                               628 N. 4th Street
17                             PO Box 3836
                               Baton Rouge LA 70821-3836
18                             225.342.9939
                               brandon.babineaux@la.gov
19

20

21

22

23

24

25
```

1                      I N D E X

2    Motions in Limine                         7

3

4    Opening Statements

5          Plaintiffs - Mr. Ho                 31

6          Defendants DHH/DCFS - Mr. Philips   40

7

8    Testimony By:

9          DIANNE BATTS

10              Direct by Mr. Ho             45, 99

11              Cross by Mr. Cade            63

12          CHRISTOPHER CHASE

13              Direct by Ms. Korgaonkar     117

14          SAMUEL GUILLORY

15              Direct by Ms. Brannon        128, 204

16              Cross by Ms. Alexander       186, 210

17          CATHERINE MICHIELS

18              Direct by Ms. Shah           218

19          DWAYNE JOUBERT

20              Direct by Ms. Shah           229

21              Cross by Ms. Alexander       244

22          STEPHANIE BROOKS

23              Direct by Ms. Rupp           247

24

25

```
 1              NEW ORLEANS, LOUISIANA; MONDAY, OCTOBER 15, 2012

 2                              8:30 A.M.

 3              THE COURT:  Please call the docket.

 4              CASE MANAGER:  This is civil action 11-926.

 5              THE COURT:  The parties make their appearances for the

 6     record, please.  Please make appearances for the record, please.

 7              MR. HO:  Good morning, Your Honor.  Dale Ho for the

 8     plaintiffs.

 9              MR. LAFFLER:  Good morning, Your Honor.  Jesse Laffler

10     for the plaintiffs.

11              MS. BRANNON:  Sarah Brannon for the plaintiffs.

12              MR. DeLEEUW:  Morning, Your Honor.  Michael DeLeeuw for

13     the plaintiffs.

14              MR. YELLIN:  Good morning, Your Honor.  David Yellin

15     for the plaintiffs.

16              MS. SOLLIE:  Erica Sollie for the plaintiffs.

17              MS. SHAH:  Niyati Shah for the plaintiffs.

18              MS. KORGAONKAR:  Natasha Korgaonkar for the plaintiffs.

19              MS. CANGELOSI:  Your Honor, representing the Secretary

20     of the State in its official capacity, Celia Cangelosi.

21              MR. JONES:  Carey Jones for the Secretary of State.

22              MR. CADE:  I'm Douglas Cade for the defendant, Bruce

23     Greenstein.

24              MR. PHILIPS:  Your Honor, Skip Philips for Bruce

25     Greenstein and Suzy Sonnier.
```

1          MS. BOWMAN:  Good morning, Your Honor, Patsy Bowman.

2          MS. ALEXANDER:  Good morning, Your Honor, Celia

3     Alexander for Mr. Greenstein and Ms. Sonnier.

4          MR. BABINEAUX:  Good morning, Your Honor.  Brian

5     Babineaux on behalf of the Secretary of State Bruce Greenstein.

6          MR. CADE:  Rebecca Clement on behalf of Bruce

7     Greenstein.

8          MR. JONES:  This is Mr. Sammy Guillory.  He's a witness

9     but he's also a representative of DCFS.

10          THE COURT:  The first thing we're going to do this

11     morning is let me rule on the motions in limine that are

12     pending.  We'll take those one at a time.

13               Docket No. 378 was a motion in limine filed by the

14     plaintiffs seeking judicial notice.  Secretary of State has

15     requested an opportunity to argue this issue.

16               Ms. Cangelosi.

17          MS. CANGELOSI:  Your Honor, the rules on judicial

18     notice say, when you ask for judicial notice, that's the rule.

19     And I think it's Federal 201, it says that you have to say the

20     purpose for which you're offering it.

21               So I think -- I don't know how to answer their

22     question for judicial notice because they haven't told us in

23     their request the purpose for which it's being offered.  That

24     would be my first argument.

25               So there's nothing to respond to, because the

1    rules require them to say the purpose for which it's being

2    offered, and they haven't said the purpose.

3            THE COURT:  Mr. Ho, are you prepared?

4            MR. HO:  Yes, Your Honor.  My colleague Michelle Rupp

5    will be addressing this motion.

6            THE COURT:  Thank you.

7            MS. RUPP:  Your Honor, with regard to the purpose,

8    there's no surprise here.  We have used the same documents in

9    our complaint in paragraphs 51, 52, 54 and 55, and also in our

10   proposed Finding of Facts, paragraphs 30 to 32.

11              We are using them -- of course, the relevancy, it

12   will be further developed at trial.  But, in short, we're

13   showing that -- we're using them to refer to the numbers of the

14   voter registration applications that have come from public

15   assistance agencies' reported to the Secretary of State to the

16   federal government.

17           MS. CANGELOSI:  So that's the sole purpose of the

18   reports.  Is that for the state of Louisiana.

19           MS. RUPP:  I'm sorry, I didn't catch of the last part.

20           THE COURT:  Is that for the state of Louisiana?

21           MS. RUPP:  The sole purpose of the report is for the

22   voter registration agencies.

23           MS. CANGELOSI:  For the state of Louisiana, is my

24   question.

25           MS. RUPP:  Yes.

1          MS. CANGELOSI:  The FEC reports are, under the NVRA, it

2   used to be called the Federal Elections Commission, and now it's

3   calls the Election Assistance Commission.  That's under Section

4   9 of the NVRA.  Section 9 of the NVRA is not a section at issue

5   in this case.

6          The FAC and the EAC have the duty to report

7   biannually, which is every two years -- I get those mixed up --

8   but every two years to Congress on what's going on with the

9   NVRA, how it's being implemented and what recommendations can we

10  make to change it.

11          And so, in coordination and connection with those

12  duties, they ask the states to give them numbers.  And they ask

13  the states to give them numbers in a format where they do a

14  survey every year.  And, if you look at the reports themselves,

15  they will say the surveys vary from year to year.  So the

16  questions asked are not the same in every year or asked in the

17  same format.

18          They're asking to introduce all the reports from

19  -- I think the first one was -- they're every two years.  Maybe

20  the first one was '93/'94, those two years.  And the last one

21  was 2009/2010.  So they want to put in -- I don't know the

22  number -- 10 or so of those reports.

23          If you look at the reports themselves, they say

24  you really can't rely on this stuff.  You really can't compare

25  it from year to year.

1          And I've cited in my memo the places where the

2    reports say:  Caution is necessary when interpreting the survey

3    data, particularly when comparing the data to from year to year

4    or state to state due to changes in the state data collection

5    process in the various times and the various levels of the

6    states' complete responses.  So the reports themselves say don't

7    do what they want you to do, don't compare them from year to

8    year.  Don't compare the numbers from year to year.

9          Maybe I don't know enough about their purpose.

10   They want to show the numbers Louisiana has shown, and I think

11   they want to say:  Well, your numbers for '93/'94 are high, your

12   numbers from 2009 to 2010 are lower, therefore you must not be

13   doing your job.

14         Well, the EAC reports -- and I can cite you every

15   report at the page numbers -- they say don't compare them from

16   year to year and don't compare them from state to state.

17         Then they also say in these various reports in,

18   see, for example, the 1995/'96 report at pages 10 and 11 and the

19   2009 and 2010 report at page 4, it says you can't compare

20   presidential years to other years.  So --

21         THE COURT:  But that would be a part of the report that

22   I would take judicial notice of.

23         MS. CANGELOSI:  Right.

24         But this is more than that, Judge.  It's just, you

25   can't compare from years to years.

 1                    It says there's a phenomenon of surge and decline

 2     based on federal elections attracting greater registration and

 3     turnout, and it cautions against comparing presidential years

 4     with any other years.

 5                    The same surge and decline phenomenon would say,

 6     you know, that at the beginning of the NVRA has more -- so

 7     there's in value to the numbers, is what I'm saying.

 8                    They say you have to read every report to see what

 9     they caution against.  In 2001 and 2010, they recognize that

10     there were a higher number of duplicate registration

11     applications making the numbers higher in the beginning because

12     people didn't understand, they thought they had to fill out a

13     new form every time they went in to any agency for any service.

14                    The surveys don't know themselves how the

15     questions vary from year to year.  So, if you read the survey,

16     you're not going to know what questions were asked of the state.

17            THE COURT:  Is the information you are giving me right

18     now part of those reports?

19            MS. CANGELOSI:  Yeah.  If you want -- but --

20            THE COURT:  So I think then -- okay, I get it.

21            MS. CANGELOSI:  So, I mean, they want to do it from

22     comparisons for years to years, but the reports say themselves

23     don't use it for year to year.  That's the purpose, is my

24     understanding.

25                    That's your understanding as well, is that

1    correct?

2              THE COURT:  Yes.

3              MS. CANGELOSI:  So, you know, that's what -- just one

4    second.

5                   (Discussion held off the record.)

6              MS. CANGELOSI:  Another thing, Judge, and this is very

7    important, is materiality.  Who was under the NVRA.  The person

8    who was going -- a private right of action, the person who is

9    aggrieved by a violation of the NVRA has a right to bring a

10   private action to address that violation.  That violation that

11   they're aggrieved by.

12             I don't know how either of these plaintiffs are

13   aggrieved by these numbers.  So I think this issue is material

14   for this case.

15             What they say they're aggrieved by is certain

16   services weren't offered at the different agencies, but they're

17   not aggrieved by what the numbers were.  And that's why we're

18   objecting to any evidence on this coding issue that comes up

19   later and the whole numbers issue, because they can't possibly

20   be aggrieved by what the numbers are.

21             And the numbers themselves, because of all the

22   caveats and all the cautions, don't have enough relevance to be

23   making a comparison, and it's deceptive.

24             In fact, we're going to stipulate we didn't do

25   certain services, which is going to obviate the need for some of

1    this information anyway.  So maybe you might want to --

2           THE COURT:  Well, we hadn't had that stipulation yet.

3    And, as a matter of fact, there have been objections to

4    everything.  So I'm not buying that the Secretary of State's

5    going to stipulate to much.

6           MS. CANGELOSI:  It's been signed.  It's been signed.

7    We have offered it, and it's been signed.  We're going to offer

8    a stipulation into evidence.

9                  You want us to offer it now?  Because it might

10   have a bearing on some of your rulings, because it's going to

11   remove a lot of these issues from the trial.

12                 You don't know about the stipulation.

13          THE COURT:  No.  I very frankly haven't gotten much

14   that was agreed to by the Secretary of State.

15          MS. CANGELOSI:  We've got a good stipulation, Your

16   Honor, that's going to obviate the need --

17          THE COURT:  At this point, I don't have the stipulation

18   in hand, and it hasn't been offered.

19                 At this point, I'm going to grant the motion in

20   limine.  Your objection is noted for the record.

21                 And, just so the report is complete, I believe

22   that all of the caveats that you read into the record regarding

23   those reports are part of the reports.  This is a bench trial,

24   it's going to go to the weight of it.  I'm going to take

25   judicial notice of the documents.

1          MS. CANGELOSI:  Thank you, Your Honor.

2          THE COURT:  Motion in limine to exclude Secretary of

3     State's Exhibit 7, 8 and 9 that was brought by the plaintiffs.

4     The Court is going to grant the motion as to the voting history

5     of Mr. Scott, but will deny the motion as to his voter

6     registration status.

7               Document No. 380, motion in limine to exclude DHH

8     Exhibits 5, 8, 15 and 16 as undisclosed documents.  The Court

9     notes that Exhibits 5 and 8, that portion of the motion is moot

10    as those have been withdrawn.

11              I'm going to deny the motion in limine as to

12    documents 15 and 16.

13              Document 380, motion by the plaintiffs to bar the

14    testimony of Sandra Wilson, that motion is denied.

15              Document No. 382, motion in limine by the

16    plaintiffs to limit the evidence of post-litigation remedial

17    measures as to its proper purpose.  I'm going to -- and I don't

18    -- I guess, because the way it's written, the motion is denied.

19    The Court's going to give what weight to that evidence that it

20    deems appropriate and then to its relevant conduct.  I'm going

21    to deny that motion.

22              Document No. 383, the motion in limine to exclude

23    evidence concerning how plaintiffs became involved in this

24    litigation.  I'm going to grant that motion.  I don't think it's

25    relevant.

1          Document 384, motion to exclude Secretary of

2    State's Exhibits 20 and 22 as beyond the scope of the relevant

3    time period.  As I appreciate the pleadings that were filed in

4    this matter, that was evidence that was not produced, and there

5    was a motion to compel related to those documents?  Because --

6    I'm just wondering, because it seems to me that Magistrate Judge

7    Wilkerson did not allow you to explore those exhibits in

8    discovery; is that correct?

9          MR. YELLIN:  Yes, Your Honor.  That is correct.

10          THE COURT:  I think, because we have so many people,

11    would you stand up again and say your name.

12          MR. YELLIN:  Sorry, Your Honor.  David Yellin for the

13    plaintiffs.

14          Yes, that's correct.  In response to defendant's

15    motion to seeking a protective order, Judge Wilkinson ordered no

16    discovery prior to 2001 would be permitted.

17          MS. CANGELOSI:  Your Honor, if I maybe heard.

18          THE COURT:  Please.

19          MS. CANGELOSI:  They've offered EAC, and you've allowed

20    them, from '93, '94, '95.  They've opened that door about that

21    judicial notice.  They have offered the EAC charts, and they

22    want to compare our numbers 49 and 95.  We can certainly offer.

23    If they want to do that, we can certainly offer evidence of what

24    we did in those years and that's what those reports show.

25          MR. YELLIN:  Your Honor, first of all, those EAC

1   reports are actually Secretary of State Exhibits 30 through 37

2   as well.  So I think all parties have agreed that those are at

3   least potentially relevant.

4            Whereas, with respect to policy, everybody has

5   agreed throughout this trial that policy prior to 2001 is

6   irrelevant.  In fact, defendants have argued throughout the

7   policy to even more recent dates.

8            MS. CANGELOSI:  Number one -- let me answer that -- we

9   put the reports in evidence because when -- they didn't put them

10  in evidence, we put them on our exhibit list.  We put them on

11  our exhibit list because, on their original exhibit list, they

12  had two pages of the report.  Our position was, if ya'll are

13  going to offer the two pages, you need to offer the whole

14  report.  So we reserved the right to put them in if they were

15  going to put in half.

16           That doesn't mean we think they are relevant.

17  But, if they want to go back and look at our numbers from '94,

18  '95, '96, '97, and compare them, they have opened the door to go

19  back to those years, and we get to show what we did in those

20  years.  I mean, it works both ways.

21           THE COURT:  I do have a policy of what's good for the

22  goose is good for the gander.  I'm going to deny the motion and

23  allow it.

24           Motion in limine to exclude DCFS Exhibit 7,

25  Secretary of State Exhibit 4, which is Luther Scott's benefits

1    application, I'm going to deny that motion.

2              Motion document No. 392, motion in limine to seek

3    judicial notice filed by the Secretary of State.  And, yes, as I

4    appreciate it, this is only proposed legislation?

5              MR. JONES:  It is, Your Honor.

6              THE COURT:  Okay.  I'm going to deny that.  I'm not

7    going to take judicial notice of proposed legislation.  Until

8    it's law, I'm not concerned about it.

9              MR. JONES:  Judge, on that last one, there were two

10   documents requested.  The first one was the Act of Congress

11   preference.  The second was an FPC manual from the inception of

12   the NVRA.

13             THE COURT:  Okay.  I apologize.  My notes -- I'm going

14   to take judicial notice of the FEC manual.  So it's denied in

15   part.

16             MR. YELLIN:  Your Honor, if I may, the FEC manual is

17   also being used as a legislative fact on the interpretation of

18   the NVRA.  And Federal Rule of Evidence 201 is rather clear that

19   legislative fact cannot be judicial notice.

20             In addition, the FEC manual has the same language

21   that states it's intended only as a reference actually if it is

22   offered without force of law, regulation or advisory opinion.

23             MR. JONES:  The FEC report is indeed advisory and so

24   states in the report itself.  It's a guide to the states to

25   implement the NVRA.

1        THE COURT:  I'm going to take judicial notice, and it

2   will go to the weight.

3              And I believe the only final motion in limine was

4   document No. 376 filed by the Secretary of State which dealt

5   with a number of exhibits, and that I'm going to defer until the

6   time of those exhibits being offered.

7              Now, as I appreciate it, the parties wanted

8   another 15 minutes.

9        MR. PHILIPS:  Your Honor, that's true.  We've got a few

10  evidentiary issues based on these rulings.

11       THE COURT:  The Court will be at recess for about 15

12  minutes.

13              (Proceedings in recess.)

14       MR. PHILIPS:  Your Honor, we have one member of the

15  DCFS legal team that was out of the courtroom and did not get an

16  opportunity to make an appearance for the record.  May we do

17  that now?

18       THE COURT:  That will be fine.

19       MS. TOWNSEND:  Good morning, Your Honor.  Eboni

20  Townsend for DCFS.

21       THE COURT:  Mr. Ho.

22       MR. HO:  Your Honor, during the recess, the parties

23  conferred, and plaintiffs and DCFS and DHH have been able to

24  come to agreement to admit a number of exhibits en mass at the

25  beginning of trial so as to save the parties a lot of time, like

1   foundation for these exhibits, which is there is no authenticity

2   or relevance.  The Secretary of State hasn't joined in that

3   agreement.  But I do have a list of those exhibits that

4   plaintiffs intend to offer, to which DCFS or DHH have no

5   objection, and we request that those exhibits be admitted.

6             And I can divide those documents that are from

7   DCFS, those that are from the DHH.

8             And, obviously, we've agreed to a number of their

9   exhibits as well.  The vast majority.

10       MR. JONES:  Just the one comment.  As I understand the

11  exhibits, they pertain to -- some, to DHH, some to DCFS.  They

12  are their documents, and they're comfortable with them.

13            I think, under Rule 105, if those documents are

14  admitted as to that defendant that they are identified with and

15  not the Secretary of State, we have no objection to those going

16  in.

17            If they're going to go in as to the Secretary of

18  State, we would need foundation as to why.

19       THE COURT:  Mr. Ho.

20       MR. HO:  I think it's kind of a problem here, Your

21  Honor, because one of the chief legal arguments in this case is

22  whether or not the Secretary of State is legally responsible for

23  the violations of NVRA that we have alleged that have been

24  committed by DCFS and DHH.

25            Now, these documents were produced by DCFS or DHH

1   during the course of discovery.  They have no objection to them

2   on the basis of authenticity, relevancy or otherwise.

3               There's no reason why we shouldn't admit these

4   documents into the evidence.  And the question as to the legal

5   relevance to the Secretary of State is something Your Honor can

6   resolve in your conclusions of law, your decision.

7           THE COURT:  Do you have any objection as to the

8   authenticity of those documents?

9           MR. JONES:  The authenticity, no, Your Honor.

10          THE COURT:  I'm going to allow those documents to be

11   admitted.  The Court's going to make a determination as to

12   relevance at the time I deal with its inclusion.

13          MR. JONES:  And we would respectfully reserve our

14   objection.

15          THE COURT:  Objection is noted for the record.

16          MR. HO:  Should I read those exhibits now for the

17   record?

18          THE COURT:  Please.

19          MR. HO:  So there are a number of plaintiff's exhibits,

20   which DCFS and DHH do not object to.  I'll read those.  Then

21   DCFS/DHH can read the list to their exhibits to which plaintiffs

22   have no objection.

23               The first is a group of documents that pertain

24   primarily to DCFS -- that pertains to DCFS and were produced by

25   DCFS.  They are plaintiffs Exhibits 69-H through J; 70-D through

1    G; 87-M; 91-C and D; 95-E and F; 99-A and B; 101-A.  I believe

2    this is -- I apologize -- I believe this is 104-A but it might

3    be a C.  It's E?  I apologize.  So that's 104-E and F; 105;

4    105-E; 107; 108-K; 108-S; 110; 143; 145; and 146.

5                And then, with respect to DHH documents that are

6    offered by plaintiffs as exhibits --

7                MS. ALEXANDER:  Your Honor, just for clarification,

8    66-A and 66-E should be included.

9                THE COURT:  66-A through 66-E; is that correct?

10               MS. ALEXANDER:  Yes.  Yes.

11               Bill, did you say 78?

12               MR. HO:  78 is not on here.  So 78 as well.

13               THE COURT:  That's DCFS?

14               MR. HO:  Yes, Your Honor.

15               And the DHH documents that plaintiffs are offering

16   into evidence and to which DHH/DCFS has no objection are

17   documents 147-B and C.

18               THE COURT:  B as in boy?

19               MR. HO:  Yes, Your Honor.

20               152; 154-E; 156-D; 205; 207; 208; 218; 219; and

21   220.

22               And that's the list.

23               THE COURT:  Have you entered the other evidence that

24   the parties -- I mean, the other documents, have you taken care

25   of that?  Or you're going to do that now?

1          MR. HO:  I'm sorry, Your Honor?

2          THE COURT:  We indicated earlier I wanted you to offer

3    all of your exhibits into the record.

4          MR. HO:  Oh, yes, Your Honor.  I don't have that list

5    before me.  I'll request that we do that at a later time.

6          MR. PHILIPS:  I do think, Judge, we're going to try to

7    put together a list of agreed and listed exhibits for your case

8    manager.  We'll do that as soon as we can since we just ironed

9    out those.

10             Dale, are we going to cover the plaintiff's

11   exhibits that we don't have an objection to?

12         MR. HO:  I think that's what I just did.

13             But your exhibits that we don't object to?

14         MS. ALEXANDER:  Your Honor, DCFS with regards to the

15   defendants exhibits in-globo.

16         THE COURT:  Can't hear you, Ms. Alexander.  Would you

17   either come to the podium, or speak into the mike.

18         MS. ALEXANDER:  I'm sorry.  For the record, for

19   Defendant Sonnier's list of exhibits in-globo, plaintiffs have

20   agreed to accept items 14 -- and this is using the streamline so

21   we will go down -- Exhibit 14, 25, 26, 27, 29, 31, 33, 34, 36,

22   49, 52, 53, 51, 71, 72, 73, 74, 75, 76.

23         MS. CANGELOSI:  Wait, wait.

24         MS. ALEXANDER:  For purposes of Sonnier, Secretary of

25   State, we're picking up at 53; item 71 through 79; Exhibits 92

1   and 93; 101 and 106; 113; 117; 119; 121 and 22; 123; 131; 140;

2   141; 142 through 149; 155; 161 through 163; 182 through 189; 190

3   through 192.  That's all we have.

4        MS. LAMBERT:  Amy Lambert on behalf of DHH.  I

5   understand that DHH has no objection to DHH Exhibits 1 through

6   14.  We have withdrawn Exhibit 5 and 8.  And 15 and 16 have been

7   admitted.  That's it for DHH.

8        MR. PHILIPS:  So, Judge, we accomplished something.  We

9   have got a fairly comprehensive list of exhibits that at least

10  the parties, the plaintiff, DCFS, DHH have no objection to.

11        To the extent there might be other exhibits

12  offered in connection with witnesses, we'll just make those

13  motions to admit that evidence at the time that it's offered and

14  the Court can deal with it.

15        So we made some significant progress, I believe.

16        THE COURT:  And I'm impressed.  Thank you.

17        Let those be admitted.

18        (Exhibits admitted.)

19        THE COURT:  It's a starting point.  Are we ready to

20  proceed?

21        MR. HO:  We are, Your Honor.

22        Before we call our first witness, we had two other

23  matters we wanted to address.

24        Among our exhibit lists, there are DCFS from the

25  defendants which are admissible as party admission.  DCFS has

1   agreed to admit all of theirs.  DHH has agreed to admit all of

2   theirs with one exception.  But we move to admit the last

3   discovery response on our exhibit list as a party admission.  We

4   don't understand any objection to that.

5              And we also move to admit the Secretary of State's

6   responses on our exhibit list.

7              THE COURT:  Any objection?

8              MS. CANGELOSI:  Yes, Your Honor.  I don't know which --

9   that's too general for me.  What's the exhibit numbers?

10             MR. HO:  Sure.  They are exhibits for the Secretary of

11  State 62, 63, 64, 65.  They've been our exhibit list from the

12  beginning.  They're DCFS from the Secretary of State, they are

13  admissible under the rules.

14             MS. CANGELOSI:  Exhibit 62 is defendant Schedler's

15  initial disclosures.  I wouldn't understand the purpose of

16  admitting initial disclosures as evidence at trial.  So we would

17  object to admitting Exhibit 62, what's the purpose of it?

18             Exhibit 63 is responsive to Schedler's first request

19  for admissions.  I don't know -- since those requests for

20  admission are multiple in nature, I don't know which ones he's

21  wanting to introduce for which purpose.  So I don't know what

22  he's indicating for which purpose.

23             THE COURT:  I think he's requesting that he introduce

24  all of the admissions.

25             MS. CANGELOSI:  Well, I think that the purpose of which

1    they're being admitted is not something that's pled in the

2    complaint.  I think the purpose of what they're admitting,

3    because they cover a multitude of topics -- and I'm sure he's

4    not wanting to introduce every one of them.  I think what he's

5    wanting is the request for admission on the coding issue.

6              And the coding issue is something that we've

7    objected to that's not pled in this complaint.  So, to that

8    extent, you might want to reserve on that until you rule on the

9    coding issue that's come up.  The parties can't be aggrieved by

10   the coding pled.  It's not pled.  We've got enough that's pled,

11   we've got enough to deal with.

12             That's why I was trying to say why do you want it,

13   because I think it's on that coding issue.  So, to that extent,

14   we would object to that.

15             On 64, it's interrogatory requests.  Interrogatory

16   requests are not admitted as admissions for the admission

17   requests.  There's a different standard.  You don't admit those

18   willy-nilly, and I don't know what issue those are either.

19             Exhibit 65 is admissions as well, and I don't know

20   what topic.  I mean, there are -- I think there are 63 pages.  I

21   mean, somebody ought to help you and say I'm looking for request

22   for admission No. 12 on whatever issue.

23             So I can't really address them because I don't

24   know what issue they are on.  But I think they're on the coding

25   issue, which is not pled and not before the Court for today.

1            And the initial disclosures don't go in just as an

2    admission, and neither do interrogatory requests.

3            MR. HO:  Your Honor, these are all party admissions,

4    they are all admissible.

5            The purpose for which we seek to introduce each

6    statement by the defendant is set forth in our proposed Findings

7    of Fact.  There's no ambush or surprise here.  It's a bench

8    trial, Your Honor.

9            THE COURT:  It is a bench trial.  Objection is

10   overruled.  Let them be admitted.

11           Your objection is noted for the record.

12           MS. CANGELOSI:  You're going to admit the initial

13   disclosures?

14           THE COURT:  Yes, I am.

15           (Exhibit admitted.)

16           MR. HO:  And, Your Honor, the last one after the

17   Secretary of State's list edited earlier, which is 221, which

18   are plaintiff's Exhibit 221, which are DHH responses to

19   plaintiff's second request for admission, we believe they are

20   admissible --

21           MR. PHILIPS:  We withdraw the objection, Your Honor.

22           THE COURT:  Let them be admitted.

23           (Exhibit admitted.)

24           MR. HO:  Thank you, Your Honor.

25           The last thing I did want to do before we called

```
1    our first witness, Your Honor, is read some admissions from the

2    defendants into the record that are from pleadings.  They are

3    not very many of them.  But, I mean, if the defendants are fine

4    with us just admitting them, we can do that.  Or I can just read

5    the individual ones into the record.  It shouldn't take a

6    particularly long time.

7            THE COURT:  Have you discussed it with them before?

8            MR. HO:  Why don't we discuss it at a recess.

9            I apologize, we should have discussed that.

10           MR. JONES:  Judge, we do have one other thing.

11               There is a stipulation entered that I think takes

12   a whole lot of the Secretary of State out of the case.

13               They drafted these admissions.  They were refined

14   by the plaintiffs, I think.  And I think they'll relieve a lot.

15               The first stipulation pertains to remote

16   transactions.  To the extent that's still an issue at the trial

17   level, the Secretary of State has entered an admission

18   concerning the government transactions.

19               The second area concerns enforcement of the NVRA,

20   again the voter registration.  And we've entered a stipulation

21   on that that I think takes any factual issue on that out of the

22   case.

23               The third area is the declination form, the

24   declaration form.  We've stipulated to the Secretary of State's

25   position on that and what the Secretary of State has done with
```

```
1    respect to that.  And I think that's three pretty significant
2    issues that the Secretary of State has said here's what we did.
3                   And this is a paper exhibit.  How do you want me
4    to mark it?
5                   CASE MANAGER:  I can mark it.
6                   MR. JONES:  Do you want to call it Stipulation 1?  Is
7    everybody comfortable?
8                   MR. DeLEEUW:  That's fine.
9                   THE COURT:  Any further housekeeping matters?
10                  MR. HO:  No, Your Honor.
11                  MS. CANGELOSI:  Your Honor, if I may, in light of the
12   stipulation, plaintiff had given us a list of the order of
13   witnesses and who he intended to call, and he thought he might
14   get to him calling the Secretary of State's witnesses by some
15   time this afternoon.  They're in Baton Rouge working on stuff
16   they need to work on, because we have an election.  Books just
17   closed and we're doing ballots.  You don't want to hear it all.
18   So I can call them and get them here for this afternoon.  But,
19   in light of those stipulations, I'm thinking that we might not
20   need those witnesses.  So I need some idea of when he thinks he
21   would need the Secretary of State and which witnesses here so I
22   could get them here if he intends to call them today.
23                  THE COURT:  Are you prepared to address that now?
24                  MR. HO:  If we could just confer for a moment, Your
25   Honor.  I think we will be able to not call some of the
```

```
 1   Secretary of State witnesses.
 2          THE COURT:  Why don't you all take a minute, talk
 3   amongst yourselves.
 4                 (Pause in proceedings.)
 5          THE COURT:  You need time to talk to Ms. Cangelosi and
 6   Mr. Jones?
 7          MR. HO:  Sure.
 8                 (Pause in proceedings.)
 9          THE COURT:  Are we good?
10          MR. HO:  We are, Your Honor.
11          THE COURT:  Thank you.
12                 Please call your first witness.
13          MR. HO:  Actually, Your Honor, before I call the first
14   witness, your order set forth a time for opening statements.  If
15   I may address the Court?
16                 And I know Mr. Philips has an objection to
17   demonstrative exhibit.
18          MR. PHILIPS:  I'm going to wait until he starts
19   talking.
20                 Your Honor, we have been afforded some
21   demonstrative exhibits that the plaintiffs intend to use, and
22   Mr. Ho's told me he wants to refer to them in his openings.  We
23   have an objection to the foundation of those.  So I just wanted
24   to put that on the record now, since he is going to be referring
25   to them in his opening.  I didn't want to interrupt his opening.
```

 1    But they were tendered to us to look at, and we have an

 2    objection to them.  So, if you want to look at them subject to

 3    the objection, and I think maybe they're going to ask one of the

 4    witnesses about it later on.

 5          THE COURT:  You know, it's always interesting in a

 6    bench trial that you to tell me what the evidence is, I can't

 7    look at it.  I have to look at it and decide if I can look at

 8    it.

 9          MR. PHILIPS:  The good part about it is that you can

10    ferret it out at the end.  And that's kind of where I think

11    we're going.

12              And I think, even with respect to the multiplicity

13    of defendants and some of this is relevant to one and not the

14    other, if you'll give us an opportunity to brief this that at

15    the end.

16          THE COURT:  I think that's the better way.

17          MR. PHILIPS:  The only other thing, and it kind of

18    surfaced in the plaintiff's motion in limine with respect to

19    time.  It seems to DCFS and DHH that the really relevant time

20    period for the Court to be concerned about is maybe the filing

21    of the complaint forward, particularly in light of the relief

22    that's available to the Court.

23              If, for example, someone is out of compliance ten

24    years ago, that's very nice to know, but it really didn't help

25    the Court if they're in compliance now.  And I'm reading of

 1   reading the statute, thought that was the point.  So you have a

 2   notification issue before you can file suit.

 3           It just seems to me that the relevant time period

 4   is no earlier than the filing of the complaint.  And so I want

 5   to make just kind of a general relevancy objection to anything

 6   with respect to DHH and DCFS that predates that so I don't have

 7   to stand up and keep making those interruptions, if that's

 8   sufficient for counsel and the Court.

 9           THE COURT:  That's sufficient.

10           MR. PHELPS:  Thank you very much.  Thank you, Your

11   Honor.

12           MS. CANGELOSI:  Your Honor, we spoke of demonstrative

13   or exhibits -- I only know if I got it because I checked my

14   emails, but we got it by email Sunday the day before trial.

15           It relies on exhibits that we're going to object

16   to the introduction of, and it purports to be something real

17   official because it looks like a graph, it's got testimony on it

18   and everything.  So we would object to that.  It's not

19   appropriate to use.

20           THE COURT:  And, as I indicated earlier, I'm going to

21   defer that.

22           MR. HO:  Thank you, Your Honor.

23           May I address the Court, Your Honor?

24           THE COURT:  Please.

25           MR. HO:  This case is about the most basic right in our

 1    Democracy, the right that the supreme court has described as the

 2    one right perseverative of all others, the right to vote.

 3            And, to ensure that our most vulnerable citizens

 4    are affirmatively provided an opportunity to access that right,

 5    Section 7 of the National Voter Registration Act requires public

 6    assistance offices, such as the Department of Children and

 7    Family Services or DCFS, and the Department of Health and

 8    Hospitals, DHH, to offer their clients an opportunity to

 9    register to vote with every application for, renewal of or

10    change of address in connection with benefits.

11            The evidence that you'll hear this week, Your

12    Honor, will demonstrate conclusively that the defendants have

13    violated that obligation, and that they continue to violate it

14    in several respects.

15            As you know, most of the facts relative to the

16    plaintiff's claims are no longer contested by the defendants and

17    therefore as set forth in the parties's joint pretrial order.

18    And so we're not going to hear much testimony about these facts

19    in open court this week, but they bear some mention here.  At

20    least some of them do.

21            So, for instance, with respect to remote

22    transactions, an issue that's come up a lot before, DCFS has

23    admitted that they did not provide voters registration services

24    along with every remote transaction.  DHH has admitted that they

25    didn't do it at all before this complaint was filed.  And the

1    Secretary of State has just stipulated this they didn't give any

2    contrary advice to the agencies.

3           With respect to the agencies' forms, they relied

4    on a number of forms that did not include a question about voter

5    registration and offer a voter registration and were not

6    attached to a separate form that offered a voter registration

7    and what we'll address later as a voter declaration form.

8           As Mr. Philips alluded to earlier, the defendants

9    have made some changes in their policies.  Those changes,

10   however, were made after this lawsuit was filed.

11          And, even in spite of those changes, the NVRA is a

12   very specific statute.  And, in spite of the defendants'

13   changes, there are still a few policies that they maintain which

14   we contend violate the statute.  So let me give you some

15   examples of that.

16          For instance, DCFS maintains a policy where they

17   require clients to affirmatively request a voter registration

18   form before providing them with a form.  What that means in

19   practice is that, if a client gets a voter declaration question

20   which check boxes marked yes or no, would you like to register,

21   the vote the client is not provided with a voter registration

22   form unless the complaint checks yes.  We contend that that is a

23   violation of the plain terms of the statute.

24          DCFS also maintains a discretionary policy about

25   voter registration.  And what that means is that, when a client

1 walks into DCFS office, DCFS personnel are not required to give

2 that person a voter registration form but are simply permitted

3 to advise a compliant about a website.

4 The Secretary of State's Office continues to

5 violate the statute in ways. They've stipulated that they take

6 no efforts to enforce the statute in Louisiana. And we contend

7 that, as a matter of law, that is a violation of the statute.

8 Now, in addition to that evidence, the evidence

9 this week will also include some data, data provided by the

10 defendants themselves. And what this data shows is that public

11 assistance office process hundreds of thousands of applications

12 for benefits every year but only receive a few hundred voter

13 registration applications.

14 So the first graph that I'd like to show Your

15 Honor is a chart that shows the number of applications for SNAP

16 benefits, Supplemental Nutritional Assistance Program benefits,

17 more commonly known as food stamps. And this is DCFS's own data

18 broken down by quarter from 2000 on. And what it shows is

19 during this period of time DCFS receives 60 -- in some cases

20 over 100,000 applications for SNAP benefits or over 300,000

21 applications per year.

22 The Medicare numbers are similar.

23 So the next chart will show you the number of

24 Medicaid applications also broken down by quarter. They're also

25 extremely high. In some cases it's 80,000 or over 100,000

 1    applications for Medicaid benefits per quarter, or approximately

 2    300,000 per year.

 3          What the next graph will show you is the

 4    comparison of those numbers, the green line being Medicaid, the

 5    blue line being SNAP benefits.  In comparison to the Secretary

 6    of State's own numbers about the number of voter registration

 7    applications that are processed through these agencies, which is

 8    the red almost flat down at the bottom of your graph.

 9          So, as you can see, these agencies are processing

10    tens of thousands of applications per benefits per year but only

11    a few hundred voter registration applications per quarter.

12          This last slide is going to zoom in on that red

13    line and show you what the sum of the trend lines are.  And

14    these the Secretary of State's own numbers that you will hear

15    about during this trial.

16          What they show is that, in the first quarter of

17    2004, the agencies were processing about 600 voter registration

18    applications per quarter.  Those numbers declined over the

19    years, until reaching a low of just over 100 voter registration

20    applications during the first quarter of 2010.

21          But, around 2011, the number started increasing,

22    reaching a high of over 1,300 during the third quarter of 2011.

23    Right around the time that the plaintiffs sent a notice letter

24    to the defendants in January.  And then again when the

25    plaintiffs sent the complaint in April of 2011.

1          Now, we do view things as positive developments.

2   But one of the forms of relief that the plaintiffs seek is to

3   ensure that the defendants' recent policy changes, which were

4   enacted in response to this litigation, remain in effect.

5          Now, I'd be remiss, Your Honor, if I didn't say

6   something about plaintiffs in this case, and there are two of

7   them.  The first one is a man named Luther Scott.  He's with us

8   in the courtroom today sitting in the front row.

9          Mr. Scott is 62 years old.  He lives here in New

10  Orleans.  Less than a 15 minute drive from this courthouse.

11  He's a veteran of our armed services.  He's a skilled handyman

12  and a mechanic.  But he's also lived through some difficult

13  times.  He's had to move frequently.  And, unfortunately, he's

14  had some experience with homelessness.  He's not a recipient of

15  Medicaid benefits, which we've noted from the beginning.  But he

16  is a recipient of food stamps benefits, and he has been since

17  2009.

18          Mr. Scott was not given a voter registration form

19  three separate times while applying for benefits.  First, he

20  applied for benefit in September of 2009.  He did not check the

21  no box in response to the question:  Would you like to register

22  the vote.  He did not receive a voter registration form.

23          A few months later, in December 2009, he applied

24  for benefits again.  And, once again, he did not check the no

25  box:  Would you like to register to vote.  In fact, never even

1    signed the form about voter registration.  And, once again, he

2    did he not receive a voter registration form.

3              Third, almost a year later, in November of 2010,

4    he submitted what's called a Simplified Report Form.  This is a

5    form that DCFS clients can use to change their address with the

6    agency or to ensure that their benefits continue.  And he did

7    not decline to register to vote in writing with this

8    recertification because the form itself in fact actually lacked

9    any question or any information whatsoever about voter

10   registration.  And he was not given a voter registration form.

11             So, each of these three instances, Mr. Scott was

12   not provided with an opportunity to register to vote.

13             Now, we expect the defendants, when Mr. Scott

14   testifies, to make an issue out of the fact that Mr. Scott has

15   at times misremembered things.  And he will admit that.  He'll

16   admit that his memory hasn't been perfect.  But his memory has

17   never wavered on any of the crucial facts about these three

18   benefits transaction that I described a moment ago.

19             We also expect the defendants to offer some

20   testimony about the fact that Mr. Scott was eventually offered a

21   voter registration form by representatives of DCFS, but they

22   only did so after this case was filed.  And the bottom line is

23   that, prior to the time that this case was filed, Mr. Scott

24   never -- did not decline to register to vote in writing and did

25   not receive a voter registration form from DCFS.

 1           The second plaintiff in this case is the Louisiana

 2   State Conference of the NAACP, who I'll refer to as Louisiana

 3   NAACP.  And the president of Louisiana NAACP, Dr. Johnson is

 4   with us here today, and he's also in the front row.

 5           Louisiana NAACP probably needs no introduction,

 6   but they are a non-partisan non-profit association here in the

 7   state of Louisiana.  They engage in a wide range of civic

 8   engagement work in this state, everything from disaster relief

 9   to outreach around the US census to voter empowerment work.  And

10   they've engaged in effort to register individuals to vote in low

11   income areas, and that includes people on public assistance.

12           You'll primarily hear from the Louisiana NAACP

13   through the testimony of a man named Reverend Edward Taylor.

14   He's headed many of the NAACP's civil engagement efforts, and he

15   will tell testify about the time and energy that the Louisiana

16   NAACP has expended on the voter registration work, and that

17   includes direct community outreach and canvassing in low income

18   neighborhoods.

19           Now, we expect the defendants again to make an

20   issue out of the fact that the Louisiana NAACP has not submitted

21   any financial documents about their voter registration work.

22   And it's true.  The Louisiana NAACP hasn't done that.  They

23   didn't maintain detailed records about these activities.  But

24   they also didn't have to.  They're a non-profit membership

25   organization, and their organization does not require strict

```
 1    records.
 2              So, instead, Reverend Taylor will testify about
 3    the work that he personally has done, assisting low income
 4    individuals to register to vote, including handing out the voter
 5    registration forms.
 6              The evidence will show that, if it were not for
 7    the violations of the defendants' violations of the NVRA, some
 8    of those efforts would not be necessary.
 9              I do want to say a few things about the remedies
10    that the plaintiffs have sought in this case, since Your Honor
11    asked us to brief that issue before the trial.  And I do want to
12    acknowledge again, as I did earlier, that the defendants have
13    made a number of improvements with respect to their NVRA
14    compliance.
15              But two things about that.  They still are not in
16    full compliance with the statute, and violated a number of ways.
17    And the second is that they often describe some of these changes
18    as courtesy.  And the problem with courtesy here, Your Honor, is
19    that the courtesy is something that can be taken away at any
20    time.  We're not asking to put the defendants in to any kind of
21    monitorship or receivership.  We're simply asking that they keep
22    these new policies which they claim I'm sure are responsible for
23    that spike in that chart, Your Honor, that they keep those
24    policies in place, that they make a few additional small changes
25    to policies that are in fact required by law and that they
```

1    engage in some minimal recordkeeping to ensure that their

2    offices comply with those new policies.

3              Now, in conclusion, Your Honor, I think we all

4    know that the issues in this case are not insignificant.  This

5    state has seen some hard times recently in the form of storms,

6    economic issues, and a lot of people in this state have come to

7    rely on public assistance.  Section 7 of the NVRA was enacted to

8    ensure that, when people fall on those hard times, that the

9    agencies who provide them with assistance fully integrate an

10   opportunity to register to vote in the application process and

11   in fact give them the same degree of assistance in registering

12   to vote that they get with respect to those benefits.  It's to

13   ensure that society's most vulnerable people are no less

14   entitled to participate in our Democracy than anyone else, and

15   that's what this case is ultimately about.

16             Thank you, Your Honor.

17        THE COURT:  Thank you.

18             Mr. Philips.

19        MR. PHILIPS:  Your Honor, I said I wasn't going to say

20   a whole lot, and I'm not.  I appreciate Mr. Ho's comments.

21             I will tell the Court that a lot of what you're

22   going to hear, I think, will be in response to the plaintiffs'

23   position, and a lot of it deals with what has happened in the

24   recent past.

25             I will also tell you, Your Honor, that I think,

1    prior to the initiation of this litigation and some of the

2    rulings from the Court, there was a good faith interpretation of

3    the statute that drove what the state did or did not do in

4    connection with it.  I frankly as -- because the Court, I think,

5    knows as a result of its rulings there have been changes

6    implemented.  The state agencies that I represent made a

7    confirmed decision not to simply await a final determination at

8    the end of some lengthy appeal process, and you're going to hear

9    evidence on that.

10            So the news that I think you're going to hear in

11   terms of the testimony and the exhibits are that, while there

12   may still be some lingering disputes about the scope and the

13   requirements of the Act, there's also been a recognition of the

14   Court's rulings here and action taken in response to that.

15   Which, I appreciate Mr. Ho mentioning, those are incredibly

16   positive.  So we know the Court is very, very aware of the

17   contentions in this case, and I think you kind of know what the

18   evidence is that you're going to hear from both sides.

19            I'm not going to make a closing argument like I

20   might to a jury.  But I think, Your Honor, at the end of the

21   day, once we have a chance to submit post-hearing briefs, I

22   think we can crystallize where we are and what efforts the state

23   has made to comply with it.  Thank you very much.

24            THE COURT:  Mr. Jones, Ms. Cangelosi.

25            MS. CANGELOSI:  Your Honor, the Secretary of State

```
1    would waive opening.
2            MR. HO:  Thank you, Your Honor.  So we'll call our
3    first witness.  Our first witness is Dianne Batts from the
4    Department of --
5            MS. CANGELOSI:  Your Honor, we'd like to sequester
6    witnesses from the courtroom.
7            THE COURT:  Would the witnesses in the courtroom come
8    forward?
9            MR. JONES:  Our designated representative is Ms. Angie
10   Rogers, and she's in the back.
11           MR. PHILIPS:  Mr. Guillory from the DCFS.
12           MR. HO:  And there are two plaintiffs.
13           THE COURT:  The two plaintiffs can stay.
14               If you all could stand - just line up here.  I
15   just want to give you some instructions, please.
16               Lots of witnesses, lots of witnesses.
17               Ladies and gentlemen, they have asked, the parties
18   have asked for an order of sequestration.  And what that means
19   is that you're not allowed to sit in the courtroom during the
20   course of anyone else's testimony, nor are you allowed to report
21   to any other witness as to what your testimony was.  You can
22   certainly speak to the lawyers, but you're not to be informed
23   about what testimony was heard in the courtroom or what you
24   testified to in the courtroom.
25               And the purpose of this rule is to assure
```

1    ourselves that every witness who testifies testifies only from

2    their personal knowledge, not from anything they have heard in

3    the courtroom.  So you'll be under order of the Court not to

4    report your testimony to anyone else, nor to have anyone report

5    their testimony to you.  Until you're released from this order

6    of sequestration, it remains in place.  I am going to ask you to

7    sit outside the courtroom, and you'll be called in in time to

8    testify.

9              MS. CANGELOSI:  Your Honor, two of the witnesses have

10   been subpoenaed by the Secretary of State's office, and that's

11   Ms. Shawn Banks and Yolanda Ash.  We had to subpoena them, but

12   we're not going to call them until we get to our case.  They

13   work here in New Orleans at the food stamps office.  So we want

14   them to go back to work.

15              So, if you two ladies will give your phone

16   numbers, we'll call you and let you know we need you.  And it

17   probably won't be until Wednesday.

18        THE COURT:  And I know you're disappointed that you

19   don't get to sit out in the hall for the next two days, but

20   sorry.

21        MS. CANGELOSI:  And it's my understanding that the

22   Louisiana Conference of the NAACP has designated that Mr.

23   Johnson can stay in the courtroom, and the Secretary of State

24   has designated Commissioner of State Angie Roberts.

25        THE COURT:  Those parties can stay in the courtroom.

```
 1    The rest of you need to leave.  Thank you.

 2          MR. HO:  With respect to Dr. Johnson, Your Honor, who

 3    is the representative of the Louisiana NAACP, we understand he's

 4    also been served with a subpoena by the Secretary of State.  We

 5    also understand he's not expected to testify today.  So he may

 6    have to attend to some business in Baton Rouge and may leave the

 7    courtroom for a couple of hours this afternoon.

 8          MS. CANGELOSI:  I'm sorry, you said what?

 9          MR. HO:  Dr. Johnson may leave the courtroom for a

10    couple of hours this afternoon.  We understand he's under a

11    subpoena from you.

12          MS. CANGELOSI:  The subpoena was to make sure you were

13    here.  You're not going to be called until Mr. Ho calls you, and

14    we won't need you until later in our case.  So, as far as I'm

15    concerned, you don't need to stay here.

16          THE COURT:  Mr. Ho, you're going to excuse Mr. Johnson?

17          MR. HO:  He may stay for now, but he may have to leave

18    later this afternoon.

19               DIANNE BATTS, being first duly sworn, testified as

20    follows:

21          THE COURT:  Would you please state your name.

22          THE WITNESS:  My name is Dianne Batts, D-I-A-N-N-E

23    B-A-T-T-S.

24          MR. HO:  Before I ask my first question, Your Honor, we

25    have a list of exhibits that we intend to show to Ms. Batts.
```

1    May I give her a binder?

2              THE COURT:  Yes.

3              MR. HO:  We're not going to do all of these, thanks to

4    the agreements amongst the parties.  So it looks big, but it's

5    not going to be that big.

6              THE COURT:  Don't let them fool you, it's big.

7              MR. HO:  And we can give a copy to your clerk or the

8    case manager as well.

9              MS. CANGELOSI:  It's my understanding that these are

10   the exhibits to which DHH has stipulated admissibility?

11             MR. HO:  No.  Not all of these are.  Some of these are

12   what we intend to produce with Ms. Batts, just to spare walking

13   back and forth.

14                        DIRECT EXAMINATION

15   BY MR. HO:

16   Q   Good morning, Ms. Batts.

17   A   Good morning.

18   Q   Nice to see you again.

19   A   You, too.

20   Q   My name is Dale Ho, and I represent the plaintiffs in this

21   matter.  We met about a year ago, maybe a little less.

22   A   Yes.

23   Q   Would you mind telling the Court what your job title is, Ms.

24   Batts.

25   A   I'm the Medicaid deputy director.

1    Q    And that's for DHH?

2    A    Yes.

3    Q    How long have you held that position?

4    A    Since January of 2010.

5    Q    And what are some of your duties in this position?

6    A    I oversee four sections:  The Eligibility section, that's

7    our eligibility section, our Support section, Policy and Field

8    Operations.

9    Q    Fair to say that you basically oversee the Medicaid

10   application and renewal process?

11   A    Yes, sir.

12   Q    And you also have some duties regarding the National Voter

13   Registration Act, or NVRA as I'll call it today; don't you?

14   A    Yes.

15   Q    And among those duties is to ensure that the Medicaid

16   program is compliant with the NVRA; is that correct?

17   A    Yes.

18   Q    And among those duties is to issue policies and procedures

19   regarding the NVRA; is that correct as well?

20   A    Yes.

21   Q    And among those duties is for training on the NVRA?

22         MR. CADE:  I'm going to object.  There is no duty in

23   the NVRA for us to contribute --

24         MR. HO:  I wasn't asking about her legal duty, just her

25   job function.

1       THE COURT:  I'm going to overrule the objection.  Don't

2   think that's what he asked, if there was a legal obligation.

3   What I heard was do you train and is that part of your job

4   description.  I'm going to allow it.

5       THE WITNESS:  Do we train on NVRA?  Yes.

6   BY MR. HO:

7   Q    And that's in your wheelhouse?

8   A    Yes.

9   Q    And also among your duties Is to monitor NVRA compliance at

10  DHH.

11  A    To oversee the monitoring.

12  Q    To oversee the monitoring of --

13  A    Of NVRA compliance.

14  Q    In 2011, DHH formed an NVRA task force; is that right?

15  A    Yes.

16  Q    And you're a member of that task force?

17  A    Yes, I do.

18  Q    The decision to form that task force was made as a result of

19  pending litigation; is that right?

20  A    Yes.

21  Q    And I want to ask you some more general questions about

22  Medicaid and the number of applications that DHH receives.  It's

23  true, is it, that DHH receives over 300,000 applications to

24  Medicaid annually; is that correct?

25  A    That's true.

1    Q    And DHH tracks those numbers?

2    A    Yes.

3    Q    And you find tracking of those numbers useful?

4    A    Very.

5    Q    Tell us why.

6    A    It helps us to see exactly what our workload is.

7    Distribution of TO amongst the department, where we need to --

8    what changes we might need to make.

9    Q    TO?

10   A    Table of organization.  That's our number of staff that we

11   have funded positions.

12   Q    And in addition to initial applications for Medicaid, you

13   also obviously get renewals; correct?

14   A    Yes.

15   Q    And you get about 30,000 of those per month; is that right?

16   A    Yes.  That's accurate.

17   Q    Fair to say more than 300,000 per year?

18   A    Yes.

19   Q    I'd like to turn your attention to a document in that binder

20   in front of you.

21          THE COURT:  Ma'am, I'm sorry.  I just had a quick

22   question.

23             The 300, are those new applications?

24          THE WITNESS:  We do about 400 -- 3 to 400,000

25   applications, and we also have in the neighborhood of that many

 1   renewals that our workers process a year.

 2           THE COURT:  Okay.  So it's 3 to 400 new plus 30,000 in

 3   renewals?

 4           THE WITNESS:  Re-enrollment, yes, ma'am.

 5           THE COURT:  Thank you.

 6           MR. HO:  Thank you, Your Honor.

 7   BY MR. HO:

 8   Q   The document I'd like to turn your attention to is located

 9   at tab 6 of your binder.

10           MR. HO:  For the record, this is plaintiff's trial

11   Exhibit 177.

12   BY MR. HO:

13   Q   If you don't mind, I'd ask you to take a look at the pages

14   there.  I believe there are three of them.  And, when you're

15   ready, just let us know and we'll talk about them.

16   A   I'm ready.

17   Q   Do you recognize this document?

18   A   Yes, I do.

19   Q   What is it?

20   A   This was an email, mass distribution, to all of our

21   eligibility staff letting them know that the old motor voter

22   clearance form was now obsolete and we have a new mail voter

23   registration application and a voter registration declaration

24   form.

25   Q   The third page of this, which has the page numbers DHH

 1    87229, is this the motor voter clearance form that you referred

 2    to a moment ago in your testimony?

 3            MR. CADE:  Your Honor, I'm going to object to this

 4    exhibit and questions about this because this has to do with the

 5    past.  And this -- as you can see, it's obsolete.  So we're

 6    going to object to this exhibit and the questions about it, what

 7    we were doing before the filing of this lawsuit.

 8            MR. HO:  Well, Your Honor, the lawsuit was filed on

 9    April 19, 2011.  So this form was not stamped obsolete until

10    several months later.  And, therefore, it's relevant to the time

11    of the lawsuit was filed.

12            MR. CADE:  Your Honor, it's only relevant to show some

13    sort of past noncompliance, and we think that subject is

14    irrelevant in this matter because you can't enjoin Secretary

15    Greenstein from what happened in the past.

16            THE COURT:  I'm going to allow it.  This is a bench

17    trial.  I don't want to get into what happened ten years ago;

18    but, at the time the lawsuit was filed, I think it's pertinent.

19    But there will be ample opportunity for us to show what

20    Secretary Greenstein is doing today.  And all of those things

21    will be considered.  Thank you.  Overruled.

22    BY MR. HO:

23    Q    So, Ms. Batts, is this the form that you referred to a

24    moment ago, the Motor Voter Clearance form that was going to be

25    replaced?

1    A    Yes.

2    Q    And, around, the prior page that has the page number DHH

3    87228, is this the form that replaced it that you referred to a

4    moment ago?

5    A    Yes.

6         MR. HO:  Your Honor, we'd like to offer plaintiff's

7    Exhibit 177 into evidence.

8         THE COURT:  I assume there's an objection.

9         MR. CADE:  Yes.  We object to the Motor Voter

10   Clearance.

11        THE COURT:  Objection is noted for the record.

12   Overruled.  Let it be admitted.

13        MR. JONES:  And, Judge, we would make that same

14   request.

15        THE COURT:  So noted.

16            (Exhibit admitted.)

17        MR. HO:  If we could have a standing objection to those

18   earlier documents earlier, because there are going to be some of

19   them in this case.

20        MR. JONES:  That's true.  We object on hearsay with

21   respect to us.

22        MR. HO:  We are fine with that being a standing

23   objection.

24   BY MR. HO:

25   Q    The switch from the Motor Voter Clearance form to this form,

1    Ms. Batts, that was made as a result of this litigation; is that

2    correct?

3    A    That's correct.

4    Q    Those are all the questions I have about this, Ms. Batts.

5              I just want to ask you some follow-up questions

6    about what I asked a moment ago on the data you maintain on the

7    renewals.  You testified that that data was useful, I believe.

8              Now, that data is useful for a number of reasons,

9    which I think you gave in your testimony.  In addition, though,

10   is it also useful because it helps you in performance

11   evaluations?

12   A    Yes.

13   Q    Of DHH staff?

14   A    Yes.

15   Q    And how does it do that?

16   A    Well, because we can monitor the workload that our analysts

17   process.

18   Q    So you know how hard they're working based on the number of

19   applications that they process?

20   A    Right.  And the volume.  It helps us to determine how many

21   analysts we actually need.

22   Q    And it also helps you to make adjustments in staffing, I

23   believe you said?

24   A    Yes.

25   Q    I want to turn your attention to another document in your

```
1    binder, it's located at tab 5.
2             MR. HO:  For the record, Your Honor, this is
3    plaintiff's trial Exhibit 161.
4    BY MR. HO:
5    Q   There should be two pages here, Ms. Batts.  And, when you
6    have a moment --
7             MS. CANGELOSI:  What's the exhibit number?
8             MR. HO:  161.
9    BY MR. HO:
10   Q   This is a voter registration application form; correct?
11   A   Yes.
12   Q   Designated LR1M?
13   A   Yes.
14   Q   And these are the forms that your office has utilized?
15   A   Yes.
16            MR. HO:  Your Honor, we move to offer plaintiff's
17   Exhibit 161 into evidence.
18            THE COURT:  Any objection?
19            MR. CADE:  We don't have any objection.
20            THE COURT:  Let it be admitted.
21               (Exhibit admitted.)
22   BY MR. HO:
23   Q   On the first page of this form, Ms. Batts, in the lower
24   left-hand corner, there is a box labeled Official Use Only.  Do
25   you see that?
```

1   A    Yes.

2   Q    And, near the bottom of it, do you see a line that says

3   Circle 1 followed by the initials --

4           MR. CADE:  Your Honor, I'm going to object to this line

5   of questions.  This has to do with coding, and coding is not an

6   issue in this case at all.  This is totally irrelevant to what's

7   before the Court.

8           THE COURT:  Mr. Ho?

9           MR. HO:  Well, Your Honor, it's relevant for a number

10  of reasons.  But, first of all, it's relevant because these

11  clients are the data that the Secretary of State produced as to

12  the number of voter registration applications that are received

13  in public assistance offices.  This coding is precisely how they

14  generate those numbers, and it needs to be in the record to

15  explain those numbers.

16           It's already relevant because it goes directly

17  equally to one of the remedies that we seek.  Your Honor's

18  ruling on remote transactions means that the way that the

19  Secretary of State has been coding forms is not complete and

20  what it may mean about that issue.  And the testimony there

21  shows this, that they code these forms only when they received

22  them from people in person.  Then don't code them when they

23  receive them from remote transactions.

24           In order to comply with Your Honor's ruling on

25  remote transactions, the way they coded these are going to have

1    to change to account for the voter registration forms.

2           MR. JONES:  Again, the accounting issue is immaterial

3    to the case.  But, more importantly, the Secretary of State does

4    not code any registration forms.  Someone else codes them,

5    someone else enters them, and then they show up on the Secretary

6    of State's computer system.  But the issue just isn't material

7    to the case in any, way shape or form.

8           How these things are coded and how these things

9    are counted were not pled, number one.

10          Number two, under a private right of action

11   granted under 1973GG9B, the plaintiffs can only sue for a

12   violation by which he or it was aggrieved.  And, how these

13   numbers are derived, how they're coded and how they're counted

14   has no bearing on either one of these plaintiffs, who did not

15   allege, did not plead and cannot contend aggrieves them in any

16   respect.

17          MR. CADE:  Your Honor, if I could just add, what one

18   does with this is not in the NVRA.  There's no direction about

19   this.  There's no duty to do it at all.

20          THE COURT:  I am going to overrule the objection.  I

21   just think -- the objection is overruled.  It's noted for the

22   record.

23          Please answer the question.

24          THE WITNESS:  I'm sorry, what was the question?

25          MR. HO:  Let me try again.

1          THE COURT:  This may happen a few times, ma'am.  Not to

2    worry.

3    BY MR. HO:

4    Q   So we're looking at the box in the lower left-hand corner,

5    Ms. Batts.  The one that's labeled Official Use Only.  And a

6    line that is near the bottom of that box that I'm drawing a line

7    next to here on the screen that says Circle 1 followed by

8    information PA, MV, RG, SDA and SS.  Do you see that?

9    A   Yes.

10   Q   When DHH offices receive a completed voter registration form

11   from clients, they're supposed to circle the PA here; is that

12   correct?

13   A   Yes.

14          MR. CADE:  I'm sorry, Your Honor, but I'm going to

15   object.  There is no duty to do that at all.  We're not supposed

16   to do anything about this.

17          THE COURT:  Objection is noted for the record.

18   Overruled.

19   BY MR. HO:

20   Q   My question was not about your legal obligations under the

21   statute, Ms. Batts.  It was about department policy.  As a

22   matter of policy, DHH personnel circle PA when they receive the

23   completed form?

24   A   Yes.

25   Q   Thank you.

```
 1                    And the PA stands for public assistance; is that
 2    right?
 3    A    Yes.
 4    Q    And were you given instructions to do that -- or, rather DHH
 5    was by the Secretary of State's office; is that correct?
 6    A    Yes.
 7    Q    DHH offices do not circle the PA when you distribute blank
 8    voter registration forms to clients; that's right, isn't it?
 9    A    That's correct.
10    Q    And you don't do it when you distribute them to clients via
11    remote means; is that right?
12    A    That's correct.
13    Q    Only when you receive completed ones, that's the only time
14    that you circle PA?
15    A    Yes.
16    Q    It's your understanding that this is how the Secretary of
17    State keeps track of the number of voter registration forms that
18    come in through public assistance offices?
19              MR. JONES:  Hearsay.
20              MR. CADE:  She has no idea how the Secretary of
21    State --
22              THE COURT:  Sustained.
23              MR. HO:  She testified to this in her deposition.
24              THE COURT:  You are going to have to lay a foundation
25    that she would know.
```

1   BY MR. HO:

2   Q   You testified a moment ago that you were given instructions

3   by the Secretary of State's office to circle the --

4           MR. JONES:  Wait, Judge.  I object to using the

5   deposition testimony as foundation to a question.  You can use

6   it to impeach but not as a foundation.

7           THE COURT:  She just said that she was given that

8   instruction by the Secretary of State's office in her testimony.

9   I'm not going to allow him to say what the Secretary of State

10  does with it unless he lays a foundation.

11          MR. JONES:  Judge, I think we objected to that as

12  hearsay.  As to what the Secretary of State told her.

13          MR. HO:  It's not hearsay, it not offered for the truth

14  of the matter asserted.

15          THE COURT:  It's not.  What she said is I was directed

16  to do this by the Secretary of State and that's why I did it.

17  Now, whether or not that was the Secretary of State -- it's not

18  offered for the truth of the matter, it's offered for what she

19  was told.  And that's what she did.

20  BY MR. HO:

21  Q   Do you know why you were directed -- DHH was directed to do

22  that?

23          MR. CADE:  I'm going to object to this, Your Honor.

24  She can't know.  She doesn't work at the Secretary of State's

25  office.

```
 1              THE COURT:  I think's he's trying to lay a foundation.
 2   And, if she knows, she knows.  If she doesn't, she doesn't.  But
 3   he's laying a foundation.  She's just got to answer the
 4   question.
 5              And we're not going to have any more speaking
 6   objections; okay?  You object.  If there's going to be something
 7   that you need to direct me to or to explain to the witness, you
 8   need to come up here, and we're going to handle those on the
 9   bench.  But no more speaking objections.
10              You may answer the question if you know the
11   answer.
12              THE WITNESS:  Can you repeat the question?
13              MR. HO:  Yes, Ms. Batts.
14              THE WITNESS:  I'm sorry.
15   BY MR. HO:
16   Q    That's okay.
17              Do you know why you were given those instructions
18   to circle the PA upon a completed voter registration form?
19   A    I can say that I think it's because we're a public --
20              THE COURT:  Okay.  You think, or you know?
21              THE WITNESS:  Because we're a public assistance agency.
22   BY MR. HO:
23   Q    Do you know if anything is done to count the number of voter
24   registration forms with the PA?
25   A    I don't know.
```

1   Q   This policy of only circling the initials PA when a voter

2   registration form is received rather than when a blank form is

3   handed out, that wasn't your decision; was it?

4   A   No.

5   Q   It wasn't DHH's decision; was it?

6   A   No.

7   Q   It was the Secretary of State's decision; is that correct?

8   A   To my knowledge --

9           MR. CADE:  Objection, Your Honor.

10          (Sidebar conference.)

11          MR. CADE:  Remind me what the last question was.

12          (Requested Question Read.)

13          MR. CADE:  It's my objection that there's no way she

14  could have known.

15          THE COURT:  I think that's a question for her to

16  answer.  I think she has to tell us if it's something that she

17  knows or not.

18          MR. CADE:  She is being asked who decided; isn't she?

19          THE COURT:  I think what she's asked --

20          MR. CADE:  She doesn't know who decided.  She knows it

21  wasn't her.

22          MR. HO:  That's what I'm trying to elicit from her.  If

23  she doesn't know, she doesn't know.

24          THE COURT:  I think I'm going to allow her to testify

25  as to what she knew.  If she knew whose decision it was, then

1    she can tell us.  If she doesn't, she doesn't.

2              MR. CADE:  I understand.

3                   (Sidebar concluded.)

4    BY MR. HO:

5    Q    You have to mark a PA when it is received by the client but

6    not when you hand a blank form out?

7    A    That's my understanding, yes.

8    Q    And it was your opinion, wasn't it, Ms. Batts, that DHH

9    should be permitted to circle the PA when you hand out a blank

10   voter registration form; isn't that right?

11   A    Yes.

12   Q    Just have a few other questions for you right now, Ms.

13   Batts.

14              It's true, isn't it, that when DHH Medicaid

15   personnel -- excuse me.  Let me strike that and pull that back.

16              It's true, isn't it, Ms. Batts, that when you

17   receive a complete Medicaid benefits form from a client, that

18   DHH Medicaid personnel are required to check those forms

19   line-by-line to ensure that they're complete?

20   A    I wouldn't say that that's true in the form that you

21   presented it.

22   Q    What would you say?

23   A    I would say that, when we receive a Medicaid application, we

24   review it to see if we have all the information we need to make

25   an eligibility decision.

1  Q   And it's true, isn't it, Ms. Batts, that if any information

2  is missing from the application, you don't just reject the

3  application out of hand but rather assist the applicant by

4  attempting to find that missing information through other means?

5  A   If we need the information, yes, we try to get it.

6  Q   And it's true also that DHH Medicaid personnel are not

7  required to check voter registration applications that are

8  submitted by DHH in the same manner?

9          MR. CADE:  I'm going to object, Your Honor.

10          THE WITNESS:  I would disagree with that.

11          THE COURT:  You still want to object?

12          MR. CADE:  Withdrawn.

13  BY MR. HO:

14  Q   Is there a written policy that states that they have to do

15  that, that you're aware of?

16  A   That states that they have to --

17  Q   Check voluntary voter registration forms line-by-line to

18  make sure all information is included by the applicant?  There

19  isn't is a written policy on that?

20  A   No.  That's not what you said.

21          Can you repeat?

22  Q   I'm asking a different question now.

23  A   Okay.

24          No.  There's not a policy that says they must

25  review the voter registration application line-by-line.

1    Q    And no written policy that they have to contact a client to

2    locate missing information from a voter registration application

3    form?

4    A    No policy.

5            MR. HO:   Those are in fact all the questions I have for

6    you right now, Ms. Batts.   I'm sure the attorneys for the other

7    parties will have some other questions for you, after which I

8    may come back and ask you some follow-up.   Thank you.

9            MR. PHILIPS:   Mr. Cade's going to be handling.   I

10   should have mentioned, if the Court has no objection, we thought

11   we'd take the witnesses plaintiffs call on direct and try to

12   complete their testimony as best we can.   I know you're not

13   telling us how to run our case, but I just wanted to see if

14   that's okay with the Court.

15           THE COURT:   That's fine with me, if you take it at this

16   time.  Mr. Cade.

17                        CROSS EXAMINATION

18   BY MR. CADE:

19   Q    Good morning, Ms. Batts.

20   A    Good morning.

21   Q    I want to ask you how long you've worked for DHH?

22   A    I've been with DHH for 20 years.

23   Q    How old were you when you started with DHH?

24   A    27.

25           THE COURT:   Now, that's not fair, Mr. Cade.   Because

1  those of us that know basic math and those of us that are women

2  are not going to be happy with those kinds of questions.

3          MR. CADE:  We have a special thing about --

4          MR. DeLEEUW:  We agree to have that stricken from the

5  record.

6  BY MR. CADE:

7  Q   Ms. Batts, you're the deputy medical director.  What other

8  positions have you held at DHH?  Start at the very beginning.

9  A   I started out as a secretary.  And then I was a Medicaid

10 analyst, which they were called eligibility examiners back

11 whenever I was an examiner.  Then I was a policy analyst,

12 program manager and program manager II, then IV, then Medicaid

13 deputy.

14 Q   Were you ever an examiner yourself?

15 A   Yes.

16 Q   How did you get from secretary to deputy of Medicaid?

17 A   Lots of hard work.

18 Q   How many other medicaid deputies, Medicaid directors are

19 there?

20 A   Three.

21 Q   And what is distinct about your position?

22 A   I'm over the Eligibility division.

23 Q   If you don't mind, Ms. Batts, I'm not sure everybody knows

24 exactly what Medicaid is.  Could you kind of tell us what this

25 program is?

1  A   Medicaid is Louisiana's health insurance coverage program

2  for the low income individuals and families that meet certain

3  criteria.

4  Q   What does it mean to be eligible for Medicaid?  What makes

5  you eligible?

6  A   You have to meet certain income and resource limits, and you

7  have to be categorically eligible.

8  Q   I'm not sure -- could you tell us what categorically

9  eligible is?

10  A   There's several categories to be eligible for Medicaid.

11  There's age, blind, disabled, children, families -- that's it.

12  Q   How many different categories of Medicaid eligibility are

13  there, if you know?

14  A   There's a hand-full of categories, and there's about 40

15  different Medicaid programs.

16  Q   Roughly, how many people in Louisiana are Medicaid clients?

17  A   A little over 1.2 million.

18  Q   You have a sense of what percentage of the population of

19  Louisiana that is?

20  A   They did some reports back in 2010, and it was about 27

21  percent.

22  Q   How does Medicaid determine a person's eligibility?  What do

23  we do?

24  A   Once we get a Medicaid application, we review it, verify all

25  the factors.  And then we review each applicant's eligibility

1    for which program, whichever one would grant them the most

2    benefits.  And then we have what we call a roll-down process, we

3    start at the most benefit program and then we drill down to the

4    lowest level until we can find what they're eligible for.

5    Q    I see.

6                   Specifically, who makes the eligibility

7    determination?

8    A    We have Medicaid analysts that make the eligibility

9    decisions.

10   Q    Okay.  And how many people at DHH are Medicaid analysts,

11   would you say, roughly?

12   A    It's a little over 500.

13   Q    What skill or training does it take to do this?

14   A    They have to pass a professional entry test.  And then they

15   go through training.  It takes about six months to a year to

16   become proficient in Medicaid policy.  It's a pretty complex

17   policy.

18   Q    Now, the analysts, that's the person -- is the analyst the

19   person that does eligibility determinations; is that right?

20   A    Yes.

21   Q    So, in an in-person interaction where a person applies for

22   Medicaid, what interaction takes place between the Medicaid

23   analyst and the applicant?

24   A    That's pretty rare.  What we have, we have contracts with

25   some community partners throughout the state.  We have about

1   5308 application centers, and they are available to help people

2   complete applications, people who need that in-person

3   assistance.  They come to our Medicaid office, but it's rare.

4   When the application center takes an application, they send it

5   to our and they make the decision.  But it's rare that people

6   actually drive to our offices to actually have an application

7   completed.

8           THE COURT:  Can I just ask you, you have 500 analysts

9   plus 500 partners within the communities?

10          THE WITNESS:  We have about 350 or so application

11  centers, but they're not taking applications every day.  They're

12  already providing a community service.  It could be like Council

13  on Aging, hospitals and so forth.  But we get about 15 percent

14  of our applications come through application centers.

15          THE COURT:  I understand.

16          MR. CADE:  So who makes the face-to-face contact?

17          THE WITNESS:  It's our application center.  And, if

18  they come down to the office, generally they'll see the front

19  desk receptionist.  They walk through the front door; and,

20  unless they ask for assistance by the analysts, then they'll

21  actually hand them a form and let them sit at what we call a

22  kiosk and let them fill out the application.

23  Q   If the person does this face-to-face transaction, ever

24  determine eligibility?

25  A   It's possible but rare.

1   Q   Have you ever done either of these jobs, the face-to-face or

2   the analyst?

3   A   Yes.

4   Q   You've done both; is that right?

5   A   Yes.

6   Q   I think we've heard a little bit about your involvement with

7   the National Voter Registration Act.  Why are you so involved

8   with this, with the NVRA?

9   A   Because I'm over the Eligibility division.  And because I

10  oversee the Medicaid application and renewal process.  And

11  because I've been involved to make sure that staff receive

12  training and update our policies and procedures.

13  Q   Well, the other -- let me think about, the other Medicaid

14  deputy directors, why are they not involved?

15  A   They're not involved in the eligibility process.  They don't

16  actually oversee the application and renewal process.

17  Q   I see.

18          Can you tell us what the transactions are that

19  give rise to the voter registration duty that we have.

20  A   Well, Medicaid is a public assistance program, and we have

21  applications, renewals and changes of address.

22  Q   Ms. Batts, if you know, what is the Department Health and

23  Hospital and Medicaid specifically?  What's our position with

24  regard to compliance?

25  A   We want to comply.

1    Q    Have you ever heard anyone take the position at Medicaid

2    that we shouldn't comply or we won't comply?

3    A    Never.

4    Q    Before this lawsuit happened, what was your understanding

5    about what Medicaid was supposed to do under the NVRA?

6    A    Before the lawsuit, we understood that our role was to

7    provide people opportunity to register to vote whenever they

8    conducted in-person transactions.

9    Q    And why did you think that?  Why did you -- you say in

10   person.  Why did you think in-person?

11   A    That's just the way we had been trained.

12   Q    What advice did you get from other parts of the Department

13   of Health and Hospitals about that issue?

14   A    The legal department also believed or told us that it was

15   in-person.

16   Q    And what advice if any did you get from the Secretary of

17   State?

18   A    They also trained us that in-person.

19   Q    I'm sorry, I didn't quite hear what you said.  What was --

20   why was the Secretary of State involved with us?

21   A    They provide training.

22   Q    I see.

23               About what?

24   A    National voter registration.

25   Q    How effective is the training?

```
 1   A    It was very effective.

 2   Q    Can you just summarize briefly what your role in this

 3   lawsuit has been since it started.

 4   A    Well, responding to requests from the plaintiffs.  Working

 5   with our IT staff to make any system edits.  Updating policies

 6   and procedures.  And responding to requests from the plaintiffs.

 7   Q    So how long have you been involved in the lawsuit?

 8   A    About two years.

 9   Q    Prior to this lawsuit, how much of your time did you devote

10   to the NVRA?

11   A    Not much.

12   Q    How much -- since this lawsuit started, how much do you

13   devote to it now?

14   A    A pretty good bit.

15   Q    What has been the effect if any of this lawsuit on our

16   ability to enroll people in Medicaid?

17            MR. HO:  Objection, Your Honor.  I don't see how that's

18   relevant to this case.

19            THE COURT:  I'm going to allow it.  Overruled.

20   BY MR. CADE:

21   A    I just know that it's taken me and my managers away from our

22   normal business duties to spend a lot of time researching old

23   policies, old procedures, forms, et cetera, trying to respond to

24   requests.  So it's been pretty time-consuming.

25   Q    Have you had to change any procedures as a result of this?
```

1   A   We have changed our procedures to offer the opportunity to

2   people who apply, renew or change their address remotely.

3   Q   I see.

4               And why did you make those changes?  Why did you

5   decide to offer remote registration?

6   A   Well, we've always -- not always -- we've been doing remote

7   transactions for years.  And, you know, when we first

8   implemented them, it was slow to take on.  But it's becoming now

9   where it's the majority of our business is done remotely.  We do

10  very little face-to-face.

11  Q   Well, I guess specifically, so is that the reason that you

12  decided to do voter registration that way?

13  A   It gives us an opportunity to provide those people that are

14  applying, renewing or changing their address remotely an

15  opportunity to register to vote, too.  Because we don't see

16  them.  We don't have the face-to-face contact anymore.

17  Q   In this regard, Ms. Batts, I'd like to have you look at a

18  document that we've marked DHH 6.

19               Do you recognize these?

20  A   Yes.

21  Q   Could you tell us what it is.

22  A   This was a directive that our secretary issued to all of our

23  staff back in May of 2011.

24          THE COURT:  Give me one second.

25              (Pause in proceedings.)

```
 1    BY MR. CADE:

 2    Q    Is there a second page to this, Ms. Batts?

 3    A    Yes.

 4              MR. CADE:  As I understand it, this is in evidence; is

 5    that correct?

 6    BY MR. CADE:

 7    Q    Ms. Batts, what led to the issuance of this, if you know?

 8    A    I believe because the lawsuit was filed, and the secretary

 9    and the legal department wanted to make sure that we were in

10    compliance.

11    Q    And so what did Medicaid do as a result of the directive?

12    A    We made sure that every employee, every Eligibility employee

13    received this and understood the importance of complying.

14    Q    And what procedures if any did you change as a result of

15    this?

16    A    We were already working on updating our procedures, so I

17    don't know if I would say as the direct result of this directive

18    we did update our policies.  We were already in the process of

19    doing that.

20    Q    So why were you doing the updating, the changes?  Why were

21    you?

22    A    We wanted to give people the opportunity to register to vote

23    when they applied or renewed or changed their address remotely.

24    Q    Did this have anything to do with the task force that we

25    heard about also?
```

1  A   The task force was working on the changes that we were

2  making to the policies, procedure and forms.  And we had our

3  legal department involved in our task force, and they were

4  giving us guidance.

5           THE COURT:  Can I ask, when was the task force created?

6  I know it was in 2011.  Do you recall what part of 2011?

7           THE WITNESS:  It might have been April.  I think April.

8           THE COURT:  Thank you.

9  BY MR. CADE:

10  Q   And the reason I wanted to look at page 2, how did this

11  directive relate to this, to the issue of remote transactions?

12  Do you remember?

13  A   At the time of the directive, we still thought that it

14  applied to in-person transactions only.  So I don't think the

15  directive spoke to remote transactions.

16  Q   I just wanted to direct your attention to some parts of this

17  page.  In paragraph 3, did the directive in some way seem to be

18  heading in the direction of doing remote transactions?

19  A   Yes.  It states that we were up-dating our policies.

20  Q   I wonder if you could tell us roughly what the percentage of

21  applications in each mode; that is, in person, online and mailed

22  is.

23  A   Sure.  About 15 percent of our applications come from

24  application centers, in-person.  We have about 20 percent apply

25  online.  And about 65 percent are through the mail.

1    Q    How do you explain the large percentage of online?

2    A    We developed our online application for the public use in

3    2007, and it's just slowly increased.  It kind of held steady

4    about 10 to 15 percent, and it's shot up to 20 percent lately.

5    Q    I see.

6                  What effect has this trend toward remote

7    transactions, what effect has it had on DHH Medicare?

8    A    Well, I think it's a good thing, because it allows people to

9    seek benefits, seek the health care coverage that they need

10   without having to come to our Medicaid office.

11   Q    Is coming to our office -- is that a particular issue for

12   Medicaid recipients?

13   A    It's a big deal.  Most of the people that are applying for

14   Medicaid are in need of health care coverage.  They are low

15   income, they're sick, they're disabled, they are elderly, they

16   have low paying jobs and they don't get paid -- get their pay

17   reduced when they take off to have to travel and submit an

18   application.  So we want to be out there and make it as easy as

19   possible for them to reach us.

20   Q    Well, has this had an effect on our personnel also?  Do we

21   have more people or less people these days?

22   A    We have less people now than we did in 2008.  We have about

23   251 fewer employees.

24   Q    And why is that?

25   A    Mostly, budget reductions.

1    Q    I wanted to ask you just generally about -- another thing

2    about Medicaid.  What are the financial criteria?  What gets you

3    eligible in terms of money?

4    A    Well, that varies.  Like I told you before, we have about 40

5    different Medicaid programs.  Pregnant women, for example, it's

6    200 percent of the federal poverty level for an adult with --

7    just an adult with children, and if they want coverage, that

8    income level is extremely low.  It's about 11 and a half

9    percentage of the federal poverty level, which is about $65 a

10   month.

11             For children, the income limit is 200 percent, and

12   it can go from 200 to 250 if they pay a premium for what we call

13   LACHIP, our most affordable plan.  But that's just a few -- I

14   mean, there's 40 different programs.

15   Q    So tell us when Medicaid began to offer voter registration

16   to people who applied, renewed and changed address by mail,

17   phone or online.

18   A    In July of 2011.

19   Q    So how has this change worked out for us?  For us

20   specifically, for Medicaid?

21   A    It's been good and it's had some unintended consequences.

22   Q    What effect has it had on the cost?

23   A    Our costs have gone up.

24   Q    And why is that?

25   A    Well, our printing and postage costs have gone up because we

1   have additional mailings.

2   Q    The unintended consequences, can you give us some idea of

3   what you meant by that?

4   A    Well, people are mailing their Medicaid application to the

5   registrar's office.  They see an address, and they mail their

6   entire packet to the register's office.  So that's a negative

7   because it delays their access to health care.

8   Q    And what does the registrar do when they get a Medicaid

9   application?

10  A    Then send them to us.  So it takes time.  It got mailed to

11  the wrong location, and then they have to bundle them up and

12  send them to us.  And, usually, they'll send them to our legal

13  department; and, by the time legal gets them and gets them to

14  us, it's a delay.  I don't know the exact amount of time, but

15  easily it could be a week or more delay.

16  Q    So I take it this wouldn't happen, let's just say the world

17  were different and this act were completely restricted to

18  in-person transactions, I take it this wouldn't be a problem

19  with in-person transactions?

20  A    No.

21  Q    What's the effect of doing remote transactions on the

22  assistance that we give a person with a voter registration?

23  A    We can provide assistance.  What we do, we put our toll-free

24  hotline on -- it's on our Medicaid application and it's on the

25  voter registration declaration form.  So if they need assistance

1    and they call us, we can help them.  Or if they go in to one of

2    our offices or application centers.  But, if they're applying

3    remotely through online or mail, if they need assistance, they

4    can call us.

5    Q    Has anyone ever called for assistance like that?

6    A    I don't know that they do, but I'm not going to say it

7    doesn't happen.

8    Q    While we're talking about the subject of assistance, which

9    has been sort of an issue in this thing, what's your

10   understanding of what the Medicaid worker has to do in the way

11   of assistance in completing a voter registration application?

12   A    They are to provide the same level of assistance as they

13   would in completing a Medicaid application.

14   Q    And do we do that?

15   A    To my knowledge.

16   Q    We talked earlier about the distinction between the

17   face-to-face -- the person who meets the applicant and the

18   analyst who determines eligibility.  The person who assists, who

19   is the person who assists?  It's the analyst or the clerical

20   person, the face-to-face person?

21   A    If they're at an application center, it's an application

22   center representative.

23            If they come in to our office, they're generally

24   going to meet with the front desk receptionist.  Only if they

25   need assistance and if they specifically ask for the worker

 1   would they see an analyst.

 2   Q    So what does the analyst do in terms of assistance to this

 3   client?  What's the analyst do?

 4   A    In providing assistance with completing the voter

 5   registration application?

 6   Q    Yes.

 7   A    Again, it would be, if they contact that analyst, then the

 8   analyst could help them over the phone.  But, generally, if they

 9   call us, their call is going to go to our customer service

10   hotline where we have agents answering those calls.

11   Q    How did you train people at DHH Medicaid to deal with this

12   transaction to remote voter registration?

13   A    We conducted training through what we call our running

14   management system, it's an online training system.

15   Q    Tell me, if you know, what does the NVRA require Medicaid to

16   do about training?

17   A    I'm not aware of anything.

18        MR. HO:  Objection.  Calls for a legal conclusion, Your

19   Honor.

20        THE COURT:  I'm going to allow the question.

21   Overruled.

22   BY MR. CADE:

23   Q    So, if it's not required, why do you do it?

24   A    We train our staff on just about everything that they do on

25   behalf of DHH.

1  Q   Ms. Batts, the plaintiffs in this matter have also -- one of

2  their complaints about us has been that the Medicaid application

3  form does not include questions about voter registration.  How

4  do you respond to that?

5  A   It does.  Our Medicaid application, it's actually the voter

6  registration declaration form and a mail voter registration

7  application form are both attached to all of our Medicaid

8  applications and renewals, the forms.

9  Q   So does it follow that you can get a Medicaid application,

10 you get a voter registration?

11 A   That's correct.

12 Q   The plaintiffs have also claimed that Medicaid failed in the

13 past and continues to fail to provide voter registration

14 services when a Medicaid client changes his or her address.

15 What do you understand Medicaid's duty on a change of address to

16 be?

17 A   We're to offer people the opportunity to register to vote

18 whenever they report an address change.

19 Q   Okay.  Do people ever come to a Medicaid office just to

20 change their address?

21 A   It's possible.  But, most of the address changes that we get

22 are over the phone.  People just call us to report their address

23 change.

24 Q   I'm sorry, they do what?

25 A   They call us.

1  Q    Okay.  What happens then, how do you deal with that?

2  A    We built in to our procedures a telephone script.  When

3  someone calls to report an address change, the agent that is on

4  the phone with them will ask them if they want to register to

5  vote.  If they say yes, we give them the Go-Vote website.  And,

6  if they want us to mail them a form, we'll drop them a form in

7  the mail.

8  Q    Mail them what kind of form?

9  A    Mail a voter registration application form.

10 Q    Ms. Batts, now I'd like to show you a document that we've

11 marked as DHH 1.

12         THE COURT:  DHH 1?

13         MR. CADE:  Yes.

14 BY MR. CADE:

15 Q    Do you recognize this?

16 A    Yes.  That's our general Medicaid application.

17 Q    You said general.  Are there other different Medicaid

18 application forms?

19 A    Yes.

20 Q    How many?

21 A    Thirteen.  We have 13 different application forms.  We have

22 application forms for -- it's a simplified application for

23 pregnant women we call LAMOMS.  We have a simplified application

24 for children which call LACHIP, for stands for Louisiana

25 Childrens Health Insurance Program.  We have BCC, which is

1   breast and cervical cancer.  We have long-term care.  We have 13

2   applications.

3   Q   I understand.

4           I wonder, Ms. Batts, if you could just go through

5   this thing with us a little bit and sort of explain what's

6   involved in applying for Medicaid.

7   A   Well, they tell us who they are.  Where they live.  They

8   have to give us their contact information.  We ask if they're

9   applying -- because the person who has completed the form is not

10  necessarily asking for benefits for themselves.  And then,

11  depending on their situation, if it's, you know, if they are

12  applying for themselves if they're claiming a disability, we

13  need to gather what we call resource information.  That's bank

14  accounts, any other types of assets that they may have.  Because

15  that is a factor in determining eligibility.  But, if it's just

16  applying for children, they don't have to give us that

17  information.

18  Q   How long is this form?

19  A   This one is one of our longer applications.  I don't want to

20  lie to you, it's probably six pages or more.

21  Q   I wonder if we could look at page 8 of this.  I want you to

22  just take a look at the page.

23          Do you recognize this, Ms. Batts?

24  A   Yes.  That's the voter registration declaration form.

25  Q   I wanted to ask you, how did Medicaid decide on the precise

1   form of this?  Format, I guess is what I'm getting at.

2   A   I believe this is the language that we're supposed to

3   provide on the voter registration declaration.

4   Q   Supposed to, why?

5   A   The language that we're supposed to include.

6           I'm sorry.  We ask them if they're not registered

7   to vote where you live now, would you like to register to vote

8   here today, yes or no.  It says, if you checked yes, it says you

9   can complete the attached form called the Louisiana Mail Voter

10  Registration Application.  They can mail it to their local

11  registrar's office or to us.

12          And it says, if you don't check either box, you'll

13  be considered to have declined to register to vote.

14          The main thing that we needed to include on here

15  for our federal partners is applying to register or declining to

16  register would not affect the amount of benefits that they

17  received.  And then it just gives them some contact information

18  and some information if they felt like that they wanted to

19  contact the Secretary of State's office.

20  Q   I want to ask you specifically just about a couple of these

21  things.

22          This first line:  If you are not registered to

23  vote where you live now, would you like to apply to register to

24  vote here today.  Who decided on this specific language?

25  A   I don't know.  It wasn't us.

1   Q   Okay.  If the client gets this form online or by mail, how

2   does here work in that?  What does the word here mean?  Does

3   that mean where they live?

4           MR. HO:  Objection, Your Honor.  This is an attempt to

5   relitigate remote transactions.

6           THE COURT:  Sustained.

7   BY MR. CADE:

8   Q   Ms. Batts, the part in bold and caps, what effect does that

9   have on the Medicaid worker?  This stuff about if you did not

10  check either box, et cetera, what does that do to the Medicaid

11  worker taking the application?

12  A   Well, it doesn't really matter if they check yes or no

13  because we're attaching the Mail Voter Registration form

14  regardless.  So they don't have to tell us that they want it.

15  It's already attached.

16  Q   So what is this form for?

17  A   The real benefit to the form now, since we're attaching the

18  application form, the only benefit -- I mean, I'm sure there's

19  benefits -- but they can contact -- gives them our toll-free

20  contact number so if they need assistance they can call us.

21  Q   But am I right that the yes or no doesn't affect what we do?

22  A   No.  You're right.

23  Q   What about not doing anything?  What if no one checks

24  anything?

25  A   If they don't check yes or no, again, we've included the

1   form, the mail voter registration application form whether they

2   check yes, no, or don't check anything.  It's attached.

3   Q   Okay.  So the person's there, they've gotten the forms.

4   What happens if the applicant doesn't want a voter registration

5   application?

6   A   We can't make them take it, but it's included.

7   Q   There's another thing that's come up in this case that I

8   wanted to ask you about, too.  The plaintiffs have said that

9   we're violating the act because we continue to use Medicaid

10  applications that don't have the voter registration form

11  attached.  How do you respond to that?

12  A   Well, that's a possibility.  Because, back when we

13  implemented the Louisiana Children's Health Insurance Program,

14  we implemented what we call a very aggressive grassroots

15  outreach campaign.  We had our staff go out all over the state,

16  and they'd go to health fairs, they'd go sit out in front of

17  Walmart, pharmacies, all different places, and try to promote

18  awareness to this children's health insurance program.  It was

19  all about trying to get health insurance coverage for children.

20          And another piece that we did with that outreach

21  was we put applications in what we call take-one holders.  And

22  those are put in churches, pharmacies, drug stores, grocery

23  stores.  Just about everywhere -- gas stations.  Anywhere you

24  would go, you would see a Medicaid application take-one holder.

25  And those have been out there for years.  They could be as old

 1    as 1998; and, if someone sends in -- you know, they could have

 2    picked up that application and had it sitting in their desk

 3    drawer and ten years later decide to apply for Medicaid.  They

 4    can send us that application, we are not going to reject it.  We

 5    don't obsolete our forms because we don't want to deny them

 6    access to health care.  So, if they do send in that old

 7    application form that they had in their desk drawer, they're

 8    going to get a mail voter registration application and

 9    declaration form with a decision notice.

10    Q    What's a decision notice?

11    A    We give a decision notice to everyone who applies or renews.

12    We have to give them a decision whether they've been approved or

13    denied.

14    Q    What did you do -- what did you use decision notices for

15    prior to this lawsuit?  Did you use them before?

16    A    We used decision notices.  The decision notices just got

17    longer.  We were in the process of trying to streamline our

18    notices, because, our population, if you give them too wordy of

19    notice, they don't read it.  They're just looking for that one

20    key factor for am I approved or denied.  So we're trying to

21    streamline it.  And this has just added some additional pages to

22    the notice, but it was it was the only way we could get to those

23    people who were using those old application forms.

24    Q    I see.

25                    By the way, you talked about this outreach

1    program.  What was the effect of that program?

2    A   Oh, it was very successful.  We now have less than three and

3    a half percent of the children in Louisiana uninsured.

4    Q   I want to talk now, Ms. Batts, about the last two pages of

5    the application form package.  So this would be the next two on

6    this.

7                   What are these?  What's this?

8    A   This is the mail voter registration application form.

9    Q   And what does the Medicaid worker do with regard to this

10   form?

11   A   They can provide people assistance in completing the form if

12   they need it.

13                  They also make sure that there's a signed -- if

14   someone returns it to us, they make sure that they have original

15   signature.  We found out that they will not accept faxed copies

16   of signatures, so it has to be original.

17   Q   What assistance if any do they give?

18   A   They'll assist people in completing this form the same way

19   they would help in completing a Medicaid application if they

20   need it.

21   Q   What training does Medicaid do for the people who do this?

22   A   We train everyone on completing our applications, and this

23   is part of it.

24   Q   And so what happens with this form once it's completed in

25   person?

1    A    If someone completes this form in person, we mail it to the

2    registrar's office within two business days.

3    Q    Now, is there something else that can happen?  What else

4    could happen?  Other than them leaving the form with you,

5    anything else?

6    A    They could decide to take it with them and fill it out

7    later.  And, if they do, if they get home and they want to fill

8    it out and they get stumped on a question, they can call us and

9    we can help them over the phone.

10   Q    Once they're done, then what?  Are there options then?

11   A    If they complete it at their home, they can send it to us

12   and we'll mail it to the registrar's office.  Or they can send

13   it straight to the registrar's office.

14   Q    Is that where some of these problems arise, when they mail?

15   A    That's when they send their Medicaid application, yes.

16   Q    What do you do about assistance if they take it home?

17   A    Yeah.  They can call us, and we can help them over the phone

18   if they need assistance in completing this form.

19   Q    Ms. Batts, now I want to show you a document that we've

20   marked DHH 2.

21            MR. CADE:  Understand that DHH-1 has been admitted; is

22   that correct?

23            THE COURT:  I believe it has been admitted.

24   BY MR. CADE:

25   Q    Do you recognize THIS?

1    A    This is our renewal form.

2    Q    Are there more than one variety of this page?

3    A    We have eight renewal forms.

4    Q    Are there other methods of renewing Medicaid than by filling

5    out this form in person?

6    A    Oh, yeah.  Very few of our renewals are actually done

7    completing a form.  The majority of our applications are done

8    administratively.  That's what we call administrative renewals

9    where we have -- we match the data in our system; and, if they

10   meet a certain criteria, we send them a letter saying that it

11   appears that you are still eligible; if anything's changed in

12   your situation, contact us.  They don't contact us, then they're

13   automatically extended.

14              THE COURT:  Okay.  So that requires no contact --

15              THE WITNESS:  No contact.

16              THE COURT:  -- with the participants?

17              THE WITNESS:  Only if they have a change, then they

18   call us, and then we'll look at their situation.

19                   We also have several flavors of renewals.  It's,

20   that's our administrative.  We express client eligibility, and

21   that's when we take our files that are our cases that are up for

22   renewal, we send them to DCFS.  And they send us a file back

23   telling us which children are enrolled in SNAP, Supplemental

24   Nutrition Assistance Program.  And, if the children are eligible

25   for SNAP, they're automatically eligible for Medicaid.  So,

1  based on that file that we get back, we send them a letter

2  saying that your case has been extended, you get another year of

3  benefits.

4          We have ex parte.  And that's when a case is up

5  for renewal and workers will go to other systems that we have

6  access to try to verify and make a decision if that person

7  remains eligible without having to contact the applicant, the

8  enrollee.

9          So, we've got administrative, ELE, ex parte --

10  telephone.  We do two flavors of telephone renewals.  We send

11  someone a notice saying it's time for you to renew, please

12  contact us at your convenience.  Or you can go online or we can

13  mail you a form.  Whatever works best for you, but it's time to

14  renew.

15          And we tried the cold call telephone call

16  renewals.  Those are a little less successful because we're

17  trying to reach people at random.  And, when they get the person

18  on the phone, they verify any factors that they need to to

19  establish their continuing eligibility.  And then that's it.  We

20  don't need a signature or anything because we already have their

21  signature on file.

22  BY MR. CADE:

23  Q    And how often does one have to renew Medicaid?

24  A    Generally, every year.  But some of them are more frequent.

25  Q    And how do you deal with the voter registration duty in the

1    renewals?

2    A    Pretty much the same way.  If it's the form, the voter

3    registration declaration and application form is attached to the

4    form.

5                    Oh, online.  I didn't tell you, we had online

6    renewals to.  If they go online, they get the same renewal --

7    voter registration options as they would if they were applying.

8                    If they do the administrative renewals where we

9    don't have that contact with the applicant, then they get it in

10   that notice, the administrative renewal notice or either in a

11   decision notice.  If it's ex parte and we make the decision

12   up-front and then just send them the notice, it's included in

13   the decision notice.

14   Q    So that would be, no matter how they renew, they get the

15   voter registration form?

16   A    No matter how they renew or apply, we're going to catch

17   them.

18   Q    Okay.  I'll enter -- just for this form, I wonder if we

19   could go to page 8 of this.

20                    Is that again that same form?

21   A    That's the voter registration declaration.

22   Q    And then, what should come next?  What's the next page?

23                    And that's --

24   A    Mail voter registration application form.

25   Q    Okay.  I want to show you a document now that we've marked

1   as DHH 3.

2               Do you recognize that?

3   A   Yep.  That's our change of address form.

4   Q   How long have you been using this form?

5   A   Just since 2011.  It's a new form.

6   Q   And why?  What happened in 2011?  Why did you start using

7   this?

8   A   Most people call us to report an address change.  They don't

9   come into the office.  If they do come into the office, they

10  typically can walk through the door, they tell the receptionist:

11  I need to report an address change.  And they go right to the

12  system and make the change.  They don't have to fill anything

13  out.

14              And this was just our way of making sure that, if

15  someone actually comes into our office, that they're going to

16  get that opportunity to register to vote.  They have to now fill

17  out this form to report an address change.

18  Q   I see.

19              And you said you started using it when?

20  A   In 2011.  July, I believe.

21  Q   And how much difference has this made, if any?

22  A   The only difference is additional work for our staff.

23  Because, now, they now, instead of just entering the data into

24  the system, now they have to scan this form into our electronic

25  case record and assign metadata to it.  So it takes extra time,

1    but it's our way to make sure they make that offer.

2    Q   How often do you actually use this?

3    A   I don't believe we use it that much.  Because, like I say, I

4    think most of address changes come through the telephone.

5    They're not going drive all the way to one of offices just to

6    tell us they've moved.

7    Q   Can you tell us what happens if a person does call on the

8    phone now to change an address?

9    A   If someone calls us, the agent will take their address

10   update and they will ask them if they want to register to vote.

11   And, if they say yes, they tell them they can go to govote.com

12   or we can mail them a form.  If they chose for us to mail them a

13   form, we have an automated system that can spit that form out

14   and it will get mailed within two days.

15   Q   Tell us again what govote is.

16   A   That's the website where they can go to register to vote.

17   Q   And is that our website, or someone else's?

18   A   No.  That's the Secretary of State website.

19   Q   Could you tell us now, could you explain to the Court how

20   Medicaid handles the voter registration duties which are made by

21   mail?

22                And let me ask, first, how does a Medicaid

23   applicant get in to the process of mail?

24   A   Well, they could have picked one up at one of those take-one

25   holders that we have all over the state.  They could take it and

1    put it in their desk drawer.  They can call us.  We get a lot of

2    phone calls from people that say they want to apply and we drop

3    them an application in the mail.  And, when that application

4    goes out, the voter registration declaration and application

5    form is attached to that.  So, when they get it, when they

6    receive our packet, and then they can send it in or they can

7    hold it and apply later at their convenience.

8    Q    How does -- what do we do when the applicant starts the

9    process by telephone?  How do we do that?

10   A    We do very few telephone applications because of the

11   signature requirement on an application.  Most of the telephone

12   applications that we do process are urgent care.  They need

13   immediate attention.  They may need like emergency surgery or

14   something.  So we'll take their information over the phone and

15   we have to mail them that application to sign because we have to

16   have that signature on an application.

17   Q    And, when you do that, what about the voter registration?

18   A    We offer them the voter registration opportunity over the

19   phone.  And then, whenever they get the application to sign it

20   and send it back, they get it again.  It's attached to that

21   form.

22   Q    Now, how do you deal -- what do you do with the assistance

23   of the voter registration form when it's over the telephone?

24   A    Same thing.  When they're on the phone, they'll ask them if

25   they want to register to vote.  They can walk through the form

 1    to complete it if needed.  And, when they get home to fill it

 2    out, if they need help, they can call us and we'll help them

 3    over the phone.

 4              MR. CADE:  Am I right, that DHH-3 has been admitted

 5    also?

 6    BY MR. CADE:

 7    Q    I want to show you a document that we've marked DHH 4.

 8              Do you recognize this?

 9    A    Yes.  I do.

10    Q    Tell us what this is.

11    A    This is for online services.  This is where someone can go

12    to apply for Medicaid.  They can report changes.  They can

13    report a lost or stolen Medicaid card.  They can also go and

14    click this link all the way to the right and they can find a

15    Medicaid office or a doctor.

16    Q    How long have you been doing this, roughly?

17    A    We turned on our online application for the public in 2007.

18    I believe it was October of 2007.

19    Q    Are people using it?

20    A    I'm sorry?

21    Q    Are people using it?

22    A    Oh, yes.  We started out slow, but we're up to about 20

23    percent of our applications come through our online application.

24    Q    Are people able to do this actually on a telephone?

25    A    Or can they apply with a telephone?

1   Q    That is, use the online through a phone rather than a

2   computer?

3   A    They probably can, but I would imagine it would be

4   difficult, you know, to sit there and fill out all the

5   questions.  It's not a mobile application.  It's not designed to

6   be a mobile, but they could.  Someone could.

7   Q    Is it possible for the applicant to complete an Medicaid

8   application online?

9   A    Oh, yes.

10  Q    And, when they do that, will there be voter registration

11  documents?

12  A    Yes.

13  Q    As part of that?

14  A    Once they get through the application, then they're

15  presented with the same voter registration declaration.  And

16  they get three options.  It says:  Do you want to register to

17  vote, yes or no.  And, if they check yes, they can either go to

18  govote.com, they can download and print a mail voter

19  registration application, or they can choose for us to mail them

20  one.  And, if they chose that option, then one goes out in the

21  mail within the next two business days.

22  Q    I see.

23           This Geauxvote site, is there some distinction, is

24  there something different about that than using the other

25  methods?  What happens when you do that?

 1   A    The only thing that I'm aware of on the govote, I think they

 2   have to provide a driver's license number.  They don't have to

 3   provide that for Medicaid.

 4   Q    Now, what happens online if the applicant chooses no?

 5   A    If they choose no, then that decision is recorded on the

 6   voter registration declaration.  That is stored in our

 7   electronic case record.

 8   Q    I'd like to show you now, Ms. Batts, a document we've marked

 9   DHH 7.

10                  Do you recognize that?

11   A    Yes.

12   Q    Could you tell us what this is.

13   A    That's our procedure chapter for National Voter Registration

14   Act, and it's the July 27th version.

15   Q    Does this document reflect the policy of DHH Medicaid with

16   respect to voter registration?

17   A    Yes, it does.

18   Q    And you said -- what did you say the date was?  July?

19   A    It looks like this version that you have on the screen is

20   July 27, 2011.

21   Q    Is that the most current version of it?

22   A    I don't think so.  We update our policies and procedures

23   frequently, and I think there's probably a version from February

24   of 2012.

25                  One thing that we changed when we first put out

1    the procedures, we required people to take the voter

2    registration training within 60 days of employment.  We quickly

3    changed that to within 30 days.

4              And then that's -- I don't know of any other

5    changes after that.

6    Q    Who gets copies of this manual?

7    A    This manual is available to all of our Eligibility staff.

8              MR. CADE:  Am I correct also about this being admitted,

9    this is DHH-7?

10             THE COURT:  Yes.

11   BY MR. CADE:

12   Q    Ms. Batts, how do you think we're doing on complying with

13   the NVRA, Medicaid?  Do you think we're doing a good job?

14   A    I think we're doing really good.

15   Q    How do you know, by the way, whether Medicaid workers out in

16   the field are actually carrying out our policy with regard to

17   voter registration?

18   A    Well, because we train them.  And we also do some spot

19   checking.

20   Q    I want to show you a document we've marked at DHH-9.

21             Do you recognize this?

22   A    Yes.  That's our MAQC project.

23   Q    Can you tell us what that means?

24   A    I'm sorry.  That's the Medicaid Eligibility Quality Control.

25   Q    And can you tell us what this is all about.

1   A    Yes.   We built in a procedure for our quality control staff

2   to conduct random reviews of our Medicaid offices to make sure

3   that they were complying with the National Voter Registration

4   Act.

5   Q    When did you start this project, do you remember?

6   A    I believe it was October of 2011.

7   Q    I wondered if we could look at page 3.

8              What is this all about, Mrs. Batts?

9   A    This looks like a script that they use to make some calls to

10  our Medicaid offices.   They generally will ask, they'll say:

11  Hi, my name is so and so, and I currently live in -- this one

12  looks like Alabama -- and I'm moving to Louisiana, you know,

13  where can I apply for assistance, do you offer just Medicaid,

14  can I also apply for food stamps; and, oh, is there anything

15  else, do you offer -- where can I register to vote or something

16  like that.   They will a try to ask them questions to make sure

17  that they're offering that opportunity to people.

18  Q    And do we do these things on an ongoing basis?

19  A    Every quarter, they review 10 percent of our offices.

20  Q    And, these that we're looking at here, how do these offices

21  do, if you know?

22  A    They do really well.   So far, we're 100 percent compliance.

23  Q    In terms of this oversight quality control, do you know

24  what's the NVRA requirements on this?

25  A    I don't believe --

 1              MR. HO:  Objection, legal.

 2              THE COURT:  That calls for a legal conclusion.  That's

 3    sustained.

 4              MR. CADE:  Ms. Batts, I don't think I have more

 5    questions for you.

 6              THE WITNESS:  Thank you.

 7              MR. CADE:  Thank you, Your Honor.

 8              THE COURT:  Thank you.

 9                   Secretary of State have any questions?

10              MR. JONES:  No, Your Honor.

11              THE COURT:  DCFS, I'm assuming has no questions.

12              MR. PHILIPS:  We don't have any questions for Ms.

13    Batts, Your Honor.

14              THE COURT:  Mr. Ho?

15                        REDIRECT EXAMINATION

16    BY MR. HO:

17    Q   I apologize, Ms. Batts.

18    A   That's okay.

19    Q   Just some follow-up on some of the topics that Mr. Cade

20    asked you some questions about.  I'll try to be quick.

21              You gave some testimony about the current Medicaid

22    application form.  Do you remember that?

23    A   Yes.

24              MR. HO:  Could we bring up plaintiff's Exhibit 154 E,

25    please?

1  BY MR. HO:

2  Q   This has been admitted into evidence, and it's the exact

3  same exhibit that Mr. Cade was showing you, the general

4  application form.

5  A   Okay.

6  Q   What's the date on this form, Ms. Batts?

7  A   It's kind of fuzzy, but I think it's June of 2011.

8  Q   And this is the form that had the attached voter declaration

9  form and the attached voter registration form; right, Ms. Batts?

10  A   Yes.

11  Q   And that was as of June 2011; right?

12  A   Yes.

13  Q   And those attachments, the voter registration declaration

14  form and the voter registration form, those were new additions

15  for this revision of the forms; is that right, Ms. Batts?

16  A   Yes.

17  Q   Earlier versions of the form didn't have those attached?

18  A   That's correct.

19  Q   I want to draw your attention to plaintiff's Exhibit 154-D.

20  Which, if you want to look at it in your binder, is tab 41.

21          MR. HO:  This has not yet been offered into evidence.

22          MR. CADE:  Objection.

23          MR. HO:  I believe their objection is that it's an old

24  version?

25          MR. CADE:  Yes.

1          THE COURT:  Wait.  141?

2          MR. HO:  I apologize.  It's 154-D.  It's tab 41 in Ms.

3     Batts' binder.

4          THE COURT:  This is the 2007?

5          MR. HO:  Yes, Your Honor.

6          THE COURT:  You want to just look at, it's January 2011

7     that didn't include it?

8          MR. HO:  We looked at the June 2001 that did include

9     it.

10          THE COURT:  It did.

11               And, prior to that -- I'm going to allow it.

12          MR. HO:  If that's the case, Your Honor, I think to

13     save some time --

14          THE COURT:  I have they've already stipulated.

15          MR. HO:  They haven't actually agreed to the admission

16     of -- I'm sorry, Your Honor.

17          THE COURT:  Could I get you all to approach, please?

18               (Sidebar conference.)

19          THE COURT:  I thought there was a stipulation that you

20     all weren't using it on any prior transactions.

21          MR. HO:  There is a stipulation that the voter

22     registration form was admitted to the packet before that, but

23     the old application forms aren't included to the record.  I know

24     Mr. Cade didn't admit the forms earlier because he believes the

25     old forms are not admissible.  But, if your ruling is that they

1   are, I can just list what those numbers are, and we can dispense

2   with the witness.

3            THE COURT:  I'm just seeing it as redundant because I

4   think we already have a stipulation that you weren't doing this

5   before the suit was filed.

6            MR. CADE:  That's right.

7            THE COURT:  If there is a stipulation, I think we're

8   just making more paper for me to look at.  And I just as soon

9   not get any more paper than I have to.  Sustained.

10            (Sidebar concluded.)

11   BY MR. HO:

12   Q   Just one last question about the application forms that have

13   been used in the past by DHH, Ms. Batts.  Do you recall

14   testifying that those old forms, the old applications, prior to

15   June 6 -- June 2011 application, those forms did not offer the

16   opportunity to register to vote?

17            MR. CADE:  I'm going to object at this point.

18            MR. HO:  It's a little bit different than the

19   stipulation, Your Honor.

20            THE COURT:  Let's get to where we need to go.  I'm

21   going to overrule it for right now.

22   BY MR. HO:

23   Q   It's the one question I have.

24   A   Can I explain if you can hear me?

25            While it wasn't attached to the forms in the past,

1    we were under the impression that we were to offer the

2    opportunity to register to vote if someone applied in person.

3    The majority of our in-person applications are conducted at

4    applicant centers, and that's where you saw the mail -- motor

5    voter form that was obsolete, that form was included in what we

6    call an application packet.  It's part of the process that one

7    goes through.  It wasn't attached to this form, but it was part

8    of the process that they went through for those in-person

9    transactions.

10   Q    But, the forms that were distributed in the past, they

11   didn't offer that opportunity?

12   A    No, they did not.

13   Q    I just want to ask you some questions now about address

14   changes that you mentioned earlier.

15   A    Yes.

16   Q    You said that most address changes are verbally reported?

17   A    Yes.

18   Q    And I think you testified that they're entered into the

19   system?

20   A    Yes.  Into our eligibility system.

21   Q    And the system is an electronic form; is that right, Ms.

22   Batts?

23   A    Yes.  It's our Medicaid eligibility electronic system.

24   Q    You gave some testimony about the number of Medicaid

25   analysts that you have, Ms. Batts.  Do you remember that?

```
1    A    Yes.

2    Q    And you said that -- let me ask you this.

3              Those analysts are primarily developed through

4    case review; is that right?

5    A    Yes.

6    Q    And a case review entails pulling a sampling of their cases

7    or of the cases for which an analyst is responsible?

8    A    Yes.

9    Q    And whether or not a Medicaid analyst offered a client an

10   opportunity to register to vote is supposed to be memorialized

11   in the narrative of every case file; is that right?

12             MR. CADE:  I'm going to object to that.

13             (Sidebar conference.)

14             THE COURT:  Mr. Cade?

15             MR. CADE:  There is supposed to be memorialized, it's

16   not in the NVRA.

17             THE COURT:  I don't know where we're going.

18             MR. HO:  She gives something on how case workers are

19   developed, how we know that case workers are in fact complying

20   with their obligation to provide voter registration services.

21   So it's more probative about how that's actually done in

22   practice.  It's done by looking at their case files.  And we

23   have some case files that don't indicate whether or not these

24   analysts are actually offered --

25             MR. CADE:  These case files don't say anything about
```

1    voter registration.  I want to say that proves we're not going

2    to, because I didn't mark anything that says they're not doing

3    it.  They could have a box for it.  It's a review of a counter

4    worker's review of the application.  It reviews:  Did you ask

5    him about the financial information.  They're completely

6    irrelevant.

7              THE COURT:  I'm going to let him ask the question.  I

8    don't want to spend a whole bunch of time on this.  I'm going to

9    let you ask if they evaluate that, and then I'm going to do have

10   determine if it means anything.  Because that's going to be a

11   helpful question to me, since they're required to do that under

12   the act.  But I'm going to let you ask do you do that, and then

13   we'll go there.  Thank you.

14              (Sidebar concluded.)

15   BY MR. HO:

16   Q   Ms. Batts, you were talking about the case reviews and

17   that's the way you evaluate Medicaid analysts, I think you said?

18   A   Yes.

19   Q   And whether or not clients -- excuse me -- whether or not an

20   analyst is offered an opportunity to vote is supposed to be

21   memorialized in those case files; is that right?

22   A   Yes.

23   Q   I want to turn your attention to plaintiff's Exhibit 180,

24   which is tab No. 7 in your binder.  When you're ready, just let

25   me know.

```
1                    (Pause in proceedings.)

2              THE WITNESS:  Okay.  I see it.

3   BY MR. HO:

4   Q    This is a case review form; right, Ms. Batts?

5              MR. CADE:  I'm going to object to this testimony.  He's

6   just identifying an exhibit.

7              THE COURT:  She is under cross examination.  I think

8   he's just --

9              MR. HO:  Under Rule 611 --

10             THE COURT:  Overruled.

11  BY MR. HO:

12  Q    This is a case review form for a Medicaid analyst; right,

13  Ms. Batts?

14  A    Yes.

15  Q    Could you look at the form and tell me if there's anything

16  about this -- about voter registration information memorialized

17  in this form?

18  A    I don't see it.  This is a renewal for the month of June of

19  2010.

20  Q    Yes.  I see that.

21             So it's from 2010, and it's from the New Orleans

22  office I believe; right?

23  A    Yes.

24  Q    But is there anything memorializing whether or not the

25  analyst offered a voter registration form?
```

1   A    I don't see it, no.

2           MR. HO:  Your Honor, there are 24 more of these.

3           MR. CADE:  I don't think we need to go through them

4   individually.

5           THE COURT:  I think the question is, does the form

6   provide for it.  And, if it doesn't, it doesn't, and we can move

7   on.

8           MR. HO:  Right.  There are 24 more of these on our

9   plaintiff's list.  I'd like to offer to move 181 into evidence.

10          MR. CADE:  Objection, Judge.

11          THE COURT:  And the basis of the objection?

12          MR. CADE:  This has nothing to do with the case.  It's

13  2010.  Its irrelevant how a person does Medicaid eligibility.

14  It's also from --

15          MR. HO:  It was from 2010.  It was produced from the

16  defendants when we requested case reviews.  Ms. Batts testified

17  that case reviews are how DHH offers their clients an

18  opportunity to vote.

19               After her deposition, we asked for a number of

20  these forms, and this was produced to us by the defendants.  But

21  there was nothing in them about voter registration.

22          MR. CADE:  First of all, that's not what she said.  She

23  said this is about an analyst; and, in fact, what she said is

24  the analyst doesn't do face-to-face encounters.  The analyst is

25  the person who determines Medicaid eligibility.

1          We responded to discovery.  But we didn't think it

2    had anything to do with anything then, and we still don't.  The

3    reason she doesn't figure out what it was about is because she's

4    never seen it.

5          THE COURT:  I tend to agree with Mr. Cade.  I'm not

6    going to allow the exhibit into evidence.

7          MR. HO:  Thank you.

8          THE COURT:  Sustained.

9          (Sidebar concluded.)

10   BY MR. HO:

11   Q   You testified also a moment ago, Ms. Batts, about the MECQ

12   project?

13   A   Yes.

14   Q   The calls to offices.

15          You said that you do about 10 percent of DHH

16   offices per quarter?

17   A   Yes.

18   Q   How many does that amount to?

19   A   Well, that's changed.  It used to be 10 percent.  When we

20   had 40 offices, it was four calls, four to five calls.  Now that

21   we've downsized, then we'll have to readjust our plan.  Because,

22   come January, we'll probably have about 12 offices state-wide.

23   Q   So 10 percent of 12 offices would be one a quarter?

24   A   Two.  Yeah.

25   Q   One or two a quarter that you'll be checking?

1    A    We will be doing more.

2    Q    But, before, you were doing three or four per quarter?

3    A    That's correct.

4    Q    About one a month?

5    A    Yes.

6    Q    And you said you initiated that project after this case was

7    filed?

8    A    Yes.

9    Q    I want to draw your attention to plaintiff's Exhibit 212.

10   Which is tab No. 36 in your binder.  212.  And it should be tab

11   35 in your binder.

12                   MR. HO:  I'm sorry, Your Honor.  How about 211.

13   BY MR. HO:

14   Q    So Mr. Cade showed you a few of these forms before.  This is

15   a different one.  Is this part of the MEQC project?

16   A    What tab did you tell me to go to?

17   Q    I'm sorry.  Tab 35 in your binder.

18   A    Yes.

19   Q    How many pages -- there are five calls in here; right, Ms.

20   Batts?

21   A    In this section, yes.

22   Q    That are represented in these forms?

23   A    Um-hum.

24   Q    And these are from August 2011?

25   A    Yes.

```
 1   Q   And could we turn to the third page here, 87-120.  On the
 2   bottom line, there's a sentence that says:  Did office state
 3   that it was possible to register to vote through DHH.
 4                   And what does it say there?
 5   A   Says:  No.
 6   Q   On the last page, 87122, what does it say in response to
 7   that question?
 8   A   No.
 9   Q   I want to ask you about the Medicaid application centers
10   that you referred to in your testimony.  Those are not DHH
11   offices; is that right?
12   A   No.
13   Q   So the people there are not DHH employees; is that right?
14   A   They're not DHH employees.
15   Q   And they don't receive the same training as Medicaid
16   analysts; is that right?
17   A   They do receive training.
18   Q   But it's not the same training that the Medicaid analysts
19   receive?
20   A   No.
21   Q   You testified that you thought that the training on the NVRA
22   --
23           MR. HO:  I'm sorry, Your Honor.  I apologize.  I'd like
24   to move this exhibit into evidence, plaintiff's Exhibit 211.
25           THE COURT:  Any objection?  Let it be admitted.
```

1           (Exhibit admitted.)

2           THE WITNESS:  Can I explain this form?

3    Q    I think we've moved on from that, Ms. Batts.  I was going to

4    ask you about something else now.

5               So we were talking about the Medicaid analysts.  I

6    think you've testified when Mr. Cade was asking you questions

7    that you believed that the training that they received on the

8    NVRA from the Secretary of State's office was effective.  Do you

9    remember testifying to that

10   A    I'm sorry, what did you say?

11   Q    That the training that Medicaid analysts receives from the

12   Secretary of State office was effective.

13   A    Yes.

14   Q    Did the DHH analysts provide any sort of written evaluation

15   of that training?

16   A    Not that I recall.

17   Q    Did you follow up with them to determine whether or not they

18   believed that it was effective?

19   A    All of our supervisors have unit meetings.  They meet with

20   their staff, and they go over the training.  At the time of the

21   first training that we had, it was done through what we call a

22   quarterly training.  And, yes, they would meet with staff

23   afterwards to make sure that they understood everything that was

24   presented.

25               When we went to the learning management system

1  training, then all staff are required to review the training.

2  The supervisors still get with them to make sure that they

3  understand the training that's been presented.

4  Q   With respect to the training manuals, we looked at one of

5  the training manuals from 2011.  I want to draw your attention

6  to Tab 1 of your binder, this is plaintiff's Exhibit 147-A.

7           MR. HO:  This is not yet been admitted into evidence.

8  BY MR. HO:

9  Q   The date at the bottom of this is August 6, 2009; is that

10  right?

11  A   Yes.

12  Q   So this is the procedure manual from before the one that you

13  testified earlier?

14  A   Yes.

15           MR. HO:  Your Honor, I just want to move plaintiff's

16  Exhibit 147-A into evidence.

17           MR. CADE:  We are objecting, Your Honor.  It's 609.  It

18  doesn't have anything to do with what's going on now.

19           THE COURT:  I'm going to allow it because it's the

20  immediate predecessor.  It will be admitted.  The objection is

21  noted for the record.

22  BY MR. HO:

23  Q   You testified when Mr. Cade was asking you questions about

24  the NVRA Medicaid task force, Ms. Batts.  Can I draw your

25  attention to plaintiff's Exhibit 214, tab 37 in your binder.

1    Take a moment to look through all of those pages, and just let

2    me know when you're ready.

3               THE COURT:  Mr. Ho, are we going to be much longer?

4               MR. HO:  This is the last line of questions that I

5    have, Your Honor.

6               THE WITNESS:  Okay.

7    BY MR. HO:

8    Q    Do you recognize this, Ms. Batts?

9    A    Yes.

10   Q    What is it?

11   A    This looks like our -- when we were beginning to plan what

12   changes we were going to make, this was one of the rounds of

13   suggestions that we were making.

14   Q    So it's an Outlook appointment with some pages attached with

15   the suggestions you were contemplating?

16   A    Right.  It's just a draft.

17              MR. HO:  I'd like to move plaintiff's Exhibit 214 into

18   evidence, Your Honor.

19              MR. CADE:  We object to this, Your Honor.  This is

20   about training, and there is no duty to train.

21              MR. HO:  It's actually about their benefits application

22   forms themselves and what about they did with respect to the

23   contracts.

24              THE COURT:  I'm going to allow it.  Let it be admitted.

25   The objection is noted for the record.

```
 1              (Exhibit admitted.)
 2         MR. HO:  I just wanted to confirm the authenticity of
 3    that and admit it into the record.
 4              I don't have any further questions for you at this
 5    time.  Thank you very much.
 6         THE COURT:  Mr. Cade.
 7              Before I let you come back up, I need a five
 8    minute recess.
 9              (Proceedings in recess.)
10         THE COURT:  Mr. Cade.
11              May I remind you, you are still under oath
12         MR. CADE:  I wondered if we could bring up plaintiff's
13    Exhibit 211 that we were looking at a moment ago.
14         THE COURT:  This is plaintiff's 211.
15    BY MR. CADE:
16    Q   Can you see this okay, Ms. Batts?
17    A   Yes.
18    Q   As I recall, you were about to explain something about this.
19    Tell us what this thing was.
20    A   Thank you.
21              This is from August of 2011.  We didn't actually
22    implement this procedure until October.  We were in what we call
23    a pilot phase in August.  That's when we were testing the waters
24    to see if this process would work.
25              What we found out quickly is that you just can't
```

1    make a call to someone and say:  Well, what do you -- did you

2    know, what other things can I apply for, because we don't see

3    applying to register to vote as applying for benefits.  What

4    they see is applying for benefits or SNAP.  And Medicaid.  So we

5    adjusted our questions.

6                    So this pilot phase wasn't an official document at

7    that time and didn't start in October of 2011.

8    Q    And the exchange you had with Mr. Ho about the training of

9    people at the application centers, isn't it true that the people

10   at the application centers are not Medicaid analysts?

11   A    They are not Medicaid analysts, but they go through an

12   extensive training, too.  They have to be trained in order to be

13   a certified representative.

14   Q    The fact that their training is different from the Medicaid

15   analyst is because they're not Medicaid analysts?

16   A    Right.  Because they're not determining Medicaid

17   eligibility.  Medicaid analysts get training on making that

18   decision.  They have to know how take an application.  They also

19   get a greater training that goes on a lot longer than what an

20   application center -- the application center just takes the

21   application, they help someone complete the form.

22                    MR. CADE:  That's all I have.

23                    THE COURT:  Thank you.  You may step down.  Thank you.

24                    MR. PHILIPS:  Your Honor, I believe we've reached an

25   agreement amongst counsel that, once a witness is finished, they

1    will be able to go back to work.  And, if they need to come

2    back, we'll be able to call them back on fairly short notice.

3              THE COURT:  So you get to go home.

4              MR. PHILIPS:  She gets to go back to work, Your Honor.

5              THE COURT:  Thank you.

6              Please call your next witness.

7              Do we have any short witnesses?  I meant in

8    length.

9              MR. HO:  Yes.

10             THE COURT:  I think it's a good time to call one of

11   those short witnesses.

12             MS. KORGAONKAR:  Your Honor, the plaintiffs call

13   Christopher Chase.

14             THE COURT:  Before Mr. Chase comes to the stand, during

15   the break, I had a very, very small conversation with -- I

16   believe I'm trying to remember -- one member of each parties'

17   team and indicated that I would allow testimony for the

18   procedures that were in place immediately preceding the letter

19   notification as well as the lawsuit.

20             The reason I'm going to allow that is because

21   there has been a request for injunctive relief, and the Court

22   thinks that this is important to understand what remedies have

23   been placed -- voluntarily put in place by the various agencies

24   as well as their attempt to comply before injunctive relief was

25   fashioned.  For that reason, I have indicated that I will

1    continue to overrule those objections regarding policies in

2    place prior to the filing of this lawsuit.

3            I believe some of the parties indicated that they

4    would like a continuing objection so that we can move this

5    matter along.  And, if you want to go head and just put that on

6    the record, let's do that now so that we don't have to stop

7    every couple of questions.

8            MR. PHILIPS:  Be happy to, Your Honor.  I believe the

9    objection was simply the time relevance.  And we've, on behalf

10   of DCFS and DHH, believe that any evidence documentary,

11   testimony-wise or other prior to the filing of the complaint

12   would be irrelevant.  And so we would ask to make a continuing

13   objection to any such relevance.

14           MS. KORGAONKAR:  Your Honor, may I approach the witness

15   with a binder?

16           THE COURT:  Yes.

17           CHRISTOPHER CHASE, being duly sworn, testified as

18   follows:

19           THE COURT:  Mr. Chase, I need you to say your name and

20   spell it for the court reporter, please, before we begin.

21           THE WITNESS:  Chris Chase, C-H-R-I-S C-H-A-S-E.

22           THE COURT:  Please proceed.

23                         DIRECT EXAMINATION

24   BY MS. KORGAONKAR:

25   Q   Good afternoon.  My name is Natasha Korgaonkar, and I

```
 1   represent the plaintiffs in this case.  I think we met in

 2   November of last year at your deposition?

 3   A   I'm sorry.

 4         THE COURT:  I think you had need to speak up, ma'am.

 5   Thank you.

 6   BY MS. KORGAONKAR:

 7   Q   Can you hear me better now?

 8   A   Yes.

 9   Q   Mr. Chase, what's your job title?

10   A   I'm a program manager 1A.

11   Q   And is that at DHH?

12   A   It is at DCFS.

13         THE COURT:  All right.  Mr. Chase, I think you need to

14   move the mike a little closer to you, too.

15         THE WITNESS:  How's that?

16         THE COURT:  Much better.  Thank you.

17   BY MS. KORGAONKAR:

18   Q   And you've held that position for about six years; is that

19   right?

20   A   Actually, May of 2011, I became program manager 1A.

21   Previous to that, I was a program specialist.

22   Q   And you had held that previous position of program

23   specialist for about six years?

24   A   I think total of around five or six years, yes.

25   Q   And what were your duties in your program manager position?
```

1   A    The Eligibility Policy section maintains the Medicaid

2   eligibility manual with -- which is a guide or a manual for our

3   field staff to use in determining eligibility for Medicaid

4   programs.  So I would update that, put new policies in that, do

5   policy clearances, answer questions that came from persons that

6   -- you know, anybody.  I could answer questions about policies

7   and that sort of thing.

8   Q    And are you also a member of the Medicaid NVRA task force?

9   A    Yes.

10  Q    You've scheduled NVRA trainings for DHH employees; is that

11  right?

12  A    I scheduled a training in 2009.

13  Q    And you also scheduled a training in 2011; is that correct?

14          MR. CADE:  I'm going to object, Your Honor.  This is

15  not about the date, the fact that training was not required by

16  the NVRA.

17          THE COURT:  Overruled.  I am going to allow it.

18  BY MS. KORGAONKAR:

19  Q    The question was --

20  A    I don't recall having any part in the 2011 training, as far

21  as scheduling it, to be honest.

22  Q    Do you remember giving a deposition, Mr. Chase, in this

23  case?

24  A    I do.

25  Q    And do you remember being sworn at the beginning of that

1   deposition?

2   A   I do.

3   Q   So I'd like to turn your attention to the last tab in your

4   binder, which is going to be labeled --

5   A   16.

6   Q   Deposition transcripts.

7           MS. CANGELOSI:  Your Honor, I'd like to object for the

8   record.  Depositions were not listed as exhibits on the pretrial

9   -- or a pretrial exhibit or any list.

10          MS. KORGAONKAR:  Your Honor, this is being used for

11   impeachment purposes.

12          MS. CANGELOSI:  109.1, and that's the one we all

13   followed in this case, you're required to list impeachment

14   evidence unless you will feel that there is some reason you

15   can't, and then you're supposed to tell the judge about that in

16   chambers.  If you look at 109.1, it says that.  We listed our

17   impeachment evidence in coordination with that rule, and we're

18   not prepared to address any evidence that hasn't been addressed

19   on the witness list.  The pretrial order required it.

20          THE COURT:  Overruled.

21   BY MS. KORGAONKAR:

22   Q   I'd like to turn your attention, Mr. Chase, to page 18.  If

23   I could direct you to lines starting at 23, question:  When did

24   you do that?

25                  Answer:  I think the first was in 2009.

1          Question:  When was the next one after that?

2          Answer:  I don't know if I scheduled the next one

3    or not, to be honest with you.

4          Question:  Do you recall any trainings after 2009

5    on NVRA?

6          Answer:  I didn't schedule a training but I helped

7    create a link training that we put up on our little training --

8          THE COURT:  Is that impeachment?

9          MS. KORGAONKAR:  I'm sorry, Your Honor.  I just wanted

10   to direct the witness to his training that he helped in 2011,

11   just to refresh his recollection.  That's all.

12         THE COURT:  Have you read it?

13         THE WITNESS:  Yes, I've read it.

14         THE COURT:  Does that refresh your memory?

15         THE WITNESS:  Yes, it does.

16         THE COURT:  Now ask him those questions.

17         MS. KORGAONKAR:  Thank you.

18   BY MS. KORGAONKAR:

19   Q   Mr. Chase, Medicare employees accept applications for

20   Medicare benefits; is that right?

21   A   Yes.

22   Q   But they're not the only people who accept those

23   applications; is that correct?

24   A   Who else would you be referring to?

25   Q   For example, employees at Medicaid application centers, they

1    would also accept Medicaid benefit applications; is that right?

2    A   I don't know that they would accept applications, they would

3    assist a person in applying for Medicaid.

4    Q   And --

5    A   That what you mean by accept?

6    Q   That also, but also they'd assist the applicant.  Would they

7    also take the form from them?

8    A   They'd submit the form, yes, to Medicaid.

9    Q   And workers at the Medicaid application centers do receive

10   training from DHH; is that correct?

11   A   Yes, that's correct.

12   Q   But, after they've begun, they don't receive any periodic

13   trainings from DHH again; is that correct?

14   A   They can be retrained if necessary.  But there's no periodic

15   training, if that's what you're asking.

16   Q   And staff from the Medicaid application centers weren't

17   required to go to either the 2009 or the 2011 trainings that you

18   scheduled; is that correct?

19   A   The quarterly trainings?

20          MR. CADE:  Objection.

21          MS. CANGELOSI:  I'm not trying to be difficult, but we

22   aren't required to train.  This is all irrelevant.

23          THE COURT:  Where are we going with this?

24          MS. KORGAONKAR:  I just want to establish, Your Honor,

25   that those workers at the Medicaid application centers were not

1    trained with respect to the NVRA at any point after their

2    initial trainings.

3              MR. CADE:  That's my point.  You don't violate NVRA by

4    not training those workers.

5              THE COURT:  Come on up here.

6                   (Sidebar conference.)

7              THE COURT:  I know you don't violate if you don't

8    train; but, if they're not doing their job, it's kind of in this

9    circle, they have to know what the job is so they can fill it.

10   But is that all we're going to get from him, that they didn't

11   have training after the initial training?

12             MS. KORGAONKAR:  And there's one document.

13             THE COURT:  Why don't we get to the document because

14   this is -- you know.

15             MS. KORGAONKAR:  I --

16             THE COURT:  I got it, I got it.  Let's move on.  Let's

17   get the document in.

18                   (Sidebar concluded.)

19   BY MS. KORGAONKAR:

20   Q   Mr. Chase, do you know a Ms. Cate McRitchie?

21   A   I've met Cate McRitchie.

22   Q   And who is Cate McRitchie?

23   A   She's at the Secretary of State's Office.

24   Q   And I'd like to direct your attention to plaintiff's trial

25   Exhibit 15, which should be tab 1 in your binder, Mr. Chase.

```
 1              Are you familiar with this email, Mr. Chase?

 2   A   Yes.

 3   Q   And are you a recipient and a sender on this email chain?

 4              MR. CADE:  Objection, Your Honor.

 5              THE COURT:  I'm trying to pull the exhibit up.  What

 6   number is it?

 7              MS. KORGAONKAR:  It's 15.

 8              THE COURT:  Plaintiff's 15?

 9              MS. KORGAONKAR:  That's right.

10              (Pause in proceedings.)

11              THE COURT:  Okay.  What's your objection?

12              MR. CADE:  The same, Your Honor.  This is an email

13   about training of Medicaid employees, and it's in 2009.

14              THE COURT:  Understand.

15              For the reason that I told you earlier, I'm going

16   to overrule the objection.  Objection is noted for the record.

17   BY MS. KORGAONKAR:

18   Q   Do you recall, Mr. Chase, a meeting that took place between

19   yourself and Ms. McRitchie in 2009?

20   A   I have do recall we had a meeting --

21              THE COURT:  You all both have got to start speaking up.

22              THE WITNESS:  I do recall a meeting.

23              Is that better?

24   BY MS. KORGAONKAR:

25   Q   In this email to Ms. McRitchie regarding that meeting, you
```

 1  wrote -- and I'll direct your attention the second paragraph:

 2  We also have some questions about our responsibility under NVRA.

 3  Our processes have changed quite a lot since this act was

 4  implemented.  Our face-to-face contact with the public is

 5  minimal because many of our processes have been automated.

 6              Did I read that correctly?

 7  A   Yes.  I didn't follow you line-for-line, but it sounds

 8  correct.

 9  Q   And, at that meeting that you had with Ms. McRitchie, you

10  raise a question of whether the NVRA was applicable to remote

11  transactions; is that right?

12  A   Explain remote transactions to me.  Do you mean online?

13              THE COURT:  Woe.

14              (Sidebar conference.)

15              THE COURT:  Where are we going with this?

16              MS. KORGAONKAR:  That they understood, too, that there

17  was a problem because they were doing the remote transactions

18  with the numbers.  They asked the Secretary of State what to do

19  with this, and the Secretary of State's Office affirmatively

20  gave them the advice.

21              THE COURT:  Haven't we've got that stipulation that

22  they -- nobody used remotes before because no one believed they

23  were applicable?

24              MS. KORGAONKAR:  It goes a little bit beyond the

25  stipulation because it shows that the Secretary of State's

1   office affirmatively gave the advice to the agencies not to

2   offer voter registration during remotes, whereas the stipulation

3   only says that they did not advise them with regard to remotes.

4   So it goes a little bit beyond.

5         MS. CANGELOSI:  The stipulation says we never did the

6   training.  This is really duplicative.

7         THE COURT:  I will file like it is.  And you still

8   don't think they're supposed to.

9         MS. CANGELOSI:  Right.

10         MS. KORGAONKAR:  It is simply the Secretary of State's

11   Office affirmatively offering the advice.

12         MS. CANGELOSI:  We don't deny it.  It was part of our

13   stipulation.  We never thought that the training applied.

14         THE COURT:  Is the objection does not require?

15         MS. KORGAONKAR:  This is a simply a past advice, Your

16   Honor.

17         THE COURT:  I know.  But I think we've already got

18   that.  I think that's not in dispute.  I think we need to focus

19   on what is in dispute; okay?

20         MS. CANGELOSI:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22            (Sidebar concluded.)

23         THE COURT:  Ms. Korgaonkar, if you need to talk to

24   co-counsel.

25            (Pause in proceedings.)

```
 1              MS. KORGAONKAR:  Mr. Chase, I have no further
 2    questions.  Thank you.
 3              MR. CADE:  I'm sorry, we can't hear.
 4              THE COURT:  She has no further questions.
 5                   Mr. Cade, would you like to take direct at this
 6    time?
 7              MR. CADE:  We don't have any questions for Mr. Chase,
 8    Your Honor.
 9              THE COURT:  You're free to go back to work.  I would
10    tell you to go home, but they told me I can't.  You have to go
11    back to work.
12                   It is 11:56.  I think it's a good time to break
13    for lunch, and we'll come back at 1:30.
14                   But, before we leave, one person is supposed to be
15    designated to meet with Ms. McNamara, and if I could have one
16    from each table, please.  Thank you.
17                   Court's at recess until 1:30, but I want to -- you
18    guys can meet.
19                   (12:00 noon, proceedings recessed for lunch.)
20
21
22
23
24
25
```

```
 1                         AFTERNOON SESSION

 2                            1:37 P.M.

 3          THE COURT:  Plaintiffs call your next witness.

 4          MS. BRANNON:  Your Honor, we call Samuel Guillory to

 5   the stand.

 6              SAMUEL GUILLORY, being first duly sworn, testified

 7   as follows:

 8              THE COURT:  Please sit down and say and spell your name

 9   for the court reporter.

10          MS. BRANNON:  Your Honor, just a procedural thing.  Do

11   we know how to pull this down?

12              CASE MANAGER:  I got it.

13          MS. BRANNON:  And then, Your Honor, may I approach the

14   witness?

15              THE WITNESS:  Samuel Guillory, S-A-M-U-E-L

16   G-U-I-L-L-O-R-Y.

17                       DIRECT EXAMINATION

18   BY MS. BRANNON:

19   Q   Good morning, Mr. Guillory.  You just stated your name for

20   the record.

21              Who is your current employer?

22   A   Department of Children and Family Services.

23   Q   If I refer to the Department of Children and Family Services

24   as DCFS as we go through your questioning today, will you know

25   what I'm referring to?
```

1  A    Yes.

2  Q    And your title at DCFS is deputy assistant secretary in the

3  division of programs; correct?

4  A    Correct.

5  Q    And how long have you worked for DCFS?

6  A    Since 1987.  So 25 years.

7  Q    Twenty-five years.

8            And you have been deputy assistant secretary since

9  2008?

10  A    Yes.

11  Q    What public assistance programs are offered by DCFS?

12  A    SNAP, which is Supplemental Nutrition Assistance Program

13  formally known as food stamps; FITAP and KCSP, which are family

14  independence temporary programs.  FITAP subsistance program is

15  WPSK.  Both of those are funded by TANF, the federal funding

16  source which is temporary assistance for needy families.  Also

17  child care assistance.

18  Q    And do you also have a program that's called LaCAP?

19  A    That's a form of SNAP, right.

20  Q    It's a SNAP.

21            And then do you also have a disaster assistance

22  food stamp program called D-SNAP?

23  A    Right.  D-SNAP and point of disaster occurs in certain

24  disasters.

25  Q    And these are the only public assistance programs that are

1  administered by DCFS; is that correct?

2  A    Those are the ones we consider to be public assistance

3  programming.  We also have other programs like child support,

4  but those are the benefit program.

5  Q    So, if I use the word public assistance programs as we go

6  through today, you'll understand that it refers to the six

7  programs if a we just discussed; correct?

8  A    Sure.

9  Q    Your position allows you to have knowledge of the DCFS

10 program; correct?

11 A    Yes.

12 Q    Isn't it true that your position requires you to have DCFS

13 knowledge as to voter registration?

14 A    Yes.

15 Q    To participate in a DCFS program, a person needs to apply;

16 isn't that true?

17 A    Can you repeat that?

18 Q    To participate in a public assistance program offered by

19 DCFS, a person needs to apply?

20 A    Yes.

21 Q    And then, once an individual has been accepted to

22 participate in one of your public assistance programs, do they

23 need to reapply?

24 A    Yes.

25 Q    And is that done on a periodic basis?

1    A    Yes.

2    Q    And are participants in DCFS programs expected to report a

3    change of address to DCFS?

4    A    Not all programs.

5    Q    Not all programs?

6    A    Well, not in -- there are certain reporting requirements at

7    certain periods of time.  But a change of address is not a

8    required -- it's not required to report that in those integrals.

9    Q    During the integrals, they're not required to report a

10   change of address?

11   A    Correct.

12   Q    Do applicants or recipients sometimes report a change of

13   address to DCFS even if it's not required?

14   A    Yes.

15   Q    I'm going to refer to plaintiff's Exhibit 66-E, which is

16   found in tab 5 of your binder.

17   A    Tab 5?

18   Q    Yeah.  Tab 5 of your binder.

19             And if you can turn to the second page of the

20   document.

21   A    Okay.

22   Q    Isn't this the policy that establishes the voter

23   registration responsibilities for DCFS personnel who interact

24   with applicants or recipients of public assistance programs?

25   A    Yes.  I'm just not -- I'm not sure if this is the most

1    recent version, but it is the policy.

2    Q    What's the date on the document in front of you?

3    A    March 1, 2012.

4         MS. BRANNON:   And, for the record, plaintiff's 66-E has

5    already been admitted.

6    BY MS. BRANNON:

7    Q    Have you seen a more current version since March 1st of

8    2012?

9    A    I do not recall seeing one.

10   Q    You do not recall.

11        So, as far as you know, the March 1st, 2012 is the

12   most current version?

13   A    As far as I know.

14   Q    As far as you know, okay.

15        Are DCFS personnel required to follow this policy?

16   A    Yes.

17   Q    And their supervisors are also required to follow this

18   policy; correct?

19   A    Yes.

20   Q    And I'm going state for the record that we also have in

21   evidence a -- let me rephrase my question.

22        Was there a C210 policy?  What this is, right, is

23   a C220 policy; correct?

24   A    Yes.

25   Q    Was a there a C210 policy that was issued in August of 1998?

```
1    A    Don't know.

2    Q    You don't know, okay.

3              Can you turn to tab 66-A.

4    A    Tab what?

5    Q    Tab 66-A -- I'm sorry, tab 1.  And it's plaintiff's Exhibit

6    66-A.

7              What's the date of that?

8    A    August 3, 1998.

9    Q    Are you aware of whether there was a C210 policy in effect

10   -- I'm going to rephrase the question.

11             Do you know whether this C210 policy was revised

12   as of May 2010?

13   A    Without checking, I could not say that under oath.

14   Q    So can you turn to tab 2 of your binder.

15        THE COURT:  Which is what?

16        MS. BRANNON:  Tab 2 is plaintiff's Exhibit 66-B.

17   BY MS. BRANNON:

18   Q    Can you tell me what that document is?

19   A    Same document, dated May 1, 2010.

20   Q    2010?

21             Are you aware of whether there was any version of

22   this C210 policy between the August 1998 policy we were just

23   looking at and this May 1st, 2010 policy?

24   A    To my knowledge, there was not, but --

25   Q    There was not.
```

1          So then, to your knowledge, the August 1998 policy

2    would have been in effect through May 1st of 2010?

3    A    Correct.

4    Q    So can you turn to tab 39 in your binder.  I'm going to ask

5    you a couple of questions about the CCAP program now.

6          THE COURT:  All right.  What exhibit?

7          MS. BRANNON:  This is tab 39 in his binder, and it's

8    plaintiff's Exhibit 94-G.

9    BY MS. BRANNON:

10   Q    Are you familiar with that document?

11   A    Yes.

12   Q    Can you tell us what it is?

13   A    It's one of the application forms for child care assistance.

14   Q    And what's the date on that document?

15   A    August 2010.

16        MS. BRANNON:  And, this is not in evidence, so I would

17   offer plaintiff's Exhibit 94-G into evidence.

18        THE COURT:  Any objection?

19        MS. ALEXANDER:  No objection, Your Honor.

20        THE COURT:  Let it be admitted.

21            (Exhibit admitted.)

22   BY MS. BRANNON:

23   Q    Can you take a look at that document and can you tell me

24   whether or not that application can be used to apply for the

25   child care assistance -- to participate in the child care

1    assistance program?

2    A    Yes, it can.

3    Q    If someone were to fill out and submit this application, is

4    there a reason for them to submit any other application if they

5    want to be considered for the child care assistance program?

6    A    No.  As long as they only are applying for child care

7    assistance.

8    Q    Right.

9              But, if they're applying just for child care

10   assistance, this application is sufficient?

11   A    Right.

12   Q    Can you just look through that application and tell me

13   whether there's any question about voter registration on that

14   application.

15   A    There's not.

16   Q    Now, I'll turn your attention to tab 40 in your binder,

17   which is plaintiff's Exhibit 94-H.

18              Are you familiar with this document?

19   A    Yes.

20   Q    And can you tell us what it is.

21   A    Same document, different date.

22   Q    What's the date on this document?

23   A    June 2011.

24   Q    June 2011.

25              MS. BRANNON:  This is, for the record, a child care

1    assistance application form dated June 2011.  And I would move

2    to admit this into evidence.

3                    THE COURT:  Any objection?

4                    MS. ALEXANDER:  No objection, Your Honor.

5                    THE COURT:  Let it be admitted.

6                    (Exhibit admitted.)

7    BY MS. BRANNON:

8    Q    Just to clarify, can you tell me how you know the date of

9    this document?

10   A    Because I see it in the upper left corner.

11   Q    All right.

12                    And the upper left corner of this document states

13   REV.06-11.

14   A    Right.

15   Q    Does that mean -- doesn't that mean that this document was

16   revised in June of 2011?

17   A    Yes.

18   Q    And then, underneath it, it says 08-10 Issue Obsolete.

19   Doesn't that mean that the August 2010 versions of this form was

20   made issue obsolete?

21   A    Yes.  At that point.

22   Q    Can you explain to us what issue obsolete means?

23   A    Well, we -- that language comes from years back when we had

24   normal -- I mean, all paper forms and some issued, when we

25   revised a certain document, sometimes we obsoleted and sometimes

1  we kept it if we had a high stock of it or whatever.  And this

2  means that we decided to obsolete the previous issues of this

3  document.

4  Q   And what happens to previous issues when they've been

5  obsoleted?

6  A   They are destroyed.

7  Q   They are no longer in circulation?

8  A   They're no longer in circulation from the state office.  I'm

9  sure there are still some local offices.

10  Q   And do you accept an issue obsolete form if somebody submits

11  it?

12  A   They should not accept it.

13  Q   They should not accept it, okay.

14          Now I'm going to have you turn to tab 55.

15          MS. BRANNON:  Which is, for the record, plaintiff's

16  Exhibit 104-F.

17          And plaintiff's Exhibit 104-F has been admitted

18  into evidence.

19          THE COURT:  It has?

20          MS. BRANNON:  It has.

21          THE COURT:  Thank you.

22  BY MS. BRANNON:

23  Q   This is a --

24          MS. BRANNON:  If you'll just give me a minute, Your

25  Honor.

1  BY MS. BRANNON:

2  Q   If you can turn to the second page.  Sorry for the

3  confusion.

4         Just, if you'll hold on a second, this is not what

5  -- our electronic copy is incorrect.  So I have a hard copy, if

6  you'll just give me a minute.  We'll do a little switch here.

7         MS. BRANNON:  For the record, plaintiff's Exhibit

8  104-E, which has been admitted into evidence, is a CCAP 10 form.

9  BY MS. BRANNON:

10  Q   So you'll have to look up here.  And, if you'll give me a

11  minute, I have actually a copy that I can get for you.  I do not

12  have another copy of -- it's listed on our exhibit list as

13  appropriately described on the hard drive.  There's not a

14  dispute about what the document is.

15  A   It's not tab 54?

16  Q   I apologize for the confusion.

17         If you go back to tab 55, and then if you can

18  scroll through, do you see how they are page numbered at the

19  top?

20         MS. BRANNON:  And this is the copy that everybody has,

21  it's on the electronic copy.

22         THE COURT:  What's the number?

23         MS. BRANNON:  It's tab 55.  It's plaintiff's Exhibit

24  104-E.  No.  I apologize.  It's plaintiff's Exhibit 104-F.

25  BY MS. BRANNON:

1   Q   And then, if you scroll through, you see how the page

2   numbers at the very top, this was filed with the court, and it

3   says, the very first page, says 1 of 18.  And I need you to turn

4   to 12 of 18.  I apologize for the confusion.

5              The page numbers are at the very top.  Did you

6   find it?

7   A   Um-hum.

8   Q   So this has been admitted into evidence.  But, just to make

9   sure the record is clear, isn't it true that this is a CCAP 10

10  form dated March of 2012?

11  A   Yes.

12  Q   And this form is used for what purpose?

13  A   For child care assistance recipients to report changes.

14  Q   And is change of address one of the changes that you would

15  use this form for?

16  A   Yes, it is one of them.

17  Q   Can you scroll through this form and tell me whether or not

18  there is a voter preference question or a question about voter

19  registration on this form.

20  A   Yes, there is.

21  Q   Now, if you can turn back to tab 54, which for the record is

22  plaintiff's Exhibit 104-E, and that has also been admitted into

23  the record.

24              And can you tell me what that document is.

25  A   Can you repeat that?

1    Q    Can you tell me what that document is.

2    A    The CCAP 10, which is same thing but a different date.

3    Q    And that one is dated February of 2010; correct?

4    A    Correct.

5    Q    Can you go through that document and tell me whether there's

6    any voter preference question?

7    A    I can.

8                       And there is not.

9    Q    There is not, okay.

10                      Are you aware of any version of the CCAP 10 form

11   that was issued between February 2010 and March of 2012?

12   A    I'm not.

13   Q    You are not aware of one.  Okay.

14                      So isn't it fair to say that, before March of

15   2012, the CCAP 10 form did not have any question about voter

16   registration?

17   A    I don't know.  I mean, I'd have to research to see if we had

18   other forms.  But, if we did not, then it is correct.

19   Q    But are you aware of any form --

20   A    I'm not aware of.

21   Q    You're not aware of any form that was issued between

22   February of 2010 and March of 2010?

23   A    Correct.

24   Q    And you have testified for the record that the February 2010

25   form did not have any voter preference questioning; correct?

```
 1    A    Correct.

 2    Q    But the March 2012 form does have a voter preference

 3    question.

 4    A    Correct.

 5    Q    So, if you could go to tab 50.

 6              THE COURT:  Which is what?

 7              MS. BRANNON:  I'm sorry, Your Honor.  Plaintiff's

 8    Exhibit 104-A.

 9    BY MS. BRANNON:

10    Q    Are you familiar with this document?

11    A    Looks like the same form.

12    Q    And so this a cap, a CCAP 10 form?

13              MS. ALEXANDER:  Your Honor, we're going to object to

14    this exhibit.  This is a 2005.  And, previously, in speaking

15    with Your Honor, it's a general standing objection with regard

16    to any previous forms that were not the predecessor or before

17    the filing of the suit.

18              MS. BRANNON:  Your Honor, if I may approach?  Or I can

19    make an argument?

20              THE COURT:  Okay.  Come on up.

21                   (Sidebar conference.)

22              MS. BRANNON:  So, as to this particular form, there is

23    some dispute.  It's not a conceded fact when this document was

24    produced, and we're not conducting discovery.  And the witness

25    has said he doesn't know.  I have three of them.  I would just
```

 1    authenticate them quickly in the record to make it clear that

 2    there are no other versions of this form in evidence.

 3            MS. ALEXANDER:  Why don't you offer it into evidence?

 4    Why do we need to go back a couple of years?

 5            MS. BRANNON:  Because there is a dispute as to what

 6    versions of this form exist.

 7            MS. ALEXANDER:  We're pursuing that our version does

 8    not have the language.

 9            MS. BRANNON:  It's actually a contested fact.  It is a

10    contested fact.

11            THE COURT:  That before 2011 --

12            MS. BRANNON:  Yes.  They have contested that before

13    March of 2012 CCAP 10 form did not have a voter preference

14    question.  So, if she's willing to stipulate that there are no

15    earlier versions of this form and that none of the other

16    versions of this form -- what my line of questioning was to ask

17    him about all the version I have, and then we can put on the

18    record to see whether there are anymore.  If she's willing to

19    stipulate.

20            MS. ALEXANDER:  CCAP 10 is one that did not undergo any

21    revisions prior to the suit.  So it is clear that the CCAP form

22    did not have the voter registration.

23            THE COURT:  Maybe we can just put a stipulation in the

24    record, and then we're done.

25                Move on.  Thank you very much.

1          (Sidebar concluded.)

2          MS. ALEXANDER:  With regard to the CCAP 10, 2010, C

3   attachment 10, to have no longer prior to the filing of the

4   suit, so there's no need for any additional forms of this to go

5   into the record.

6          THE COURT:  Is there a problem with that?

7          MS. BRANNON:  She wasn't clear.  Specifically, she's

8   saying no prior version?

9          MS. ALEXANDER:  Correct.  Earlier versions prior to the

10  2010 had the language.

11         MS. BRANNON:  And, for the record, the 2010 version did

12  not have.

13         THE COURT:  I think the stipulation is no version of

14  this particular form prior to March 2012 contained any voter

15  registration language.  Got it.

16  BY MS. BRANNON:

17  Q   Mr. Guillory, if you could turn to tab 30, which is

18  plaintiff's Exhibit 91-C?

19         MS. BRANNON:  And that has been admitted into the

20  record.

21  BY MS. BRANNON:

22  Q   Have you had a chance to take a look at it?

23  A   Yes.

24  Q   So plaintiff's -- this document is an application for the

25  LaCAP program that's dated January 2010; correct?

1   A    Correct.

2   Q    And this is an enrollment form; correct?

3   A    Correct.

4   Q    And an individual used this form to apply to participate in

5   the LaCAP program?

6   A    Right.

7   Q    Can a person apply to participate in the LaCAP program

8   solely using this LaCAP 1A, which is what this form is labeled

9   as?

10   A    Yes.

11   Q    Can you quickly review this and tell me if there's any voter

12   registration information on this form.

13   A    I can.

14              And there is not.

15   Q    There is not.

16              Then I can have turn in your binder to tab 31.

17   Which is plaintiff's Exhibit 91-D.

18       MS. BRANNON:  And this also has been admitted into the

19   record.

20   BY MS. BRANNON:

21   Q    This is a version of the LaCAP 1A enrollment form that's

22   dated May of 2011; correct?

23   A    Correct.

24   Q    Can you go through this and tell me if there is a voter

25   registration question in this form.

```
1    A    There is.
2    Q    Are you aware of whether there were any voter -- this is
3    plaintiff's Exhibit 91-D.  Are you aware of whether or not there
4    were any versions of the LaCAP enrollment form that predated
5    January 2010 that had any voter preference question in them?
6    A    I'm not aware of them.
7    Q    You're not aware of any, okay.
8              Your job duties ensure making sure that DCFS
9    personnel are trained about DCFS voter registration policies;
10   correct?
11   A    Can you repeat that?
12   Q    Sure.
13             Your job duties include making sure that DCFS
14   personnel are trained on their voter registration duties;
15   correct?
16   A    Yes.
17   Q    Can I have you turn to plaintiff's Exhibit 78, which is in
18   your binder.
19             MS. BRANNON:  I'm sorry, you know what?  This one is
20   not in his binder.  I apologize.
21             Your Honor, may I approach the witness?
22             THE COURT:  Yes.
23             MS. BRANNON:  Your Honor, you should have a copy of the
24   plaintiff's Exhibit 78.
25   BY MS. BRANNON:
```

1   Q   Are you familiar with this document?

2   A   Yes.

3           MS. BRANNON:  This document, also my understanding, has

4   been admitted.

5   BY MS. BRANNON:

6   Q   Can you tell me what that document is?

7   A   It's an executive bulletin regarding voter registration

8   training.

9   Q   And when was this document issued?

10  A   March 24, 2011.

11  Q   March 24, 2011?

12          And can you see, in the middle of, at the start of

13  the second paragraph, this document states:  In an effort for

14  the agency to fulfill its voter registration obligations the

15  DCFS training and development unit ES will post the annual voter

16  registration on the webex training on the DCFS intranet by March

17  25, 2011.

18          Correct?

19  A   Correct.

20  Q   Was there any voter registration training on the webex

21  intranet before March 25, 2011?

22  A   On the webex intranet, no.

23  Q   There was not.

24          Just for our clarification, can you explain what

25  is a webex training.

1   A    It's just an interactive form of providing a training

2   without having staff to travel.  Kind of like a video

3   conference.  Except it's not live.

4   Q    It's not live.

5             If we talk about the DCFS intranet, what is that?

6   A    It's our internal Internet, pretty much.

7   Q    And how does a webex training work from the perspective of a

8   personnel -- one of your staff who is going to participate in

9   it, what steps do they take?

10  A    It depends.  But they could get together in the local

11  office, say, and view the webex presentation on a screen, or

12  they can view it individually on their computer.

13  Q    Is there some kind of certification process involved in this

14  webex training to ensure that they actually do it?

15  A    There is a -- our training section tracks that.  I don't

16  know, I think they use moodle to do that.  But I don't know if

17  you can see on the webex and it automatically --

18          THE COURT:  They use what?

19          THE WITNESS:  It's called the called moodle.  I'm not a

20  techie, but it's --

21          THE COURT:  It's some kind of --

22          THE WITNESS:  Some kind of software that tracks the

23  types of training, like a sign-in sheet for types of trainings

24  that staff participate in.

25  BY MS. BRANNON:

1    Q    And this system oodle --

2    A    Moodle.

3    Q    Moodle.  It allows the supervisors to confirm who has viewed

4    a certain webex training; correct?

5    A    Right.

6    Q    Do you know if a voter registration webex training was

7    placed on the DCFS intranet as of March 25, 2011?

8    A    I do not know the date that it was placed on it.

9    Q    You don't know the date that it was placed on it.

10          Can I have you turn to tab 78 in your binder,

11   which is plaintiff's Exhibit 110.  Just let me know when

12   everybody's there.

13   A    I'm there.

14          MS. BRANNON:  And, for the record, this has also been

15   already admitted into evidence.

16   BY MS. BRANNON:

17   Q    Is this the DCFS intranet training on voter registration

18   duties?

19   A    Yes.

20   Q    Can I have you -- do you see how it has page numbers at the

21   very bottom with all those Bates labels?

22   A    Yes.

23   Q    Can I have you turn to in that document, it's Bates labeled

24   DCFS 0119.

25   A    0119?

1   Q   Yes.

2   A   Yes.

3   Q   That's part of this intranet webex voter registration

4   training; correct?

5   A   Yes.

6   Q   And do you see how that says -- it's dated May 2011 in the

7   right-hand corner?

8   A   Left corner?

9   Q   1119.  I may have misspoken.

10              So, in this corner down here, it says May 2011;

11  correct?

12  A   Yes.

13  Q   Does that refresh your recollection about when this webex

14  training might have actually been available to DCFS personnel?

15  A   I know it's around that time.

16  Q   It was around that time?

17  A   Right.

18  Q   And was there any training similar to this training that's

19  plaintiff's Exhibit 110 that existed before March of 2011?

20  A   Not to my knowledge.

21  Q   Not to your knowledge, okay.

22              Is this training now offered to DCFS personnel on

23  an annual basis?

24  A   It's available I think on the intranet to be taken at at any

25  time.

1    Q    To be taken at any time.

2                     What's your policy about when DCFS personnel have

3    to take this training?

4    A    I think as -- well, they do get some training when they're

5    hired.  When a new person is hired.  And voter registration

6    responsibilities are covered there.

7                     The ongoing staff should complete its training

8    annually.

9    Q    Annually.

10                    And, just to make sure we clarify for the record,

11   that's because the executive bulletin that we were looking at a

12   few minutes ago states that there should be an annual training;

13   correct?

14   A    Correct.

15   Q    So that's DCFS's current policy as of the date of that

16   executive bulletin, which is March 24, 2011?

17   A    Correct.

18   Q    Do new hires, are they required to participate and take this

19   webex training right now?

20   A    I can't answer that, I'm not sure.

21   Q    You're not sure?

22   A    If they're required to.

23                    I know they are required to do orientation for the

24   programs that they are working in, and that includes voter

25   registration training.  But I don't know that they complete this

1    EAC webex training each time a new hire comes on board.

2    Q    Okay.  So you're not familiar as to whether or not they

3    complete a webex training.  Okay.

4              So, when you talk about an orientation training

5    that new hires are supposed to complete, what is that

6    orientation training?

7    A    As someone's hired, usually they don't have experience in

8    any of our programs, and they go to a -- I think it's a one-week

9    or four-day training where they learn all of the different parts

10   of the particular program for that orientation.  Could be SNAP,

11   could be FITAP, could be child care.

12   Q    Okay.  So you have a SNAP orientation training manual; is

13   that correct?

14   A    Yes.

15   Q    And does the SNAP orientation training manual address voter

16   registration?

17   A    I can't say yes.  I'd have to look at it.

18   Q    You'd have to look at it.

19              You're not aware?

20   A    I think it does, but I'd have to look at.

21   Q    So you'd have to look at it.

22              So you're not aware whether the SNAP training

23   manual addresses voter registration training.

24   A    Not without looking at it.

25   Q    And you're not aware whether the SNAP orientation manual

```
 1   contains -- let me go back.  Let's go back to the webex training

 2   that you're looking at.

 3                  Actually, you know what, I'm going to talk about a

 4   new document.  Can you turn to tab 79 in your binder.  And this

 5   is plaintiff's Exhibit 112-A.

 6   A    Okay.

 7   Q    So this is a voter registration training that was created by

 8   DCFS as of March 2011; correct?

 9   A    Yes.

10   Q    And you're not aware that any version of this training

11   existed before March 2011; correct?

12   A    I'm not aware.

13   Q    You're not aware of it, okay.

14            MS. BRANNON:  Plaintiff's Exhibit 112-A has not been

15   admitted into evidence.  I would move to admit it into evidence

16   now.

17            THE COURT:  Any objection?

18            MS. ALEXANDER:  112-A?

19            MS. BRANNON:  Yeah, it's 112-A.

20            MS. ALEXANDER:  Your Honor, we're going to object to

21   this exhibit.  This is appears to be a partial production of

22   some documents.  This is something in total where there's

23   additional information, and we would be willing to review it in

24   its complete form.  But it appears to be just a portion of some

25   training that was provided.
```

 1          MS. BRANNON:  And I guess I'll state for Your Honor

 2    that this is the complete document that was produced to us and

 3    discovered.

 4          MS. ALEXANDER:  I believe that what defendants produced

 5    is our training provided with regards to voter registration.  So

 6    it was produced along with additional materials and additional

 7    courses.

 8          THE COURT:  Wait.  Are you saying that there are pages

 9    missing from this particular document?

10          MS. ALEXANDER:  This is not a complete document.

11          MS. BRANNON:  And I am stating for the record that, if

12    there are pages missing from this document, plaintiffs do not

13    have them.

14          THE COURT:  Ms. Alexander, was this part of another

15    larger document?  Is what you're telling me?

16          MS. ALEXANDER:  This was provided along with a packet

17    for training.  So, right now, it's produced just five pages, and

18    this was provided along with additional MDR training.

19          THE COURT:  Let me get you all up here.

20              (Sidebar conference.)

21          THE COURT:  This is the complete portion of this

22    particular document, but this is part of something larger?

23          MS. ALEXANDER:  It all came from a packet of training.

24          MS. BRANNON:  We have a training manual, I believe,

25    which is what's been marked as Exhibit 110 and admitted, but has

 1   a different date for this document.  And, for this document, all

 2   we have are those pages.

 3              MS. ALEXANDER:  This is what was scanned?

 4              THE COURT:  This is what I think you need to do.  We're

 5   going to take a little break, you find out if there's anything

 6   missing on this document.  I'm not going to rule on.

 7              MS. ALEXANDER:  Let's take care of it, because this is

 8   110.

 9              THE COURT:  Why don't you just go check, and we'll give

10   you a minute.  And we'll just take a little unofficial break.

11                   (Pause in Proceedings.)

12                   (Sidebar concluded.)

13   BY MS. BRANNON:

14   Q   Just for the record, Mr. Guillory, turning back to

15   plaintiff's Exhibit 112-A, the date of that document is March

16   2011; correct?

17   A   Correct.

18              MS. BRANNON:  And we do move to admit that document

19   into evidence.

20              THE COURT:  Any objection?

21              MS. ALEXANDER:  No objection.

22              THE COURT:  Let it be admitted.

23                   (Exhibit admitted.)

24   BY MS. BRANNON:

25   Q   If you can follow me, also using the Bates numbers that we

1    were using before, and turn to DCFS NVRA it says 00157.

2                     Can you look at the top of that document.  It

3    says:  Inform the applicant that the voter registration

4    application LR1M may be returned to the DCFS office and we will

5    send the form in for them or may be returned directly to their

6    parish registrar or voters using the address on the reverse side

7    of the application.

8                     That's what the document says; correct?

9    A    Yes.

10   Q    Do you know if that same piece of advice is in the SNAP

11   orientation manual?

12   A    I do not know.

13   Q    You do not know, okay.

14                     Then can you go down to the next bullet point.

15   And the next bullet point says:  If the applicant returns the

16   form LR1M to the parish office, the staff must review the voter

17   registration application for legibility and completeness, verify

18   that the applicant signed the voter registration application in

19   the appropriate box, detach the top portion of the voter

20   registration application and return it to the applicant.

21                     Is that correct?

22   A    Correct.

23   Q    Do you know if the SNAP orientation manual provides any of

24   that information?

25   A    I know it's in the policy.  I do not know if it's in the

1    orientation manual.

2    Q    You don't know.

3    A    So I'd have to look at it.

4    Q    If you move down to the fourth bullet point, fifth bullet

5    point, it says:  Provide assistance to applicants/recipients in

6    completing the voter registration application LR1M if requested.

7              Correct, that's what the document says?

8    A    Yes.

9    Q    And, just so we're all clear, when we talk about the LR1M,

10   that's just the name of the Louisiana voter registration

11   application; correct?

12   A    Right.

13   Q    And do you know if that information and that guidance is

14   found in the SNAP orientation manual?

15   A    Not without looking at it.

16   Q    Not without looking at it.

17             If you could please turn to tab 76.  That's

18   plaintiff's Exhibit 108-R.

19             Let me know when you've gotten there.

20        MS. ALEXANDER:  Judge, while they're looking at it,

21   DCFS is going to object to the November 2010 SNAP orientation

22   manual that's being used right now.  There's also a version that

23   was admitted into the record that we did accept.  This is an

24   earlier version that was not in circulation being used by the

25   department at the time the suit was filed.

1           THE COURT:  Why are we going back even further?

2           MS. BRANNON:  We can talk about 108-S -- because --

3      well, Your Honor, if we can approach.

4           THE COURT:  Please.

5                (Sidebar conference.)

6           MS. BRANNON:  So I anticipate asking him about both

7      this version and the version after.  This is the one that was

8      the preceding version of the SNAP orientation.  And there are

9      multiple versions, I'm not going to go through all of them.  But

10     this is one that was in effect before the lawsuit was filed, and

11     the one that's been admitted into evidence was in fact after the

12     lawsuit was filed.

13          MS. ALEXANDER:  There was a February 2011 version.

14     This would be two months.

15          MS. BRANNON:  I believe that the copy that I have has

16     draft stamped on it.  If there's no objection and defense

17     counsel is willing to concede that that version --

18          MS. ALEXANDER:  There was no objection.  There was very

19     little difference between this one page in each one of these

20     manuals.

21          THE COURT:  So we can move on.  Thank you.

22                (Sidebar concluded.)

23     BY MS. BRANNON:

24     Q   So, instead, can we turn to tab 77, which is plaintiff's

25     Exhibit 108-S.  This is the table of contents -- when you get a

1    chance.

2    A    I'm there.

3         MS. BRANNON:  And, for the record, this document has

4    been admitted into evidence.

5    BY MS. BRANNON:

6    Q    This is the SNAP -- an excerpt from the SNAP orientation

7    manual dated February 2011; correct?

8    A    Correct.

9    Q    Can you go through the table of contents and tell me where

10   it mentions the term voter registration?

11   A    Page 94 of the document.

12   Q    Ninety-four of the document.

13        Does it mention voter registration any other

14   place?

15   A    I do not see it.

16   Q    If you'd turn several pages to past the table of contents, I

17   believe the page is DCFS 06161.  And it's page 5 of the SNAP

18   orientation manual.

19   A    Page 6?

20   Q    Huh?

21   A    Page 6?

22   Q    I'm sorry.  I'm sorry, it is page 6, you're correct.

23        Are you familiar with this page of the orientation

24   manual?

25   A    I mean, it's a 200-page document.

1   Q   But you do have occasion to review the SNAP orientation

2   manual in the course of being responsible for training of DCFS

3   personnel; don't you?

4   A   Yes.

5   Q   Can you tell me what this document, this page of the manual,

6   relates to.

7   A   It provides direction about interviewing applicants and

8   recipients.

9   Q   And, if you scroll down through this whole page, if you look

10   in the middle of the page on a bullet point, there's a statement

11   that says:  Inform clients about the availability of voter

12   registration services.

13                    Correct?

14   A   Correct.

15   Q   Is there anything else on this page about voter

16   registration?

17   A   Doesn't look like on this page.

18   Q   Doesn't look like, okay.

19                    Can you turn to the next page in your exhibit,

20   which I believe is labeled DCFS 06249.

21   A   Okay.

22   Q   So that is page 94; correct?

23   A   Yes.

24   Q   And you already testified, according to the index, page 94

25   is the only page in the SNAP orientation manual that addresses

1   voter registration; correct?

2   A   That's what the table of contents looks like.  It's a

3   200-page document.  Don't have it memorized.

4   Q   Are you aware of any other portion of the SNAP orientation

5   manual that talks about voter registration besides this page and

6   the interview page that we were just talking about?

7   A   I'm not.

8   Q   You're not, okay.

9               Can you read through this page and tell me if at

10  any point it provides guidance about where a client, an

11  applicant or recipient can return their voter registration

12  application.

13               (Pause in proceedings.)

14  BY MS. BRANNON:

15  A   It says the completed form must be mailed to the register of

16  voters.

17  Q   Is that an instruction for the client and the applicant?

18  A   No.  That's for us.

19  Q   So this document does not provide the instruction that the

20  other training manual we were looking at provides about the fact

21  that clients can either return -- should be told, or informed, I

22  believe is the word it uses, that their voter registration

23  application either can be return to DCFS and DCFS will make sure

24  it gets to the registrar or that their voter registration

25  application can be mailed to the Registrar of Voters?

1   A    That's what it appears to be.

2   Q    Right.  It doesn't say that here?

3   A    Right.

4   Q    Okay.  And then, anywhere on this training page, does it

5   provide any guidance about the fact that staff must review voter

6   registration applications for legibility and completeness?

7   A    It does not.

8   Q    And, anywhere on here, does it provide guidance that staff

9   must sign the voter registration application, must confirm that

10  the voter registration is signed in the appropriate box?

11  A    No.

12  Q    And anywhere on here does it provide guidance to staff that

13  they have to provide assistance to recipient and applicants in

14  completing the voter registration application if requested?

15  A    No.

16  Q    So this SNAP orientation manual, at least based on this

17  page, did not provide the same detailed guidance as your voter

18  registration training NVRA webex training did?

19  A    Not in writing, correct.

20  Q    Not in writing.

21                Does DCFS track the number of SNAP applications it

22  receives each month?

23  A    Yes.

24  Q    And does DCFS track the number of SNAP redeterminations it

25  receives each month?

1   A    I know we can get that.  I'm not sure if it's tracked as an

2   ongoing report.

3   Q    How would you say you can get that information?  What do you

4   do?

5   A    We can run different reports on our eligibility systems to

6   get data.  We have some reports that are automatically run each

7   month.  I know number of applications is.  I'm not sure about

8   number of redeterminations.

9   Q    But your testimony is that your eligibility system could

10  generate a report about the number of redeterminations received

11  each month?

12  A    Yes.

13  Q    Does DCFS track the number of FITAP and Kindercare

14  applications received each month?

15  A    Kinship care.

16  Q    Kinship care, I apologize.

17  A    Yes.

18  Q    It does.

19          And does it track the number of FITAP and Kinship

20  redeterminations received each month?

21  A    Same as SNAP, we could get it.

22  Q    You could get that information, okay.

23          Do you know what the CAFE system is?

24  A    Do I know?

25  Q    Do you know what the CAFE system is?

1   A   Yes.

2   Q   What is it?

3   A   It's a common access front-end system that is web-based,

4   front-end to our eligibility systems.

5   Q   And is the CAFE system currently available for use by

6   clients in Louisiana?

7   A   Yes.

8   Q   And when did it become available?

9   A   Within the last year.

10  Q   Within the last year?

11  A   I don't know exactly when.

12  Q   You don't know exactly when?

13  A   No.

14  Q   Do you know if having the CAFE system available to clients

15  has increased the number of SNAP allocations per month that you

16  receive?

17  A   I know that --

18          THE COURT:  I'm sorry.  What is the CAFE system?

19          THE WITNESS:  CAFE, it's a way that clients can apply

20  online.

21          THE COURT:  Okay.

22          THE WITNESS:  It also has a worker side of it that the

23  workers can use to process the application before the

24  information goes to what we call our legacy system, which are

25  the old green screen eligibility systems.

1          THE COURT:  I want to make sure I understand.

2               So someone could apply from their home computer,

3     and then it goes to an analyst?

4          THE WITNESS:  Right.

5          THE COURT:  Or someone who makes a determination, and

6     then it's forwarded?

7          THE WITNESS:  Right.  They use that information to

8     interview the client.  And they have the information updated

9     that the client entered themselves.  And then, as they interview

10    the client, they enter and update the information.  And then,

11    once they finish that, it moves to the actual eligibility system

12    that gives the benefits and authorizes the benefits.

13         THE COURT:  Okay.  So I just want to make sure I

14    understand.

15              I can go to my public library and apply, but then

16    I have to go in person to the interview?

17         THE WITNESS:  No.  You can do that by phone.

18         THE COURT:  All right.  So, over the phone, they're

19    reviewing, and they're able to basically communicate with the

20    information on the computer and they're talking on the phone,

21    verifying all of this information and completing the process?

22         THE WITNESS:  Correct.

23         THE COURT:  Okay, thank you.

24    BY MS. BRANNON:

25    Q    But, to be clear, the CAFE system -- that's on the

1    front-end.  It can also be used on the back-end by the

2    caseworker?

3    A    Right.  There's a customer portal and a case worker portal.

4    Q    So the customer submits the information, and then the

5    caseworker gets the information?

6    A    Right.

7    Q    And that's what they use to process the application?

8    A    Correct.

9    Q    Can you turn now to your binder, tab 23, which is

10   plaintiff's Exhibit 86-A.

11             Isn't this an online application for assistance

12   that's dated May 27, 2010?

13        MS. ALEXANDER:  Judge, DCFS is going to object to that.

14   It's an earlier version of a public application.  There were

15   other versions in place prior to the filing of the suit.

16        MS. BRANNON:  So my understanding is, this is the

17   online application that was in place until it was replaced by

18   CAFE, and this witness is not going to be to tell us when this

19   was replaced by CAFE.  So, I believe this document is in use

20   before the suit was filed, so it's relevant to what changes

21   occurred over time.

22        THE COURT:  So no changes occurred on this form until

23   after the suit was filed?

24        MS. BRANNON:  Your Honor, as far as I know, I don't

25   know if any changes were ever -- changes were made to this form.

1   This has been replaced by CAFE.  But it was in existence when

2   the suit was filed.

3            MS. ALEXANDER:  There is a completely different system.

4   This was an application that was fillable.  They are two

5   separate programs.

6            THE COURT:  Was CAFE out in place?

7            MS. ALEXANDER:  CAFE was out in February 2012.  So, no,

8   it wasn't.

9            THE COURT:  It would seem to me that CAFE would be

10  relevant, but what is this going to show me?

11           MS. BRANNON:  I don't intend to ask the question.

12  These documents are not admitted.

13           THE COURT:  Right.

14           MS. BRANNON:  I want to admit them into evidence.

15           THE COURT:  But there's a reason.

16           MS. BRANNON:  Your Honor, this application was in

17  effect at the time the suit was filed, and then it was in effect

18  until February of 2012.  So while this litigation was pending.

19  So this is the predecessor application to CAFE, which I think is

20  relevant both to understanding what they were doing at the time

21  the suit was filed, what they were doing a period of time after

22  the suit was filed and then to understanding to what changes

23  they've made in light of the fact that CAFE is now what they're

24  using.

25           MS. ALEXANDER:  We withdraw that.

```
 1              THE COURT:  Let it be admitted.
 2                    (Exhibit admitted.)
 3  BY MS. BRANNON:
 4  Q   So, and then, Mr. Guillory, if you can just move to tab 24
 5  -- I take that back.  Start again.
 6              I just want to ask one more question.  This is a
 7  child care assistance program application.  Child care
 8  assistance has been blacked in on this document; correct?  Can
 9  you see where that is on this first page?
10  A   Yes.
11  Q   So this has been admitted.
12              If you can move to 86-B, which is tab 24 in your
13  binder.
14  A   Okay.
15  Q   So this is the exact same form; correct?
16  A   Yes.
17  Q   Except, in this form, the FITAP has been blacked in;
18  correct?
19  A   Correct.
20  Q   So this is a FITAP application?
21  A   Correct.
22         MS. BRANNON:  Plaintiffs would move to admit
23  plaintiff's Exhibit 86-B into evidence.
24         THE COURT:  Any objection?
25         MS. ALEXANDER:  Same objection, Your Honor.
```

1                THE COURT:  Wait.

2                MS. ALEXANDER:  I withdraw it.

3                MR. PHILIPS:  I think she meant no objection.

4                THE COURT:  Let it be admitted.

5                     (Exhibit admitted.)

6    BY MS. BRANNON:

7    Q   If you can go to plaintiff's Exhibit 86-C, which is tab 25

8    -- there are only four.

9                     And then this again is the same exact form also

10   dated May 27, 2012, except the Kinship Care subsidy program is

11   filled in.

12   A   Correct.

13   Q   So this is an online application for the Kinship Care

14   subsidy program; correct?

15   A   Correct.

16                MS. BRANNON:  I would move to admit Exhibit 86-C.

17                MR. PHILIPS:  No objection, Your Honor.

18                MS. BRANNON:  This is the last one.  For the record,

19   this is plaintiff's Exhibit 86-D.

20   BY MS. BRANNON:

21   Q   And this, Mr. Guillory, again, is the same application dated

22   May 27, 2010, but this one has the SNAP bullet point filled in;

23   correct?

24   A   Correct.

25   Q   So this is an online application for SNAP?

```
 1    A    Correct.
 2              MS. BRANNON:  I would move to admit plaintiff's Exhibit
 3    86-D.
 4              MR. PHILIPS:  No objection, Your Honor.
 5              THE COURT:  That will be admitted.
 6                   (Exhibit admitted.)
 7    BY MS. BRANNON:
 8    Q    Mr. Guillory, do you know if the application for disaster
 9    SNAP, Supplemental Nutrition Assistance Program, D-SNAP, has a
10    voter preference question on it?
11    A    It has one on it?
12    Q    Do you know.
13    A    I know that we have a form for voter registration
14    declaration.
15    Q    And is that form a part of the disaster -- the D-SNAP
16    application?
17    A    It's given with the D-SNAP application.
18    Q    It's a separate form?
19    A    At the time of the application.  It's a separate page.
20              The D-SNAP application I think is one page, front
21    and back maybe.  And it's a third page.  It's a separate
22    different page.
23    Q    The actual D-SNAP application itself does not have any
24    question about voter registration?
25    A    Correct.
```

1   Q   And that's true today?

2   A   Correct.

3   Q   And that was true at the time that the lawsuit was filed in

4   April of 2011; correct?

5   A   Correct.

6   Q   Correct.  Okay.

7              So we were discussing before a little bit about

8   training, and we talked about the SNAP orientation manual, and

9   then the voter registration training that was created in March

10  of 2011; correct?

11  A   Yes.

12  Q   Are there other training manuals at DCFS?

13             Is there a FITAP training manual?

14  A   Yes.

15  Q   Is there also a document that's called SNAP Interview

16  Procedures?

17  A   I'm sure there is.

18  Q   I'm sure there is.

19             Are you familiar with it?

20  A   I mean -- I'm sure -- we have 100 manuals.  So, you know, I

21  can't recite them all.

22  Q   Do you know which manuals at DCFS specifically address voter

23  registration duties of DCFS personnel?

24  A   It should be in each orientation manual.

25  Q   So it's in each orientation manual.

1              And, then, where else is the information about

2    training located?  Where else is training related to voter

3    registration located in --

4    A    Training?

5    Q    Yeah.  You have said there were 80 training manuals.

6    A    No.  I said there were 80 manuals.

7    Q    80 manuals?

8    A    I didn't say 80.  I said I'm sure there are 100.  There are

9    very many programs besides the public assistance programs that

10   are within DCFS, and I can't recite them all.

11   Q    So let me rephrase my question, because I'm only interested

12   in public assistance programs.

13   A    Okay.

14   Q    So the training materials that you make available and that

15   you require your staff who are involved in administering public

16   assistance programs, which one of those discuss voter

17   registration?

18   A    Without looking at them all, I can't for sure tell you.  I

19   do know it should be in the orientation manuals.  It's on the

20   one that we looked at.

21   Q    Did the one -- it was a created in March of 2011?

22   A    Right.  I don't know that it's in any others.

23   Q    You don't know that there's any other training --

24   A    That addresses NVRA, no.

25   Q    Do you know if there's a document that's called the SNAP

```
1    Interview Procedures?

2    A    Sounds like there is.

3    Q    It sounds like there is, okay.

4              So maybe if you can turn to, in your binder,

5    plaintiff's Exhibit 69-J, which I believe has been admitted.

6              Now that you've seen this document, does that

7    refresh your recollection about it?

8    A    This is our normal policy manual.

9    Q    It's your own policy manual.

10             So what does that mean?

11   A    That means Chapter 4 is our policy manual that includes

12   information on all of the different eligibility factors

13   regarding SNAP, FITAP, KCSP.

14   Q    And would this policy manual be available to DCFS staff who

15   are administering --

16   A    Yes.

17   Q    -- SNAP programs?

18   A    Yes.

19   Q    Is this a document that DCFS staff would refer to if they

20   had a question about how to conduct a SNAP interview?

21   A    Yes.

22   Q    Can you look through this document and tell me what it says

23   about voter registration.

24   A    Second page.  You want me to read it?

25   Q    Yes.
```

1    A    Inform clients of the availability of voter registration

2    services and ensure that all clients are asked if they wish to

3    register to vote and document their statement.  If the client

4    requests assistance in completing the voter registration

5    application, the worker shall provide the requested assistance.

6    Refer to Chapter 7C2 for more information on voter registration.

7    Q    That does not provide any additional information about voter

8    registration; does it?

9    A    No.  It just references the part that has more information.

10   Q    Okay.  And that, when it talks about Chapter C-200, would

11   that include the C210 policy that we discussed earlier today?

12   A    Yes.

13   Q    Does this interview procedure provide any guidance to DCFS

14   personnel about what they're supposed to do if they receive a

15   voter registration application from a client that's not

16   complete?

17   A    No.  Not at this part.

18   Q    Not at this part.

19              Are you aware of any of DCFS training manual or

20   policy document that provides guidance to DCFS personnel about

21   what they're supposed to do if they receive a voter registration

22   application that's not complete?

23   A    I'm not.

24   Q    You're not aware.

25              So you don't know if any such document exists?

1    A    I do not know.

2    Q    You do not know.

3              Turning back to plaintiff's Exhibit 110.

4          MS. ALEXANDER:  Exhibit number?

5          MS. BRANNON:  I'm sorry, 110.  I apologize.

6              It's been admitted into evidence, and it is tab 78

7    in your binder.

8    BY MS. BRANNON:

9    Q    This is the intranet webex training about voter

10   registration; correct?

11   A    Correct.

12   Q    Does this document anywhere provide any guidance to DCFS

13   personnel about what they're supposed to do if they receive an

14   incomplete voter registration application from a client?

15   A    I'd have to look it up.

16   Q    Take your time.

17              (Pause in proceedings.)

18          THE WITNESS:  The only thing I see is where it says

19   they must review for EAC legibility and completeness.

20   BY MS. BRANNON:

21   Q    But that doesn't give any guidance to the staff about what

22   to do if they find out -- find the voter registration is not

23   complete; does it?

24   A    Not directly.

25   Q    Okay.  Can you turn back to plaintiff's Exhibit 66-E, which

1    is tab 5.

2              THE COURT:  You said 66-E?

3              MS. BRANNON:  Yes.  Plaintiff's Exhibit 66-E, and it's

4    tab 5 in his binder.

5    BY MS. BRANNON:

6    Q   And if we can go to the second page.

7              So this is the March 1, 2012 C10 policy; correct?

8    A   C210.

9    Q   I'm sorry.  For the record, this is the March C210 policy

10   2012; correct?

11   A   Correct.

12   Q   Can you review that policy and tell me if it anywhere

13   provides guidance to DCFS personnel about what they are supposed

14   to do if they have an incomplete voter registration application

15   from an applicant or recipient.

16              (Pause in proceedings.)

17        THE WITNESS:  It does not directly.

18   BY MS. BRANNON:

19   Q   It does not, okay.  Thank you.

20              Can I have you turn to what's plaintiff's Exhibit

21   107, which is tab 58 in your binder.  And that's also been

22   admitted.

23              THE COURT:  I'm sorry, this was 158?

24              MS. BRANNON:  No, Your Honor.  It's plaintiff's exhibit

25   107, and it's tab 58 in the witness's binder.  And it has been

1   admitted.

2   BY MS. BRANNON:

3   Q    That's the FITAP orientation manual dated August 2010;

4   correct?

5   A    Correct.

6   Q    Can you look at the table of contents and tell me if that

7   says anything about voter registration.

8                  (Pause in proceedings.)

9             THE WITNESS:   I didn't see it.

10  BY MS. BRANNON:

11  Q    You don't see it.

12                 Can I have you turn, using the Bates numbers at

13  the bottom on the right-hand page, to page DCFS 02875.

14  A    Okay.

15  Q    Does that document anywhere say anything about voter

16  registration?

17  A    Yes.

18                 It says:   Inform clients of the availability of

19  voter registration services.

20  Q    So it does not give any of the guidance about what to do if

21  you get an incomplete voter registration application; does it?

22  A    Not in writing.

23  Q    Okay.   Not in writing, okay.

24                 We're almost done.

25                 Do you know how many initial SNAP applications

 1   DCFS got on average per month in November?

 2   A   Per month in November?  November of what year?

 3   Q   I'm sorry.  Do you know how many -- let me rephrase the

 4   question.  I'm sorry.

 5              Do you know how many initial SNAP applications

 6   DCFS received per month in the year 2011?

 7   A   I would guess about 30,000.

 8   Q   About 30,000, okay.

 9              Do you know how many initial SNAP applications

10   DCFS received online on average per month in 2011?

11   A   I do not.  I know that, once CAFE was implemented, like

12   right now, we're about 80 percent online.

13   Q   But you don't remember?

14   A   No.

15   Q   Mr. Guillory, did you give a deposition in this case?

16   A   Yes.

17   Q   Were you under oath when you gave that deposition?

18   A   Yes.

19   Q   Can you turn to the small binder in front of you, if you

20   don't mind.

21         MS. ALEXANDER:  Objection, Your Honor.  She's offering

22   the deposition testimony, and I don't think she established any

23   foundation or grounds right now with regard to counseling.

24         MS. BRANNON:  I'm offering the deposition testimony for

25   impeachment for his statement that he didn't know --

1          MR. PHILIPS:  Your Honor, I know we've got a one lawyer

2     rule here, but I don't know is not an impeachable statement.

3          THE COURT:  He can refresh his memory.

4          MR. PHILIPS:  If I can clarify my objection, it's not

5     the proper way to do it.

6          THE COURT:  I think you have to refresh his memory.

7          MR. PHILIPS:  Is the question how many?  And what's the

8     relevance of it?  Because maybe we can just figure it out,

9     instead of going through this drill.  Is that what you want to

10    know?

11         MS. BRANNON:  I'm trying to enter a number of exhibits,

12    but I wanted to see what the witness did remember and his

13    knowledge.  I just wanted to get into the record the number of

14    applications that DCFS receives on an annual basis.

15         THE COURT:  Think he said 30,000 a month.

16         MS. BRANNON:  He did, but that's paper applications.

17    And now I'm asking him about online applications.

18         THE COURT:  He said about 80 percent of that.

19         MS. BRANNON:  The 30,000 was paper applications.

20         THE COURT:  I thought what he'd said was:  We received

21    30,000 and 80 percent.

22         MS. BRANNON:  He said, since the CAFE was up and

23    running, it's about 80 percent.  But it's not been established

24    yet in the record when the CAFE started.

25         MR. PHILIPS:  I thought the answer was 30,000 a month.

1          THE COURT:  That's what I thought, too.  And 80 percent

2   of that was CAFE.

3          MS. ALEXANDER:  Maybe you should try that again,

4   instead of impeaching him with his testimony.

5          MS. BRANNON:  I know you're going to have an objection

6   because you have not yet agreed to admit the documents that

7   showed the number of benefits applications public transactions.

8          MR. PHILIPS:  What's the question?  The question was,

9   how many applications do we get a year, a month?

10         MS. BRANNON:  Yes.

11         MR. PHILIPS:  And then how many on CAFE?

12         MS. BRANNON:  I don't want to know on CAFE.

13         THE COURT:  The question was, do you recall any --

14         MR. PHILIPS:  Maybe the easiest way would be to let him

15   read the deposition.

16         MS. BRANNON:  I'm happy to withdraw this question and

17   move on to ask him -- lay a foundation to authenticate the

18   charts that show the number of public transactions, and then I

19   can move on, if that's -- if that will be an easier way to do

20   it.  I'm happy to do that, Your Honor.

21         THE COURT:  I'm so confused.  I don't know what the

22   question is or where we are trying to get to.  Are we looking at

23   the end of the day --

24         MS. BRANNON:  At the end of the day, Your Honor, I

25   would like in the record the number of applications that DHH

 1   processed.  They have a number of charges for the information.

 2   I am happy to withdraw this question and see if this witness can

 3   authenticate those documents, and then I'll admit them into

 4   evidence and move on.

 5              MS. ALEXANDER:  And part of the reason, just so you

 6   know, the number we have in the Court's Findings of Fact and the

 7   information about the number of applications that they did not

 8   concede, it's a contested fact, is --

 9              MS. BRANNON:  That's a conclusion of law about what we

10   can do.

11              MS. ALEXANDER:  My thing was, from the contested fact,

12   that you were actually taking those numbers and relating them in

13   some form of or fashion with regards to the number of

14   individuals that should have been registered to vote.  So you

15   weren't using it for the purpose -- was just to show the number

16   of applications taken.

17              MS. BRANNON:  So, Your Honor, the analysis is a

18   question of law, to which defendants are free to contest.  At

19   this point, I'm only trying to prove the fact of what the number

20   is.  This witness can't give me testimony about what those

21   numbers may mean.

22              THE COURT:  I'm asking you if in his deposition did he

23   tell you what --

24              MS. BRANNON:  He did tell me.

25              THE COURT:  But there are documents.

```
 1              MS. BRANNON:  There are documents, which I would like
 2    to admit.  So I'm happy to withdraw the question.
 3              THE COURT:  Either way, he can refresh his memory or he
 4    can use the documents.
 5              MS. BRANNON:  So I withdraw the question and we'll get
 6    the documents in.
 7                   (Sidebar concluded.)
 8    BY MS. BRANNON:
 9    Q   I withdraw my question, Mr. Guillory.
10              Can you turn to tab 82, which is the bigger binder
11              MS. BRANNON:  And, for the record, this is plaintiff's
12    128.
13              THE WITNESS:  Tab 8.
14    BY MS. BRANNON:
15    Q   Yeah, tab 8.  And it's plaintiff's trial Exhibit 128.
16    A   Okay.
17    Q   Can you tell me what that document is.
18    A   Looks like a spreadsheet showing number of applications,
19    food stamps by parish.
20    Q   Is that a document that you're familiar with?
21    A   Not in this format but --
22    Q   Not in that format?
23              Does that look like that's a document with numbers
24    and information that you would be familiar with?
25    A   Yes.
```

1    Q    Can you scroll through the whole document and just tell me

2    what years it covers.

3    A    2007, 2008, 2009, 2010 -- is this a test?   2011.   I think

4    that's it.

5              MS. BRANNON:   I move to admit plaintiff's Exhibit 128.

6              MS. ALEXANDER:   No objection.

7              THE COURT:   Let it be admitted.

8                   (Exhibit admitted.)

9    BY MS. BRANNON:

10   Q    Then can you move to plaintiff's Exhibit 129.

11   A    Which tab?

12   Q    The next tab, 73.

13   A    Okay.

14                   (Pause in Proceedings.)

15   BY MS. BRANNON:

16   Q    Can you tell us what that document is.

17   A    Looks like a spreadsheet showing a number of SNAP

18   redeterminations, certified and rejected, by parish.

19   Q    And is the information contained in that document something

20   that you're familiar with?

21   A    Yes.

22   Q    Can you just tell us again what years that document covers?

23   A    2007 looks like through 2011.

24   Q    Through 2011, okay.

25              MS. BRANNON:   Plaintiffs move to admit plaintiff's

```
1    Exhibit 129.

2              MS. ALEXANDER:  No objection.

3              THE COURT:  Let it be admitted.

4                  (Exhibit admitted.)

5              MS. BRANNON:  Your Honor, I have a number of similar

6    documents.  Instead of going through with the witness, does

7    defendant DCFS object if we move them into evidence?

8              THE COURT:  We're going to take a little informal

9    recess, and why don't you show her the documents you actually

10   want to do this for, and maybe we can enter those in by

11   stipulation.

12             We're going to take -- why don't we take a five

13   minute recess.  Court's adjourned.

14                  (Proceedings in recess.)

15             MS. BRANNON:  Your Honor, we were able to reach some

16   agreement.

17             So there is no objection if I move to admit

18   plaintiff's exhibit -- I think 130 was already admitted.

19   Plaintiff's Exhibit 130.

20             So plaintiff's 28 and 29 was already admitted.

21             THE COURT:  128 and 129?

22             MS. BRANNON:  Sorry.  128 and 129 was already admitted.

23             So then I now move to admit plaintiff's Exhibit

24   130, 131, 133-F, 133-K, 134-A through G and then 134-K.

25             THE COURT:  They will be admitted.
```

```
 1              (Exhibits admitted.)

 2   BY MS. BRANNON:

 3   Q   Mr. Guillory, I just have a few more questions for you.

 4              If you can turn to tab 4 in your binder, which is

 5   plaintiff's trial Exhibit 66-D.

 6   A   Tab 4?

 7   Q   Tab 4.

 8        CASE MANAGER:  Is this 130?

 9        MS. BRANNON:  No.  This is plaintiff's Exhibit 66-D.

10   It's tab 4.  It's already been admitted.

11   BY MS. BRANNON:

12   Q   Are you there?

13   A   Yes.

14   Q   So this is the C210 policy for September 2011; correct?

15   A   Correct.

16   Q   Can you, about middle way of the page, there's a bullet

17   point, starts with the word Distribute.

18              And this document says:  Distribute the form LR1M

19   to persons who wish to register to vote or advise that an online

20   application may be completed using the Secretary of State's

21   website.

22              Correct?

23   A   Correct.

24   Q   So this written policy as drafted uses the word Or; doesn't

25   it?
```

1  A    Yes.

2  Q    So, according to this written policy, it would not be wrong

3  if a DCFS -- if DCFS personnel directed individuals to the

4  Secretary of State's website; correct?

5  A    Correct.

6  Q    Then can you turn -- if you can just turn back to tab 2.

7            THE COURT:  Which exhibit?

8            MS. BRANNON:  I'm sorry.  This is trial Exhibit 66-B.

9  BY MS. BRANNON:

10  Q    And this is the C210 policy dated May 1, 2010; correct?

11  A    Right.

12  Q    And isn't it true that, pursuant to this policy, DCFS

13  personnel were not required to ask about voter registration if a

14  client or recipient submitted a change of address remotely?

15  A    Can you repeat that?

16  Q    Sure.

17            Isn't it true that, according to this written

18  policy, that as of May 1st, 2010, DCFS personnel were not

19  required to distribute -- to ask about or distribute voter

20  registration information to a client or a recipient who notified

21  DCFS about a change of address remotely?

22  A    Correct.

23  Q    And isn't it true that DCFS personnel currently are required

24  to offer voter registration information to clients or recipients

25  who report a change of address remotely?

```
 1   A    Correct.
 2            MS. BRANNON:  Thank you very much, Mr. Guillory.  I
 3   have no further questions.
 4            THE COURT:  Ms. Alexander, do you want to take a
 5   minute?
 6                         CROSS EXAMINATION
 7   BY MS. ALEXANDER:
 8   Q    Mr. Guillory, I just have a couple of questions for you,
 9   just for clarifications.
10            What was your title -- your title as deputy
11   assistant secretary?
12   A    Deputy assistant secretary currently.
13   Q    And, as deputy assistant secretary, would you be directly
14   responsible for training staff whether -- at a supervisory level
15   or either staff in a field office?
16   A    Not directly.
17            MS. BRANNON:  Objection, Your Honor.  I think that was
18   a leading question.
19   BY MS. ALEXANDER:
20   Q    What are your duties as a deputy secretary?
21   A    Deputy assistant secretary, I help the deputy secretary of
22   Programs administer the various programs within DCFS, the policy
23   and other things.  We do not supervise the field staff.  But we
24   write the policies, interpret legislation and laws, do rule
25   making when necessary, testify in front of the state
```

1   legislature, testify here, things like that.

2   Q    So, with those duties, would you be responsible for

3   delegating training?

4   A    Yes.

5   Q    Yes.

6   A    I do not actually do training.

7   Q    And to whom or what position would the delegation be made?

8   A    The people who actually do training are like two levels

9   below me.  I function on and I supervise the director of the

10  Program Integrity unit, and our training section is a part of

11  that unit.

12  Q    You represented manuals, plaintiff's Exhibit 61-H.

13           THE COURT:  What number, ma'am?

14           MS. ALEXANDER:  Plaintiff's Exhibit 69-H.

15  BY MS. ALEXANDER:

16  Q    You were presented manuals of the C210.  Was this a manual

17  you were presently involved with in regards to the language

18  regarding NVRA training or any other factors of the SNAP

19  program?

20  A    This is part of our Chapter 4 policy manual.  I have usually

21  have to sign off on the revisions.  I do not write it.

22  Q    So your knowledge of this manual would be just general?

23  A    Correct.

24  Q    What about C410, this is plaintiff's Exhibit 78 -- excuse

25  me -- 70 through 70-G, FITAP policies, would you be responsible

1    for any of the language contained therein or any other facet of

2    the FITAP program?

3    A    Again, as part of the regular policy manual for our staff.

4    And we have staff that write these manuals.  I usually have to

5    sign off on them.

6    Q    Would these training manuals would be used in conjunction

7    with any policy or other guidance?

8    A    This is the actual policy manual, because it's in chapter 4.

9    This is not a training manual.

10   Q    And, when a staff is using an orientation manual with the

11   staff or FITAP, would they be using this policy in conjunction

12   with that?

13   A    Yes.  And the trainers cover some material in more detail

14   than what's written.

15   Q    Are you aware that NVRA requires any language regarding

16   specific training with regards to public assistance agencies and

17   their staff?

18   A    From what I've read of the statute, it does not.

19   Q    You were provided some reports earlier.  What are the

20   purposes of those reports that were you provided?

21   A    Those long reports with the applications and

22   redeterminations; right?

23   Q    Yes.

24   A    We have probably thousands of reports for our various

25   programs that we look at monthly, usually monthly.  The number

1   of application, number of redeterminations, number of cases

2   closed, number of cases certified.  We use that information to

3   report to our federal partners.  We also look at it to monitor,

4   you know, any trends.  We see our case load growing, it might

5   mean the need for more staff.  If we see our case load

6   declining, it might try to make us look at why.  Especially if

7   some areas are not representative of the rest of the state.

8   Q   With regards to those reports, is it possible that any

9   applicant identified on an initial determination counted in an

10  initial determination report be counted in the end later in the

11  year in an additional report?

12  A   Yes.  Some applicants have their cases closed and then they

13  re-apply.  So like, in a given year, a certain person could

14  apply more than one time.

15  Q   So it's possible that the numbers could replicate one

16  individual more than one time?

17  A   Yes.

18  Q   With regards to FITAP and food stamps applications, would

19  those applicants be sometimes the same applicant?  Would they be

20  eligible for one program and also participate in another

21  program?

22  A   Yes.  Most of our FITAP applicants either receive or apply

23  for SNAP.

24  Q   So it's possible for an individual to appear on a food

25  stamps application report and a SNAP -- on a FITAP report?

1    A    Yes.

2              THE COURT:  Is that likely?

3              THE WITNESS:  Almost always FITAP applicants apply to

4    SNAP.  But FITAP is a very small program in comparison to SNAP.

5    So many SNAP applicants don't apply for FITAP.

6              MS. ALEXANDER:  Let's take look at defendant's Exhibit

7    26.  Defendant's.

8    BY MS. ALEXANDER:

9    Q    Earlier --

10              THE COURT:  DCFS exhibit what?

11              MS. ALEXANDER:  26.

12              THE COURT:  Thank you.

13   BY MS. ALEXANDER:

14   Q    Earlier, you were presented some voter registration training

15   policies.  I want you to take a look at -- this is our policy

16   E-2451, it's developed March 24, 2011.

17              Are you familiar with that policy?

18   A    Yes.

19   Q    And could you give us a foundation of as to why that policy

20   was developed.  What prompted additional NVRA training policy?

21   A    We had questions about our policy, and we wanted to develop

22   something to help our staff understand their exact requirements

23   and responsibilities.

24   Q    So this was in addition to voter registration language that

25   was already put out in other policies?

1    A    Yes.

2    Q    To your knowledge, did staff receive training as a result of

3    this directive?

4    A    Yes.

5    Q    Do you know of any additional steps that the department took

6    with regards to evaluating training or providing training for

7    staff?

8    A    I know we revised our policy a couple of times, but I don't

9    think we've developed any additional training before the webex

10   training.

11   Q    You mentioned the webex.  In addition to webex, is there any

12   intranet policy guidance assistance that's available for our

13   staff to review?

14   A    Regarding NVRA?

15   Q    Yes.

16   A    Well, this is on the intranet.  The webex is referred to

17   here is on the intranet for them to use at any time.

18   Q    So it wouldn't only be a six month period; they could

19   actually review this policy at any time?

20   A    Yes.

21   Q    What about any additional NVRA policy, is it available on

22   the intranet system as well?

23   A    It's available on our policy management system, which is our

24   online policy.  The Chapter 7 C210 that was referred to earlier,

25   that's existing live policy on our system.

1   Q    Look at policy C210.  Let's take a look in that Exhibit 26,

2   already admitted into the record.

3              Exhibit 29, C210, you made reference to that.

4   Just, in general, what is our policy 210?

5   A    It's essentially our policy that addresses the

6   responsibilities of our staff for voter registration.

7   Q    So this is general -- is this general NVRA information used

8   in conjunction with other training?

9   A    It can be used in conjunction with training, yes.  That's

10  the part that was also referenced in one of the earlier

11  documents.  In one of those documents where it said:  Refer to

12  this section for more information, this is where it gets into

13  more details.

14  Q    If a staff is reviewing certain policy that tells them to

15  reference, are they able to check it and it would take them back

16  to the NVRA 210 policy?

17  A    Yes.

18  Q    Is this policy available at any time for staff to review?

19  A    Yes.

20  Q    What about other DCFS policies regarding our other programs

21  or any programs that the department might administer?

22  A    Yes.  It's all online for staff.

23  Q    How does staff know that NVRA policy is available to them?

24  Are there any alerts or anything that's sent out to staff?

25  A    I don't think there are alerts.  But supervisors, you know,

```
 1   use -- they address certain areas with staff at all times.
 2                    There's also a search function on our system
 3   where, they want to just type in a word, they can find the
 4   policy on it.
 5   Q   When you took position as our deputy assistant secretary,
 6   was the NVRA already in place?
 7   A   Yes.
 8   Q   So there was an ongoing effort to comply with the NVRA?
 9   A   Yes.
10   Q   You spoke of changes and revisions.  What changes are you
11   aware of with regards to the NVRA policy that have taken place
12   since filing of this litigation?
13   A   We've added the language to -- well, LaCAP and CCAP and
14   D-SNAP that we did not have before.
15                    We did this training.
16                    We clarified our policy a little bit.
17                    We've been involved with discussions with you and
18   your staff about the remoteness and other parts of the statute.
19   Q   So is there an ongoing effort to continue to revise these
20   policies?
21   A   Yes.
22   Q   And, what about training, is there ongoing effort to
23   continue additional NVRA training?
24   A   Yes.  We have this requirement for the annual training.
25   And, as interpretations come down or rulings or whatever, we
```

1   will tweak the training to make it as correct as can be.

2   Q   You mentioned CAFE.  Earlier, you were provided some

3   exhibits regarding online applications.  If you would, let's see

4   if we can review plaintiff's Exhibit 86-A.

5                   Prior to CAFE, did the department have an online

6   application system already in place?

7   A   Yes.  A PDF fillable document.

8   Q   So it was just one document?  It was just a document that

9   would drop down?

10  A   Yes.

11  Q   How was that process -- how did the online application

12  process work at that time?

13  A   Someone could go online, fill it -- prior to that, it was

14  just a PDF that they had to download and print and send it in.

15                  Then we developed that document to where someone

16  could fill it in online and submit it to us.  It wasn't a smart

17  application like CAFE is to where it only asks questions that

18  are pertinent to that individual's circumstances.  But it was

19  pretty much a mirror of our paper application, but it allowed

20  applicants to do it online.

21  Q   The application that the person viewed on the online

22  application system in 2010 would be the same as the paper

23  application that they received?

24  A   It was very similar if it was not exactly.

25  Q   You said, as reference to changes in the document, if I

1  clicked on CCAP moodle, as you were shown earlier in plaintiff's

2  86-A, if I clicked on that moodle, were there any changes in the

3  documents, or did the document remain the same and the moodle

4  just identified the type of application?

5  A   To my knowledge, it stayed the same.  It was just a fillable

6  document.

7  Q   If voter registration language was located in that

8  application, if one clicked the moodle, that voter registration

9  language still appeared in that application?

10 A   Right.

11 Q   How would that caseworker process an online application?

12 You mentioned print down and mill in.

13 A   Well, that was the first version.  This online application,

14 I think they got it in a queue, a worker got it.  And, we had to

15 do interviews, so they used this information to do a telephone

16 interview.  Sometimes face-to-face, but mostly telephone

17 interviews with the applicants to go over the information and

18 process.

19 Q   So, depending on the program, after receipt by a caseworker,

20 they would -- an applicant would be contacted for an interview?

21 A   Yes.

22 Q   How was that contact made?

23 A   By mail usually.

24 Q   How was the interview conducted?

25 A   Usually by phone.

1  Q    So, before any rulings or awareness regarding remote

2  transaction, was DCFS using online applications and telephone

3  interviews and using voter registration language in those

4  applications and interviews?

5           THE COURT:  I'm sorry, I didn't hear the last part.

6           THE WITNESS:  Can you repeat that?

7  BY MS. ALEXANDER:

8  Q    Before any rulings or any decisions regarding remote

9  transactions, was DCFS using voter registration within its

10 applications online as well as its telephone interviews?

11 A    Yes.  We still cover, for applications and redeterminations,

12 we still covered voter registration responsibilities, whether it

13 was a telephone interview or a face-to-face interview.

14 Q    Earlier, you looked at some CCAP documents presented to you

15 by plaintiffs, plaintiff's Exhibit 94-G, the application for

16 child care assistance, which is a CCAP 2.

17           You identified that version as not having any

18 voter registration language; is that correct?

19 A    Correct.

20 Q    Since then, once the department was made aware of any of its

21 deficits regarding that application, did it add voter

22 registration language?

23 A    Yes.  And it was also -- the voter registration language was

24 also on the 4APP, which is often used to apply for child care

25 assistance.

1  Q    And so, in place of CCAP 2, an individual would probably

2  complete a 4APP, a public assistance application?

3  A    Yes.

4  Q    And that application has the voter registration language?

5  A    Yes.

6  Q    Does it have a voter declination statement within the

7  application?

8  A    Yes.

9  Q    So they have been asked regarding the voter registration

10  duties or responsibilities?

11  A    If they used a 4APP, yes.

12  Q    When did DCFS acquire the CCAP program?

13  A    In the 1990s.

14  Q    In the '90s.

15          How was it previously administered?  Was it always

16  with the Department of Economic Stability or OFS?

17  A    It was within the Department of Social Services, but it was

18  in the secretary's section.  And then, at some point, it moved

19  to the other public assistance programs.  And I'm not sure of

20  the date.

21  Q    But there was some transfer of that particular program?

22  A    Yes.

23  Q    But, as of now, these CCAP forms do have voter registration

24  language?

25  A    Yes.

1   Q    You earlier were asked with regards to D-SNAP, our disaster

2   food stamps application.  You viewed plaintiff's Exhibit 95-E.

3   You testified that an earlier version of D-SNAP application had

4   no voter registration language; is that correct?

5   A    Correct.

6   Q    How did DCFS render the voter registration requirement with

7   regards to our D-SNAP program?

8   A    We had a form, a disc 12, that we used with the -- that

9   contained the language from the Act, and we give that to every

10  D-SNAP applicant.

11              And D-SNAP is an on-run in a report.

12              Before Hurricane Isaac or Tropical Strom Isaac, we

13  had not had a D-SNAP since Hurricane Gustav and Ike.  So it's

14  like -- and, before that, it was Katrina and Rita.  So it's, you

15  know, we've run five programs since 2005.  And they typically

16  run for about two weeks or three weeks.

17  Q    So the primary document used for application for assistance

18  would be the 4APP unless there's a disaster calling in use for

19  the D-SNAP app?

20  A    Right.  This application is only for D-SNAP.  And D-SNAP is

21  for people who do not get regular SNAP.

22  Q    The applicant who receives regular SNAP, they would still be

23  provided with their 4APP forms?  The regular redetermination

24  forms?

25  A    Yes.  Right.  It's a form for redeterminations, but it's

1   almost identical to the 4APP.

2   Q   What is the purpose of 4MR?

3   A   To do a redetermination on the existing recipients.

4   Q   Does it contain voter registration language?

5   A   Yes.

6   Q   And there's a voter preference form contained within the

7   document?

8   A   Yes.

9   Q   Let's take a look at defendant's Exhibit 140.

10                  You mentioned a 4MR, and it's a redetermination

11   form.  What programs do we use the 4MR for?

12   A   The 4MR?  For SNAP, FITAP, KCSP and CCAP.  I'm not sure if

13   it covers CCAP.

14   Q   If you would take a look at the document at the very top

15   here --

16   A   It does.  It has CCAP.

17   Q   So it includes the CCAP program?

18   A   Yes.

19   Q   Document 140 is already made part of the record.

20                  If you would, let's go to page 13 of the last page

21   of the document, please.

22                  You stated that the voter registration language

23   and the voter preference form are included in the document?

24   A   Yes.

25   Q   To your knowledge, has the continued application always

1    included the voter registration language?

2    A    Yes.

3    Q    Since the statute was enacted?

4    A    Yes.  It was before my time, but yes.

5    Q    When you acquired your position, it was made part of the

6    document?

7    A    Yes.

8    Q    With reference to the online application, what system

9    replaced online application?  What system replaced our 2010

10   online application or the PDF form that you talked about

11   earlier?

12   A    The CAFE.

13   Q    So, once CAFE was rolled out, was the online application

14   program discontinued?

15   A    I think there was about a month or two where we phased -- we

16   had some applications that were submitted in the previous

17   version, so we had to finish processing those.  So we kept both

18   of them up for maybe a couple of months.

19   Q    So, if I went to a DCFS website today, could I pull up this

20   2010 online application in PDF form?

21   A    No.

22   Q    And what is the purpose of CAFE?  You spoke of the worker

23   portal and the customer portal.  What is the purpose of the CAFE

24   program?

25   A    The purpose is to allow citizens to more easily apply for

1    benefits, and to allow our staff to be able to get the

2    information without having to -- without having to type it in

3    again.  And to use that information to conduct the interview

4    and/or make the eligibility decision.

5    Q    Is NVRA one of the questions that's required to make an

6    eligibility determination?

7    A    No.  It has nothing to do with eligibility determinations.

8    It's a required question, but it does not impact eligibility.

9    Q    So how would a staff or an individual with regards to an

10   online application -- would they contact you via telephone?

11   A    Yes.  Most of our interviews are done by telephone.

12   Q    Would the online application be reviewed with the client

13   during that interview?

14   A    Yes.

15   Q    Would the voter registration question be asked during that

16   interview?

17   A    Yes.

18   Q    With regards to training, we have several federal programs

19   that we have that are under FNS, under the Food and Nutrition

20   Service; correct?

21   A    Several what?

22   Q    Programs that are under FNS, under the Food and Nutrition

23   Service?

24   A    I mean, our department only has SNAP.

25   Q    We have SNAP.  Does our LaCAP program fall under --

1    A    Right.  Well, LaCAP and D-SNAP are considered to be SNAP, so

2    that's -- and all of those are under FNS.

3    Q    If the department has questions with regards to

4    implementations of any regulations, can we contact FNS or their

5    liaison for guidance?

6    A    Yes.  We have a regional office in Dallas.

7    Q    Does the department only contact Dallas regional office if

8    they have any type of questions?

9    A    Yes.  They provide us with guidance on their regulations and

10   so forth.

11   Q    Is it common for the department to have to deal with federal

12   programs and different federal agencies in administering those

13   programs?

14   A    Yes.

15        MS. BRANNON:  Your Honor, I'm going to object.  I'm not

16   sure what the relevance of the guidance that DCFS gets from the

17   Federal government.

18        THE COURT:  You can move on.

19        MS. ALEXANDER:  Yes.

20   BY MS. ALEXANDER:

21   Q    To your knowledge, does NVRA -- is there anyone that the

22   department would contact with regards to NVRA guidance that's

23   with the federal program?

24   A    Not with our -- like with our SNAP partners and our TANF,

25   which runs FITAP and KCSP and CCDF which funds child care

 1   assistance, they do not give us -- you know, sometimes they'll

 2   question us about what our voter registration policies are.  But

 3   it's not part of the eligibility for those programs.

 4   Q   So those agencies will not provide guidance with regard to

 5   NVRA?

 6           MS. BRANNON:  Again, I'm going to object.  I'm not sure

 7   what the relevance.

 8           THE COURT:  Move on.

 9           MS. ALEXANDER:  Withdrawn.

10           THE COURT:  Objection sustained.

11   BY MS. ALEXANDER:

12   Q   With regards to our CAFE program, are there currently any

13   revisions that the department's making regarding the CAFE

14   system?

15   A   Yes.  We've only -- I think we have four releases, and we've

16   only finished one so far.  So we're phasing in two or three over

17   a period.  So we're constantly revising it.

18           We're also considering adding more information

19   regarding voter registration.

20   Q   So there's an effort ongoing to update and improve the CAFE

21   system as well?

22   A   Right.

23           MS. ALEXANDER:  Those are all the questions I have.

24           THE COURT:  Anything?

25           MS. BRANNON:  Your Honor, if I could have just a

1    minute.

2                    (Pause in proceedings.)

3              THE COURT:  Do we have any?

4              MS. BRANNON:  I just have a few questions, Your Honor.

5                    REDIRECT EXAMINATION

6    BY MS. BRANNON:

7    Q    Mr. Guillory, isn't it true that you can't certify the

8    number of people who -- isn't it true that an individual can be

9    certified to receive SNAP benefits more than once in a year?

10   A    No.

11   Q    Not true?

12   A    That's not true.

13   Q    You can be certified more than once in a year?

14   A    Yes.

15              I can apply on January 1st, get certified, my case

16   can close the next month, and then I can reapply the following

17   month.

18   Q    But --

19   A    And, each time, it counts as an application.

20   Q    But, to reapply, you would also need to have an another

21   interaction with a DCFS caseworker and submit a new application;

22   would you not?

23   A    Right.

24   Q    You testified that there was NVRA training in place when you

25   took your current position in 2008.  What was that training?

1   A   It was part of our ongoing orientation trainings.

2   Q   So it's part of the SNAP orientation manual that you and I

3   discussed earlier today?

4   A   If we had -- well, we didn't have this training that was

5   referenced earlier at that time.  But it was covered in -- I

6   mean, back since the Act was implemented.  Like I said, I

7   started doing public assistance policy in 2003, and at that time

8   we had the language on our forms and -- most of our forms.  And

9   it was also a part of our orientation trainings.

10   Q   It was part of your orientation training.

11          But, as you testified, the webex training we

12   discussed earlier didn't exist before March 2011; correct?

13   A   Correct.

14   Q   And, when you're talking about it being part of the

15   orientation training, that is the SNAP orientation manual that

16   we went over earlier today; correct?

17   A   Yes.

18   Q   You also testified that you had ongoing efforts to include

19   additional NVRA training; I believe that's what you said.

20   A   Additional NVRA --

21   Q   Training at DCFS.  As part of your ongoing efforts to

22   ensure --

23   A   Well, we're requiring that annual training that everyone

24   participate in annually.  And, as more guidance or rulings or

25   interpretations are made on NVRA, we will tweak that training to

 1    cover that.

 2          MS. BRANNON:  I want to ask the witness about

 3    plaintiff's Exhibit 142, which I do not have in hard copy.  This

 4    is a rebuttal question.

 5    BY MS. BRANNON:

 6    Q   Can you review this screen, Mr. Guillory.

 7    A   Yes.  It's an issuance from March 1, 2011 regarding Voter

 8    Registration Act from ACF.

 9    Q   So that's --

10          MS. ALEXANDER:  Your Honor, I'm going to object to this

11    exhibit.  I don't see the relevance of the TANF guidance that's

12    provided here.

13          MS. BRANNON:  Can we approach, Your Honor?

14          THE COURT:  Yes.

15              (Sidebar conference.)

16          MS. BRANNON:  He just testified as his counsel was

17    questioning that he never got any guidance from a federal agency

18    on the programs from the NVRA.  This is a guidance and conducted

19    administering TANF, of which is the FITAP program.

20          MS. ALEXANDER:  You're introducing your evidence,

21    you're introducing something into the record.

22          MS. BRANNON:  I just wanted him to acknowledge what it

23    is.  I don't intend to ask him any questions about the content

24    of the document.  I just want him to acknowledge that it exists.

25    He testified that he has never seen such a document.

1          MS. ALEXANDER:  She just said she's intending to

2    introduce something into the record.

3          THE COURT:  If it's something that contradicts

4    something that you covered, then I think it's appropriate.

5              But what's the objection to the document?  Just

6    that she's trying to introduce it at this time?

7          MS. ALEXANDER:  Yes.

8          THE COURT:  You recall your question him on that?

9          MS. ALEXANDER:  I do recall the question.

10         THE COURT:  I think that's appropriate.  Sometimes,

11   when you open the door, people walk through it.

12         MS. ALEXANDER:  Thank you, Your Honor.

13             (Sidebar concluded.)

14   BY MS. BRANNON:

15   Q   So, Mr. Guillory, is this a document dated March 1, 2011

16   from the US Department of Health and Human Services discussing

17   the national voter registration in relationship to TANF;

18   correct?

19   A   Correct.

20   Q   And TANF is the FITAP program; correct?

21   A   FITAP and KCSP.

22   Q   So this is guidance from the US Department of Health and

23   Human Services about the NVRA; correct?

24   A   It's -- right.  It's a reminder to make sure that we have

25   our policies in accordance with the NVRA.

1  Q    And DCFS as a state agency that administers a TANF program

2  would have received this; correct?

3  A    Correct.

4           MS. BRANNON:  I move to admit plaintiff's 142.

5           THE COURT:  Did you receive this document?

6           THE WITNESS:  Yes.

7           THE COURT:  Any objection?

8               Let it be admitted.

9               (Exhibit admitted.)

10  BY MS. BRANNON:

11  Q    If a client or an applicant applies to the CCAP program

12  using the CCAP10 form, would there be any reason that they would

13  see a 4APP form?

14  A    You cannot apply using a CCAP10.

15  Q    I'm sorry.  A CCAP2 form.  Let me withdraw.

16               If an individual client applies to the CCAP

17  program usage CCAP2 form -- CCAP2 form is an enrollment form;

18  correct?

19  A    Right.

20  Q    -- would there be any reason for an individual who applied

21  to the CCAP program using a CCAP2 form to see a 4APP form?

22  A    No.  Not unless they were applying for other programs at the

23  same time.

24  Q    But if they're applying only for the CCAP program, they

25  would not see a 4APP form?

1    A    Right.

2    Q    And I just had one more question.

3              You stated that you're planning to update the CAFE

4    system.  Do you have any idea when that will take place?

5    A    Over the next -- like I said, we have like three more phases

6    to go.  But it's going to also address other programs like child

7    support and even child welfare.  So they're all planned in

8    phase-ins.  Hurricane Isaac threw us back about a month.  But I

9    think the plan is for us to finish like at the end of next year.

10   Q    Do you know what updates in the CAFE program are proposed?

11   A    Regarding NVRA?

12   Q    Regarding the NVRA.

13   A    Consideration is being given to attachment or somehow get a

14   voter registration form with every application and every

15   redetermination.

16   Q    Okay.  CAFE currently does not do that?

17   A    Correct.

18   Q    But you are considering --

19   A    It has the voter declaration language, but it does not have

20   the form attached to it.  Had has a link to the Secretary of

21   State's website, but it does not have a copy of the actual form.

22   Q    But in your understanding that the CAFE would have the

23   capacity to have a voter registration form attached to the

24   benefits explanation?

25   A    We're exploring that.  I mean, we're in discussions.

```
 1   Q   You are in discussions with it.  Okay.

 2            MS. BRANNON:  I have no further questions, Your Honor.

 3            THE COURT:  Thank you.

 4              Mr. Alexander, anything further?

 5            MS. ALEXANDER:  Just one.

 6            THE COURT:  You know the odds of a lawyer asking just

 7   one question are slim and none, but we're going to see.

 8                        CROSS EXAMINATION

 9   BY MS. ALEXANDER:

10   Q   I do have just one question.

11              With regards to plaintiff's Exhibit 142 here, if

12   the department received the TANF guidance reminding the agency

13   to implement the voter registration, is it correct to assume

14   that the department thought it was in compliance with the NVRA

15   as it was implemented at that time?

16   A   Regarding TANF, yes.  Our federal partners, after we

17   received the guidance, said we were okay.

18   Q   So you did do some follow-up?

19            MS. BRANNON:  Your Honor, I object.  I think she's

20   asking the witness for a legal conclusion.

21            THE COURT:  Frankly, I had trouble following the

22   question.  So maybe we need to rephrase the question so I can

23   see if there's --

24   BY MS. ALEXANDER:

25   Q   If the department received the TANF guidance, plaintiff's
```

```
 1  142, reminding the agencies to continue to implement voter

 2  registration, is it correct to assume that the department

 3  thought it was in compliance in accurately implementing the

 4  voter registration act?

 5          MS. BRANNON:  And, Your Honor, I think that calls for a

 6  legal conclusion.

 7          THE COURT:  I think it's -- sustained.

 8              I think we need to move on.  So now you get

 9  another question.

10  BY MS. ALEXANDER:

11  Q   To your knowledge, did the department think it was in

12  compliance with the NVRA?

13          MS. BRANNON:  Again, I object.  I think the definition

14  of compliance calls for a legal conclusion.

15          THE COURT:  You're asking if the Federal government

16  found if they were in compliance?

17          MS. ALEXANDER:  No.  Sammy said that they received

18  this, and the TANF partners told us that we were accurately

19  implemented.

20          THE WITNESS:  Correct.  Regarding TANF, our federal

21  partners, once this came out said -- I mean, we're okay.

22          THE COURT:  Sustained.

23              Well, whether or not they were in fact in

24  compliance is a legal issue.  It is for the Court to decide.

25  But it could go to the --
```

1          MS. BRANNON:  Your Honor, I also want to object.  I

2     think what the Department of Health and Human Services may have

3     said to DCFS would be hearsay.

4          THE COURT:  That's sustained.

5     BY MS. ALEXANDER:

6     Q    Sammy, was there follow-up regarding this document 142?  Was

7     there follow-up upon receipt to ensure that we were following

8     through with our voter registration requirements?

9     A    From ACF?

10    Q    Yes.

11    A    Not to my knowledge.

12         MS. ALEXANDER:  Thank you.

13         THE COURT:  I have a couple quick questions.

14              When someone fills out a CAFE application, as I

15    appreciate it, it's forwarded to a caseworker?

16         THE WITNESS:  Correct.

17         THE COURT:  And the caseworker arranges a telephone

18    conference.

19         THE WITNESS:  Correct.

20         THE COURT:  Is that telephone conference arranged via

21    mail, telephone or email?

22         THE WITNESS:  Mail.

23         THE COURT:  And then the telephone conference takes

24    place, and at that time both parties have -- well, the

25    caseworker has access to the application that was completed by

1   the applicant?

2          THE WITNESS:  Right.

3          THE COURT:  Once the final application is filled out

4   with the assistance of the caseworker, does the applicant come

5   in, or is the original application then mailed to the applicant

6   for original signatures, or no signatures required.

7          THE WITNESS:  No.  They have some form of electronic

8   signature that -- we do not have to send them a paper

9   application for them to sign and send back.

10          THE COURT:  Okay.  So they can sign on line.

11          THE WITNESS:  Right.

12          THE COURT:  So the only -- scratch that.

13               After the determination is made as to whether or

14   not you qualify for those benefits, is another mailing made to

15   the applicant?

16          THE WITNESS:  Yes.  Whether they're approved or denied,

17   a letter goes out to them telling them, if they're approved, how

18   much and so forth and what period of time they're approved for.

19   Or, if they're denied, it tells them the reason that they're

20   denied.

21          THE COURT:  Okay.  So, for every applicant that uses

22   the CAFE system, there are at least two mailings that go to that

23   person from DCFS?

24          THE WITNESS:  Not every one.  There are a few.  There

25   are some applicants who do not require an interview.  LaCAP

1   applicants do not require an interview.  Oftentimes -- and CCAP

2   do not require interviews.

3          THE COURT:  Do they get mailings then for the award of

4   benefits or the denial of benefits?

5          THE WITNESS:  Yes.  So that means everyone gets at

6   least one.

7          THE COURT:  At least one mailing, at most three.

8          THE WITNESS:  Right.  At most three.

9               Because, a lot of times, you have to ask for

10  additional information, like verification, check stubs or

11  whatever.  So that's a different mailing.

12              So, like, if someone applies and they say I make

13  -- I work at McDonald's and I make $200 a week, we have to

14  verify that.  And, if somehow we cannot verify it on our system,

15  we ask the applicant to provide us with their check stubs.  And,

16  we do that in writing, so that's a mail-out also.

17         THE COURT:  All right.  So one, two or three --

18         THE WITNESS:  Right.

19         THE COURT:  -- mailings from you for each of these

20  online applications.

21         THE WITNESS:  Right.

22         THE COURT:  Okay.

23              How many employees do you have that actually

24  accept applications -- I don't know what you call it, case

25  workers.  What is the title of the person that is accepting

1    these applications?

2           THE WITNESS:  Social services analyst.

3           THE COURT:  How many social services analysts?

4           THE WITNESS:  I think there's between 800 and 1,100.

5    I'm not sure exactly.  But I know that it's close to 1,000

6    state-wide.

7           THE COURT:  I know you were in court this morning when

8    we talked about Medicaid applications, and that there were some

9    contractor partners.  Does DCFS have that same relationship with

10   other contracting partners, or are all of your applications

11   received in DCFS offices?

12          THE WITNESS:  We have I think it's between 300 and 350

13   what we call community partners.  But they do not do the same

14   thing that they do for Medicaid.  Medicaid, they actually pay

15   them to take applications.  We do not pay our partners.  They

16   just help provide access for our citizens.  So they can help

17   them, you know, do an online application or they can hand them a

18   paper application, but --

19          THE COURT:  Who are some of these community partners?

20          THE WITNESS:  Some of the same ones, Council on Aging

21   and places like that.  But FNS, our SNAP federal partner, only

22   allows state merit system employees to do the interview and to

23   make the eligibility decision.  So we cannot even allow them to

24   interview the client.  All they can do is assist with completed

25   applications.  And, sometimes, they help by getting verification

1    that we might need to make the decision.

2            THE COURT:  But none of your community -- maybe I just

3    misunderstood this.  So none of your community partners would be

4    actually conducting interviews?  That's all by the systems

5    analysts, right?

6            THE WITNESS:  Right, right.

7            THE COURT:  But your community partners might provide a

8    mechanism for an application process?

9            THE WITNESS:  Right.  It's more seen as an outreach or

10   easier access for citizens.  Because we've had to close some

11   offices, too.  And we don't have an office in every parish like

12   we used to.  So we need the community partners, especially in

13   the parishes that do not have a DCFS office.

14           THE COURT:  Okay.  But, under any circumstance, if I

15   showed up at the public library and asked for access to the

16   computer to fill out an application for SNAP, let's say, I would

17   still at some point receive a mailing --

18           THE WITNESS:  Yes.

19           THE COURT:  -- from your office, either setting up my

20   telephone interview or advising me of my award or denial of

21   benefits?

22           THE WITNESS:  Right.

23           THE COURT:  And perhaps another one indicating that I

24   needed to provide more information?

25           THE WITNESS:  Correct.  Exactly.

1      THE COURT:  Now, based solely on the questions I asked,

2   are there any questions you would like to follow-up?

3      MS. BRANNON:  No, Your Honor.

4      THE COURT:  Okay.  Thank you.

5          The Court will be at recess for about 15 minutes.

6          (Proceedings in recess.)

7      MS. SHAH:  Your Honor, my name is Niyati Shah.  And,

8   before we call our next witness, we had a witness on our list

9   who was subpoenaed and was -- we were unable to serve him, both

10  plaintiffs and defendants, DCFS.  And that's Mr. Wendell Young.

11  And so, at this point, we'd like to enter his deposition into

12  the record.

13     THE COURT:  Have you all made designations from the

14  deposition?

15     MR. PHILIPS:  Your Honor, I think the designations

16  virtually consumed the whole deposition by the time it was

17  offered, if I'm not mistaken.  It was only a few pages that the

18  plaintiffs suggested.  It's not going to be overly-burdensome

19  for the Court, or we're not going to extract, I don't think,

20  given -- and the statement is correct, Your Honor, we tried to

21  -- he's no longer employed by the agency.  We tried to serve

22  him, to no avail.  So he's unavailable.

23     THE COURT:  Okay.  Let it be admitted.

24     MS. SHAH:  Your Honor, we'd like to call Catherine

25  Michiels.

```
 1              CATHERINE MICHIELS, being first duly sworn,

 2   testified as follows:

 3              THE COURT:  Ms. Michiels, I need you to say your name

 4   and spell it, please, for the court reporter.

 5              THE WITNESS:  Catherine C-A-T-H-E-R-I-N-E Michiels

 6   M-I-C-H-I-E-L-S.

 7              THE COURT:  Thank you.

 8              MS. Shah:  Your Honor, may I approach?

 9              THE COURT:  Please proceed.

10                          DIRECT EXAMINATION

11   BY MS. SHAH:

12   Q   Ms. Michiels, are you currently employed by DCFS?

13   A   Yes.

14   Q   And you are a regional administrator; is that correct?

15   A   Yes.

16   Q   And you're the regional administrator for Region 6; is that

17   right?

18   A   Yes.

19   Q   Can you tell us what parishes are composed of in Region 6.

20   A   Calcasieu, Cameron, Allen, Beauregard and Jeff Davis.

21   Q   And, as regional administrator, you're responsible for all

22   management oversight; is that right?

23   A   Yes.

24   Q   And it includes management oversight of the economic

25   stability units in your region?
```

1    A    Yes.

2    Q    And the economic stability programs include SNAP, FITAP,

3    KCSP and the CCAP programs; is that correct?

4    A    Yes.

5    Q    Do you supervise anybody?

6    A    Yes.

7    Q    Who do you supervise directly with regards to economic

8    stability programs in your region?

9    A    Directly?

10   Q    Yes.

11   A    Dawn Beckdon, Rose Green, and Cheryl Farmer.

12   Q    And Ms. Beckdon and Ms. Green are your area directors; is

13   that correct?

14   A    Yes.

15   Q    And Ms. Farmer is your economic stability consultant; is

16   that right?

17   A    Yes.

18   Q    And do you have somebody like a performance measures person;

19   is that right?

20   A    Yes.

21   Q    And what's her name?

22   A    His.  John Nelson.

23   Q    But it was apparently formerly a woman; correct?

24   A    Yes.

25   Q    A different person.

1           And what is his title exactly?

2    A   Well, he's our performance measures consultant.

3    Q   And, your performance measures consultant, he actually

4    oversees your performance measures for the economic stability

5    programs; isn't that right?

6    A   He gathers the performance measures data for all of the

7    programs.

8    Q   And that includes economic stability; isn't that right?

9    A   Yes.

10   Q   And isn't it true --

11          THE COURT:  Ms. Shah, can I just get you to hold on a

12   second.

13              (Pause in proceedings.)

14   BY MS. SHAH:

15   Q   So, to go back to your performance measures consultant, he

16   gathers -- you said, he compiles data; is that right?

17   A   Yes.

18   Q   And the actual performance measures themselves, they're set

19   by the state and Federal government; isn't that right?

20   A   Yes.

21   Q   And is voter registration among the performance measures set

22   by the state government?

23   A   No, it is not.

24   Q   And so your performance measures consultant doesn't compile

25   any voter registration data; isn't that right?

 1   A   He does not.

 2   Q   Ms. Michiels, I placed a binder in front of you.

 3           Would you please turn to tab 1 on your binder,

 4   which is plaintiff's trial Exhibit 84.

 5           Are you familiar with this document?

 6   A   I've seen it, yes.

 7   Q   And what is it?

 8   A   It's an operations memorandum dated May 31, 2011.

 9   Q   And it's about?

10   A   Performance planning and review regarding voter registration

11   responsibilities.

12           MS. SHAH:  Your Honor, I'd like to enter this into the

13   record as evidence, please.

14           MS. ALEXANDER:  No objection, Your Honor.

15           THE COURT:  Let it be admitted.

16              (Exhibit admitted.)

17   BY MS. SHAH:

18   Q   And, in terms of personnel, isn't it true that the Economic

19   Stability unit includes social service analysts or case workers,

20   their supporting clerical staff and their supervisors and parish

21   managers?

22   A   Yes.

23   Q   And isn't it true at that all of these people are required

24   to have a refresher training on the NVRA every six months?

25   A   Yes.

1  Q   And would you agree that that's been required since May

2  2011?

3  A   Yes.

4  Q   Ms. Michiels, do you conduct performance evaluations?

5  A   Yes.

6  Q   For who?

7  A   For the people I directly supervise.

8  Q   And isn't it true that, at least as of September 2011,

9  evaluation of voter registration was not specifically included

10  in their evaluations?

11      MS. TOWNSEND:  Your Honor, I'm sorry.  I'm going to

12  object to this line of questioning.  It is not a requirement

13  that we in any way track this information for voter

14  registration.

15      MS. SHAH:  Your Honor, DCFS is responsible for ensuring

16  that voter registration is provided to their clients.  And, if

17  their management doesn't know, how would they know that they're

18  meeting their responsibilities within the NVRA?

19      THE COURT:  They were doing it -- they started it -- I

20  just want to make sure I understand the question that you're

21  asking.

22          Prior to September 2011, did they do those

23  evaluations?

24      MS. SHAH:  They did not, as far as we understand.

25      THE COURT:  Right.  But then, subsequent to --

1          MS. SHAH:  I don't think they did either.  And I'm

2    trying to establish that.  I actually don't know the answer to

3    that.

4          THE COURT:  I'm going to allow it.  I understand what

5    the obligation is under the NVRA.

6               Go ahead and answer the question.

7          THE WITNESS:  Could you ask it again?

8          MS. SHAH:  Of course.

9    BY MS. SHAH:

10   Q   Isn't it true that, at least as of September 2011, voter

11   registration wasn't among the criterias you used to evaluate the

12   people you directly supervised?

13   A   I don't think it was September.  This is dated May.

14   Q   No.  I'm talking about the people -- we're no longer in that

15   document.

16   A   Okay.

17   Q   I'm talking about the people you directly supervise.  Which

18   actually doesn't include the people in that document; correct?

19   A   Right.

20   Q   So the people you directly supervise and for whom you

21   conduct performance evaluations, they were not evaluated for

22   voter registration; is that correct?

23   A   They were evaluated --

24          MS. TOWNSEND:  Your Honor, I'm going to object.  She

25   hasn't provided a time reference.

```
 1              THE COURT:  Rephrase.

 2              MS. SHAH:  I will rephrase.

 3   BY MS. SHAH:

 4   Q   Those people that you directly supervise, their evaluations,

 5   as of September 2011, did not include voter registration

 6   responsibilities; is that correct?

 7   A   Their evaluations did not include the term voter

 8   registration.

 9   Q   And isn't it true that they still don't?

10   A   That's correct.

11   Q   And isn't it true that you're also evaluated on your

12   performance?

13   A   Yes.

14   Q   And isn't it true that your evaluation also does not include

15   voter registration?

16   A   It does not include those terms.

17   Q   And isn't it true that you actually don't have day-to-day

18   interactions with case workers?

19   A   No.

20   Q   You do have day-to-day interactions with case workers?

21   A   I see case workers in different programs every day almost.

22   Q   Do you recall being deposed in this case?

23   A   Yes.

24   Q   And do you remember being sworn in?

25   A   Yes.
```

1    Q    And you told the truth on that day?

2    A    Yes.

3    Q    The last tab in your binder, please turn to page 66.

4         MS. TOWNSEND:  Your Honor, what is she referring to

5    specifically?

6         MS. SHAH:  Her deposition.

7         MR. PHILIPS:  What page are you on?

8         MS. SHAH:  66.  Line -- beginning line 15.

9         MR. PHILIPS:  Thank you.

10   BY MS. SHAH:

11   Q    So please read along while I read out loud.

12        Question:  Do you have day-to-day interactions

13   with case workers that would you allow to directly observe and

14   review specifically the voter registration line of questioning?

15        Answer:  No.

16   A    But that's not what you asked me.

17        THE COURT:  Let her answer the question.

18        THE WITNESS:  So I do have day-to-day interaction

19   almost every day with some case workers.

20   BY MS. SHAH:

21   Q    I'll move on.

22        And isn't it true that you rely on your area

23   directors and economic stability consultants to alert you if

24   there are any problems related to the NVRA?

25   A    Yes.  That is their job.

1  Q   And you assume that offices in your region are in compliance

2  with the NVRA or else it will be brought to your attention?

3  A   Yes.

4  Q   Ms. Michiels, please turn to tab 4.  It's been marked as

5  plaintiff's Exhibit 82?

6       MS. TOWNSEND:  Your Honor, I'm sorry.  I'm going to

7  object to this.  I'm not even sure what plaintiff's exhibit

8  number this is.

9       MS. SHAH:  82.

10      MS. TOWNSEND:  Your Honor, this is irrelevant to these

11 proceedings.  It deals with our quality control, and it has

12 nothing to do with NVRA.

13      MS. SHAH:  Your Honor, one of the ways that DCFS

14 ensures compliance with the NVRA is that they review case files.

15 And case files are reviewed by quality control.

16      THE COURT:  Does NVRA --

17      MS. SHAH:  They say they assure compliance with the

18 NVRA by reviewing the case files to ensure that the NVRA has

19 been complied with, and case files are included within quality

20 control.

21      MS. TOWNSEND:  Your Honor, that is totally inaccurate.

22 Our QC --

23      THE COURT:  Come up.

24          (Sidebar conference.)

25      MS. TOWNSEND:  It has nothing to do with us in terms of

1    whether eligibility -- it's if we have given overpayment or

2    underpayment.  And so the QC allows our FMA partners to give us

3    a disallowance if we've overpaid.  That's all it is.  It's only

4    eligible.

5            MS. SHAH:  Part of that is going through the files to

6    make sure that every question on the application form has been

7    clear to ensure that there are current eligibility, that their

8    eligibility determinations are correct.

9            THE COURT:  I think, before you try to enter this into

10   evidence, you're going to have to lay a foundation that it's got

11   some relationship to NVRA.  But, if this is a document that is

12   used more as an audit --

13           MS. TOWNSEND:  It is.

14           THE COURT:  If it does, I don't see where it relates to

15   NVRA.  You're going to need to a lay a foundation.

16                (Sidebar concluded.)

17           THE COURT:  Ms. Townsend.

18           MR. PHILIPS:  Could we have 30 seconds, Your Honor?

19           THE COURT:  While you're doing that, I have a question.

20               Ma'am, you indicated in your evaluation you don't

21   use the term voter registration.  What did you mean by that?

22           THE WITNESS:  Because our evaluations are to evaluate

23   whether or not we are complying with all of the policies,

24   procedures regulations.  So voter registration would be one of

25   those.  But it's not specifically said.

1        THE COURT:  Let me ask you, when you do an evaluation,

2   is there a form that you fill out to determine have you asked

3   this or have you asked this?

4        THE WITNESS:  No, ma'am.

5        THE COURT:  Why don't you explain it to me.

6        THE WITNESS:  Performance evaluations just changed.

7             But we set goals for each individual position.

8   And then, for the office, and then of course for the region.  So

9   the individual positions list certain things, like

10  communication, dependability, work product.  And work product is

11  the one where you make sure that your subordinates are carrying

12  out all the policies, procedures.  And you gather that all year

13  so that you know what they're doing, how they're doing their job

14  and such as that.

15            So I don't -- and it's easier for me in child

16  support -- that's where my first background was -- I don't

17  specifically ask my child support worker on every case did you

18  do dot, dot, dot.  But, if they're doing their job, they are

19  doing dot, dot, dot.  And it's more of a broad policy procedure

20  type guideline.

21       THE COURT:  Thank you.

22       MS. TOWNSEND:  I have no questions, Your Honor.

23       THE COURT:  You may step down.

24       MS. SHAH:  Your Honor, we'd like to call Mr. Dwayne

25  Joubert, please.

1          DWAYNE JOUBERT, being duly sworn, testified as

2    follows:

3          THE COURT:  Mr. Joubert, I need you to state your name,

4    please, and spell it for the court reporter.

5          THE WITNESS:  Dwayne Joubert, J-O-U-B-E-R-T.

6          MS. SHAH:  Your Honor, may I approach?

7          THE COURT:  Yes.

8                        DIRECT EXAMINATION

9    BY MS. SHAH:

10   Q   Mr. Joubert, who is your employer?

11   A   The state of Louisiana, Department of Children and Family

12   Services.

13   Q   How long have you been there?

14   A   Since March of 2009.

15   Q   What is your current position?

16   A   SSA 2.

17   Q   Is that, by SSA 2, meaning social services analyst?

18   A   Social Services 2.

19   Q   And what are your responsibilities in that position?

20   A   Currently, I'm assigned to the STEP program, which is -- it

21   stands for Strategies to Empower.  And it is a program that

22   follows up the FITAP eligibility program.

23   Q   And, prior to that, were you also -- weren't you an intake

24   analyst for the SNAP program?

25   A   I was.

1    Q    And what was -- when was that?

2    A    That was prior to January of 2012, for approximately two

3    years, I guess.

4    Q    And what were your responsibilities in that role?

5    A    To determine eligibility for SNAP applicants.

6    Q    So, by that, you mean that your responsibilities were

7    processing applications, interviewing clients to determine

8    eligibility and certifying cases; isn't that right?

9    A    Yes, ma'am.

10   Q    Can individuals come in to your DCFS office building where

11   you work and fill out an application for benefits on the

12   computer?

13   A    Yes, they can.

14   Q    When you were doing the SNAP -- actually, most of my

15   questions will be when you were in that position at doing the

16   SNAP intake, but I'll clarify if it's not.

17            Can you just take a look at what's marked tab 3 in

18   your binder.

19            THE COURT:  What exhibit is that?  Plaintiff's exhibit?

20            MS. SHAH:  I apologize, Your Honor.  It's plaintiff's

21   Exhibit 161, it's already in evidence.

22   BY MS. SHAH:

23   Q    Do you recognize this document?

24   A    Yes, ma'am.

25   Q    Isn't it true that there is a voter registration form?

```
 1   A    Yes, ma'am.

 2   Q    And isn't it true that you mailed this form to individuals

 3   who checked yes to the voter registration question under

 4   Benefits Application?

 5   A    If you would do me the favor of stating that question or

 6   providing me with the application, so I can check it.  I haven't

 7   seen an application in awhile since I'm not in that position

 8   anymore.

 9   Q    A SNAP application?

10   A    Yes.

11   Q    You need that?  Okay.

12               One moment, Your Honor.

13               (Pause in proceedings.)

14          MS. SHAH:  I'm going to pull up plaintiff's Exhibit 87.

15   It's plaintiff's Exhibit 87-N.

16          THE COURT:  87 --

17   BY MS. SHAH:

18   Q    And if you could turn to what's on page 36.

19   A    Can I see the last page of the application?

20   Q    Sure.

21   A    This application doesn't have any boxes on it.

22          THE COURT:  Doesn't have what?

23          THE WITNESS:  The boxes that she's alluding to.  I

24   don't know if this is an older version.

25          MS. SHAH:  Scroll down or scroll back up.  Work your
```

```
1    way down.
2            THE WITNESS:  My reason for seeing the application is
3    to be able to discern whether or not the verbiage that you're
4    asking me about is what I remember it to be.  That's the only
5    reason I'm asking to see it.
6            THE COURT:  Do we have a hard copy that we can show?
7    Sometimes that's easier.
8                    It's a SNAP application from 2010.
9                    That's when you were there?
10           THE WITNESS:  Yes, ma'am.
11           MR. PHILIPS:  I have a January 2010 and a December
12   2010.
13           THE WITNESS:  Either of those should be fine.
14           THE COURT:  Why don't you have give him both, since I'm
15   not sure when he exactly left that position.
16   BY MS. SHAH:
17   Q   Would you like me to repeat my question?
18   A   Would you please?
19           THE COURT:  Why don't you take your time and look
20   through both of those documents, and tell us which one you
21   recall being the one you worked with.
22                    And then let's ask him those questions.
23           THE WITNESS:  May I speak?
24           THE COURT:  You may.
25           THE WITNESS:  The 4APP Revised Version 02-10, I recall
```

1    working with that document.

2              And it does have a box at the top.  And that

3    question reads:  If you are not registered to vote where you

4    live now, would you like to register to vote?

5              If the client checked yes, then a voter

6    registration form would indeed be sent to him or her.

7    BY MS. SHAH:

8    Q   Right.  So I'm going to cut -- I'm going to repeat my

9    question.

10             Isn't it true that you mailed the voter

11   registration form, which is in your tab plaintiff Exhibit 161,

12   to individuals who checked yes to that question on the benefits

13   application?

14   A   That would be true.

15   Q   And, on the voter registration form, there is a place for

16   official use; isn't that right?

17   A   Correct.  Right.

18   Q   And isn't it true that you circled the letters PA in this

19   area before you mailed it out?

20   A   You circle the letters PA when it's returned to the office

21   before you send it to the registrar's office.

22   Q   But isn't it true that you circled the letters PA before you

23   mailed it out?

24   A   I won't say that I did not do that.

25   Q   So will you say you did?

```
1    A    I possibly did.

2    Q    Did you always do that?

3    A    I wouldn't say I always did.

4    Q    And can you tell us what PA means?

5    A    Public assistance.

6    Q    Back when you were working with SNAP at locations, isn't it

7    true that you personally received voter registration

8    applications back from clients on occasion?

9    A    I recall having received less than half a dozen.

10   Q    So, yes or no?

11   A    Yes.

12   Q    And you would receive them in the mail; right?

13   A    I would receive them, I assume, via the mail.  They were

14   forwarded to me by the mail processing.

15   Q    And, once you personally received a completed voter

16   registration application, you'd give it to the clerical staff

17   without doing anything else; right?

18   A    I would ensure the PA was circled, and I would sign that I

19   received it.

20   Q    Did you do anything else?

21   A    No.

22   Q    And isn't it true that you almost always interviewed SNAP

23   applicants over the telephone?

24   A    Yes.

25   Q    And the isn't it true that benefit applications have to be
```

1    signed?

2    A    By the applicant; is that your question?  Yes, ma'am.

3    Q    Yes.

4                    And sometimes the applicant doesn't sign it;

5    right?

6    A    Sometimes, they don't.

7    Q    So, if you had received an unsigned benefits application,

8    you would at least send the signature page back to the client to

9    sign it; right?

10   A    That would be correct.

11   Q    And sometimes clients also leave questions or boxes on the

12   benefits application unanswered; isn't that right?

13   A    Correct.

14   Q    So, if a specific box on the benefits application was left

15   blank or unanswered, you would question the client about it in

16   the interview?

17   A    Correct.

18   Q    And, when you were the SNAP intake, doing SNAP intakes, you

19   had a supervisor; isn't that right?

20   A    Yes.

21   Q    And he would sometimes sit in your interviews; isn't that

22   right?

23   A    Occasionally.

24   Q    In fact, isn't it true that your supervisor sits in on five

25   interviews per month when you were doing SNAP to ensure you were

1  covering voter registration questions on the benefits

2  application?

3  A   As I recall, that was the office policy at the time.

4  Q   And isn't it the case that he sat in on five interviews only

5  since after this litigation?

6  A   True.

7  Q   And, Mr. Joubert, are you familiar with the simplified

8  report form?

9  A   Vaguely.

10  Q   And isn't it true that a simplified report form states that,

11  if this is not returned by a client on the date specified in it,

12  that his case could be closed?

13  A   I could not speak to that, I do not know.

14  Q   If you saw the form would, that refresh your recollection?

15  A   It would probably.

16  Q   Would you turn to tab 2 in your binder.  It's what's marked

17  as plaintiff's trial Exhibit 146.  And it has been admitted into

18  evidence.

19          And, if you could turn to page 54 in that

20  document, which is Bate stamped DCFS 9424.

21  A   Could you repeat your question.

22  Q   Sure.

23          Isn't it true that the simplified report form says

24  that, if it is not returned by a client on a due date specified

25  in it, that his case may be closed?

```
 1              MS. CANGELOSI:  Your Honor, I'll object.  This is the
 2    file of Luther Scott, who is the plaintiff in this case.  I
 3    don't know that this witness had anything to do with Luther
 4    Scott.
 5              THE COURT:  Why don't up all come up.
 6                  (Sidebar conference.)
 7              MS. SHAH:  It's not about any particular client.
 8              THE COURT:  You're just asking him to recognize the
 9    form without any of the markings on it?
10              MS. CANGELOSI:  It is the file, it's the Luther Scott
11    file.  She wants to ask this man, who is no longer a SNAP
12    worker, if something was appropriate on the Luther Scott file.
13    It's not appropriate.
14              THE COURT:  That's not the question I heard.
15                  I thought you said does this -- does this include
16    from the form.
17                  Where are we going from here?
18              MS. SHAH:  Your Honor, DCFS is contesting that the form
19    for SNAP is not used to determine eligibility, and we're saying
20    that the form is being used to determine eligibility.
21              MS. ALEXANDER:  You just want to use the blank SR?
22              MS. SHAH:  Unfortunately, you all didn't provide us
23    with a blank SR.
24              MS. ALEXANDER:  You never received a blank SR?
25              MS. SHAH:  No.
```

1          THE COURT:  Didn't he just say that?  That these forms

2    are sometimes used to determine eligibility?

3          MS. SHAH:  He did not.  I don't know if he said that;

4    but, if he did, I didn't hear that.

5          THE COURT:  He said, yes, sometimes we use those forms.

6    So, if that's all --

7          MS. SHAH:  That's all I wanted to do.

8          THE COURT:  Then I think we can move on.  He did say.

9          MS. SHAH:  Okay.  Then we can move on.

10         THE COURT:  Thank you.

11               (Sidebar concluded.)

12         MS. SHAH:  One moment, Your Honor.

13               (Pause in proceedings.)

14         MS. SHAH:  Your Honor, we'd just like to establish that

15   Mr. Joubert said that this 4SR form was used to determine

16   eligibility.

17   BY MS. SHAH:

18   Q   Is that right?  That you just testified to that?

19   A   I say it was used to determine continued eligibility.  Not

20   initial eligibility.

21   Q   And isn't it true that, in general, DCFS's policies are

22   available online?

23   A   Yes.

24   Q   And isn't it true that you may access DCFS online?

25   A   Yes.

1   Q   Isn't it true that you would refer to the policies available

2   online if you questioned your accurate knowledge of a particular

3   policy?

4   A   That would be the general protocol.

5           MS. SHAH:  Your Honor, I don't have anything further at

6   this time.

7               Actually, I apologize -- for a second.

8           MS. CANGELOSI:  I didn't hear a word she said.

9           THE COURT:  I think she said -- what she said was I

10  think I'm done, and now I think she needs to confer with

11  counsel.  So we're going to allow her to do that.  Sit down for

12  just a minute.

13              (Pause in proceedings.)

14  BY MS. SHAH:

15  Q   Mr. Joubert, I'm sorry.  I apologize.

16  A   I thought I was getting away.  You can run but you can't

17  hide.

18  Q   Can you turn to tab 1 in your binder.

19  A   Sure.

20          THE COURT:  Which exhibit is that?

21          MS. SHAH:  It's Exhibit 125.

22          MS. ALEXANDER:  Your Honor, I'm going to object to any

23  material regarding any PPRs.  This is a performance review

24  conducted on Mr. Joubert, and we don't see the relevance of any

25  of the allegations.

1          THE COURT:  Come on up.

2               (Sidebar conference.)

3          THE COURT:  The reason I called you up is because

4    there's no talking objections.

5          MS. SHAH:  This addresses specifically the motions.

6    Because, under Responsibilities, this PPR does allow -- the

7    purpose of the PPR is for merit determinations.  It's used to

8    evaluate the staff.  And, generally, it's used to determine

9    their duties, their duties as related to the determination --

10   eligibility determination.

11         MS. ALEXANDER:  The purpose of the form was never to

12   the NVRA.  NVRA was added in as a component to ensure we're

13   carrying out the compliance throughout the agency.  But the

14   purpose of the document itself was not specifically for NVRA

15   clients, it was for the voter registration check.

16         THE COURT:  Let me ask, where are we going with this?

17   Tell me where.

18         MS. SHAH:  Your Honor, specifically, this PPR mentions

19   NVRA responsibility and requests compliance with it.  Ms.

20   Michiels testified that they don't mention the registration

21   directly.  This one does.  I want to show the difference.  And

22   what is evaluated and what workers are evaluated with when

23   they're monitored for compliance under the NVRA.

24         MS. ALEXANDER:  We provided several PPRs.

25         THE COURT:  She said specifically that we don't

```
1   evaluate.  Because, actually, that's the one question I went

2   back and asked her.

3              MS. ALEXANDER:  Did she speak to RAs, to her staff.

4              THE COURT:  She said they don't use the term voter

5   registration.

6              MS. ALEXANDER:  I thought it was in her staff.  Her

7   PPR.  Her staff is Rose Green and other regional areas.  This

8   is, we're talking analysts here.  She would not be responsible

9   for the PPRs.

10             MS. SHAH:  We're not talking about NVRA compliance by

11  any one client.  We're talking about NVRA as a whole.

12             MS. ALEXANDER:  And then you should have simplified

13  your question with regard to Ms. Michiels.

14                  But, as to Joubert, the purpose of PPR --

15             THE COURT:  I think it's appropriate for you to ask him

16  in your evaluation, unless he contradicts this form, is his NVRA

17  compliance a component.  And then, if he doesn't, we'll look at

18  his --

19             MS. CANGELOSI:  Civil Service Rules of the state of

20  Louisiana define those forms.  Because our state, just like

21  every other agency in the state, we don't design them.  They're

22  designed by the Civil Service Rules under Civil Service Law, and

23  you can't get a raise without doing it.  I don't see how we can

24  change it or do something different.

25             THE COURT:  I think, if your evaluation, albeit civil
```

 1   service, you determine if this person is not asking a certain

 2   amount of voter registration, then you have got a person that,

 3   you know, is not in compliance.  I think it's --

 4        MS. CANGELOSI:  You totally could have been working in

 5   doing his job, he doesn't do the civil service.  But we can't

 6   change the forms.

 7        THE COURT:  Nobody's talking about changing the form.

 8   It's just if it is a method of determining whether or not there

 9   is compliance.

10        MS. ALEXANDER:  That would go to, say, before we added

11   the question, just to ensure that -- this form for us is similar

12   to the task force.  We didn't develop the task force, but we did

13   add a specific question.  On the same token, if it didn't add

14   the question, we're not asking the voter registration, the

15   answer is no, that does not say that.  Because the 404(b) has

16   the question in the document.  So, whether it's not within the

17   PPR as an evaluation, the question is still being asked.  I'm

18   just saying that the PPR tool itself says nothing with regards

19   to just NVRA.  This is just a general tool that was implemented

20   by the department --

21        THE COURT:  Did you just say that it's not included in

22   here?

23        MS. ALEXANDER:  This was added.

24            This is the sender division; right?

25        MS. SHAH:  It was added to this, yes.

1          MS. CANGELOSI:  They need to prove somebody violated.

2     They're trying to violate -- they'd have to see if we violated.

3     They need to prove we violated because a person didn't evaluate.

4     They're saying it is a violation.

5          MS. ALEXANDER:  NVRA doesn't speak to evaluations.  It

6     doesn't speak to any evaluations.  The documents like QCs and

7     evaluations, rulings and PPRs would complicate the report.  What

8     we need to show is their forms and our policies of whether there

9     is any compliance or not compliance.

10         MS. SHAH:  It's not just about compliance.  It's

11    actually executing those things.  And the fact that, you know,

12    that your workers are executing them.

13         MS. CANGELOSI:  They don't have to, no.

14         MS. ALEXANDER:  They've got to prove a violation.

15         THE COURT:  What is this going to tell me, Ms. Shah,

16    that I don't know?

17         MS. SHAH:  Your Honor, it's going to say that we are

18    currently evaluating the workers to ensure compliance with the

19    NVRA.

20         THE COURT:  Answered that.

21         MS. SHAH:  But they're not doing it for those workers

22    like Ms. Michiels and Ms. Green, who are also responsible for

23    this.

24         MS. ALEXANDER:  Ms. Michiels didn't have client

25    contact.

1        MS. SHAH:  She's responsible for management,

2   overseeing.

3        THE COURT:  Okay.  I'm going to sustain the objection.

4   I think we're going far afield.  Let's move on.

5             (Sidebar concluded.)

6        MS. SHAH:  So, Your Honor, we'll just note for the

7   record that we attempted to admit this document.

8        THE COURT:  You can proffer it at the break.

9        MS. SHAH:  Thank you.

10        THE COURT:  Thank you.

11             Cross?

12        THE COURT:  You were objecting?

13             Ms. Alexander, come up.

14                    CROSS EXAMINATION

15   BY MS. ALEXANDER:

16   Q   Mr. Joubert, I just have one or two follow-up questions.

17             You stated you're with the STEP program currently?

18   A   Yes, ma'am.

19   Q   And, previously, as an SSA 2, you did intake; correct?

20   A   Correct.

21   Q   You conducted an interview within the STEP program?

22   A   I'm sorry?

23   Q   Did you conduct interviews within the STEP program?

24   A   Don't.  Not eligibility interviews.

25   Q   There's no NVRA in the STEP program?

1    A    Do we discuss NVRA for the STEP program, no, ma'am.

2    Q    But with regards to the intake process or the SNAP program?

3    A    We discuss NVRA?

4    Q    Did you discuss NVRA?

5    A    Absolutely.

6    Q    What are client's rights and responsibilities?

7    A    What are they?

8    Q    What are they.

9    A    List them?

10   Q    Yes.  What are your clients rights and responsibilities?

11           THE COURT:  As to what?

12           MS. ALEXANDER:  Clients rights and responsibilities is

13   a group of information that is discussed with a client during

14   the interview.  It includes voter registration.  It's normally

15   what our staff says for the voter registration.

16           THE COURT:  Thank you.

17           THE WITNESS:  I just, when you said client voter rights

18   and responsibilities, I didn't know if we were talking about

19   eligibility or NVRA.

20           MS. SHAH:  Objection.  I don't understand the relevance

21   of this rights and responsibilities in relation to the voter

22   registration.

23           THE COURT:  I can't hear you.

24           MS. SHAH:  I object to the relevancy of the client's

25   rights and responsibilities.

1          THE COURT:  Let's see where we're going with it.

2          THE WITNESS:  When discussing the rights and

3    responsibilities, when I was an intake analyst, I would ask the

4    client if they're registered to vote at their current address.

5    And, if they were not, would they like to have a form, a voter

6    registration form sent to them.  And then I would list the

7    rights of -- their rights and responsibilities, such as an

8    impartial determination of their application not based on race,

9    religion, creed and any other partiality things.  I mean, it's

10   written out for us.  But, paraphrasing, that would be what I

11   discussed with them.

12   Q    Okay.  So, routinely, you would ask voters, you would

13   discuss voter registration with regards to rights and

14   responsibilities; true?

15   A    Routinely, voter registration was discussed as a part of

16   rights and responsibilities, yes.

17   Q    If you had any questions regarding voter registration and

18   how it should be implemented or how you should conduct an

19   interview and discuss voter registration, would you refer to any

20   particular sources?

21   A    We'd refer to the policy manual online.

22          And, if I still had questions, I would ask my

23   supervisor.

24          MS. ALEXANDER:  I have no further questions.

25          MS. SHAH:  Nothing further, Your Honor.

1          THE COURT:  You're done, Mr. Joubert.

2          MS. RUPP:  Your Honor, my name is Michelle Rupp, and at

3     this time plaintiffs call Ms. Stephanie Brooks.

4               STEPHANIE BROOKS, being duly sworn, testified as

5     follows:

6          THE COURT:  Ms. Brooks, I need you to say your name and

7     spell it for the court reporter, please.

8          THE WITNESS:  Stephanie Brooks, S-T-E-P-A-H-A-N-I-E,

9     Brooks, B-R-O-O-K-S.

10                    DIRECT EXAMINATION

11    BY MS. RUPP:

12    Q    Good afternoon, Ms. Brooks.

13    A    Good afternoon.

14    Q    My name is Michelle Rupp.  I'll be asking you some questions

15    today.

16              You used to work at DCFS; is that correct?

17    A    Correct.

18    Q    But you're now retired?

19    A    No.

20    Q    Where do you work now?

21    A    I work at Secretary of State's Office.

22    Q    And when did you leave DCFS?

23    A    September 25th of this year.

24    Q    At the time that you left DCFS, your title was assistant

25    director of Emerging and Legacy Technology; is that correct?

```
 1    A    No.

 2    Q    What was your title when you left?

 3    A    Technical architect coordinator.

 4    Q    And what did you do as the technical architect coordinator?

 5    A    My overall was to ensure that the third-party tools that

 6    were used on the transformation project as far as the

 7    development architecture for those tools that were used to do

 8    development work were in accordance with DCFS standards.

 9    Q    And would those third-party tools involve CAFE?

10    A    Yes.

11    Q    And, at some point before you were the technical architect

12    coordinator, were you the assistant director of Emerging and

13    Legacy Technologies?

14    A    Yes.

15    Q    And when did you become the assistant director of Emerging

16    and Legacy Technologies?

17    A    It was early 2011.  I'm not quite sure of the month.

18    Q    If I said April 2011, would that sound right?

19    A    It was around there, yes.

20    Q    And you also dealt with CAFE in that position; is that

21    correct?

22    A    Yes.

23    Q    So what was the difference in what you were doing with CAFE

24    between when you were the assistant director of Emerging and

25    Legacy Technologies and when you became technical architect
```

1   coordinator?

2   A   The difference -- there were several differences.   The main

3   difference was I was no longer -- I had no -- my oversight was

4   no longer over the developer, the state staff developers on the

5   project.

6               As technical architect coordinator, my overview --

7   my control was mainly over the third-party tools instead of

8   staff.

9   Q   Okay.   And you've been working at DCFS since 1999; is that

10  correct?

11  A   That's correct.

12  Q   And have you ever been a computer programmer for DCFS?

13  A   Yes.

14  Q   So you already said you are familiar with CAFE and you

15  worked with CAFE.

16               Can you explain what CAFE is?

17  A   My understanding of CAFE is that it's a common front-end --

18  CAFE stands for Common Access Front-End.   So it's a web portal

19  that has integration points to the mainframe Legacy systems.

20  And it's used by DCFS staff members to aid them in their work in

21  the fields.

22  Q   So can a client use CAFE to apply for benefits online?

23  A   Can you expound on that, please?   Can you explain that a

24  little bit more?

25  Q   When a client applies for benefits -- for public assistance

1    benefits, such as SNAP, CCAP, KCSP, any of those, any other

2    public assistance, the system that they use to apply online,

3    they're using CAFE; is that right?

4    A    The SNAP -- now, understand that my understanding of it was

5    from that period of time, that April to January.  And January is

6    when the Release 1 phase of CAFE was getting ready to be rolled

7    out.  So my -- the only thing I know is from that period of

8    time.  And, during that period of time, I'm only familiar with

9    the SNAP application.  And I think it also -- all I know for

10   sure is that the SNAP application was available through CAFE.

11   Q    Do you know if -- case workers also used CAFE during

12   interviews with clients; is that right?

13   A    I'm not sure.

14   Q    Do you know whether -- actually, let me back up.

15            As the assistant director of Emerging and Legacy

16   Technologies, you were responsible for overseeing the building

17   of CAFE; correct?

18   A    Not correct.  No.

19   Q    No.

20            Ms. Brooks, do you remember giving a deposition in

21   this case?

22   A    Yes.

23   Q    And you were under oath when you gave that deposition?

24   A    Yeah, yeah.

25   Q    And did you tell the truth during that deposition?

```
 1   A    Yes.

 2   Q    Let me ask my question.  I'm sorry.

 3                Did you oversee the development of what the

 4   developers were --

 5                I'm sorry.  Can you give me just a moment?

 6   A    Sure.

 7                (Pause in proceedings.)

 8   BY MS. RUPP

 9   Q    So let's look at your deposition.  I'm going to hand you a

10   binder, and the last tab in the binder is a transcript of your

11   deposition.

12                If you look at page --

13           MS. CANGELOSI:  Your Honor, is this for impeachment?  I

14   don't know what question we're impeaching on.

15           MS. RUPP:  I'll repeat the question.

16           THE COURT:  I think you need to repeat the question.

17   BY MS. RUPP:

18   Q    I asked:  When you were specifically the director of

19   Developing and Emerging Technologies, you were responsible for

20   overseeing the building of CAFE?

21   A    No.  That's not correct.

22   Q    Were you responsible for understanding what the contractors

23   were supposed to build for CAFE?

24   A    Yes.

25   Q    And you were responsible for making sure that what the
```

1    contractors -- were you responsible for making sure that what

2    the contractors built were within DCFS policies; is that right?

3    A    Yes.

4    Q    In your understanding of CAFE, when you were working with

5    it, did CAFE have a question in it that said:  If you are not

6    registered to vote where you live now, would you like to apply

7    to register to vote?

8                    Do you remember that?

9    A    Don't recall that.

10   Q    Do you remember if there was any question asking about voter

11   registration?

12   A    Didn't memorize the application.  I don't know exactly.

13   Q    And you say your knowledge of CAFE only goes to January of

14   2012; is that what you said?

15   A    Yes.

16   Q    And what stage was CAFE at in January of 2012?

17   A    It was Release 1.

18   Q    That was Release 1?

19                   And what does that mean, that it was Release 1?

20   A    It was the whatever business requirements that were supposed

21   to go in CAFE at that particular time.  There were other

22   business requirements that were going to come up in future

23   releases.

24   Q    So you would know what the business requirements were as of

25   January 2012?  I'm sorry, 2011, January 2011 or 2012?

1    A    2012.

2    Q    You knew what the business requirements were?

3    A    Not that I knew what the business requirements were, per se,

4    no.  I knew what they needed the system to do.  And so my

5    purview was over the technical piece of how the system should

6    behave based on whatever requirements were given to us.  I was

7    not very versed on every business requirement, no.

8    Q    So, with your technical knowledge of CAFE, are you able --

9    would you know what CAFE was capable and not capable of doing?

10   A    At that time it was being rolled out, so we were in the

11   process of designing the technical architecture of it.  It was

12   not completed at that time.  I would not want to say

13   affirmatively, yes, because it was not completed at that time

14   that I left.

15            MS. RUPP:  May I consult?

16            THE COURT:  Yes.

17                 (Pause in proceedings.)

18            MS. RUPP:  Thank you for your patience.

19   BY MS. RUPP:

20   Q    Based on your knowledge of the technical capabilities of

21   CAFE, would it be possible for CAFE to be programmed to send a

22   mailing if the user tells it to?

23            MS. TOWNSEND:  I'm going to object, because this is

24   speculative at this point.  She no longer works there, and she

25   hasn't had any interaction with CAFE since February 2012.

1          MS. RUPP:  Ms. Brooks testified specifically to this

2    question.  I'm asking, based on her knowledge at the time she

3    testified, was this a possibility.

4          THE COURT:  I'm going to sustain the objection.  I

5    think we need to move on.

6          MS. RUPP:  Yes, Your Honor.

7    BY MS. RUPP:

8    Q    Do you know when CAFE was rolled out state-wide?  When it

9    was made available state-wide?

10   A    Release 1?

11   Q    Well, you said Release 1 was in January; correct?  January

12   2012.  And you said -- and was that state-wide, or was that only

13   in a specific area?

14   A    I'm foggy.  I really don't remember.

15   Q    At the time that you were working with CAFE, was it capable

16   of making reports?

17   A    Release 1, I do not -- there were no reports in Release 1.

18   Q    Was it capable of running transaction audits?

19   A    Can you explain that?

20         MS. CANGELOSI:  What's the relevance?

21         THE COURT:  Come up here and tell me where we're going

22   with this.

23              (Sidebar conference.)

24         MS. RUPP:  During Ms. Brooks' deposition in November,

25   she testified to multiple things that the CAFE system was

1    capable of doing.  And that it was capable of doing directly the

2    remedy --

3         MS. TOWNSEND:  That was when it was in the development

4    stage.  So she doesn't know what it's capable of doing today

5    because she never even had anything to do with CAFE.  There were

6    changes.  That was a pilot in the first one, so they were

7    continually making updates to CAFE.  So she might have been able

8    to testify to something in November of 2011 that is not true

9    through October, whatever today's date is, of 2012.

10        MS. RUPP:  I understand she won't be able to testify as

11   to what is currently happening.  But, if something was

12   technically capable of November 2011, I don't see why the system

13   would not be capable of doing it now.

14        MS. TOWNSEND:  Because they could have made changes to

15   the system.

16        THE COURT:  I'm going to allow this question, assuming

17   this is the last question.

18             How much have you got left?  Because I think I'm

19   going to give a conference.

20        MS. RUPP:  Well, so, based on what's happened today, I

21   would like to ask her the question I just asked, which is

22   whether CAFE is able to run transaction audits, and then I'd

23   like to ask two follow-up questions.

24        MS. CANGELOSI:  What's a transaction, what's the

25   relevance?

1          MS. RUPP:  That's the term she used in her deposition.

2          THE COURT:  It doesn't matter, just because she said it

3     in the deposition doesn't mean it's admissible at trial.

4          MS. RUPP:  I understand.

5          THE COURT:  So where are we going with this?

6          MS. RUPP:  The end result is I believe Ms. Brooks will

7     be able to testify that, at the time she left, CAFE was able to

8     track how many times a person checked a particular box.  And

9     that, therefore, it would be able to track how many times an

10    applicant tried to scroll down and the answers --

11         THE COURT:  How many times they checked no?

12         MS. RUPP:  Categories.  So, if you had 30,000

13    applicants, how many checks.

14         MS. CANGELOSI:  They don't require that, Judge.

15         THE COURT:  They're asking for that in the injunctive

16    relief.

17              I don't think she's right.  I want to talk about

18    what's currently available.  I think you need whoever is there

19    now to tell us what the system provides.  I'm going to allow you

20    to ask this question because -- I'm going to allow you to ask

21    this question, and then I want to see everybody in chambers.

22         MS. RUPP:  Yes, Your Honor.

23              Does that include the two follow-up questions?

24         THE COURT:  You can ask your two follow-ups, and then

25    we're going to take a little break.

1          (Sidebar concluded.)

2     BY MS.  RUPP:

3     Q   Ms. Brooks, as of January 2012, CAFE was able to run

4     transaction audits; is that correct?

5     A   Yes.  Yes.

6     Q   And those transactions audits could show how many times a

7     person checked a particular box?

8     A   User transactions are subjective based on what the business

9     requirements are.  I cannot say that CAFE had that particular

10    piece in their transactional auditing.  It is capable of

11    transaction auditing, yes.  As a system, you know, it's capable

12    of doing that.

13              However, when you say check box, I'm not sure if

14    that was in part of the transactional auditing.  If it existed

15    in the system, yes.

16    Q   So let me give you a specific example then.  If CAFE had a

17    question at the time asking a person if they wanted to register

18    to vote, yes or no, would the system have been capable of

19    tracking how many applicants checked yes to that answer and how

20    many applicants chose not to that answer?

21    A   The capability is there, yes.

22              MS. RUPP:  Thank you.

23              THE COURT:  Ms. Townsend -- are you done?  Ms.

24    Townsend?

25              MS. TOWNSEND:  Your Honor, I'm good.  No questions.

1          THE COURT:  It's 5:30.  I do want to have about a 15

2    minute conference in chambers with one person from each party.

3    The Court will be at recess for about 15 minutes.

4          MR. HO:  Your Honor, if I may, there is one other issue

5    we'd like to address on the record before the conference, if

6    that's all right.

7          THE COURT:  That's fine.

8          MR. HO:  It should be very, very brief, Your Honor.

9          And it has to do with -- I know you already ruled

10   on the motions in limine, but it has to do with one of them.

11   Specifically, Document 381, which was the motion in limine that

12   we filed to exclude the testimony of Sandra Wilson.

13          There's some case law that's precisely on this

14   issue that we would like to address briefly, Your Honor.  And,

15   just to review that objection, we think it would also save

16   everyone's time, for example, if this witness becomes not

17   necessary.  And I want to turn it over to my colleague, Ms.

18   Sollie to briefly outline that.

19          MS. CANGELOSI:  Judge you've ruled on that motion.

20          THE COURT:  I've already ruled on that one.  I'm not

21   going take it up again.

22          Court's at recess for 15 minutes.  One person from

23   each table.

24          (Proceedings in recess.)

25          THE COURT:  It is 6:00 o'clock, and we are going to

1   adjourn for the day.  The court will be in session 8:30 tomorrow

2   morning.

3              I do want a conference with the select few at

4   8:15.

5              Those of you that have not been invited to the

6   back, it is nothing personal, but it's just very difficult to

7   get much done with 50 people in the room.

8              So court's adjourned until 8:30 tomorrow morning.

9              I am going to meet with you at 8:15.  I'm just

10  wondering, Mr. Ho, if I need you to contact Stephanie tonight --

11  I don't know if we need to know if those witnesses are going to

12  be called.  I would suspect they won't need to be.  I'm hoping

13  they won't need to authenticate any documents.  Okay?

14             Thank you.  Court's adjourned until 8:30 tomorrow

15  morning.

16             (6:00 p.m., proceedings recessed.)

17

18                        CERTIFICATE

19

20

21        I, Susan A. Zielie, Official Court Reporter, do hereby
    certify that the foregoing transcript is correct.

22

23

24                         /S/ SUSAN A. ZIELIE, FCRR
                          _____
25                            Susan A. Zielie, FCRR

**$**

**$200** [1] - 214:13
**$65** [1] - 75:9

**'**

**'90s** [1] - 197:14
**'93** [1] - 15:20
**'93/'94** [2] - 9:20, 10:11
**'94** [2] - 15:20, 16:17
**'95** [2] - 15:20, 16:18
**'96** [1] - 16:18
**'97** [1] - 16:18

**/**

**/S** [1] - 259:23

**0**

**00157** [1] - 155:1
**0119** [2] - 148:24, 148:25
**02-10** [1] - 232:25
**02875** [1] - 176:13
**06161** [1] - 158:17
**06249** [1] - 159:20
**08-10** [1] - 136:18

**1**

**1** [26] - 23:5, 28:6, 54:3, 56:7, 80:11, 80:12, 112:6, 123:25, 132:3, 133:5, 133:19, 139:3, 175:7, 185:10, 206:7, 207:15, 221:3, 239:18, 250:6, 252:17, 252:18, 252:19, 254:10, 254:11, 254:17
**1,000** [1] - 215:5
**1,100** [1] - 215:4
**1,300** [1] - 35:22
**1.2** [1] - 65:17
**1/2** [1] - 2:23
**10** [17] - 9:22, 10:18, 74:4, 98:19, 108:15, 108:19, 108:23, 138:8, 139:9, 140:2, 140:10, 140:15, 141:12, 142:13, 142:20, 143:2, 143:3
**100** [4] - 35:19, 98:22, 170:20, 171:8
**100,000** [2] - 34:20,

34:25
**10004** [1] - 2:15
**10013** [1] - 2:6
**101** [2] - 3:5, 23:1
**101-A** [1] - 21:1
**104-A** [2] - 21:2, 141:8
**104-E** [4] - 21:3, 138:8, 138:24, 139:22
**104-F** [3] - 137:16, 137:17, 138:24
**105** [2] - 19:13, 21:3
**105-E** [1] - 21:4
**106** [1] - 23:1
**107** [3] - 21:4, 175:21, 175:25
**108-K** [1] - 21:4
**108-R** [1] - 156:18
**108-S** [3] - 21:4, 157:2, 157:25
**109.1** [2] - 120:12, 120:16
**11** [2] - 10:18, 75:8
**11-926** [2] - 1:8, 6:4
**110** [7] - 21:4, 148:11, 149:19, 153:25, 154:8, 174:3, 174:5
**1119** [1] - 149:9
**112-A** [5] - 152:5, 152:14, 152:18, 152:19, 154:15
**113** [1] - 23:1
**117** [2] - 5:13, 23:1
**119** [1] - 23:1
**11:56** [1] - 127:12
**12** [5] - 25:22, 108:22, 108:23, 139:4, 198:8
**121** [1] - 23:1
**123** [1] - 23:1
**125** [1] - 239:21
**1250** [1] - 2:19
**128** [6] - 5:15, 181:12, 181:15, 182:5, 183:21, 183:22
**129** [4] - 182:10, 183:1, 183:21, 183:22
**12:00** [1] - 127:19
**13** [3] - 80:21, 81:1, 199:20
**130** [4] - 183:18, 183:19, 183:24, 184:8
**131** [2] - 23:1, 183:24
**133-F** [1] - 183:24
**134-A** [1] - 183:24
**134-K** [1] - 183:24
**1350** [1] - 2:19

**14** [3] - 22:20, 22:21, 23:6
**140** [3] - 23:1, 199:9, 199:19
**141** [2] - 23:2, 101:1
**142** [6] - 23:2, 206:3, 208:4, 210:11, 211:1, 212:6
**143** [1] - 21:4
**145** [1] - 21:4
**146** [2] - 21:4, 236:17
**147-A** [2] - 112:6, 112:16
**147-B** [1] - 21:17
**149** [1] - 23:2
**15** [19] - 1:9, 6:1, 14:8, 14:12, 18:8, 18:11, 23:6, 36:10, 67:13, 73:23, 74:4, 123:25, 124:7, 124:8, 217:5, 225:8, 258:1, 258:3, 258:22
**152** [1] - 21:20
**154** [1] - 99:24
**154-D** [2] - 100:19, 101:2
**154-E** [1] - 21:20
**155** [1] - 23:2
**156-D** [1] - 21:20
**158** [1] - 175:23
**16** [4] - 14:8, 14:12, 23:6, 120:5
**1600** [1] - 2:5
**161** [6] - 23:2, 53:3, 53:8, 53:17, 230:21, 233:11
**163** [1] - 23:2
**177** [2] - 49:11, 51:7
**18** [3] - 120:22, 139:3, 139:4
**180** [1] - 105:23
**181** [1] - 107:9
**182** [1] - 23:2
**186** [1] - 5:16
**1887** [1] - 3:13
**189** [1] - 23:2
**19** [1] - 50:9
**190** [1] - 23:2
**192** [1] - 23:3
**1973GG9B** [1] - 55:11
**1987** [1] - 129:6
**1990s** [1] - 197:13
**1995/'96** [1] - 10:18
**1998** [5] - 85:1, 132:25, 133:8, 133:22, 134:1
**1999** [1] - 249:9
**1:30** [2] - 127:13, 127:17

**1:37** [1] - 128:2
**1A** [4] - 118:10, 118:20, 144:8, 144:21
**1st** [6] - 132:7, 132:11, 133:23, 134:2, 185:18, 204:15

**2**

**2** [13] - 3:1, 73:10, 87:20, 133:14, 133:16, 185:6, 196:16, 197:1, 229:16, 229:17, 229:18, 236:16, 244:19
**20** [5] - 15:2, 63:22, 73:24, 74:4, 94:22
**200** [3] - 75:6, 75:11, 75:12
**200-page** [2] - 158:25, 160:3
**2000** [1] - 34:18
**20003** [1] - 2:24
**20005** [1] - 2:20
**2001** [4] - 11:9, 15:16, 16:5, 101:8
**2003** [1] - 205:7
**2004** [1] - 35:17
**2005** [2] - 141:14, 198:15
**2007** [6] - 74:3, 94:17, 94:18, 101:4, 182:3, 182:23
**2008** [4] - 74:22, 129:9, 182:3, 204:25
**2009** [14] - 10:12, 10:19, 36:17, 36:20, 36:23, 112:9, 119:12, 120:25, 121:4, 122:17, 124:13, 124:19, 182:3, 229:14
**2009/2010** [1] - 9:21
**201** [2] - 7:19, 17:18
**2010** [41] - 10:12, 10:19, 11:9, 35:20, 37:3, 46:4, 65:20, 106:19, 106:21, 107:13, 107:15, 133:12, 133:19, 133:20, 133:23, 134:2, 134:15, 136:19, 140:3, 140:11, 140:22, 140:24, 143:2, 143:10, 143:11, 143:25, 145:5, 156:21, 165:12,

168:22, 176:3, 182:3, 185:10, 185:18, 194:22, 200:9, 200:20, 232:8, 232:11, 232:12
**2011** [72] - 35:21, 35:22, 35:25, 47:14, 50:9, 71:23, 73:6, 75:18, 91:5, 91:6, 91:20, 96:20, 98:6, 100:7, 100:11, 101:6, 102:15, 109:24, 112:5, 114:21, 115:7, 118:20, 119:13, 119:20, 121:10, 122:17, 135:23, 135:24, 136:1, 136:16, 142:11, 144:22, 146:10, 146:11, 146:17, 146:21, 148:7, 149:6, 149:10, 149:19, 150:16, 152:8, 152:11, 154:16, 157:13, 158:7, 170:4, 170:10, 171:21, 177:6, 177:10, 182:3, 182:23, 182:24, 184:14, 190:16, 205:12, 206:7, 207:15, 221:8, 222:2, 222:8, 222:22, 223:10, 224:5, 248:17, 248:18, 252:25, 255:8, 255:12
**2012** [27] - 1:9, 6:1, 96:24, 132:3, 132:8, 132:11, 139:10, 140:11, 140:15, 141:2, 142:13, 143:14, 166:7, 166:18, 168:10, 175:7, 175:10, 230:2, 252:14, 252:16, 252:25, 253:1, 253:25, 254:12, 255:9, 257:3
**202.546.4173** [2] - 2:20, 2:24
**204** [1] - 5:15
**205** [1] - 21:20
**207** [1] - 21:20
**208** [1] - 21:20
**210** [3] - 5:16, 192:4, 192:16
**211** [4] - 109:12,

110:24, 114:13, 114:14
**212** [2] - 109:9, 109:10
**212.859.8247** [1] - 2:16
**212.965.2200** [1] - 2:6
**214** [2] - 112:25, 113:17
**218** [2] - 5:18, 21:20
**219** [1] - 21:20
**22** [1] - 15:2, 23:1
**220** [1] - 21:21
**221** [2] - 26:17, 26:18
**225.342.1125** [1] - 3:14
**225.342.9939** [2] - 4:6, 4:18
**225.387.0511** [1] - 3:6
**225.387.3221** [2] - 3:19, 4:13
**225.664.0077** [1] - 3:9
**229** [1] - 5:20
**23** [2] - 120:23, 165:9
**24** [8] - 107:2, 107:8, 146:10, 146:11, 150:16, 167:4, 167:12, 190:16
**244** [1] - 5:21
**247** [1] - 5:23
**2471** [2] - 3:18, 4:12
**25** [6] - 22:21, 129:6, 146:17, 146:21, 148:7, 168:7
**250** [1] - 75:12
**251** [1] - 74:23
**2556** [1] - 2:9
**25th** [1] - 247:23
**26** [4] - 22:21, 190:7, 190:11, 192:1
**27** [7] - 22:21, 63:24, 65:20, 96:20, 165:12, 168:10, 168:22
**27th** [1] - 96:14
**28** [1] - 183:20
**29** [3] - 22:21, 183:20, 192:3

### 3

**3** [8] - 4:1, 48:24, 49:2, 73:17, 91:1, 98:7, 133:8, 230:17
**30** [5] - 8:10, 16:1, 97:3, 143:17, 227:18
**30,000** [9] - 48:15, 49:2, 177:7, 177:8, 178:15, 178:19, 178:21, 178:25, 256:12

**300** [2] - 48:23, 215:12
**300,000** [4] - 34:20, 35:2, 47:23, 48:17
**3036** [1] - 3:4
**31** [4] - 5:5, 22:21, 146:16, 221:8
**32** [1] - 8:10
**33** [1] - 22:21
**34** [1] - 22:21
**35** [2] - 109:11, 109:17
**350** [2] - 67:10, 215:12
**36** [3] - 22:21, 109:10, 231:18
**37** [2] - 16:1, 112:25
**376** [1] - 18:4
**378** [1] - 7:13
**380** [2] - 14:7, 14:13
**381** [1] - 258:11
**382** [1] - 14:15
**383** [1] - 14:22
**3836** [2] - 4:5, 4:17
**384** [1] - 15:1
**39** [2] - 134:4, 134:7
**392** [1] - 17:2

### 4

**4** [11] - 10:19, 16:25, 94:7, 172:11, 184:4, 184:6, 184:7, 184:10, 187:20, 188:8, 226:4
**40** [6] - 5:6, 65:14, 75:4, 75:14, 108:20, 135:16
**400** [2] - 48:24, 49:2
**400,000** [1] - 48:24
**404(b** [1] - 242:15
**406** [1] - 1:22
**41** [2] - 100:20, 101:2
**45** [1] - 5:10
**451** [2] - 3:17, 4:11
**49** [2] - 15:22, 22:22
**4APP** [10] - 196:24, 197:2, 197:11, 198:18, 198:23, 199:1, 208:13, 208:21, 208:25, 232:25
**4MR** [4] - 199:2, 199:10, 199:11, 199:12
**4SR** [1] - 238:15
**4th** [3] - 3:13, 4:5, 4:16

### 5

**5** [10] - 14:8, 14:9, 23:6, 53:1, 131:16, 131:17, 131:18,

158:17, 175:1, 175:4
**50** [2] - 141:5, 259:7
**500** [4] - 1:22, 66:12, 67:8, 67:9
**504.525.4361** [1] - 2:10
**504.589.7781** [1] - 1:24
**51** [2] - 8:9, 22:22
**52** [2] - 8:9, 22:22
**53** [2] - 22:22, 22:25
**5308** [1] - 67:1
**54** [4] - 8:9, 138:15, 139:21, 236:19
**55** [4] - 8:9, 137:14, 138:17, 138:23
**58** [2] - 175:21, 175:25
**5:30** [1] - 258:1

### 6

**6** [9] - 49:9, 71:18, 102:15, 112:9, 158:19, 158:21, 158:22, 218:16, 218:19
**60** [2] - 34:19, 97:2
**600** [1] - 35:17
**609** [1] - 112:17
**61-H** [1] - 187:12
**611** [1] - 106:9
**62** [4] - 24:11, 24:14, 24:17, 36:9
**627** [1] - 3:13
**628** [2] - 4:5, 4:16
**63** [4] - 5:11, 24:11, 24:18, 25:20
**64** [2] - 24:11, 25:15
**65** [3] - 24:11, 25:19, 73:25
**66** [2] - 225:3, 225:8
**66-A** [5] - 21:8, 21:9, 133:3, 133:5, 133:6
**66-B** [2] - 133:16, 185:8
**66-D** [2] - 184:5, 184:9
**66-E** [7] - 21:8, 21:9, 131:15, 132:4, 174:25, 175:2, 175:3
**69-H** [2] - 20:25, 187:14
**69-J** [1] - 172:5
**6:00** [2] - 258:25, 259:16

### 7

**7** [8] - 5:2, 14:3, 16:24, 32:5, 40:7, 96:9, 105:24, 191:24

**70** [1] - 187:25
**70-D** [1] - 20:25
**70-G** [1] - 187:25
**700** [1] - 3:8
**70112** [1] - 2:10
**70130** [1] - 1:23
**7072-0700** [1] - 3:9
**70821** [4] - 3:5, 3:14, 3:19, 4:12
**70821-3836** [2] - 4:6, 4:17
**71** [2] - 22:22, 22:25
**72** [1] - 22:22
**73** [2] - 22:22, 182:12
**737** [1] - 2:23
**74** [1] - 22:22
**75** [1] - 22:22
**76** [2] - 22:22, 156:17
**77** [1] - 157:24
**78** [8] - 21:11, 21:12, 145:17, 145:24, 148:10, 174:6, 187:24
**79** [2] - 22:25, 152:4
**7C2** [1] - 173:6

### 8

**8** [8] - 14:3, 14:8, 14:9, 23:6, 81:21, 90:19, 181:13, 181:15
**80** [9] - 171:5, 171:6, 171:7, 171:8, 177:12, 178:18, 178:21, 178:23, 179:1
**80,000** [1] - 34:25
**800** [1] - 215:4
**82** [3] - 181:10, 226:5, 226:9
**84** [1] - 221:4
**86-A** [3] - 165:10, 194:4, 195:2
**86-B** [2] - 167:12, 167:23
**86-C** [2] - 168:7, 168:16
**86-D** [2] - 168:19, 169:3
**87** [2] - 231:14, 231:16
**87-120** [1] - 110:1
**87-M** [1] - 21:1
**87-N** [1] - 231:15
**87122** [1] - 110:6
**87228** [1] - 51:3
**87229** [1] - 51:2
**8:15** [2] - 259:4, 259:9
**8:30** [4] - 6:2, 259:1, 259:8, 259:14
**8th** [3] - 2:23, 3:18,

**4:11**

### 9

**9** [3] - 9:4, 14:3
**909** [1] - 2:9
**91-C** [2] - 21:1, 143:18
**91-D** [2] - 144:17, 145:3
**918** [1] - 3:4
**92** [1] - 22:25
**93** [1] - 23:1
**94** [3] - 158:11, 159:22, 159:24
**94-G** [3] - 134:8, 134:17, 196:15
**94-H** [1] - 135:17
**9424** [1] - 236:20
**95** [1] - 15:22
**95-E** [2] - 21:1, 198:2
**99** [2] - 2:5, 5:10
**99-A** [1] - 21:1

### A

**A.M** [1] - 6:2
**ability** [1] - 70:16
**able** [18] - 18:23, 28:25, 94:24, 116:1, 116:2, 164:19, 183:15, 192:15, 201:1, 232:3, 253:8, 255:7, 255:10, 255:22, 256:7, 256:9, 257:3
**absolutely** [1] - 245:5
**accept** [12] - 22:20, 86:15, 121:19, 121:22, 122:1, 122:2, 122:5, 137:10, 137:12, 137:13, 156:23, 214:24
**accepted** [1] - 130:21
**accepting** [1] - 214:25
**access** [10] - 32:4, 76:7, 85:6, 89:6, 163:3, 212:25, 215:16, 216:10, 216:15, 238:24
**Access** [1] - 249:18
**accomplished** [1] - 23:8
**accordance** [2] - 207:25, 248:8
**according** [3] - 159:24, 185:2, 185:17
**account** [1] - 55:1
**accounting** [1] - 55:2

accounts [1] - 81:14
accurate [2] - 48:16, 239:2
accurately [2] - 211:3, 211:18
ACF [2] - 206:8, 212:9
acknowledge [3] - 39:12, 206:22, 206:24
acquire [1] - 197:12
acquired [1] - 200:5
Act [10] - 17:10, 32:5, 41:13, 46:13, 68:7, 96:14, 98:4, 198:9, 205:6, 206:8
act [5] - 76:17, 84:9, 105:12, 125:3, 211:4
action [5] - 6:4, 12:8, 12:10, 41:14, 55:10
activities [1] - 38:23
actual [5] - 164:11, 169:23, 188:8, 209:21, 220:18
add [4] - 55:17, 196:21, 242:13
added [6] - 85:21, 193:13, 240:12, 242:10, 242:23, 242:25
adding [1] - 203:18
addition [6] - 17:20, 34:8, 48:12, 52:9, 190:24, 191:11
additional [19] - 39:24, 76:1, 85:21, 91:22, 143:4, 152:23, 153:6, 153:18, 173:7, 189:11, 190:20, 191:5, 191:9, 191:21, 193:23, 205:19, 205:20, 214:10
additions [1] - 100:14
address [48] - 12:10, 23:23, 25:23, 28:23, 29:15, 31:23, 32:10, 33:7, 37:5, 68:21, 71:2, 71:14, 72:23, 75:16, 76:5, 79:14, 79:15, 79:18, 79:20, 79:21, 79:22, 80:3, 91:3, 91:8, 91:11, 91:17, 92:4, 92:8, 92:9, 103:13, 103:16, 120:18, 131:3, 131:7, 131:10, 131:13, 139:14, 151:15, 155:6, 170:22,

185:14, 185:21, 185:25, 193:1, 209:6, 246:4, 258:5, 258:14
addressed [1] - 120:18
addresses [5] - 151:23, 159:25, 171:24, 192:5, 240:5
addressing [1] - 8:5
adjourn [1] - 259:1
adjourned [3] - 183:13, 259:8, 259:14
adjusted [1] - 115:5
adjustments [1] - 52:22
administer [2] - 186:22, 192:21
administered [2] - 130:1, 197:15
administering [4] - 171:15, 172:15, 202:12, 206:19
administers [1] - 208:1
administrative [5] - 88:8, 88:20, 89:9, 90:8, 90:10
administratively [1] - 88:8
administrator [3] - 218:14, 218:16, 218:21
admissibility [1] - 45:10
admissible [6] - 23:25, 24:13, 26:4, 26:20, 101:25, 256:3
admission [10] - 23:25, 24:3, 24:20, 25:5, 25:16, 25:22, 26:2, 26:19, 27:17, 101:15
admissions [7] - 24:19, 24:24, 25:16, 25:19, 26:3, 27:1, 27:13
admit [29] - 18:24, 20:3, 23:13, 24:1, 24:2, 24:5, 25:17, 26:12, 37:15, 37:16, 101:24, 114:3, 136:2, 152:15, 154:18, 166:14, 167:22, 168:16, 169:2, 179:6, 180:3, 181:2, 182:5, 182:25, 183:17, 183:23, 208:4, 244:7

admitted [79] - 19:5, 19:14, 20:11, 23:7, 23:17, 23:18, 25:1, 25:16, 26:10, 26:15, 26:22, 26:23, 32:23, 32:24, 51:12, 51:16, 53:20, 53:21, 87:21, 87:23, 94:4, 97:8, 100:2, 101:22, 110:25, 111:1, 112:7, 112:20, 113:24, 114:1, 132:5, 134:20, 134:21, 136:5, 136:6, 137:17, 138:8, 139:8, 139:22, 143:19, 144:18, 146:4, 148:15, 152:15, 153:25, 154:22, 154:23, 156:23, 157:11, 158:4, 166:12, 167:1, 167:2, 167:11, 168:4, 168:5, 169:5, 169:6, 172:5, 174:6, 175:22, 176:1, 182:7, 182:8, 183:3, 183:4, 183:18, 183:20, 183:22, 183:25, 184:1, 184:10, 192:2, 208:8, 208:9, 217:23, 221:15, 221:16, 236:17
admitting [4] - 24:16, 24:17, 25:2, 27:4
adult [2] - 75:6, 75:7
advice [8] - 33:2, 69:12, 69:16, 125:20, 126:1, 126:11, 126:15, 155:10
advise [3] - 34:3, 126:3, 184:19
advising [1] - 216:20
advisory [2] - 17:22, 17:23
affect [2] - 82:16, 83:21
affirmatively [6] - 32:4, 33:17, 125:19, 126:1, 126:11, 253:13
affordable [1] - 75:13
afforded [1] - 29:20
afield [1] - 244:4
AFTERNOON [1] - 128:1
afternoon [8] - 28:15,

28:18, 44:7, 44:10, 44:18, 117:25, 247:12, 247:13
afterwards [1] - 111:23
age [1] - 65:11
agencies [14] - 8:22, 12:16, 33:2, 35:7, 35:9, 35:17, 40:9, 41:6, 116:23, 126:1, 188:16, 202:12, 203:4, 211:1
agencies' [2] - 8:15, 33:3
agency [10] - 11:13, 37:6, 59:21, 146:14, 206:17, 208:1, 210:12, 217:21, 240:13, 241:21
agent [2] - 80:3, 92:9
agents [1] - 78:10
aggressive [1] - 84:14
aggrieved [8] - 12:9, 12:11, 12:13, 12:15, 12:17, 12:20, 25:9, 55:12
aggrieves [1] - 55:15
Aging [2] - 67:13, 215:20
ago [12] - 30:24, 37:18, 45:21, 50:2, 50:17, 50:24, 51:4, 52:6, 58:2, 108:11, 114:13, 150:12
agree [3] - 64:4, 108:5, 222:1
agreed [10] - 13:14, 16:2, 16:5, 19:8, 22:7, 22:20, 24:1, 101:15, 179:6
agreement [4] - 18:24, 19:3, 115:25, 183:16
agreements [1] - 45:4
ahead [1] - 223:6
aid [1] - 249:20
aided [1] - 1:25
Alabama [1] - 98:12
albeit [1] - 241:25
alert [1] - 225:23
alerts [2] - 192:24, 192:25
Alexander [8] - 5:16, 5:21, 7:3, 22:16, 153:14, 186:4, 210:4, 244:13
ALEXANDER [84] - 3:11, 7:2, 21:7, 21:10, 22:14, 22:18, 22:24, 134:19, 136:4, 141:13,

142:3, 142:7, 142:20, 143:2, 143:9, 152:18, 152:20, 153:4, 153:10, 153:16, 153:23, 154:3, 154:7, 154:21, 156:20, 157:13, 157:18, 165:13, 166:3, 166:7, 166:25, 167:25, 168:2, 174:4, 177:21, 179:3, 180:5, 180:11, 182:6, 183:2, 186:7, 186:19, 187:14, 187:15, 190:6, 190:8, 190:11, 190:13, 196:7, 202:19, 202:20, 203:9, 203:11, 203:23, 206:10, 206:20, 207:1, 207:7, 207:9, 207:12, 210:5, 210:9, 210:24, 211:10, 211:17, 212:5, 212:12, 221:14, 237:21, 237:24, 239:22, 240:11, 240:24, 241:3, 241:6, 241:12, 242:10, 242:23, 243:5, 243:14, 243:24, 244:15, 245:12, 246:24
allegations [1] - 239:25
allege [1] - 55:15
alleged [1] - 19:23
Allen [1] - 218:20
allocations [1] - 163:15
allow [26] - 15:7, 16:23, 20:10, 47:4, 50:16, 58:9, 60:24, 70:19, 78:20, 101:11, 108:6, 112:19, 113:24, 116:17, 116:20, 119:17, 200:25, 201:1, 215:23, 223:4, 225:13, 239:11, 240:6, 255:16, 256:19, 256:20
allowed [4] - 15:19, 42:19, 42:20, 194:19
allows [5] - 74:8,

130:9, 148:3,
215:22, 227:2
**alluded** [1] - 33:8
**alluding** [1] - 231:23
**almost** [8] - 35:8,
37:3, 176:24, 190:3,
199:1, 224:21,
225:19, 234:22
**ambush** [1] - 26:7
**amount** [4] - 76:14,
82:16, 108:18, 242:2
**ample** [1] - 50:19
**Amy** [1] - 23:4
**AMY** [2] - 3:16, 4:10
**amy.lambert@**
**taylorporter.com** [2]
- 3:20, 4:13
**analysis** [1] - 180:17
**analyst** [26] - 64:10,
64:11, 66:18, 66:23,
68:2, 77:18, 77:19,
78:1, 78:2, 78:3,
78:7, 78:8, 104:7,
104:9, 105:20,
106:12, 106:25,
107:23, 107:24,
115:15, 164:3,
215:2, 229:17,
229:24, 246:3
**analysts** [24] - 52:16,
52:21, 66:8, 66:10,
66:18, 67:8, 67:20,
103:25, 104:3,
104:24, 105:17,
110:16, 110:18,
111:5, 111:11,
111:14, 115:10,
115:11, 115:15,
115:17, 215:3,
216:5, 221:19, 241:8
**angie** [1] - 42:9
**Angie** [1] - 43:24
**annual** [6] - 146:15,
149:23, 150:12,
178:14, 193:24,
205:23
**annually** [4] - 47:24,
150:8, 150:9, 205:24
**answer** [21] - 7:21,
16:8, 55:23, 59:3,
59:10, 59:11, 60:16,
119:5, 119:6,
120:25, 121:2,
121:6, 150:20,
178:25, 223:2,
223:6, 225:15,
225:17, 242:15,
257:19, 257:20
**answered** [1] - 243:20
**answering** [1] - 78:10

**answers** [1] - 256:10
**anticipate** [1] - 157:6
**anyway** [1] - 13:1
**apologize** [16] - 17:13,
21:2, 21:3, 27:9,
99:17, 101:2,
110:23, 138:16,
138:24, 139:4,
145:20, 162:16,
174:5, 230:20,
239:7, 239:15
**app** [1] - 198:19
**appeal** [1] - 41:8
**appear** [1] - 189:24
**appearance** [1] -
18:16
**APPEARANCES** [3] -
2:1, 3:1, 4:1
**appearances** [2] - 6:5,
6:6
**appeared** [1] - 195:9
**applicable** [2] -
125:10, 125:23
**applicant** [35] - 62:3,
62:18, 66:23, 77:17,
84:4, 89:7, 90:9,
92:23, 93:8, 95:7,
96:4, 103:4, 122:6,
155:3, 155:15,
155:18, 155:20,
160:11, 160:17,
175:15, 189:9,
189:19, 195:20,
198:10, 198:22,
208:11, 213:1,
213:4, 213:5,
213:15, 213:21,
214:15, 235:2,
235:4, 256:10
**applicant's** [1] - 65:25
**applicants** [18] -
131:12, 131:24,
159:7, 161:13,
189:12, 189:19,
189:22, 190:3,
190:5, 194:20,
195:17, 213:25,
214:1, 230:5,
234:23, 256:13,
257:19, 257:20
**applicants/**
**recipients** [1] - 156:5
**Application** [2] -
82:10, 231:4
**application** [202] -
17:1, 32:9, 40:10,
46:10, 49:23, 53:10,
61:23, 62:2, 62:3,
62:25, 63:2, 65:24,
67:1, 67:4, 67:6,

67:10, 67:14, 67:17,
67:22, 68:10, 68:16,
73:24, 74:2, 74:18,
76:4, 76:9, 76:24,
77:2, 77:11, 77:13,
77:21, 78:5, 79:2,
79:5, 79:7, 79:9,
80:9, 80:16, 80:18,
80:21, 80:22, 80:23,
83:11, 83:18, 84:1,
84:5, 84:24, 85:2,
85:4, 85:7, 85:8,
85:23, 86:5, 86:8,
86:19, 87:15, 90:3,
90:24, 93:3, 93:4,
93:11, 93:15, 93:16,
93:19, 94:17, 94:23,
95:5, 95:8, 95:14,
95:19, 99:22, 100:4,
101:23, 102:12,
102:15, 103:6,
105:4, 110:9,
113:21, 115:9,
115:10, 115:18,
115:20, 115:21,
121:25, 122:9,
122:16, 122:25,
134:13, 134:24,
135:3, 135:4,
135:10, 135:12,
135:14, 136:1,
143:24, 155:4,
155:7, 155:17,
155:18, 155:20,
156:6, 156:11,
160:12, 160:23,
160:25, 161:9,
161:14, 163:23,
165:7, 165:11,
165:14, 165:17,
166:4, 166:16,
166:19, 167:7,
167:20, 168:13,
168:21, 168:25,
169:8, 169:16,
169:17, 169:19,
169:20, 169:23,
173:5, 173:15,
173:22, 174:14,
175:14, 176:21,
184:20, 189:1,
189:25, 194:6,
194:11, 194:17,
194:19, 194:21,
194:22, 194:23,
195:4, 195:8, 195:9,
195:11, 195:13,
196:15, 196:21,
197:2, 197:4, 197:7,
198:2, 198:3,
198:17, 198:20,

199:25, 200:8,
200:9, 200:10,
200:13, 200:20,
201:10, 201:12,
204:19, 204:21,
209:14, 212:14,
212:25, 213:3,
213:5, 213:9,
215:17, 215:18,
216:8, 216:16,
227:6, 230:11,
231:6, 231:7, 231:9,
231:19, 231:21,
232:2, 232:8,
233:13, 234:16,
235:7, 235:12,
235:14, 236:2,
246:8, 250:9,
250:10, 252:12
**applications** [79] -
8:14, 11:11, 34:11,
34:13, 34:15, 34:20,
34:21, 34:24, 35:1,
35:7, 35:10, 35:11,
35:18, 35:20, 47:22,
47:23, 48:12, 48:23,
48:25, 52:19, 54:12,
62:7, 67:2, 67:11,
67:14, 68:21, 73:21,
73:23, 79:8, 81:2,
81:19, 84:10, 84:21,
86:22, 88:7, 93:10,
93:12, 94:23,
102:14, 103:3,
121:19, 121:23,
122:1, 122:2, 161:6,
161:21, 162:7,
162:14, 176:25,
177:5, 177:9,
178:14, 178:16,
178:17, 178:19,
179:7, 179:9,
179:25, 180:7,
180:16, 181:18,
188:21, 189:18,
194:3, 196:2, 196:4,
196:10, 196:11,
200:16, 214:20,
214:24, 215:1,
215:8, 215:10,
215:15, 215:25,
230:7, 234:8, 234:25
**applied** [8] - 36:20,
36:23, 72:23, 73:14,
75:16, 103:2,
126:13, 208:20
**applies** [6] - 66:21,
85:11, 208:11,
208:16, 214:12,
249:25
**apply** [32] - 71:2,

73:24, 82:23, 85:3,
90:16, 93:2, 93:7,
94:12, 94:25, 98:13,
98:14, 115:2,
130:15, 130:19,
134:24, 144:4,
144:7, 163:19,
164:2, 164:15,
189:13, 189:14,
189:22, 190:3,
190:5, 196:24,
200:25, 204:15,
208:14, 249:22,
250:2, 252:6
**applying** [18] - 36:19,
71:14, 74:13, 77:2,
81:6, 81:9, 81:12,
81:16, 82:15, 90:7,
115:3, 115:4, 122:3,
135:6, 135:9,
208:22, 208:24
**appointment** [1] -
113:14
**appreciate** [6] - 15:3,
17:4, 18:7, 40:20,
41:15, 212:15
**approach** [9] - 101:17,
117:14, 128:13,
141:18, 145:21,
157:3, 206:13,
218:8, 229:6
**appropriate** [9] -
14:20, 31:19,
155:19, 161:10,
207:4, 207:10,
237:12, 237:13,
241:15
**appropriately** [1] -
138:13
**approved** [5] - 85:12,
85:20, 213:16,
213:17, 213:18
**April** [7] - 35:25, 50:9,
73:7, 170:4, 248:18,
250:5
**architect** [5] - 248:3,
248:4, 248:11,
248:25, 249:6
**architecture** [2] -
248:7, 253:11
**area** [6] - 27:19, 27:23,
219:12, 225:22,
233:19, 254:13
**areas** [4] - 38:11,
189:7, 193:1, 241:7
**argue** [1] - 7:15
**argued** [1] - 16:6
**argument** [3] - 7:24,
41:19, 141:19
**arguments** [1] - 19:21

**arise** [1] - 87:14
**armed** [1] - 36:11
**arranged** [1] - 212:20
**arranges** [1] - 212:17
**Ash** [1] - 43:11
**asserted** [1] - 58:14
**assets** [1] - 81:14
**assign** [1] - 91:25
**assigned** [1] - 229:20
**assist** [5] - 62:3,
   86:18, 122:3, 122:6,
   215:24
**assistance** [73] - 8:15,
   32:6, 34:11, 38:11,
   40:7, 40:9, 40:11,
   54:13, 57:1, 57:18,
   59:21, 67:3, 67:20,
   68:20, 76:22, 76:23,
   76:25, 77:3, 77:5,
   77:8, 77:11, 77:12,
   77:25, 78:2, 78:4,
   83:20, 86:11, 86:17,
   87:16, 87:18, 93:22,
   98:13, 129:11,
   129:16, 129:17,
   129:21, 129:25,
   130:2, 130:5,
   130:18, 130:22,
   131:24, 134:13,
   134:25, 135:1,
   135:5, 135:7,
   135:10, 136:1,
   139:13, 156:5,
   161:13, 165:11,
   167:7, 167:8, 171:9,
   171:12, 171:16,
   173:4, 173:5,
   188:16, 191:12,
   196:16, 196:25,
   197:2, 197:19,
   198:17, 203:1,
   205:7, 213:4, 234:5,
   249:25, 250:2
**Assistance** [5] - 9:3,
   34:16, 88:24,
   129:12, 169:9
**assistant** [12] - 129:2,
   129:8, 186:11,
   186:12, 186:13,
   186:21, 193:5,
   247:24, 248:12,
   248:15, 248:24,
   250:15
**assisting** [1] - 39:3
**assists** [2] - 77:18,
   77:19
**association** [1] - 38:6
**assume** [5] - 51:8,
   210:13, 211:2,
   226:1, 234:13

**assuming** [2] - 99:11,
   255:16
**assure** [2] - 42:25,
   226:17
**AT** [1] - 1:3
**attached** [17] - 33:6,
   79:7, 82:9, 83:15,
   84:2, 84:11, 90:3,
   93:5, 93:20, 100:8,
   100:9, 100:17,
   102:25, 103:7,
   113:14, 209:20,
   209:23
**attaching** [1] - 83:13,
   83:17
**attachment** [2] -
   143:3, 209:13
**attachments** [1] -
   100:13
**attempt** [2] - 83:4,
   116:24
**attempted** [1] - 244:7
**attempting** [1] - 62:4
**attend** [1] - 44:6
**attention** [16] - 48:19,
   49:8, 52:25, 73:16,
   93:13, 100:19,
   105:23, 109:9,
   112:5, 112:25,
   120:3, 120:22,
   123:24, 125:1,
   135:16, 226:2
**attorneys** [1] - 63:6
**attracting** [1] - 11:2
**Atty** [3] - 2:8, 3:3, 3:8
**audit** [1] - 227:12
**auditing** [3] - 257:10,
   257:11, 257:14
**audits** [4] - 254:18,
   255:22, 257:4, 257:6
**August** [11] - 109:24,
   112:9, 114:21,
   114:23, 132:25,
   133:8, 133:22,
   134:1, 134:15,
   136:19, 176:3
**authenticate** [4] -
   142:1, 179:17,
   180:3, 259:13
**authenticity** [5] - 19:1,
   20:2, 20:8, 20:9,
   114:2
**authorizes** [1] -
   164:12
**automated** [2] - 92:13,
   125:5
**automatically** [4] -
   88:13, 88:25,
   147:17, 162:6
**avail** [1] - 217:22

**availability** [3] -
   159:11, 173:1,
   176:18
**available** [20] - 30:22,
   67:1, 97:7, 149:14,
   149:24, 163:5,
   163:8, 163:14,
   171:14, 172:14,
   191:12, 191:21,
   191:23, 192:18,
   192:23, 238:22,
   239:1, 250:10,
   254:9, 256:18
**average** [2] - 177:1,
   177:10
**await** [1] - 41:7
**award** [2] - 214:3,
   216:20
**aware** [27] - 41:16,
   62:15, 78:17, 96:1,
   133:9, 133:21,
   140:10, 140:13,
   140:19, 140:20,
   140:21, 145:2,
   145:3, 145:6, 145:7,
   151:19, 151:22,
   151:25, 152:10,
   152:12, 152:13,
   160:4, 173:19,
   173:24, 188:15,
   193:11, 196:20
**awareness** [2] - 84:18,
   196:1
**awhile** [1] - 231:7

**B**

**B-A-T-T-S** [1] - 44:23
**B-R-O-O-K-S** [1] -
   247:9
**BABINEAUX** [2] -
   4:14, 7:4
**Babineaux** [1] - 7:5
**back-end** [1] - 165:1
**background** [1] -
   228:16
**ballots** [1] - 28:17
**bank** [1] - 81:13
**Banks** [1] - 43:11
**bar** [1] - 14:13
**based** [13] - 11:2,
   18:10, 52:18, 89:1,
   161:16, 163:3,
   217:1, 246:8, 253:6,
   253:20, 254:2,
   255:20, 257:8
**basic** [2] - 31:25, 64:1
**basis** [6] - 20:2, 98:18,
   107:11, 130:25,
   149:23, 178:14

**Bate** [1] - 236:20
**Bates** [4] - 148:21,
   148:23, 154:25,
   176:12
**Baton** [8] - 3:5, 3:14,
   3:19, 4:6, 4:12, 4:17,
   28:15, 44:6
**Batts** [55] - 42:3,
   44:22, 44:25, 45:12,
   45:16, 45:24, 50:23,
   52:1, 52:4, 53:5,
   53:23, 56:5, 56:21,
   59:13, 61:8, 61:13,
   61:16, 62:1, 63:6,
   63:19, 64:7, 64:23,
   68:22, 71:17, 72:2,
   72:7, 79:1, 80:10,
   81:4, 81:23, 83:8,
   86:4, 87:19, 96:8,
   97:12, 98:8, 99:4,
   99:13, 99:17, 100:6,
   100:9, 100:15,
   102:13, 103:22,
   103:25, 105:16,
   106:4, 106:13,
   107:16, 108:11,
   109:20, 111:3,
   112:24, 113:8,
   114:16
**BATTS** [2] - 5:9, 44:19
**Batts'** [1] - 101:3
**BCC** [1] - 80:25
**bear** [1] - 32:19
**bearing** [2] - 13:10,
   55:14
**Beauregard** [1] -
   218:20
**became** [3] - 14:23,
   118:20, 248:25
**Beckdon** [1] - 219:11
**beckdon** [1] - 219:12
**become** [3] - 66:16,
   163:8, 248:15
**becomes** [1] - 258:16
**becoming** [1] - 71:8
**BEFORE** [1] - 1:18
**began** [1] - 75:15
**begin** [1] - 117:20
**beginning** [9] - 11:6,
   11:11, 18:25, 24:12,
   36:15, 64:8, 113:11,
   119:25, 225:8
**begun** [1] - 122:12
**behalf** [5] - 7:5, 7:6,
   23:4, 78:25, 117:9
**behave** [1] - 253:6
**believes** [1] - 101:24
**below** [1] - 187:9
**bench** [6] - 13:23,
   26:7, 26:9, 30:6,

   50:16, 59:9
**Bench** [1] - 1:9
**benefit** [7] - 36:20,
   66:3, 83:17, 83:18,
   122:1, 130:4, 234:25
**Benefits** [1] - 231:4
**benefits** [46] - 16:25,
   32:10, 34:12, 34:16,
   34:20, 35:1, 35:5,
   35:10, 36:15, 36:16,
   36:19, 36:24, 37:6,
   37:18, 40:12, 61:17,
   66:2, 74:9, 81:10,
   82:16, 83:19, 89:3,
   113:21, 115:3,
   115:4, 121:20,
   164:12, 179:7,
   201:1, 204:9,
   209:24, 213:14,
   214:4, 216:21,
   230:11, 233:12,
   235:7, 235:12,
   235:14, 236:1,
   249:22, 249:25,
   250:1
**best** [2] - 63:12, 89:13
**better** [4] - 30:16,
   118:7, 118:16,
   124:23
**between** [10] - 66:22,
   77:16, 124:18,
   133:22, 140:11,
   140:21, 157:19,
   215:4, 215:12,
   248:24
**beyond** [3] - 15:2,
   125:24, 126:4
**biannually** [1] - 9:7
**Bienville** [2] - 4:4,
   4:16
**big** [4] - 45:4, 45:5,
   45:6, 74:13
**bigger** [1] - 181:10
**Bill** [1] - 21:11
**binder** [44] - 45:1,
   48:19, 49:9, 53:1,
   100:20, 101:3,
   105:24, 109:10,
   109:11, 109:17,
   112:6, 112:25,
   117:15, 120:4,
   123:25, 131:16,
   131:18, 133:14,
   134:4, 134:7,
   135:16, 144:16,
   145:18, 145:20,
   148:10, 152:4,
   165:9, 167:13,
   172:4, 174:7, 175:4,
   175:21, 175:25,

177:19, 181:10,
184:4, 221:2, 221:3,
225:3, 230:18,
236:16, 239:18,
251:10
**bit** [9] - 68:6, 70:14,
81:5, 102:18,
125:24, 126:4,
170:7, 193:16,
249:24
**blacked** [2] - 167:8,
167:17
**blank** [8] - 57:7, 60:2,
61:6, 61:9, 235:15,
237:21, 237:23,
237:24
**blind** [1] - 65:11
**blue** [1] - 35:5
**board** [1] - 151:1
**bold** [1] - 83:8
**books** [1] - 28:16
**bottom** [8] - 35:8,
37:22, 54:2, 56:6,
110:2, 112:9,
148:21, 176:13
**BOWMAN** [1] - 7:1
**Bowman** [1] - 7:1
**box** [15] - 36:21,
36:25, 53:24, 56:4,
56:6, 82:12, 83:10,
105:3, 155:19,
161:10, 233:2,
235:14, 256:8,
257:7, 257:13
**Box** [7] - 3:4, 3:8,
3:13, 3:18, 4:5, 4:12,
4:17
**boxes** [4] - 33:20,
231:21, 231:23,
235:11
**boy** [1] - 21:18
**BRANDON** [1] - 4:14
**brandon.babineaux**
**@la.gov** [1] - 4:18
**BRANNON** [137] -
2:18, 6:11, 128:4,
128:10, 128:13,
128:18, 132:4,
132:6, 133:16,
133:17, 134:7,
134:9, 134:16,
134:22, 135:25,
136:7, 137:15,
137:20, 137:22,
137:24, 138:1,
138:7, 138:9,
138:20, 138:23,
138:25, 141:7,
141:9, 141:18,
141:22, 142:5,

142:9, 142:12,
143:7, 143:11,
143:16, 143:19,
143:21, 144:18,
144:20, 145:19,
145:23, 145:25,
146:3, 146:5,
147:25, 148:14,
148:16, 152:14,
152:19, 153:1,
153:11, 153:24,
154:13, 154:18,
154:24, 157:2,
157:6, 157:15,
157:23, 158:3,
158:5, 160:14,
164:24, 165:16,
165:24, 166:11,
166:14, 166:16,
167:3, 167:22,
168:6, 168:16,
168:18, 168:20,
169:2, 169:7, 174:5,
174:8, 174:20,
175:3, 175:5,
175:18, 175:24,
176:2, 176:10,
177:24, 178:11,
178:16, 178:19,
178:22, 179:5,
179:10, 179:12,
179:16, 179:24,
180:9, 180:17,
180:24, 181:1,
181:5, 181:8,
181:11, 181:14,
182:5, 182:9,
182:15, 182:25,
183:5, 183:15,
183:22, 184:2,
184:9, 184:11,
185:8, 185:9, 186:2,
186:17, 202:15,
203:6, 203:25,
204:4, 204:6, 206:2,
206:5, 206:13,
206:16, 206:22,
207:14, 208:4,
208:10, 210:2,
210:19, 211:5,
211:13, 212:1, 217:3
**Brannon** [2] - 5:15,
6:11
**break** [6] - 116:15,
127:12, 154:5,
154:10, 244:8,
256:25
**breast** [1] - 81:1
**Brian** [1] - 7:4
**brief** [3] - 30:14,

39:11, 258:8
**briefly** [3] - 70:2,
258:14, 258:18
**briefs** [1] - 41:21
**bring** [3] - 12:9, 99:24,
114:12
**broad** [1] - 228:19
**broken** [2] - 34:18,
34:24
**BROOKS** [2] - 5:22,
247:4
**Brooks** [10] - 3:17,
4:10, 247:3, 247:6,
247:8, 247:9,
247:12, 250:20,
254:1, 257:3
**brooks** [1] - 256:6
**Brooks'** [1] - 254:24
**brought** [2] - 14:3,
226:2
**BRUCE** [1] - 1:11
**Bruce** [4] - 6:22, 6:24,
7:5, 7:6
**budget** [1] - 74:25
**build** [1] - 251:23
**Building** [2] - 4:4, 4:16
**building** [3] - 230:10,
250:16, 251:20
**built** [3] - 80:2, 98:1,
252:2
**bullet** [7] - 155:14,
155:15, 156:4,
159:10, 168:22,
184:16
**bulletin** [3] - 146:7,
150:11, 150:16
**bunch** [1] - 105:8
**bundle** [1] - 76:11
**burdensome** [1] -
217:18
**Bureau** [2] - 4:4, 4:15
**business** [12] - 44:6,
70:22, 71:9, 87:2,
95:21, 252:20,
252:22, 252:24,
253:2, 253:3, 253:7,
257:8
**buying** [1] - 13:4
**BY** [128] - 45:15, 47:6,
49:7, 49:12, 50:22,
51:24, 53:4, 53:9,
53:22, 56:3, 56:19,
58:1, 58:20, 59:15,
59:22, 61:4, 62:13,
63:18, 64:6, 70:20,
72:1, 72:6, 73:9,
78:22, 80:14, 83:7,
87:24, 89:22, 94:6,
97:11, 99:16, 100:1,
102:11, 102:22,

105:15, 106:3,
106:11, 108:10,
109:13, 112:8,
112:22, 113:7,
114:15, 117:24,
118:6, 118:17,
119:18, 120:21,
121:18, 123:19,
124:17, 124:24,
128:18, 132:6,
133:17, 134:9,
134:22, 136:7,
137:22, 138:1,
138:9, 138:25,
141:9, 143:16,
143:21, 144:20,
145:25, 146:5,
147:25, 154:13,
154:24, 157:23,
158:5, 160:14,
164:24, 167:3,
168:6, 168:20,
169:7, 174:8,
174:20, 175:5,
175:18, 176:2,
176:10, 181:8,
182:9, 182:15,
184:2, 184:11,
185:9, 186:7,
186:19, 187:15,
190:8, 190:13,
196:7, 202:20,
203:11, 204:6,
206:5, 207:14,
208:10, 210:9,
210:24, 211:10,
212:5, 218:11,
220:14, 221:17,
223:9, 224:3,
225:10, 225:20,
229:9, 230:22,
231:17, 232:16,
233:7, 238:17,
239:14, 244:15,
247:11, 251:8,
251:17, 253:19,
254:7, 257:2

# C

**C-200** [1] - 173:10
**C-H-A-S-E** [1] - 117:21
**C10** [1] - 175:7
**C210** [14] - 132:22,
132:25, 133:9,
133:11, 133:22,
173:11, 175:8,
175:9, 184:14,
185:10, 187:16,
191:24, 192:1, 192:3
**C220** [1] - 132:23

**C410** [1] - 187:24
**Cabra12@aol.com** [1]
- 2:11
**CADE** [67] - 4:2, 6:22,
7:6, 46:22, 50:3,
50:12, 51:9, 53:19,
54:4, 55:17, 56:14,
57:20, 58:23, 60:9,
60:11, 60:13, 60:18,
60:20, 61:2, 62:9,
62:12, 63:18, 64:3,
64:6, 67:16, 70:20,
72:1, 72:4, 72:6,
73:9, 78:22, 80:13,
80:14, 83:7, 87:21,
87:24, 89:22, 94:4,
94:6, 97:8, 97:11,
99:4, 99:7, 100:22,
100:25, 102:6,
102:17, 104:12,
104:15, 104:25,
106:5, 107:3,
107:10, 107:12,
107:22, 112:17,
113:19, 114:12,
114:15, 115:22,
119:14, 122:20,
123:3, 124:4,
124:12, 127:3, 127:7
**Cade** [15] - 5:11, 6:22,
63:16, 63:25, 99:19,
100:3, 101:24,
104:14, 108:5,
109:14, 111:6,
112:23, 114:6,
114:10, 127:5
**Cade's** [1] - 63:9
**CAFE** [73] - 162:23,
162:25, 163:5,
163:14, 163:18,
163:19, 164:25,
165:18, 165:19,
166:1, 166:6, 166:7,
166:9, 166:19,
166:23, 177:11,
178:22, 178:24,
179:2, 179:11,
179:12, 194:2,
194:5, 194:17,
200:12, 200:13,
200:22, 200:23,
203:12, 203:13,
203:20, 209:3,
209:10, 209:16,
209:22, 212:14,
213:22, 248:9,
248:20, 248:23,
249:14, 249:15,
249:16, 249:17,
249:18, 249:22,

250:3, 250:6, 250:10, 250:11, 250:17, 251:20, 251:23, 252:4, 252:5, 252:13, 252:16, 252:21, 253:8, 253:9, 253:21, 253:25, 254:8, 254:15, 254:25, 255:5, 255:7, 255:22, 256:7, 257:3, 257:9, 257:16
**calcasieu** [1] - 218:20
**Cameron** [1] - 218:20
**campaign** [1] - 84:15
**cancer** [1] - 81:1
**CANGELOSI** [51] - 3:3, 6:19, 7:17, 8:17, 8:23, 9:1, 10:23, 11:19, 11:21, 12:3, 12:6, 13:6, 13:15, 14:1, 15:17, 15:19, 16:8, 22:23, 24:8, 24:14, 24:25, 26:12, 28:11, 31:12, 41:25, 42:5, 43:9, 43:21, 44:8, 44:12, 45:9, 53:7, 120:7, 120:12, 122:21, 126:5, 126:9, 126:12, 126:20, 237:1, 237:10, 239:8, 241:19, 242:4, 243:1, 243:13, 251:13, 254:20, 255:24, 256:14, 258:19
**cangelosi** [1] - 41:24
**Cangelosi** [4] - 3:3, 6:20, 7:16, 29:5
**cannot** [6] - 17:19, 55:15, 208:14, 214:14, 215:23, 257:9
**canvassing** [1] - 38:17
**cap** [1] - 141:12
**capabilities** [1] - 253:20
**capability** [1] - 257:21
**capable** [12] - 253:9, 254:15, 254:18, 255:1, 255:4, 255:12, 255:13, 257:10, 257:11, 257:18
**capacity** [5] - 1:9, 1:10, 1:12, 6:20, 209:23
**caps** [1] - 83:8

**card** [1] - 94:13
**care** [25] - 21:24, 74:9, 74:14, 76:7, 81:1, 85:6, 93:12, 129:17, 134:13, 134:25, 135:5, 135:6, 135:9, 135:25, 139:13, 151:11, 154:7, 162:15, 162:16, 167:7, 196:16, 196:24, 202:25
**Care** [2] - 168:10, 168:13
**carey** [1] - 6:21
**CAREY** [1] - 3:7
**Carey** [1] - 3:8
**carrying** [3] - 97:16, 228:11, 240:13
**case** [74] - 9:5, 12:14, 19:21, 22:7, 27:12, 27:22, 31:25, 36:6, 37:22, 37:23, 38:1, 39:10, 40:4, 40:15, 41:17, 43:12, 44:14, 45:8, 51:19, 54:6, 55:3, 55:7, 63:13, 70:18, 84:7, 89:2, 89:4, 91:25, 96:7, 101:12, 104:4, 104:6, 104:11, 104:18, 104:19, 104:22, 104:23, 104:25, 105:16, 105:21, 106:4, 106:12, 107:12, 107:16, 107:17, 109:6, 118:1, 119:23, 120:13, 165:3, 177:15, 189:4, 189:5, 204:15, 214:24, 221:19, 224:18, 224:20, 224:21, 224:22, 225:13, 225:19, 226:14, 226:15, 226:18, 226:19, 228:17, 236:4, 236:12, 236:25, 237:2, 250:11, 250:21, 258:13
**Case** [1] - 1:8
**CASE** [4] - 6:4, 28:5, 128:12, 184:8
**cases** [9] - 34:19, 34:25, 88:21, 104:6, 104:7, 189:1, 189:2, 189:12, 230:8
**caseworker** [9] - 165:2, 165:5,

195:11, 195:19, 204:21, 212:15, 212:17, 212:25, 213:4
**catch** [2] - 8:19, 90:16
**cate** [1] - 123:20
**Cate** [2] - 123:21, 123:22
**categorically** [2] - 65:7, 65:8
**categories** [4] - 65:10, 65:12, 65:14, 256:12
**Catherine** [2] - 217:24, 218:5
**CATHERINE** [3] - 5:17, 218:1, 218:5
**caution** [2] - 10:2, 11:9
**cautions** [2] - 11:3, 12:22
**caveats** [2] - 12:22, 13:22
**CCAP** [29] - 134:5, 138:8, 139:9, 140:2, 140:10, 140:15, 141:12, 142:13, 142:20, 142:21, 143:2, 193:13, 195:1, 196:14, 196:16, 197:1, 197:12, 197:23, 199:12, 199:13, 199:16, 199:17, 208:11, 208:16, 208:21, 208:24, 214:1, 219:3, 250:1
**CCAP10** [2] - 208:12, 208:14
**CCAP2** [4] - 208:15, 208:17, 208:21
**CCDF** [1] - 202:25
**ceciacan@bellsouth .net** [1] - 3:6
**CELIA** [2] - 3:3, 3:11
**Celia** [3] - 3:3, 6:20, 7:2
**celia.alexander@la. gov** [1] - 3:15
**census** [1] - 38:9
**center** [6] - 67:4, 67:17, 77:21, 77:22, 115:20
**centers** [13] - 67:1, 67:11, 67:14, 73:24, 77:2, 103:4, 110:9, 115:9, 115:10, 121:25, 122:9, 122:16, 122:25
**certain** [15] - 12:15, 12:25, 65:2, 65:6,

88:10, 129:23, 131:6, 131:7, 136:25, 148:4, 189:13, 192:14, 193:1, 228:9, 242:1
**certainly** [3] - 15:22, 15:23, 42:22
**CERTIFICATE** [1] - 259:18
**certification** [1] - 147:13
**certified** [6] - 115:13, 182:18, 189:2, 204:9, 204:13, 204:15
**certify** [2] - 204:7, 259:21
**certifying** [1] - 230:8
**cervical** [1] - 81:1
**cetera** [2] - 70:23, 83:10
**chain** [1] - 124:3
**chambers** [3] - 120:16, 256:21, 258:2
**chance** [3] - 41:21, 143:22, 158:1
**change** [30] - 9:10, 32:10, 37:5, 55:1, 70:25, 71:2, 72:14, 75:19, 79:15, 79:18, 79:20, 79:23, 80:3, 88:17, 91:3, 91:8, 91:11, 91:12, 91:17, 92:8, 131:3, 131:7, 131:10, 131:12, 139:14, 185:14, 185:21, 185:25, 241:24, 242:6
**changed** [9] - 71:1, 72:23, 75:16, 88:11, 96:25, 97:3, 108:19, 125:3, 228:6
**changes** [35] - 10:4, 33:9, 33:11, 33:13, 36:3, 39:17, 39:24, 41:5, 48:8, 68:21, 71:4, 72:20, 73:1, 79:14, 79:21, 92:4, 94:12, 97:5, 103:14, 103:16, 113:12, 139:13, 139:14, 165:20, 165:22, 165:25, 166:22, 193:10, 194:25, 195:2, 255:6, 255:14
**changing** [2] - 71:14, 242:7
**chapter** [2] - 96:13, 188:8

**Chapter** [5] - 172:11, 173:6, 173:10, 187:20, 191:24
**charges** [1] - 180:1
**chart** [3] - 34:15, 34:23, 39:23
**charts** [2] - 15:21, 179:18
**Chase** [3] - 116:13, 117:19, 117:21
**CHASE** [2] - 5:12, 117:17
**chase** [5] - 116:14, 118:9, 118:13, 119:22, 120:22, 121:19, 123:20, 123:25, 124:1, 124:18, 127:1, 127:7
**check** [20] - 33:20, 36:20, 36:24, 61:18, 62:7, 62:17, 82:12, 83:10, 83:12, 83:25, 84:2, 95:17, 154:9, 192:15, 214:10, 214:15, 231:6, 240:15, 257:13
**checked** [9] - 31:13, 82:8, 231:3, 233:5, 233:12, 256:8, 256:11, 257:7, 257:19
**checking** [3] - 97:19, 108:25, 133:13
**checks** [3] - 33:22, 82:23, 256:13
**Cheryl** [1] - 219:11
**chief** [1] - 19:21
**child** [20] - 129:17, 130:3, 134:13, 134:25, 135:5, 135:6, 135:9, 135:25, 139:13, 151:11, 167:7, 196:16, 196:24, 202:25, 209:6, 209:7, 228:15, 228:17
**children** [9] - 65:11, 75:7, 75:11, 80:24, 81:16, 84:19, 86:3, 88:23, 88:24
**Children** [6] - 1:11, 3:12, 32:6, 128:22, 128:23, 229:11
**Children's** [1] - 84:13
**children's** [1] - 84:18
**Childrens** [1] - 80:25
**choose** [2] - 95:19, 96:5
**chooses** [1] - 96:4

**chose** [3] - 92:12, 95:20, 257:20
**Chris** [1] - 117:21
**CHRIS** [1] - 117:21
**CHRISTOPHER** [2] - 5:12, 117:17
**Christopher** [1] - 116:13
**churches** [1] - 84:22
**circle** [9] - 56:11, 56:22, 57:7, 57:14, 58:3, 59:18, 61:9, 123:9, 233:20
**Circle** [2] - 54:3, 56:7
**circled** [3] - 233:18, 233:22, 234:18
**circling** [1] - 60:1
**circulation** [3] - 137:7, 137:8, 156:24
**circumstance** [1] - 216:14
**circumstances** [1] - 194:18
**cite** [1] - 10:14
**cited** [1] - 10:1
**citizens** [4] - 32:3, 200:25, 215:16, 216:10
**civic** [1] - 38:7
**civil** [4] - 6:4, 38:14, 241:25, 242:5
**Civil** [3] - 241:19, 241:22
**claim** [1] - 39:22
**claimed** [1] - 79:12
**claiming** [1] - 81:12
**claims** [1] - 32:16
**clarification** [2] - 21:7, 146:24
**clarifications** [1] - 186:9
**clarified** [1] - 193:16
**clarify** [4] - 136:8, 150:10, 178:4, 230:16
**clear** [8] - 17:18, 139:9, 142:1, 142:21, 143:7, 156:9, 164:25, 227:7
**Clearance** [3] - 50:24, 51:10, 51:25
**clearance** [2] - 49:22, 50:1
**clearances** [1] - 119:5
**Clement** [1] - 7:6
**CLEMENT** [1] - 4:2
**clerical** [3] - 77:19, 221:20, 234:16
**clerk** [1] - 45:7
**click** [1] - 94:14

**clicked** [3] - 195:1, 195:2, 195:8
**client** [38] - 143:19, 33:21, 33:25, 61:5, 61:17, 63:1, 78:3, 79:14, 83:1, 88:20, 104:9, 160:10, 160:17, 164:8, 164:9, 164:10, 173:3, 173:15, 174:14, 185:14, 185:20, 201:12, 208:11, 208:16, 215:24, 233:5, 235:8, 235:15, 236:11, 236:24, 237:7, 241:11, 243:24, 245:13, 245:17, 246:4, 249:22, 249:25
**client's** [2] - 245:6, 245:24
**clients** [27] - 32:8, 33:17, 37:5, 54:11, 56:11, 57:8, 57:10, 65:16, 105:19, 107:17, 159:11, 160:21, 163:6, 163:14, 163:19, 173:1, 173:2, 176:18, 185:24, 222:16, 230:7, 234:8, 235:11, 240:15, 245:10, 245:12, 250:12
**close** [3] - 204:16, 215:5, 216:10
**closed** [5] - 28:17, 189:2, 189:12, 236:12, 236:25
**closer** [1] - 118:14
**closing** [1] - 41:19
**co** [1] - 126:24
**co-counsel** [1] - 126:24
**code** [3] - 54:21, 54:22, 55:4
**coded** [3] - 54:25, 55:8, 55:13
**codes** [1] - 55:4
**coding** [11] - 12:18, 25:5, 25:6, 25:9, 25:10, 25:13, 25:24, 54:5, 54:13, 54:19
**cold** [1] - 89:15
**colleague** [2] - 8:4, 258:17
**collection** [1] - 10:4
**COLLIER** [2] - 3:16, 4:10

**comfortable** [2] - 19:12, 28:7
**coming** [1] - 74:11
**comment** [1] - 19:10
**comments** [1] - 40:20
**Commission** [2] - 9:2, 9:3
**Commissioner** [1] - 43:24
**committed** [1] - 19:24
**Common** [1] - 249:18
**common** [3] - 163:3, 202:11, 249:17
**commonly** [1] - 34:17
**communicate** [1] - 164:19
**communication** [1] - 228:10
**communities** [1] - 67:9
**community** [9] - 38:17, 66:25, 67:12, 215:13, 215:19, 216:2, 216:3, 216:7, 216:12
**compare** [9] - 9:24, 10:7, 10:8, 10:15, 10:16, 10:19, 10:25, 15:22, 16:18
**comparing** [2] - 10:3, 11:3
**comparison** [4] - 12:23, 35:4, 35:5, 190:4
**comparisons** [1] - 11:22
**compel** [1] - 15:5
**compile** [1] - 220:24
**compiles** [1] - 220:16
**complaint** [9] - 8:9, 25:2, 25:7, 30:21, 31:4, 32:25, 33:22, 35:25, 117:11
**complaints** [1] - 79:2
**complete** [24] - 10:6, 13:21, 54:19, 61:17, 61:19, 63:12, 67:2, 82:9, 87:11, 94:1, 95:7, 115:21, 150:7, 150:25, 151:3, 151:5, 152:24, 153:2, 153:10, 153:21, 173:16, 173:22, 174:23, 197:2
**completed** [14] - 56:10, 56:23, 57:13, 59:18, 67:7, 81:9, 86:24, 160:15, 184:20, 212:25,

215:24, 234:15, 253:12, 253:13
**completely** [3] - 76:17, 105:5, 166:3
**completeness** [3] - 155:17, 161:6, 174:19
**completes** [1] - 87:1
**completing** [13] - 77:11, 77:13, 78:4, 86:11, 86:18, 86:19, 86:22, 87:18, 88:7, 156:6, 161:14, 164:21, 173:4
**complex** [1] - 66:16
**compliance** [29] - 30:23, 30:25, 39:14, 39:16, 47:9, 47:13, 68:24, 72:10, 98:22, 210:14, 211:3, 211:12, 211:14, 211:16, 211:24, 226:1, 226:14, 226:17, 240:13, 240:19, 240:23, 241:10, 241:17, 242:3, 242:9, 243:9, 243:10, 243:18
**compliant** [2] - 34:3, 46:16
**complicate** [1] - 243:7
**complied** [1] - 226:19
**comply** [8] - 40:2, 41:23, 54:24, 68:25, 69:2, 116:24, 193:8
**complying** [5] - 72:13, 97:12, 98:3, 104:19, 227:23
**component** [2] - 240:12, 241:17
**composed** [1] - 218:19
**comprehensive** [1] - 23:9
**Computer** [1] - 1:25
**computer** [8] - 55:6, 95:2, 147:12, 164:2, 164:20, 216:16, 230:12, 249:12
**Computer-aided** [1] - 1:25
**concede** [2] - 157:17, 180:8
**conceded** [1] - 141:23
**concerned** [3] - 17:8, 30:20, 44:15
**concerning** [2] - 14:23, 27:18
**concerns** [1] - 27:19
**concluded** [15] - 61:3,

102:10, 105:14, 108:9, 123:18, 126:22, 143:1, 154:12, 157:22, 181:7, 207:13, 227:16, 238:11, 244:5, 257:1
**conclusion** [7] - 40:3, 78:18, 99:2, 180:9, 210:20, 211:6, 211:14
**conclusions** [1] - 20:6
**conclusively** [1] - 32:12
**conduct** [8] - 14:20, 98:2, 172:20, 201:3, 222:4, 223:21, 244:23, 246:18
**conducted** [7] - 69:8, 78:13, 103:3, 195:24, 206:18, 239:24, 244:21
**conducting** [2] - 141:24, 216:4
**confer** [2] - 28:24, 239:10
**CONFERENCE** [1] - 1:5
**conference** [21] - 60:10, 101:18, 104:13, 123:6, 125:14, 141:21, 147:3, 153:20, 157:5, 206:15, 212:18, 212:20, 212:23, 226:24, 237:6, 240:2, 254:23, 255:19, 258:2, 258:5, 259:3
**Conference** [2] - 38:2, 43:22
**conferred** [1] - 18:23
**confirm** [2] - 114:2, 148:3, 161:9
**confirmed** [1] - 41:7
**confused** [1] - 179:21
**confusion** [3] - 138:3, 138:16, 139:4
**Congress** [2] - 9:8, 17:10
**conjunction** [4] - 188:6, 188:11, 192:8, 192:9
**connection** [4] - 9:11, 23:12, 32:10, 41:4
**consequences** [2] - 75:21, 76:2
**consider** [1] - 130:2
**consideration** [1] - 209:13

considered [4] -
50:21, 82:13, 135:5,
202:1
considering [2] -
203:18, 209:18
constantly [1] -
203:17
consult [1] - 253:15
consultant [5] -
219:15, 220:2,
220:3, 220:15,
220:24
consultants [1] -
225:23
consumed [1] -
217:16
consuming [1] - 70:24
contact [24] - 63:1,
67:16, 71:16, 78:7,
81:8, 82:17, 82:19,
83:19, 83:20, 88:12,
88:14, 88:15, 89:7,
89:12, 90:9, 125:4,
195:22, 201:10,
202:4, 202:7,
202:22, 243:25,
259:10
contacted [1] - 195:20
contain [1] - 199:4
contained [5] -
143:14, 182:19,
188:1, 198:9, 199:6
contains [1] - 152:1
contemplating [1] -
113:15
contend [4] - 33:14,
33:22, 34:6, 55:15
content [1] - 206:23
contentions [1] -
41:17
contents [5] - 157:25,
158:9, 158:16,
160:2, 176:6
contest [1] - 180:18
contested [6] - 32:16,
142:9, 142:10,
142:12, 180:8,
180:11
contesting [1] -
237:18
continually [1] - 255:7
continue [7] - 32:13,
37:6, 84:9, 117:1,
193:19, 193:23,
211:1
continued [2] -
199:25, 238:19
continues [2] - 34:4,
79:13
continuing [3] - 89:19,

117:4, 117:12
contracting [1] -
215:10
contractor [1] - 215:9
contractors [3] -
251:22, 252:1, 252:2
contracts [2] - 66:24,
113:23
contradicts [2] -
207:3, 241:16
contrary [1] - 33:2
contribute [1] - 46:23
Control [1] - 97:24
control [6] - 98:1,
98:23, 226:11,
226:15, 226:20,
249:7
convenience [2] -
89:12, 93:7
conversation [1] -
116:15
coordination [2] -
9:11, 120:17
coordinator [5] -
248:3, 248:4,
248:12, 249:1, 249:6
copies [2] - 86:15,
97:6
copy [12] - 45:7,
138:5, 138:11,
138:12, 138:20,
138:21, 145:23,
157:15, 206:3,
209:21, 232:6
corner [7] - 53:24,
56:4, 136:10,
136:12, 149:7,
149:8, 149:10
correct [168] - 12:1,
15:8, 15:9, 15:14,
21:9, 46:16, 46:19,
47:24, 48:13, 52:2,
52:3, 53:10, 56:12,
57:5, 57:9, 57:12,
60:7, 72:5, 79:11,
87:22, 97:8, 100:18,
109:3, 119:13,
121:23, 122:10,
122:11, 122:13,
122:18, 125:8,
129:3, 129:4, 130:1,
130:7, 130:10,
131:11, 132:18,
132:23, 134:3,
140:3, 140:4,
140:18, 140:23,
140:25, 141:1,
141:4, 143:9,
143:25, 144:1,
144:2, 144:3,

144:22, 144:23,
145:10, 145:15,
146:18, 146:19,
148:4, 149:4,
149:11, 150:13,
150:14, 150:17,
151:13, 152:8,
152:11, 154:16,
154:17, 155:8,
155:21, 155:22,
156:7, 156:11,
158:7, 158:8,
158:22, 159:13,
159:14, 159:22,
160:1, 161:19,
164:22, 165:8,
167:8, 167:15,
167:18, 167:19,
167:21, 168:12,
168:14, 168:15,
168:23, 168:24,
169:1, 169:25,
170:2, 170:4, 170:5,
170:6, 170:10,
174:10, 174:11,
175:7, 175:10,
175:11, 176:4,
176:5, 184:14,
184:15, 184:22,
184:23, 185:4,
185:5, 185:10,
185:22, 186:1,
187:23, 194:1,
196:18, 196:19,
198:4, 198:5,
201:20, 205:12,
205:13, 205:16,
207:18, 207:19,
207:20, 207:23,
208:2, 208:3,
208:18, 209:17,
210:13, 211:2,
211:20, 212:16,
212:19, 216:25,
217:20, 218:14,
219:3, 219:13,
219:23, 223:18,
223:22, 224:6,
224:10, 227:8,
233:17, 235:10,
235:13, 235:17,
244:19, 244:20,
247:16, 247:17,
247:25, 248:21,
249:10, 249:11,
250:17, 250:18,
251:21, 254:11,
257:4, 259:21
correctly [1] - 125:6
cost [1] - 75:22
costs [2] - 75:23,

75:25
Council [2] - 67:12,
215:20
counsel [6] - 31:8,
115:25, 126:24,
157:17, 206:16,
239:11
counseling [1] -
177:23
count [1] - 59:23
counted [4] - 55:9,
55:13, 189:9, 189:10
counter [1] - 105:3
counts [1] - 204:19
couple [10] - 44:7,
44:10, 82:20, 117:7,
134:5, 142:4, 186:8,
191:8, 200:18,
212:13
course [6] - 8:11,
20:1, 42:20, 159:2,
223:8, 228:8
courses [1] - 153:7
COURT [361] - 1:1,
6:3, 6:5, 7:10, 8:3,
8:6, 8:20, 10:21,
11:17, 11:20, 12:2,
13:2, 13:13, 13:17,
14:2, 15:10, 15:18,
18:1, 18:11, 18:18,
18:21, 19:19, 20:7,
20:10, 20:15, 20:18,
21:9, 21:13, 21:18,
21:23, 22:2, 22:16,
23:16, 23:19, 24:7,
24:23, 26:9, 26:14,
26:22, 27:7, 28:9,
28:23, 29:2, 29:5,
29:9, 29:11, 30:5,
30:16, 31:9, 31:20,
31:24, 40:17, 41:24,
42:7, 42:13, 43:18,
43:25, 44:16, 44:21,
45:2, 45:6, 47:1,
48:21, 49:2, 49:5,
50:16, 51:8, 51:11,
51:15, 53:18, 53:20,
54:8, 55:20, 56:1,
56:17, 57:22, 57:24,
58:7, 58:15, 59:1,
59:20, 60:15, 60:19,
60:24, 62:11, 63:15,
63:25, 67:8, 67:15,
70:19, 71:24, 73:5,
73:8, 78:20, 80:12,
83:6, 87:23, 88:14,
88:16, 97:10, 99:2,
99:8, 99:11, 99:14,
101:1, 101:4, 101:6,

101:10, 101:14,
101:17, 101:19,
102:3, 102:7,
102:20, 104:14,
104:17, 105:7,
106:7, 106:10,
107:5, 107:11,
108:5, 108:8,
110:25, 112:19,
113:3, 113:24,
114:6, 114:10,
114:14, 115:23,
116:3, 116:5,
116:10, 116:14,
117:16, 117:19,
117:22, 118:4,
118:13, 118:16,
119:17, 120:20,
121:8, 121:12,
121:14, 121:16,
122:23, 123:5,
123:7, 123:13,
123:16, 124:5,
124:8, 124:11,
124:14, 124:21,
125:13, 125:15,
125:21, 126:7,
126:14, 126:17,
126:21, 126:23,
127:4, 127:9, 128:3,
128:8, 133:15,
134:6, 134:18,
134:20, 136:3,
136:5, 137:19,
137:21, 138:22,
141:6, 141:20,
142:11, 142:23,
143:6, 143:13,
145:22, 147:18,
147:21, 152:17,
153:8, 153:14,
153:19, 153:21,
154:4, 154:9,
154:20, 154:22,
157:1, 157:4,
157:21, 163:18,
163:21, 164:1,
164:5, 164:13,
164:18, 164:23,
165:22, 166:6,
166:9, 166:13,
166:15, 167:1,
167:24, 168:1,
168:4, 169:5, 175:2,
175:23, 178:3,
178:6, 178:15,
178:18, 178:20,
179:1, 179:13,
179:21, 180:22,
180:25, 181:3,
182:7, 183:3, 183:8,

183:21, 183:25,
185:7, 186:4,
187:13, 190:2,
190:10, 190:12,
196:5, 202:18,
203:8, 203:10,
203:24, 204:3,
206:14, 207:3,
207:8, 207:10,
208:5, 208:7, 210:3,
210:6, 210:21,
211:7, 211:15,
211:22, 212:4,
212:13, 212:17,
212:20, 212:23,
213:3, 213:10,
213:12, 213:21,
214:3, 214:7,
214:17, 214:19,
214:22, 215:3,
215:7, 215:19,
216:2, 216:7,
216:14, 216:19,
216:23, 217:1,
217:4, 217:13,
217:23, 218:3,
218:7, 218:9,
220:11, 221:15,
222:19, 222:25,
223:4, 224:1,
225:17, 226:16,
226:23, 227:9,
227:14, 227:17,
227:19, 228:1,
228:5, 228:21,
228:23, 229:3,
229:7, 230:19,
231:16, 231:22,
232:6, 232:14,
232:19, 232:24,
237:5, 237:8,
237:14, 238:1,
238:5, 238:8,
238:10, 239:9,
239:20, 240:1,
240:3, 240:16,
240:25, 241:4,
241:15, 241:25,
242:7, 242:21,
243:15, 243:20,
244:3, 244:8,
244:10, 244:12,
245:11, 245:16,
245:23, 246:1,
247:1, 247:6,
251:16, 253:16,
254:4, 254:21,
255:16, 256:2,
256:5, 256:11,
256:15, 256:24,
257:23, 258:1,

258:7, 258:20,
258:25
**Court** [28] - 1:21, 14:4,
14:8, 18:11, 23:14,
25:25, 29:15, 30:20,
30:22, 30:25, 31:8,
31:23, 40:21, 41:2,
41:4, 41:16, 43:3,
45:23, 54:7, 63:10,
63:14, 92:19,
116:21, 211:24,
217:5, 217:19,
258:3, 259:20
**court** [10] - 32:1,
32:19, 117:20,
128:9, 139:2, 215:7,
218:4, 229:4, 247:7,
259:1
**Court's** [7] - 14:19,
20:11, 41:14,
127:17, 180:6,
258:22, 259:14
**court's** [2] - 183:13,
259:8
**courtesy** [3] - 39:18,
39:19
**courthouse** [1] -
36:10
**courtroom** [13] -
18:15, 36:8, 42:6,
42:7, 42:19, 42:23,
42:24, 43:3, 43:7,
43:23, 43:25, 44:7,
44:9
**cover** [5] - 22:10, 25:3,
188:13, 196:11,
206:1
**coverage** [5] - 65:1,
74:9, 74:14, 75:7,
84:19
**covered** [4] - 150:6,
196:12, 205:5, 207:4
**covering** [1] - 236:1
**covers** [3] - 182:2,
182:22, 199:13
**create** [1] - 121:7
**created** [4] - 73:5,
152:7, 170:9, 171:21
**creed** [1] - 246:9
**criteria** [3] - 65:3,
75:2, 88:10
**criterias** [1] - 223:11
**CROSS** [4] - 63:17,
186:6, 210:8, 244:14
**Cross** [3] - 5:11, 5:16,
5:21
**cross** [2] - 106:7,
244:11
**crucial** [1] - 37:17
**crystallize** [1] - 41:22

**current** [10] - 96:21,
99:21, 128:21,
132:7, 132:12,
150:15, 204:25,
227:7, 229:15, 246:4
**customer** [4] - 78:9,
165:3, 165:4, 200:23
**cut** [1] - 233:8

# D

**D-SNAP** [18] - 129:22,
129:23, 169:9,
169:15, 169:17,
169:20, 169:23,
193:14, 198:1,
198:3, 198:7,
198:10, 198:11,
198:13, 198:19,
198:20, 202:1
**Dale** [3] - 6:7, 22:10,
45:20
**DALE** [1] - 2:3
**Dallas** [2] - 202:6,
202:7
**data** [17] - 10:3, 10:4,
34:9, 34:10, 34:17,
52:6, 52:7, 52:8,
54:11, 88:9, 91:23,
162:6, 220:6,
220:16, 220:25
**date** [20] - 96:18,
100:6, 112:9,
119:15, 132:2,
133:7, 134:14,
135:21, 135:22,
136:8, 140:2, 148:8,
148:9, 150:15,
154:1, 154:15,
197:20, 236:11,
236:24, 255:9
**dated** [16] - 133:19,
136:1, 139:10,
140:3, 143:25,
144:22, 149:6,
158:7, 165:12,
168:10, 168:21,
176:3, 185:10,
207:15, 221:8,
223:13
**dates** [1] - 16:7
**dating** [1] - 73:19
**DAVID** [2] - 2:13, 4:3
**David** [2] - 6:14, 15:12
**david.mccay@la.gov**
[1] - 4:8
**Davis** [1] - 218:20
**dawn** [1] - 219:11
**day-to-day** [4] -
224:17, 224:20,

225:12, 225:18
**days** [7] - 43:19,
74:21, 87:2, 92:14,
95:21, 97:2, 97:3
**DC** [2] - 2:20, 2:24
**DCFS** [132] - 7:9,
16:24, 18:15, 18:20,
18:23, 19:4, 19:7,
19:11, 19:24, 19:25,
20:20, 20:24, 20:25,
21:13, 22:14, 23:10,
23:24, 23:25, 24:12,
30:19, 31:6, 32:7,
32:22, 33:16, 33:24,
34:1, 34:19, 37:5,
37:21, 37:25, 42:11,
88:22, 99:11,
117:10, 118:12,
128:24, 129:2,
129:5, 129:11,
130:1, 130:9,
130:12, 130:15,
130:19, 131:2,
131:3, 131:13,
131:23, 132:15,
145:8, 145:9,
145:13, 146:15,
146:16, 147:5,
148:7, 148:17,
148:24, 149:14,
149:22, 150:2,
152:8, 155:1, 155:4,
156:21, 158:17,
159:2, 159:20,
160:23, 161:21,
161:24, 162:13,
165:13, 170:12,
170:22, 170:23,
171:10, 172:14,
172:19, 173:13,
173:19, 173:20,
174:12, 175:13,
176:13, 177:1,
177:6, 177:10,
178:14, 183:7,
185:3, 185:12,
185:18, 185:21,
185:23, 186:22,
190:10, 192:20,
196:2, 196:9,
197:12, 198:6,
200:19, 202:16,
204:21, 205:21,
208:1, 212:3,
213:23, 215:9,
215:11, 216:13,
217:10, 218:12,
222:15, 226:13,
230:10, 236:20,
237:18, 238:24,
247:16, 247:22,

247:24, 248:8,
249:9, 249:12,
249:20, 252:2
**DCFS's** [3] - 34:17,
150:15, 238:21
**DCFS/DHH** [1] - 20:21
**deal** [9] - 20:12, 23:14,
25:11, 74:13, 78:11,
80:1, 89:25, 93:22,
202:11
**deals** [2] - 40:23,
226:11
**dealt** [2] - 18:4, 248:20
**December** [2] - 36:23,
232:11
**deceptive** [1] - 12:23
**decide** [6] - 30:7, 71:5,
81:25, 85:3, 87:6,
211:24
**decided** [5] - 60:18,
60:20, 71:12, 82:24,
137:2
**decision** [25] - 20:6,
41:7, 47:18, 60:3,
60:5, 60:7, 60:25,
61:25, 67:5, 85:9,
85:10, 85:11, 85:12,
85:14, 85:16, 89:6,
90:11, 90:13, 96:5,
115:18, 201:4,
215:23, 216:1
**decisions** [2] - 66:9,
196:8
**declaration** [18] -
27:24, 33:7, 33:19,
49:23, 76:25, 79:6,
81:24, 82:3, 85:9,
90:3, 90:21, 93:4,
95:15, 96:6, 100:8,
100:13, 169:14,
209:19
**declination** [2] -
27:23, 197:6
**decline** [4] - 11:1,
11:5, 37:7, 37:24
**declined** [2] - 35:18,
82:13
**declining** [2] - 82:15,
189:6
**deems** [1] - 14:20
**defendant** [5] - 6:22,
19:14, 24:14, 26:6,
183:7
**Defendant** [4] - 3:3,
3:11, 4:2, 22:19
**defendant's** [4] -
15:14, 190:6, 190:7,
199:9
**Defendants** [2] - 1:14,
5:6

**defendants** [21] - 16:6, 22:15, 23:25, 27:2, 27:3, 30:13, 32:12, 32:16, 33:8, 34:10, 35:24, 37:13, 37:19, 38:19, 39:12, 39:20, 107:16, 107:20, 153:4, 180:18, 217:10

**defendants'** [3] - 33:12, 36:3, 39:7

**defense** [1] - 157:16

**Defense** [1] - 2:4

**defer** [2] - 18:5, 31:21

**deficits** [1] - 196:21

**define** [1] - 241:20

**definition** [1] - 211:13

**degree** [1] - 40:11

**delay** [2] - 76:14, 76:15

**delays** [1] - 76:7

**DeLeeuw** [5] - 2:12, 6:12, 28:8, 64:4

**delegating** [1] - 187:3

**delegation** [1] - 187:7

**Democracy** [2] - 32:1, 40:14

**demonstrate** [1] - 32:12

**demonstrative** [3] - 29:17, 29:21, 31:12

**Denham** [1] - 3:9

**denial** [2] - 214:4, 216:20

**denied** [8] - 14:14, 14:18, 17:14, 85:13, 85:20, 213:16, 213:19, 213:20

**deny** [8] - 14:5, 14:11, 14:21, 16:22, 17:1, 17:6, 85:5, 126:12

**department** [23] - 48:7, 56:21, 69:14, 72:9, 73:3, 76:13, 128:22, 156:25, 191:5, 192:21, 194:5, 196:20, 201:24, 202:3, 202:7, 202:11, 202:22, 210:12, 210:14, 210:25, 211:2, 211:11, 242:20

**Department** [14] - 1:11, 1:12, 32:6, 32:7, 42:4, 68:22, 69:12, 128:23, 197:16, 197:17, 207:16, 207:22, 212:2, 229:11

**department's** [1] - 203:13

**dependability** [1] - 228:10

**deposed** [1] - 224:22

**deposition** [25] - 57:23, 58:5, 107:19, 118:2, 119:22, 120:1, 120:6, 177:15, 177:17, 177:22, 177:24, 179:15, 180:22, 217:11, 217:14, 217:16, 225:6, 250:20, 250:23, 250:25, 251:9, 251:11, 254:24, 256:1, 256:3

**depositions** [1] - 120:8

**deputies** [1] - 64:18

**deputy** [14] - 45:25, 64:7, 64:13, 64:16, 68:14, 129:2, 129:8, 186:10, 186:12, 186:13, 186:20, 186:21, 193:5

**derived** [1] - 55:13

**describe** [1] - 39:17

**described** [3] - 32:1, 37:18, 138:13

**description** [1] - 47:4

**design** [1] - 241:21

**designated** [5] - 42:9, 43:22, 43:24, 53:12, 127:15

**designations** [2] - 217:13, 217:15

**designed** [2] - 95:5, 241:22

**designing** [1] - 253:11

**desk** [5] - 67:19, 77:24, 85:2, 85:7, 93:1

**destroyed** [1] - 137:6

**detach** [1] - 155:19

**detail** [1] - 188:13

**detailed** [2] - 38:23, 161:17

**details** [1] - 192:13

**determination** [11] - 20:11, 41:7, 66:7, 164:5, 189:9, 189:10, 201:6, 213:13, 240:9, 240:10, 246:8

**determinations** [4] - 66:19, 201:7, 227:8, 240:7

**determine** [15] -

52:20, 65:22, 67:24, 105:10, 111:17, 228:2, 230:5, 230:7, 237:19, 237:20, 238:2, 238:15, 238:19, 240:8, 242:1

**determines** [2] - 77:18, 107:25

**determining** [4] - 81:15, 115:16, 119:3, 242:8

**develop** [2] - 190:21, 242:12

**developed** [8] - 8:12, 74:2, 104:3, 104:19, 190:16, 190:20, 191:9, 194:15

**developer** [1] - 249:4

**developers** [2] - 249:4, 251:4

**Developing** [1] - 251:19

**development** [5] - 146:15, 248:7, 248:8, 251:3, 255:3

**developments** [1] - 36:1

**devote** [2] - 70:9, 70:13

**DHH** [71] - 14:7, 18:23, 19:4, 19:7, 19:11, 19:24, 19:25, 20:20, 21:5, 21:15, 23:4, 23:5, 23:7, 23:10, 24:1, 26:18, 30:19, 31:6, 32:8, 32:24, 45:10, 46:1, 47:10, 47:14, 47:22, 47:23, 48:1, 49:25, 51:2, 52:13, 56:10, 56:22, 57:4, 57:7, 58:21, 61:8, 61:14, 61:18, 62:6, 62:8, 63:21, 63:22, 63:23, 64:8, 66:10, 71:18, 74:7, 78:11, 78:25, 80:11, 80:12, 87:20, 91:1, 94:7, 96:9, 96:15, 102:13, 107:17, 108:15, 110:3, 110:10, 110:13, 110:14, 111:14, 117:10, 118:11, 119:10, 122:10, 122:13, 179:25

**DHH's** [1] - 60:5

**DHH-1** [1] - 87:21

**DHH-3** [1] - 94:4

**DHH-7** [1] - 97:9

**DHH-9** [1] - 97:20

**DHH/DCFS** [2] - 5:6, 21:16

**dho@naacpldf.org** [1] - 2:7

**Dianne** [2] - 42:3, 44:22

**DIANNE** [3] - 5:9, 44:19, 44:22

**difference** [7] - 91:21, 91:22, 157:19, 240:21, 248:23, 249:2, 249:3

**differences** [1] - 249:2

**different** [28] - 12:16, 25:17, 62:22, 65:12, 65:15, 75:5, 75:14, 76:17, 80:17, 80:21, 84:17, 95:24, 102:18, 109:15, 115:14, 135:21, 140:2, 151:9, 154:1, 162:5, 166:3, 169:22, 172:12, 202:12, 214:11, 219:25, 224:21, 241:24

**difficult** [4] - 36:12, 95:4, 122:21, 259:6

**DIRECT** [6] - 45:14, 117:23, 128:17, 218:10, 229:8, 247:10

**Direct** [5] - 5:10, 5:15, 5:18, 5:20, 5:23

**direct** [11] - 5:13, 38:17, 59:7, 63:11, 72:17, 73:16, 120:23, 121:10, 123:24, 125:1, 127:5

**directed** [4] - 58:15, 58:21, 185:3

**direction** [3] - 55:18, 73:18, 159:7

**directive** [8] - 71:22, 72:11, 72:17, 73:11, 73:13, 73:15, 73:17, 191:3

**directly** [16] - 54:16, 155:5, 174:24, 175:17, 186:13, 186:16, 219:7, 219:9, 222:7, 223:12, 223:17, 223:20, 224:4, 225:13, 240:21, 255:1

**director** [9] - 45:25, 64:7, 187:9, 247:25, 248:12, 248:15, 248:24, 250:15,

251:18

**directors** [4] - 64:18, 68:14, 219:12, 225:23

**disability** [1] - 81:12

**disabled** [2] - 65:11, 74:15

**disagree** [1] - 62:10

**disallowance** [1] - 227:3

**disappointed** [1] - 43:18

**disaster** [7] - 38:8, 129:21, 129:23, 169:8, 169:15, 198:1, 198:18

**disasters** [1] - 129:24

**disc** [1] - 198:8

**discern** [1] - 232:3

**disclosures** [4] - 24:15, 24:16, 26:1, 26:13

**discontinued** [1] - 200:14

**discovered** [1] - 153:3

**discovery** [6] - 15:8, 15:16, 20:1, 24:3, 108:1, 141:24

**discretionary** [1] - 33:24

**discuss** [7] - 27:8, 171:16, 245:1, 245:3, 245:4, 246:13, 246:19

**discussed** [9] - 27:7, 27:9, 130:7, 173:11, 205:3, 205:12, 245:13, 246:11, 246:15

**discussing** [3] - 170:7, 207:16, 246:2

**Discussion** [1] - 12:5

**discussions** [3] - 193:17, 209:25, 210:1

**dispense** [1] - 102:1

**dispute** [5] - 126:18, 126:19, 138:14, 141:23, 142:5

**disputes** [1] - 41:12

**distinct** [1] - 64:21

**distinction** [2] - 77:16, 95:23

**Distribute** [1] - 184:17

**distribute** [5] - 57:7, 57:10, 184:18, 185:19

**distributed** [1] - 103:10

**distribution** [2] - 48:7,

49:20
**DISTRICT** [3] - 1:1, 1:2, 1:19
**divide** [1] - 19:6
**division** [4] - 64:22, 68:9, 129:3, 242:24
**docket** [2] - 6:3, 7:13
**doctor** [1] - 94:15
**document** [123] - 14:7, 14:13, 14:15, 14:22, 15:1, 17:2, 18:4, 48:19, 49:8, 49:17, 52:25, 71:18, 80:10, 87:19, 90:25, 94:7, 96:8, 96:15, 97:20, 115:6, 123:12, 123:13, 123:17, 131:20, 132:2, 133:18, 133:19, 134:10, 134:14, 134:23, 135:18, 135:21, 135:22, 136:9, 136:12, 136:15, 136:25, 137:3, 138:14, 139:24, 140:1, 140:5, 141:10, 141:23, 143:24, 146:1, 146:3, 146:6, 146:9, 146:13, 148:23, 152:4, 153:2, 153:9, 153:10, 153:12, 153:15, 153:22, 154:1, 154:6, 154:15, 154:18, 155:2, 155:8, 156:7, 158:3, 158:11, 158:12, 158:25, 159:5, 160:3, 160:19, 165:19, 167:8, 170:15, 171:25, 172:6, 172:19, 172:22, 173:3, 173:20, 173:25, 174:12, 176:15, 181:17, 181:20, 181:23, 182:1, 182:16, 182:19, 182:22, 184:18, 194:7, 194:8, 194:15, 194:25, 195:3, 195:6, 198:17, 199:7, 199:14, 199:19, 199:21, 199:23, 200:6, 206:24, 206:25, 207:5, 207:15, 208:5, 212:6, 221:5,

223:15, 223:18, 227:11, 230:23, 233:1, 236:20, 240:14, 242:16, 244:7
**Document** [1] - 258:11
**documentary** [1] - 117:10
**documents** [38] - 8:8, 13:25, 14:8, 14:12, 15:5, 17:10, 19:6, 19:12, 19:13, 19:25, 20:4, 20:8, 20:10, 20:23, 21:5, 21:15, 21:17, 21:24, 38:21, 51:18, 95:11, 152:22, 166:12, 179:6, 180:3, 180:25, 181:1, 181:4, 181:6, 183:6, 183:9, 192:11, 195:3, 196:14, 232:20, 243:6, 259:13
**done** [21] - 27:25, 38:22, 39:3, 59:23, 68:1, 68:4, 71:9, 87:10, 88:6, 88:7, 104:21, 104:22, 111:21, 130:25, 142:24, 176:24, 201:11, 239:10, 247:1, 257:23, 259:7
**door** [5] - 15:20, 16:18, 67:19, 91:10, 207:11
**dot** [6] - 228:18, 228:19
**Douglas** [1] - 6:22
**DOUGLAS** [1] - 4:2
**douglas.cade@la. gov** [1] - 4:7
**down** [22] - 22:21, 34:18, 34:24, 35:8, 66:2, 66:3, 67:18, 115:23, 128:8, 128:11, 149:10, 155:14, 156:4, 159:9, 193:25, 194:9, 195:12, 228:23, 231:25, 232:1, 239:11, 256:10
**download** [2] - 95:18, 194:14
**downsized** [1] - 108:21
**dozen** [1] - 234:9
**Dpt** [3] - 3:12, 4:3,

4:15
**Dr** [3] - 38:3, 44:2, 44:9
**draft** [2] - 113:16, 157:16
**drafted** [2] - 27:13, 184:24
**draw** [4] - 100:19, 109:9, 112:5, 112:24
**drawer** [3] - 85:3, 85:7, 93:1
**drawing** [1] - 56:6
**drill** [2] - 66:3, 178:9
**drive** [4] - 36:10, 67:6, 92:5, 138:13
**driver's** [1] - 96:2
**drop** [3] - 80:6, 93:2, 194:9
**drove** [1] - 41:3
**drug** [1] - 84:22
**due** [2] - 10:4, 236:24
**duly** [6] - 44:19, 117:17, 128:6, 218:1, 229:1, 247:4
**duplicate** [1] - 11:10
**duplicative** [1] - 126:6
**during** [17] - 18:22, 20:1, 34:19, 35:15, 35:20, 35:22, 42:19, 116:14, 126:2, 131:9, 201:13, 201:15, 245:13, 250:8, 250:11, 250:25, 254:24
**duties** [20] - 9:12, 46:5, 46:12, 46:15, 46:18, 46:21, 47:9, 70:22, 92:20, 118:25, 145:8, 145:13, 145:14, 148:18, 170:23, 186:20, 187:2, 197:10, 240:9
**duty** [9] - 9:6, 46:22, 46:24, 55:19, 56:15, 68:19, 79:15, 89:25, 113:20
**Dwayne** [2] - 228:24, 229:5
**DWAYNE** [2] - 5:19, 229:1

# E

**E-2451** [1] - 190:16
**EAC** [7] - 9:6, 10:14, 15:19, 15:21, 15:25, 15:1, 174:19
**early** [1] - 248:17
**easier** [4] - 179:19,

216:10, 228:15, 232:7
**easiest** [1] - 179:14
**easily** [2] - 76:15, 200:25
**EASTERN** [1] - 1:2
**easy** [1] - 74:18
**EBONI** [1] - 3:11
**Eboni** [1] - 18:19
**economic** [8] - 40:6, 218:24, 219:2, 219:7, 219:15, 220:4, 220:8, 225:23
**Economic** [2] - 197:16, 221:18
**edited** [1] - 26:17
**edits** [1] - 70:5
**Educational** [1] - 2:4
**Edward** [1] - 38:13
**effect** [14] - 36:4, 70:15, 74:6, 74:7, 74:20, 75:22, 76:21, 83:8, 86:1, 133:9, 134:2, 157:10, 166:17
**effective** [5] - 69:25, 70:1, 111:8, 111:12, 111:18
**effort** [6] - 38:10, 146:13, 193:8, 193:19, 193:22, 203:20
**efforts** [6] - 34:6, 38:14, 39:8, 41:22, 205:18, 205:21
**eight** [1] - 88:3
**either** [18] - 12:12, 22:17, 25:18, 55:14, 68:1, 82:12, 83:10, 90:10, 95:17, 122:17, 160:21, 160:23, 181:3, 186:15, 189:22, 216:19, 223:1, 232:13
**elderly** [1] - 74:15
**ELE** [1] - 89:9
**election** [1] - 28:16
**Election** [1] - 9:3
**elections** [1] - 11:2
**Elections** [1] - 9:2
**electronic** [7] - 91:24, 96:7, 103:21, 103:23, 138:5, 138:21, 213:7
**elicit** [1] - 60:22
**Eligibility** [7] - 46:6, 64:22, 68:9, 72:12, 97:7, 97:24, 119:1
**eligibility** [50] - 46:7,

49:21, 61:25, 64:10, 65:12, 65:22, 65:25, 66:6, 66:8, 66:19, 67:24, 68:15, 77:18, 81:15, 88:20, 89:19, 103:20, 103:23, 107:13, 107:25, 115:17, 119:2, 119:3, 162:5, 162:9, 163:4, 163:25, 164:11, 172:12, 201:4, 201:6, 201:7, 201:8, 203:3, 215:23, 227:1, 227:7, 227:8, 229:22, 230:5, 230:8, 237:19, 237:20, 238:2, 238:16, 238:19, 238:20, 240:10, 244:24, 245:19
**eligible** [13] - 65:4, 65:5, 65:7, 65:9, 65:10, 66:4, 75:3, 88:11, 88:24, 88:25, 89:7, 189:20, 227:4
**email** [7] - 31:14, 49:20, 124:1, 124:3, 124:12, 124:25, 212:21
**emails** [1] - 31:14
**emergency** [1] - 93:13
**Emerging** [6] - 247:25, 248:12, 248:15, 248:24, 250:15, 251:19
**employed** [2] - 217:21, 218:12
**employee** [2] - 72:12
**employees** [9] - 74:23, 110:13, 110:14, 119:10, 121:19, 121:25, 124:13, 214:23, 215:22
**employer** [2] - 128:21, 229:10
**employment** [1] - 97:2
**Empower** [1] - 229:21
**empowerment** [1] - 38:9
**en** [1] - 18:24
**enacted** [3] - 36:4, 40:7, 200:3
**encounters** [1] - 107:24
**end** [14] - 30:10, 30:15, 41:8, 41:20, 163:3, 163:4, 165:1, 179:23, 179:24, 189:10, 209:9,

249:17, 256:6
**End** [1] - 249:18
**energy** [1] - 38:15
**enforce** [1] - 34:6
**enforcement** [1] -
27:19
**engage** [2] - 38:7,
40:1
**engaged** [1] - 38:10
**engagement** [2] -
38:8, 38:14
**enjoin** [1] - 50:14
**enroll** [1] - 70:16
**enrolled** [1] - 88:23
**enrollee** [1] - 89:8
**enrollment** [5] - 49:4,
144:2, 144:21,
145:4, 208:17
**ensure** [21] - 32:3,
36:3, 37:6, 40:1,
40:8, 40:13, 46:15,
61:19, 145:8,
147:14, 173:2,
205:22, 212:7,
226:18, 227:7,
234:18, 235:25,
240:12, 242:11,
243:18, 248:5
**ensures** [1] - 226:14
**ensuring** [1] - 222:15
**entails** [1] - 104:6
**enter** [7] - 90:18,
164:10, 178:11,
183:10, 217:11,
221:12, 227:9
**entered** [6] - 21:23,
27:11, 27:17, 27:20,
103:18, 164:9
**entering** [1] - 91:23
**enters** [1] - 55:5
**entire** [1] - 76:6
**entitled** [1] - 40:14
**entry** [1] - 66:14
**equally** [1] - 54:17
**ERICA** [1] - 2:12
**Erica** [1] - 6:16
**ES** [1] - 146:15
**especially** [2] - 189:6,
216:12
**ESQ** [22] - 2:3, 2:3,
2:8, 2:12, 2:12, 2:13,
2:13, 2:17, 2:18,
2:22, 3:3, 3:7, 3:11,
3:11, 3:16, 3:16, 4:2,
4:2, 4:3, 4:9, 4:10,
4:14
**essentially** [1] - 192:5
**establish** [4] - 89:19,
122:24, 223:2,
238:14

**established** [2] -
177:22, 178:23
**establishes** [1] -
131:22
**et** [2] - 70:23, 83:10
**evaluate** [7] - 105:9,
105:17, 223:11,
227:22, 240:8,
241:1, 243:3
**evaluated** [5] - 223:21,
223:23, 224:11,
240:22
**evaluating** [1] - 191:6,
243:18
**evaluation** [8] -
111:14, 222:9,
224:14, 227:20,
228:1, 241:16,
241:25, 242:17
**evaluations** [12] -
52:11, 222:4,
222:10, 222:23,
223:21, 224:4,
224:7, 227:22,
228:6, 243:5, 243:6,
243:7
**eventually** [1] - 37:20
**everywhere** [1] -
84:23
**evidence** [61] - 12:18,
13:8, 14:16, 14:19,
14:23, 15:4, 15:23,
16:9, 16:10, 20:4,
21:16, 21:23, 23:13,
24:16, 30:6, 32:11,
34:8, 39:6, 41:9,
41:18, 51:7, 53:17,
72:4, 100:2, 100:21,
107:9, 108:6,
110:24, 112:7,
112:16, 113:18,
117:10, 120:14,
120:17, 120:18,
132:21, 134:16,
134:17, 136:2,
137:18, 138:8,
139:8, 142:2, 142:3,
148:15, 152:15,
154:19, 157:11,
158:4, 166:14,
167:23, 174:6,
180:4, 183:7,
206:20, 221:13,
227:10, 230:21,
236:18
**Evidence** [1] - 17:18
**evidentiary** [1] - 18:10
**ex** [3] - 89:4, 89:9,
90:11
**exact** [5] - 76:14,

100:2, 167:15,
168:9, 190:22
**exactly** [10] - 48:6,
64:24, 163:11,
163:12, 194:24,
215:5, 216:25,
220:1, 232:15,
252:12
**examination** [1] -
106:7
**EXAMINATION** [12] -
45:14, 63:17, 99:15,
117:23, 128:17,
186:6, 204:5, 210:8,
218:10, 229:8,
244:14, 247:10
**examiner** [2] - 64:11,
64:14
**examiners** [1] - 64:10
**example** [6] - 10:18,
30:23, 75:5, 121:25,
257:16, 258:16
**examples** [1] - 33:15
**except** [3] - 147:3,
167:17, 168:10
**exception** [1] - 24:2
**excerpt** [1] - 158:6
**exchange** [1] - 115:8
**exclude** [6] - 14:2,
14:7, 14:22, 15:1,
16:24, 258:12
**excuse** [4] - 44:16,
61:15, 105:19,
187:24
**executing** [2] -
243:11, 243:12
**executive** [3] - 146:7,
150:11, 150:16
**exhibit** [34] - 16:10,
16:11, 23:24, 24:3,
24:6, 24:9, 24:11,
28:3, 29:17, 50:4,
50:6, 53:7, 100:3,
106:6, 108:6,
110:24, 120:9,
124:5, 134:6,
138:12, 141:14,
152:21, 159:19,
174:4, 175:24,
183:18, 185:7,
190:10, 206:11,
226:7, 230:19,
239:20
**Exhibit** [107] - 14:3,
16:24, 16:25, 22:21,
23:6, 24:14, 24:17,
24:18, 25:19, 26:15,
26:18, 26:23, 49:11,
51:7, 51:16, 53:3,
53:17, 53:21, 99:24,

100:19, 105:23,
109:9, 110:24,
111:1, 112:6,
112:16, 112:25,
113:17, 114:1,
114:13, 123:25,
131:15, 133:5,
133:16, 134:8,
134:17, 134:21,
135:17, 136:6,
137:16, 137:17,
138:7, 138:23,
138:24, 139:22,
141:8, 143:18,
144:17, 145:3,
145:17, 145:24,
148:11, 149:19,
152:5, 152:14,
153:25, 154:15,
154:23, 156:18,
157:25, 165:10,
167:2, 167:23,
168:5, 168:7,
168:16, 168:19,
169:2, 169:6, 172:5,
174:3, 174:25,
175:3, 175:20,
181:15, 182:5,
182:8, 182:10,
183:1, 183:4,
183:19, 183:23,
184:5, 184:9, 185:8,
187:12, 187:14,
187:24, 190:6,
192:1, 192:3, 194:4,
196:15, 198:2,
199:9, 206:3, 208:9,
210:11, 221:4,
221:16, 226:5,
230:21, 231:14,
231:15, 233:11,
236:17, 239:21
**exhibits** [32] - 15:7,
18:5, 18:6, 18:24,
19:1, 19:3, 19:5,
19:9, 19:11, 20:16,
20:19, 20:21, 21:6,
22:3, 22:7, 22:11,
22:13, 22:15, 22:19,
23:9, 23:11, 23:18,
24:10, 29:21, 31:13,
31:15, 41:11, 44:25,
45:10, 120:8,
178:11, 194:3
**Exhibits** [8] - 14:8,
14:9, 15:2, 16:1,
20:25, 22:25, 23:5,
184:1
**exist** [2] - 142:6,
205:12
**existed** [3] - 149:19,

152:11, 257:14
**existence** [1] - 166:1
**existing** [2] - 191:25,
199:3
**exists** [2] - 173:25,
206:24
**expect** [3] - 37:13,
37:19, 38:19
**expected** [2] - 44:5,
131:2
**expended** [1] - 38:16
**experience** [2] -
36:14, 151:7
**explain** [15] - 54:15,
59:7, 74:1, 81:5,
92:19, 102:24,
111:2, 114:18,
125:12, 136:22,
146:24, 228:5,
249:16, 249:23,
254:19
**explanation** [1] -
209:24
**explore** [1] - 15:7
**exploring** [1] - 209:25
**expound** [1] - 249:23
**express** [1] - 88:20
**extended** [2] - 88:13,
89:2
**extensive** [1] - 115:12
**extent** [4] - 23:11,
25:8, 25:13, 27:16
**extra** [1] - 91:25
**extract** [1] - 217:19
**extremely** [2] - 34:25,
75:8
**Eye** [1] - 2:19

**F**

**FAC** [1] - 9:6
**face** [22] - 67:16,
67:23, 68:1, 71:10,
71:16, 77:17, 77:20,
107:24, 125:4,
195:16, 196:13
**face-to-face** [11] -
67:16, 67:23, 68:1,
71:10, 71:16, 77:17,
77:20, 107:24,
125:4, 195:16,
196:13
**facet** [1] - 188:1
**fact** [30] - 12:24, 13:3,
16:6, 17:17, 17:19,
36:25, 37:8, 37:14,
37:20, 38:20, 39:25,
40:11, 63:5, 104:19,
107:23, 115:14,
119:15, 141:23,

142:9, 142:10,
157:11, 160:20,
161:5, 166:23,
180:8, 180:11,
180:19, 211:23,
235:24, 243:11
**Fact** [2] - 26:7, 180:6
**factor** [2] - 81:15,
85:20
**factors** [4] - 65:25,
89:18, 172:12,
187:18
**Facts** [1] - 8:10
**facts** [3] - 32:15,
32:18, 37:17
**factual** [1] - 27:21
**fail** [1] - 79:13
**failed** [1] - 79:12
**fair** [4] - 46:9, 48:17,
63:25, 140:14
**fairly** [2] - 23:9, 116:2
**fairs** [1] - 84:16
**faith** [1] - 41:2
**fall** [2] - 40:8, 201:25
**familiar** [16] - 124:1,
134:10, 135:18,
141:10, 146:1,
151:2, 158:23,
170:19, 181:20,
181:24, 182:20,
190:17, 221:5,
236:7, 249:14, 250:8
**families** [3] - 65:2,
65:11, 129:16
**family** [1] - 129:13
**Family** [6] - 1:11, 3:12,
32:7, 128:22,
128:23, 229:11
**far** [11] - 44:14, 98:22,
119:20, 132:11,
132:13, 132:14,
165:24, 203:16,
222:24, 244:4, 248:6
**Farmer** [1] - 219:11
**farmer** [1] - 219:15
**fashion** [1] - 180:13
**fashioned** [1] - 116:25
**favor** [1] - 231:5
**faxed** [1] - 86:15
**FCRR** [3] - 1:21,
259:23, 259:24
**February** [10] - 96:23,
140:3, 140:11,
140:22, 140:24,
157:13, 158:7,
166:7, 166:18,
253:25
**FEC** [5] - 9:1, 17:14,
17:16, 17:20, 17:23
**Federal** [6] - 7:19, 9:2,

17:18, 202:17,
211:15, 220:19
**federal** [15] - 8:16,
11:2, 75:6, 75:9,
82:15, 129:15,
189:3, 201:18,
202:11, 202:12,
202:23, 206:17,
210:16, 211:20,
215:21
**felt** [1] - 82:18
**FERRAND** [1] - 1:5
**ferret** [1] - 30:10
**few** [19] - 18:9, 33:13,
34:12, 35:11, 36:23,
39:9, 39:24, 56:1,
61:12, 75:13, 88:6,
93:10, 109:14,
150:12, 184:3,
204:4, 213:24,
217:17, 259:3
**fewer** [1] - 74:23
**field** [4] - 97:16, 119:3,
186:15, 186:23
**Field** [1] - 46:7
**fields** [1] - 249:21
**fifth** [1] - 156:4
**figure** [2] - 108:3,
178:8
**file** [10] - 31:2, 88:22,
89:1, 89:21, 104:11,
126:7, 237:2,
237:10, 237:11,
237:12
**filed** [26] - 7:13, 15:3,
17:3, 18:4, 32:25,
33:10, 37:22, 37:23,
50:8, 50:11, 50:18,
72:8, 102:5, 109:7,
139:2, 156:25,
157:10, 157:12,
165:20, 165:23,
166:2, 166:17,
166:21, 166:22,
170:3, 258:12
**files** [10] - 88:21,
104:22, 104:23,
104:25, 105:21,
226:14, 226:15,
226:18, 226:19,
227:5
**filing** [9] - 30:20, 31:4,
50:7, 117:2, 117:11,
141:17, 143:3,
165:15, 193:12
**fill** [15] - 11:12, 67:22,
87:6, 87:7, 91:12,
91:16, 94:1, 95:4,
123:9, 135:3,
194:13, 194:16,

216:16, 228:2,
230:11
**fillable** [3] - 166:4,
194:7, 195:5
**filled** [3] - 168:11,
168:22, 213:3
**filling** [1] - 88:4
**fills** [1] - 212:14
**final** [3] - 18:3, 41:7,
213:3
**financial** [3] - 38:21,
75:2, 105:5
**Findings** [2] - 26:6,
180:6
**fine** [7] - 18:18, 27:3,
28:8, 51:22, 63:15,
232:13, 258:7
**finish** [3] - 164:11,
200:17, 209:9
**finished** [2] - 115:25,
203:16
**first** [38] - 7:10, 7:24,
9:19, 9:20, 15:25,
17:10, 20:23, 23:22,
24:18, 27:1, 27:15,
29:12, 29:13, 34:14,
35:16, 35:20, 36:7,
36:19, 42:3, 44:19,
44:24, 53:23, 54:10,
71:7, 82:22, 92:22,
96:25, 107:22,
111:21, 120:25,
128:6, 139:3, 167:9,
195:13, 218:1,
228:16, 255:6
**FITAP** [2] - 129:13,
129:14, 151:11,
162:13, 162:19,
167:17, 167:20,
170:13, 172:13,
176:3, 187:25,
188:2, 188:11,
189:18, 189:22,
189:25, 190:3,
190:4, 190:5,
199:12, 202:25,
206:19, 207:20,
207:21, 219:2,
229:22
**five** [10] - 108:20,
109:19, 114:7,
118:24, 129:7,
153:17, 183:12,
198:15, 235:24,
236:4
**flat** [1] - 35:8
**flavors** [2] - 88:19,
89:10
**Floor** [2] - 3:18, 4:11
**Florida** [2] - 3:17, 4:11

**FMA** [1] - 227:2
**FNS** [5] - 201:19,
201:22, 202:2,
202:4, 215:21
**focus** [1] - 126:18
**foggy** [1] - 254:14
**follow** [17] - 52:5,
63:8, 79:9, 99:19,
111:17, 125:7,
132:15, 132:17,
154:25, 210:18,
212:6, 212:7, 217:2,
244:16, 255:23,
256:23, 256:24
**follow-up** [10] - 52:5,
63:8, 99:19, 210:18,
212:6, 212:7, 217:2,
244:16, 255:23,
256:23
**follow-ups** [1] -
256:24
**followed** [1] - 54:3,
56:7, 120:13
**following** [3] - 204:16,
210:21, 212:7
**follows** [7] - 44:20,
117:18, 128:7,
218:2, 229:2,
229:22, 247:5
**food** [10] - 34:17,
36:16, 43:13, 98:14,
129:13, 129:22,
181:19, 189:18,
189:24, 198:2
**Food** [2] - 201:19,
201:22
**fool** [1] - 45:6
**FOR** [1] - 1:1
**force** [12] - 17:22,
47:14, 47:16, 47:18,
72:24, 73:1, 73:3,
73:5, 112:24, 119:8,
242:12
**foregoing** [1] - 259:21
**form** [213] - 11:13,
27:23, 27:24, 33:6,
33:7, 33:18, 33:22,
34:2, 36:18, 36:22,
37:1, 37:2, 37:5,
37:8, 37:10, 37:21,
37:25, 40:5, 47:18,
49:22, 49:24, 50:1,
50:9, 50:23, 50:24,
51:3, 51:25, 53:10,
53:23, 55:7, 56:10,
56:23, 59:18, 60:2,
61:6, 61:10, 61:17,
61:20, 63:3, 67:21,
76:25, 79:3, 79:6,
79:7, 80:6, 80:8,

80:9, 81:9, 81:18,
81:24, 82:1, 82:9,
83:1, 83:13, 83:16,
83:17, 83:18, 84:1,
84:10, 85:7, 85:9,
86:5, 86:8, 86:10,
86:11, 86:18, 86:24,
87:1, 87:4, 87:18,
88:1, 88:5, 88:7,
89:13, 90:2, 90:3,
90:4, 90:15, 90:18,
90:20, 90:24, 91:3,
91:4, 91:5, 91:17,
91:24, 92:12, 92:13,
93:5, 93:21, 93:23,
93:25, 99:22, 100:4,
100:6, 100:8, 100:9,
100:14, 100:17,
101:22, 103:5,
103:7, 103:21,
106:4, 106:12,
106:15, 106:17,
106:25, 107:5,
111:2, 115:21,
122:7, 122:8,
129:19, 136:1,
136:19, 137:10,
138:8, 139:10,
139:12, 139:15,
139:17, 139:19,
140:10, 140:15,
140:19, 140:21,
140:25, 141:2,
141:11, 141:12,
141:22, 142:2,
142:6, 142:13,
142:15, 142:16,
142:21, 143:14,
144:2, 144:4, 144:8,
144:12, 144:21,
144:25, 145:4,
147:1, 152:24,
155:5, 155:16,
160:15, 165:22,
165:25, 167:15,
167:17, 168:9,
169:13, 169:15,
169:18, 180:13,
184:18, 198:8,
198:25, 199:6,
199:11, 199:23,
200:10, 200:20,
208:12, 208:13,
208:15, 208:17,
208:21, 208:25,
209:14, 209:20,
209:21, 209:23,
213:7, 227:6, 228:2,
230:25, 231:2,
233:6, 233:11,
233:15, 236:8,

236:10, 236:14, 236:23, 237:9, 237:16, 237:18, 237:20, 238:15, 240:11, 241:16, 242:7, 242:11, 246:5, 246:6
**Form** [1] - 37:4
**formally** [1] - 129:13
**format** [5] - 9:13, 9:17, 82:1, 181:21, 181:22
**formed** [1] - 47:14
**formerly** [1] - 219:23
**forms** [52] - 33:3, 33:4, 36:2, 39:5, 53:14, 54:19, 54:21, 55:1, 55:4, 57:8, 57:17, 59:24, 61:18, 62:17, 70:23, 73:2, 79:8, 80:18, 80:21, 80:22, 84:3, 85:5, 85:23, 88:3, 100:15, 101:23, 101:24, 101:25, 102:12, 102:14, 102:15, 102:25, 103:10, 107:20, 109:14, 109:22, 113:22, 134:13, 136:24, 140:18, 141:16, 143:4, 197:23, 198:23, 198:24, 205:8, 238:1, 238:5, 241:20, 242:6, 243:8
**forth** [7] - 26:6, 29:14, 32:17, 45:13, 67:13, 202:10, 213:18
**forward** [2] - 30:21, 42:8
**forwarded** [3] - 164:6, 212:15, 234:14
**foundation** [14] - 19:1, 19:18, 29:23, 57:24, 58:5, 58:6, 58:10, 59:1, 59:3, 177:23, 179:17, 190:19, 227:10, 227:15
**four** [8] - 46:6, 108:20, 109:2, 151:9, 158:12, 168:8, 203:15
**four-day** [1] - 151:9
**fourth** [1] - 156:4
**FPC** [1] - 17:11
**Frank** [1] - 2:14
**frankly** [3] - 13:13, 41:4, 210:21
**free** [4] - 76:23, 83:19, 127:9, 180:18
**frequent** [1] - 89:24

**frequently** [2] - 36:13, 96:23
**Fried** [1] - 2:14
**Front** [1] - 249:18
**front** [17] - 36:8, 38:4, 48:20, 67:18, 67:19, 77:24, 84:16, 90:12, 132:2, 163:3, 163:4, 165:1, 169:20, 177:19, 186:25, 221:2, 249:17
**front-end** [4] - 163:3, 163:4, 165:1, 249:17
**Front-End** [1] - 249:18
**fulfill** [1] - 146:14
**full** [2] - 39:16, 65:14
**fully** [1] - 40:9
**function** [3] - 46:25, 187:9, 193:2
**Fund** [1] - 2:4
**funded** [2] - 48:11, 129:15
**funding** [1] - 129:15
**funds** [1] - 202:25
**future** [1] - 252:22
**fuzzy** [1] - 100:7

**G**

**G-U-I-L-L-O-R-Y** [1] - 128:16
**gander** [1] - 16:22
**gas** [1] - 84:23
**gather** [2] - 81:13, 228:12
**gathers** [2] - 220:6, 220:16
**Geauxvote** [1] - 95:23
**general** [14] - 24:9, 31:5, 47:21, 80:16, 80:17, 100:3, 141:15, 187:22, 192:4, 192:7, 238:21, 239:4, 242:19
**generally** [7] - 67:18, 75:1, 77:23, 78:8, 89:24, 98:10, 240:8
**generate** [2] - 54:14, 162:10
**gentlemen** [1] - 42:17
**given** [13] - 28:12, 36:18, 37:10, 57:4, 58:2, 58:7, 59:17, 169:17, 189:13, 209:13, 217:20, 227:1, 253:6
**globo** [2] - 22:15, 22:19
**Go-Vote** [1] - 80:5

**goals** [1] - 228:7
**goose** [1] - 16:22
**government** [6] - 8:16, 27:18, 202:17, 211:15, 220:19, 220:22
**Government** [1] - 3:4
**govote** [2] - 92:15, 96:1
**govote.com** [2] - 92:11, 95:18
**grant** [4] - 13:19, 14:4, 14:24, 66:1
**granted** [1] - 55:11
**graph** [4] - 31:17, 34:14, 35:3, 35:8
**grassroots** [1] - 84:14
**greater** [2] - 11:2, 115:19
**green** [3] - 35:4, 163:25, 219:12
**Green** [3] - 219:11, 241:7, 243:22
**Greenstein** [8] - 4:2, 6:23, 6:25, 7:3, 7:5, 7:7, 50:15, 50:20
**GREENSTEIN** [1] - 1:12
**grocery** [1] - 84:22
**grounds** [1] - 177:23
**group** [2] - 20:23, 245:13
**growing** [1] - 189:4
**guess** [6] - 14:18, 71:11, 82:1, 153:1, 177:7, 230:3
**guidance** [28] - 73:4, 156:13, 160:10, 161:5, 161:8, 161:12, 161:17, 173:13, 173:20, 174:12, 174:21, 175:13, 176:20, 188:7, 191:12, 202:5, 202:9, 202:16, 202:22, 203:4, 205:24, 206:11, 206:17, 206:18, 207:22, 210:12, 210:17, 210:25
**guide** [2] - 17:24, 119:2
**guideline** [1] - 228:20
**GUILLORY** [2] - 5:14, 128:6
**Guillory** [18] - 7:8, 42:11, 128:4, 128:15, 128:19, 143:17, 154:14,

167:4, 168:21, 169:8, 177:15, 181:9, 184:3, 186:2, 186:8, 204:7, 206:6, 207:15
**Gustav** [1] - 198:13
**guys** [1] - 127:18

**H**

**half** [4] - 16:15, 75:8, 86:3, 234:9
**hall** [1] - 43:19
**hand** [12] - 13:18, 53:24, 56:4, 61:6, 61:9, 62:3, 65:14, 67:21, 149:7, 176:13, 215:17, 251:9
**hand-full** [1] - 65:14
**handed** [1] - 60:3
**handing** [1] - 39:4
**handle** [1] - 59:8
**handles** [1] - 92:20
**handling** [1] - 63:9
**handyman** [1] - 36:11
**happy** [6] - 64:2, 117:8, 179:16, 179:20, 180:2, 181:2
**hard** [8] - 40:5, 40:8, 52:18, 64:17, 138:5, 138:13, 206:3, 232:6
**Harris** [1] - 2:14
**HARRY** [2] - 3:16, 4:9
**HB** [1] - 1:22
**head** [1] - 117:5
**headed** [1] - 38:14
**heading** [1] - 73:18
**Health** [11] - 1:13, 4:3, 4:15, 32:7, 68:22, 69:13, 80:25, 84:13, 207:16, 207:22, 212:2
**health** [8] - 65:1, 74:9, 74:14, 76:7, 84:16, 84:18, 84:19, 85:6
**hear** [18] - 22:16, 28:17, 32:11, 32:18, 35:14, 38:12, 40:22, 41:8, 41:10, 41:18, 69:19, 102:24, 118:7, 127:3, 196:5, 238:4, 239:8, 245:23
**heard** [8] - 15:17, 42:23, 43:2, 47:3, 68:6, 69:1, 72:25, 237:14
**hearing** [1] - 41:21
**hearsay** [5] - 51:20, 57:19, 58:12, 58:13,

212:3
**held** [6] - 12:5, 46:3, 64:8, 74:3, 118:18, 118:22
**help** [16] - 25:21, 30:24, 67:1, 77:1, 78:8, 86:19, 87:9, 87:17, 94:2, 115:21, 186:21, 190:22, 215:16, 215:25
**helped** [2] - 121:6, 121:10
**helpful** [1] - 105:11
**helps** [4] - 48:6, 52:10, 52:20, 52:22
**hereby** [1] - 259:20
**hi** [1] - 98:11
**hide** [1] - 239:17
**high** [4] - 10:11, 34:25, 35:22, 137:1
**higher** [2] - 11:10, 11:11
**hire** [1] - 151:1
**hired** [3] - 150:5, 151:7
**hires** [2] - 150:18, 151:5
**history** [1] - 14:4
**HO** [112] - 2:3, 6:7, 8:4, 18:22, 19:20, 20:16, 20:19, 21:12, 21:14, 21:19, 22:1, 22:4, 22:12, 23:21, 24:10, 26:3, 26:16, 26:24, 27:8, 28:10, 28:24, 29:7, 29:10, 29:13, 31:22, 31:25, 42:2, 42:12, 44:2, 44:9, 44:17, 44:24, 45:3, 45:7, 45:11, 45:15, 46:24, 47:6, 49:6, 49:7, 49:10, 49:12, 50:8, 50:22, 51:6, 51:17, 51:22, 51:24, 53:2, 53:4, 53:8, 53:9, 53:16, 53:22, 54:9, 55:25, 56:3, 56:19, 57:23, 58:1, 58:13, 58:20, 59:13, 59:15, 59:22, 60:22, 61:4, 62:13, 63:5, 70:17, 78:18, 83:4, 99:1, 99:16, 99:24, 100:1, 100:21, 100:23, 101:2, 101:5, 101:8, 101:12, 101:15, 101:21, 102:11, 102:18, 102:22, 104:18, 105:15,

106:3, 106:9, 106:11, 107:2, 107:8, 107:15, 108:7, 108:10, 109:12, 109:13, 110:23, 112:7, 112:8, 112:15, 112:22, 113:4, 113:7, 113:17, 113:21, 114:2, 116:9, 258:4, 258:8
**Ho** [15] - 5:5, 5:10, 6:7, 8:3, 18:21, 19:19, 41:15, 44:13, 44:16, 45:20, 54:8, 99:14, 113:3, 115:8, 259:10
**ho's** [1] - 29:22
**Ho's** [1] - 40:20
**hold** [3] - 93:7, 138:4, 220:11
**holder** [1] - 84:24
**holders** [2] - 84:21, 92:25
**home** [7] - 87:7, 87:11, 87:16, 94:1, 116:3, 127:10, 164:2
**homelessness** [1] - 36:14
**honest** [2] - 119:21, 121:3
**Honor** [194] - 6:7, 6:9, 6:12, 6:14, 6:19, 6:24, 7:1, 7:2, 7:4, 7:17, 8:4, 8:7, 13:16, 14:1, 15:9, 15:12, 15:17, 15:25, 17:5, 17:16, 18:9, 18:14, 18:19, 18:22, 19:21, 20:5, 20:9, 21:7, 21:14, 21:19, 22:1, 22:4, 22:14, 23:21, 24:8, 26:3, 26:8, 26:16, 26:21, 26:24, 27:1, 28:10, 28:11, 28:25, 29:10, 29:13, 29:20, 31:11, 31:12, 31:22, 31:23, 32:12, 34:15, 36:5, 39:10, 39:18, 39:23, 40:3, 40:16, 40:19, 40:25, 41:20, 41:25, 42:2, 42:5, 43:9, 44:2, 44:24, 49:6, 50:3, 50:8, 50:12, 51:6, 53:2, 53:16, 54:4, 54:9, 55:17, 56:14, 58:23, 60:9, 62:9, 70:17, 78:19, 83:4, 99:7, 99:10, 99:13, 101:5, 101:12,

101:16, 102:19, 107:2, 109:12, 110:23, 112:15, 112:17, 113:5, 113:18, 113:19, 115:24, 116:4, 116:12, 117:8, 117:14, 119:14, 120:7, 120:10, 121:9, 122:24, 124:4, 124:12, 126:16, 126:20, 127:8, 128:4, 128:10, 128:13, 134:19, 136:4, 137:25, 141:7, 141:13, 141:15, 141:18, 145:21, 145:23, 152:20, 153:1, 157:3, 165:24, 166:16, 167:25, 168:17, 169:4, 175:24, 177:21, 178:1, 179:20, 179:24, 180:17, 183:5, 183:15, 186:17, 202:15, 203:25, 204:4, 206:10, 206:13, 207:12, 210:2, 210:19, 211:5, 212:1, 217:3, 217:7, 217:15, 217:20, 217:24, 218:8, 221:12, 221:14, 222:11, 222:15, 223:24, 225:4, 226:6, 226:10, 226:13, 226:21, 227:18, 228:22, 228:24, 229:6, 230:20, 231:12, 237:1, 237:18, 238:12, 238:14, 239:5, 239:22, 240:18, 243:17, 244:6, 246:25, 247:2, 251:13, 254:6, 256:22, 257:25, 258:4, 258:8, 258:14
**Honor's** [2] - 54:17, 54:24
**HONORABLE** [1] - 1:18
**hoping** [1] - 259:12
**Hospital** [1] - 68:23
**Hospitals** [5] - 1:13, 4:3, 4:15, 32:8, 69:13

**hospitals** [1] - 67:13
**hotline** [2] - 76:24, 78:10
**hours** [2] - 44:7, 44:10
**housekeeping** [1] - 28:9
**Hudson** [1] - 2:5
**hum** [2] - 109:23, 139:7
**Human** [3] - 207:16, 207:23, 212:2
**hundred** [2] - 34:12, 35:11
**hundreds** [1] - 34:11
**Hurricane** [3] - 198:12, 198:13, 209:8

**I**

**idea** [4] - 28:20, 57:20, 76:2, 209:4
**identical** [1] - 199:1
**identified** [4] - 19:14, 189:9, 195:4, 196:17
**identifying** [1] - 106:6
**II** [1] - 64:12
**Ike** [1] - 198:13
**imagine** [1] - 95:3
**immaterial** [1] - 55:2
**immediate** [2] - 93:13, 112:20
**immediately** [1] - 116:18
**impact** [1] - 201:8
**impartial** [1] - 246:8
**impeach** [1] - 58:6
**impeachable** [1] - 178:2
**impeaching** [2] - 179:4, 251:14
**impeachment** [6] - 120:11, 120:13, 120:17, 121:8, 177:25, 251:13
**implement** [4] - 17:25, 114:22, 210:13, 211:1
**implementations** [1] - 202:4
**implemented** [12] - 9:9, 41:6, 71:8, 84:13, 84:14, 125:4, 177:11, 205:6, 210:15, 211:19, 242:19, 246:18
**implementing** [1] - 211:3
**importance** [1] - 72:13
**important** [2] - 12:7,

116:22
**importantly** [1] - 55:3
**impressed** [1] - 23:16
**impression** [1] - 103:1
**improve** [1] - 203:20
**improvements** [1] - 39:13
**IN** [1] - 1:1
**in-globo** [2] - 22:15, 22:19
**in-person** [12] - 66:21, 67:2, 69:8, 69:10, 69:15, 69:18, 73:14, 73:24, 76:18, 76:19, 103:3, 103:8
**inaccurate** [1] - 226:21
**Inc** [1] - 2:4
**inception** [1] - 17:11
**include** [18] - 33:4, 34:9, 79:3, 82:5, 82:14, 101:7, 101:8, 145:13, 173:11, 205:18, 219:2, 223:18, 224:5, 224:7, 224:14, 224:16, 237:15, 256:23
**included** [12] - 21:8, 62:18, 83:25, 84:6, 90:12, 101:23, 103:5, 199:23, 200:1, 222:9, 226:19, 242:21
**includes** [9] - 38:11, 38:17, 150:24, 172:11, 199:17, 218:24, 220:8, 221:19, 245:14
**including** [1] - 39:4
**inclusion** [1] - 20:12
**income** [8] - 38:11, 38:17, 39:3, 65:2, 65:6, 74:15, 75:8, 75:11
**incomplete** [3] - 174:14, 175:14, 176:21
**incorrect** [1] - 138:5
**increased** [2] - 74:3, 163:15
**increasing** [1] - 35:21
**incredibly** [1] - 41:15
**indeed** [2] - 17:23, 233:6
**independence** [1] - 129:14
**index** [1] - 159:24
**indicate** [1] - 104:23
**indicated** [6] - 22:2,

31:20, 116:17, 116:25, 117:3, 227:20
**indicating** [2] - 24:22, 216:23
**individual** [12] - 27:5, 130:21, 144:4, 189:16, 189:24, 197:1, 201:9, 204:8, 208:16, 208:20, 228:7, 228:9
**individual's** [1] - 194:18
**individually** [2] - 107:4, 147:12
**individuals** [8] - 38:10, 39:4, 65:2, 180:14, 185:3, 230:10, 231:2, 233:12
**inform** [4] - 155:3, 159:11, 173:1, 176:18
**informal** [1] - 183:8
**information** [55] - 11:17, 13:1, 37:9, 56:8, 61:24, 62:1, 62:4, 62:5, 62:18, 63:2, 81:8, 81:13, 81:17, 82:17, 82:18, 93:14, 105:5, 106:16, 144:12, 152:23, 155:24, 156:13, 162:3, 162:22, 163:24, 164:7, 164:8, 164:10, 164:20, 164:21, 165:4, 165:5, 171:1, 172:12, 173:6, 173:7, 173:9, 180:1, 180:7, 181:24, 182:19, 185:20, 185:24, 189:2, 192:7, 192:12, 195:15, 195:17, 201:2, 201:3, 203:18, 214:10, 216:24, 222:13, 245:13
**informed** [2] - 42:22, 160:21
**initial** [13] - 24:15, 24:16, 26:1, 26:12, 48:12, 123:2, 123:11, 176:25, 177:5, 177:9, 189:9, 189:10, 238:20
**initials** [2] - 54:3, 60:1
**initiated** [1] - 109:6

**initiation** [1] - 41:1
**injunctive** [3] -
116:21, 116:24,
256:15
**insignificant** [1] - 40:4
**instance** [2] - 32:21,
33:16
**instances** [1] - 37:11
**instead** [7] - 39:2,
91:23, 157:24,
178:9, 179:4, 183:6,
249:7
**instruction** [1] - 58:8,
160:17, 160:19
**instructions** [4] -
42:15, 57:4, 58:2,
59:17
**Insurance** [2] - 80:25,
84:13
**insurance** [3] - 65:1,
84:18, 84:19
**intake** [6] - 229:23,
230:16, 235:18,
244:19, 245:2, 246:3
**intakes** [1] - 235:18
**integrals** [2] - 131:8,
131:9
**integrate** [1] - 40:9
**integration** [1] -
249:19
**Integrity** [1] - 187:10
**intend** [6] - 19:4,
29:21, 44:25, 45:12,
166:11, 206:23
**intended** [2] - 17:21,
28:13
**intending** [1] - 207:1
**intends** [1] - 28:22
**interact** [1] - 131:23
**interaction** [5] - 66:21,
66:22, 204:21,
225:18, 253:25
**interactions** [3] -
224:18, 224:20,
225:12
**interactive** [1] - 147:1
**interested** [1] - 171:11
**interesting** [1] - 30:5
**internal** [1] - 147:6
**Internet** [1] - 147:6
**interpret** [1] - 186:24
**interpretation** [2] -
17:17, 41:2
**interpretations** [2] -
193:25, 205:25
**interpreting** [1] - 10:2
**interrogatory** [3] -
25:15, 26:2
**interrupt** [1] - 29:25
**interruptions** [1] -

31:7
**Interview** [2] - 170:15,
172:1
**interview** [23] - 160:6,
164:8, 164:9,
164:16, 172:20,
173:13, 195:16,
195:20, 195:24,
196:13, 201:3,
201:13, 201:16,
213:25, 214:1,
215:22, 215:24,
216:20, 235:16,
244:21, 245:14,
246:19
**interviewed** [1] -
234:22
**interviewing** [2] -
159:7, 230:7
**interviews** [14] -
195:15, 195:17,
196:3, 196:4,
196:10, 201:11,
214:2, 216:4,
235:21, 235:25,
236:4, 244:23,
244:24, 250:12
**intranet** [13] - 146:16,
146:21, 146:22,
147:5, 148:7,
148:17, 149:3,
149:24, 174:9,
191:12, 191:16,
191:17, 191:22
**introduce** [7] - 9:18,
24:21, 24:23, 25:4,
26:5, 207:2, 207:6
**introducing** [2] -
206:20, 206:21
**introduction** [2] -
31:16, 38:5
**invited** [1] - 259:5
**involve** [1] - 248:9
**involved** [13] - 14:23,
68:7, 68:11, 68:14,
68:15, 69:20, 70:7,
73:3, 81:6, 147:13,
171:15, 187:17,
193:17
**involvement** [1] - 68:6
**ironed** [1] - 22:8
**irrelevant** [8] - 16:6,
50:14, 54:6, 105:6,
107:13, 117:12,
122:22, 226:10
**Isaac** [3] - 198:12,
209:8
**issuance** [2] - 72:7,
206:7
**Issue** [1] - 136:18

**issue** [35] - 7:15, 9:4,
12:13, 12:18, 12:19,
25:5, 25:6, 25:9,
25:13, 25:18, 25:22,
25:24, 25:25, 27:16,
27:21, 31:2, 32:22,
37:14, 38:20, 39:11,
46:18, 54:6, 54:20,
55:2, 55:6, 69:13,
73:11, 74:11, 77:9,
136:20, 136:22,
137:10, 211:24,
258:4, 258:14
**issued** [6] - 71:22,
132:25, 136:24,
140:11, 140:21,
146:9
**issues** [7] - 13:11,
18:10, 28:2, 40:4,
40:6, 137:2, 137:4
**IT** [1] - 70:5
**item** [1] - 22:25
**items** [1] - 22:20
**itself** [5] - 17:24, 37:8,
169:23, 240:14,
242:18
**IV** [1] - 64:12

## J

**J-O-U-B-E-R-T** [1] -
229:5
**Jacobson** [1] - 2:14
**JAMES** [1] - 4:14
**JANE** [1] - 1:18
**January** [18] - 35:24,
46:4, 101:6, 108:22,
143:25, 145:5,
204:15, 230:2,
232:11, 250:5,
252:13, 252:16,
252:25, 254:11,
257:3
**Jeff** [1] - 218:20
**JESSE** [1] - 2:13
**Jesse** [1] - 6:9
**job** [14] - 10:13, 45:23,
46:25, 47:3, 97:13,
118:9, 123:8, 123:9,
145:8, 145:13,
225:25, 228:13,
228:18, 242:5
**jobs** [2] - 68:1, 74:16
**John** [1] - 219:22
**JOHNSON** [1] - 1:10
**Johnson** [5] - 38:3,
43:23, 44:2, 44:9,
44:16
**joined** [1] - 19:2
**joint** [1] - 32:17

**JONES** [19] - 3:7,
6:21, 7:8, 17:5, 17:9,
17:23, 19:10, 20:9,
20:13, 27:10, 28:6,
42:9, 51:13, 51:20,
55:2, 57:19, 58:4,
58:11, 99:10
**Jones** [4] - 3:8, 6:21,
29:6, 41:24
**JOSEPH** [2] - 3:16,
4:9
**Joubert** [11] - 228:25,
229:3, 229:5,
229:10, 236:7,
238:15, 239:15,
239:24, 241:14,
244:16, 247:1
**JOUBERT** [2] - 5:19,
229:1
**JR** [3] - 1:5, 3:16, 4:9
**judge** [5] - 17:9,
58:11, 120:15,
156:20, 258:19
**JUDGE** [1] - 1:19
**Judge** [12] - 10:24,
12:6, 15:6, 15:15,
22:6, 23:8, 27:10,
51:13, 58:4, 107:10,
165:13, 256:14
**judicial** [12] - 7:14,
7:17, 7:18, 7:22,
10:22, 13:25, 15:21,
17:3, 17:7, 17:14,
17:19, 18:1
**July** [5] - 75:18, 91:20,
96:14, 96:18, 96:20
**June** [10] - 100:7,
100:11, 101:8,
102:15, 106:18,
135:23, 135:24,
136:1, 136:16
**jury** [1] - 41:20

## K

**Katrina** [1] - 198:14
**KCSP** [7] - 129:13,
172:13, 199:12,
202:25, 207:21,
219:3, 250:1
**keep** [3] - 31:7, 39:21,
39:23
**keeps** [1] - 57:17
**kept** [2] - 137:1,
200:17
**key** [1] - 85:20
**kind** [15] - 19:20,
30:10, 30:17, 31:5,
39:20, 41:17, 64:24,
74:3, 80:8, 100:7,

123:8, 147:2,
147:13, 147:21,
147:22
**Kindercare** [1] -
162:13
**kinds** [1] - 64:2
**kinship** [2] - 162:15,
162:16
**Kinship** [3] - 162:19,
168:10, 168:13
**kiosk** [1] - 67:22
**knowledge** [22] - 43:2,
60:8, 77:15, 130:9,
130:13, 133:24,
134:1, 149:20,
149:21, 178:13,
187:22, 191:2,
195:5, 199:25,
202:21, 211:11,
212:11, 239:2,
252:13, 253:8,
253:20, 254:2
**known** [3] - 34:17,
60:14, 129:13
**knows** [6] - 41:5, 59:2,
60:17, 60:20, 64:23
**KORGAONKAR** [26] -
2:3, 6:18, 116:12,
117:14, 117:24,
118:6, 118:17,
119:18, 120:10,
120:21, 121:9,
121:17, 121:18,
122:24, 123:12,
123:15, 123:19,
124:7, 124:9,
124:17, 124:24,
125:16, 125:24,
126:10, 126:15,
127:1
**korgaonkar** [1] - 5:13
**Korgaonkar** [3] - 6:18,
117:25, 126:23

## L

**LA** [8] - 2:10, 3:5, 3:9,
3:14, 3:19, 4:6, 4:12,
4:17
**labeled** [6] - 53:24,
56:5, 120:4, 144:8,
148:23, 159:20
**labels** [1] - 148:21
**LaCAP** [11] - 129:18,
143:25, 144:5,
144:7, 144:8,
144:21, 145:4,
193:13, 201:25,
202:1, 213:25
**LACHIP** [2] - 75:13,

80:24
**lacked** [1] - 37:8
**ladies** [2] - 42:17, 43:15
**LAFFLER** [1] - 6:9
**Laffler** [1] - 6:9
**Lambert** [1] - 23:4
**LAMBERT** [3] - 3:16, 4:10, 23:4
**LAMOMS** [1] - 80:23
**language** [28] - 17:20, 82:2, 82:5, 82:24, 136:23, 142:8, 143:10, 143:15, 187:17, 188:1, 188:15, 190:24, 193:13, 195:7, 195:9, 196:3, 196:18, 196:22, 196:23, 197:4, 197:24, 198:4, 198:9, 199:4, 199:22, 200:1, 205:8, 209:19
**large** [1] - 74:1
**larger** [2] - 153:15, 153:22
**last** [23] - 8:19, 9:20, 17:9, 24:2, 26:16, 26:25, 35:12, 60:11, 86:4, 102:12, 110:6, 113:4, 118:2, 120:3, 163:9, 163:10, 168:18, 196:5, 199:20, 225:3, 231:19, 251:10, 255:17
**lately** [1] - 74:4
**law** [8] - 17:8, 17:22, 20:6, 34:7, 39:25, 180:9, 180:18, 258:13
**Law** [4] - 2:8, 3:3, 3:8, 241:22
**LAWRENCE** [1] - 2:8
**laws** [1] - 186:24
**lawsuit** [19] - 33:10, 50:7, 50:8, 50:11, 50:18, 69:4, 69:6, 70:3, 70:7, 70:9, 70:12, 70:15, 72:8, 85:15, 116:19, 117:2, 157:10, 157:12, 170:3
**lawyer** [2] - 178:1, 210:6
**lawyers** [1] - 42:22
**lay** [5] - 57:24, 59:1, 179:17, 227:10, 227:15

**laying** [1] - 59:3
**lays** [1] - 58:10
**leading** [1] - 186:18
**learn** [1] - 151:9
**learning** [1] - 111:25
**least** [10] - 16:3, 23:9, 32:20, 161:16, 213:22, 214:6, 214:7, 222:8, 223:10, 235:8
**leave** [7] - 44:1, 44:6, 44:9, 44:17, 127:14, 235:11, 247:22
**leaving** [1] - 87:4
**led** [1] - 72:7
**left** [12] - 53:24, 56:4, 136:10, 136:12, 149:8, 232:15, 235:14, 247:24, 248:2, 253:14, 255:18, 256:7
**left-hand** [2] - 53:24, 56:4
**Legacy** [6] - 247:25, 248:13, 248:16, 248:25, 249:19, 250:15
**legacy** [1] - 163:24
**Legal** [3] - 2:4, 4:4, 4:15
**legal** [18] - 18:15, 19:21, 20:4, 46:24, 47:2, 56:20, 69:14, 72:9, 73:3, 76:12, 76:13, 78:18, 99:1, 99:2, 210:20, 211:6, 211:14, 211:24
**legally** [1] - 19:22
**legibility** [3] - 155:17, 161:6, 174:19
**legislation** [3] - 17:4, 17:7, 186:24
**legislative** [2] - 17:17, 17:19
**legislature** [1] - 187:1
**length** [1] - 116:8
**lengthy** [1] - 41:8
**less** [8] - 36:10, 40:13, 45:21, 74:21, 74:22, 86:2, 89:16, 234:9
**letter** [5] - 35:23, 88:10, 89:1, 116:18, 213:17
**letters** [3] - 233:18, 233:20, 233:22
**letting** [1] - 49:21
**level** [7] - 27:17, 66:4, 75:6, 75:8, 75:9, 77:12, 186:14
**levels** [2] - 10:5, 187:8

**liaison** [1] - 202:5
**library** [2] - 164:15, 216:15
**license** [1] - 96:2
**lie** [1] - 81:20
**light** [4] - 28:11, 28:19, 30:21, 166:23
**likely** [1] - 190:2
**Limine** [1] - 5:2
**limine** [14] - 7:11, 7:13, 13:20, 14:2, 14:7, 14:11, 14:15, 14:22, 16:24, 17:2, 18:3, 30:18, 258:10, 258:11
**limit** [2] - 14:16, 75:11
**limits** [1] - 65:6
**line** [26] - 35:4, 35:5, 35:13, 37:22, 42:14, 54:2, 54:4, 56:6, 61:19, 62:17, 62:25, 82:22, 110:2, 113:4, 125:7, 142:16, 213:10, 222:12, 225:8, 225:14
**line-by-line** [3] - 61:19, 62:17, 62:25
**line-for-line** [1] - 125:7
**lines** [2] - 35:13, 120:23
**lingering** [1] - 41:12
**link** [3] - 94:14, 121:7, 209:20
**list** [26] - 16:10, 16:11, 19:3, 20:21, 21:22, 22:4, 22:7, 22:19, 23:9, 24:3, 24:6, 24:11, 26:17, 28:12, 44:25, 102:1, 107:9, 120:9, 120:13, 120:19, 138:12, 217:8, 228:9, 245:9, 246:6
**listed** [4] - 22:7, 120:8, 120:16, 138:12
**lists** [1] - 23:24
**litigation** [9] - 14:16, 14:24, 36:4, 41:1, 47:19, 52:1, 166:18, 193:12, 236:5
**live** [10] - 81:7, 82:7, 82:23, 83:3, 98:11, 147:3, 147:4, 191:25, 233:4, 252:6
**lived** [1] - 36:12
**lives** [1] - 36:9
**LLP** [3] - 2:14, 3:17, 4:10
**load** [2] - 189:4, 189:5

**local** [3] - 82:10, 137:9, 147:10
**locate** [1] - 63:2
**located** [5] - 49:8, 53:1, 171:2, 171:3, 195:7
**location** [1] - 76:11
**locations** [1] - 234:6
**LOFFLER** [1] - 2:13
**long-term** [1] - 81:1
**look** [52] - 9:14, 9:23, 16:17, 30:1, 30:2, 30:7, 49:13, 71:17, 73:10, 81:21, 81:22, 88:18, 98:7, 100:20, 101:6, 102:8, 106:15, 113:1, 120:16, 134:23, 135:12, 138:10, 143:22, 151:17, 151:18, 151:20, 151:21, 155:2, 156:3, 159:9, 159:17, 159:18, 172:22, 174:15, 176:6, 181:23, 188:25, 189:3, 189:6, 190:6, 190:15, 192:1, 199:9, 199:14, 230:17, 232:19, 241:17, 251:9, 251:12
**looked** [4] - 101:8, 112:4, 171:20, 196:14
**looking** [16] - 25:21, 56:4, 85:19, 98:20, 104:22, 114:13, 133:23, 150:11, 151:24, 152:2, 156:15, 156:16, 156:20, 160:20, 171:18, 179:22
**looks** [11] - 31:17, 45:4, 96:19, 98:9, 98:12, 113:11, 141:11, 160:2, 181:18, 182:17, 182:23
**lost** [1] - 94:13
**loud** [1] - 225:11
**LOUISIANA** [3] - 1:2, 1:5, 6:1
**Louisiana** [34] - 1:10, 1:11, 1:12, 1:23, 3:12, 4:3, 4:15, 8:18, 8:20, 8:23, 10:10, 34:6, 38:1, 38:2, 38:3, 38:5, 38:7,

38:12, 38:15, 38:20, 38:22, 43:22, 44:3, 65:16, 65:19, 80:24, 82:9, 84:13, 86:3, 98:12, 156:10, 163:6, 229:11, 241:20
**Louisiana's** [1] - 65:1
**low** [8] - 35:19, 38:10, 38:17, 39:3, 65:2, 74:14, 74:16, 75:8
**lower** [3] - 10:12, 53:23, 56:4
**lowest** [1] - 66:4
**LR1M** [6] - 53:12, 155:4, 155:16, 156:6, 156:9, 184:18
**lunch** [2] - 127:13, 127:19
**LUTHER** [1] - 1:5
**Luther** [6] - 16:25, 36:7, 237:2, 237:3, 237:10, 237:12

## M

**M-I-C-H-I-E-L-S** [1] - 218:6
**ma'am** [14] - 48:21, 49:4, 56:1, 118:4, 187:13, 227:20, 228:4, 230:9, 230:24, 231:1, 232:10, 235:2, 244:18, 245:1
**Magistrate** [1] - 15:6
**Mail** [2] - 82:9, 83:13
**mail** [37] - 49:22, 73:25, 75:16, 76:5, 77:3, 79:6, 80:6, 80:7, 80:8, 80:9, 82:10, 83:1, 84:1, 85:8, 86:8, 87:1, 87:12, 87:14, 89:13, 90:24, 92:12, 92:21, 92:23, 93:3, 93:15, 95:18, 95:19, 95:21, 103:4, 195:23, 212:21, 212:22, 214:16, 234:12, 234:13, 234:14
**mail-out** [1] - 214:16
**mailed** [10] - 73:21, 76:10, 92:14, 160:15, 160:25, 213:5, 231:2, 233:10, 233:19, 233:23
**mailing** [6] - 76:4, 213:14, 214:7,

214:11, 216:17, 253:22
**mailings** [4] - 76:1, 213:22, 214:3, 214:19
**main** [2] - 82:14, 249:2
**mainframe** [1] - 249:19
**maintain** [3] - 33:13, 38:23, 52:6
**maintains** [3] - 33:16, 33:24, 119:1
**majority** [4] - 19:9, 71:9, 88:7, 103:3
**man** [3] - 36:7, 38:13, 237:11
**management** [7] - 78:14, 111:25, 191:23, 218:22, 218:24, 222:17, 244:1
**MANAGER** [4] - 6:4, 28:5, 128:12, 184:8
**manager** [7] - 22:8, 45:8, 64:12, 118:10, 118:20, 118:25
**managers** [2] - 70:21, 221:21
**manner** [1] - 62:8
**manual** [48] - 17:11, 17:14, 17:16, 17:20, 97:6, 97:7, 112:12, 119:2, 151:12, 151:15, 151:23, 151:25, 153:24, 155:11, 155:23, 156:1, 156:14, 156:22, 158:7, 158:18, 158:24, 159:2, 159:5, 159:25, 160:5, 160:20, 161:16, 170:8, 170:13, 170:24, 170:25, 172:8, 172:9, 172:11, 172:14, 173:19, 176:3, 187:16, 187:20, 187:22, 188:3, 188:8, 188:9, 188:10, 205:2, 205:15, 246:21
**manuals** [14] - 112:4, 112:5, 157:20, 170:12, 170:20, 170:22, 171:5, 171:6, 171:7, 171:19, 187:12, 187:16, 188:4, 188:6
**MAQC** [1] - 97:22

**March** [29] - 132:3, 132:7, 132:11, 139:10, 140:11, 140:14, 140:22, 141:2, 142:13, 143:14, 146:10, 146:11, 146:16, 146:21, 148:7, 149:19, 150:16, 152:8, 152:11, 154:15, 170:9, 171:21, 175:7, 175:9, 190:16, 205:12, 206:7, 207:15, 229:14
**MARIE** [1] - 3:11
**mark** [4] - 28:4, 28:5, 61:5, 105:2
**marked** [12] - 33:20, 71:18, 80:11, 87:20, 90:25, 94:7, 96:8, 97:20, 153:25, 226:4, 230:17, 236:16
**markings** [1] - 237:9
**mass** [2] - 18:24, 49:20
**match** [1] - 88:9
**material** [4] - 12:13, 55:6, 188:13, 239:23
**materiality** [1] - 12:7
**materials** [2] - 153:6, 171:14
**math** [1] - 64:1
**matter** [14] - 13:3, 15:4, 34:7, 45:21, 50:14, 56:22, 58:14, 58:18, 79:1, 83:12, 90:14, 90:16, 117:5, 256:2
**matters** [2] - 23:23, 28:9
**McCAY** [1] - 4:3
**McDonald's** [1] - 214:13
**McNamara** [1] - 127:15
**McRitchie** [6] - 123:20, 123:21, 123:22, 124:19, 124:25, 125:9
**MDR** [1] - 153:18
**mean** [34] - 11:21, 16:16, 16:20, 21:24, 25:20, 25:21, 27:3, 54:20, 65:4, 75:14, 83:2, 83:3, 83:18, 122:5, 125:12, 136:15, 136:19, 136:24, 140:17,

158:25, 170:20, 172:10, 180:21, 189:5, 201:24, 205:6, 209:25, 211:21, 227:21, 230:6, 246:9, 252:19, 256:3
**meaning** [1] - 229:17
**means** [13] - 33:18, 33:25, 42:18, 54:18, 57:11, 62:4, 97:23, 105:10, 136:22, 137:2, 172:11, 214:5, 234:4
**meant** [3] - 76:3, 116:7, 168:3
**measures** [10] - 14:17, 219:18, 220:2, 220:3, 220:4, 220:6, 220:15, 220:18, 220:21, 220:24
**mechanic** [1] - 36:12
**mechanism** [1] - 216:8
**MECQ** [1] - 108:11
**medicaid** [1] - 64:18
**Medicaid** [128] - 34:24, 35:1, 35:4, 36:15, 45:25, 46:9, 46:15, 47:22, 47:24, 48:12, 61:14, 61:17, 61:18, 61:23, 62:6, 64:9, 64:12, 64:16, 64:18, 64:24, 65:1, 65:4, 65:10, 65:12, 65:15, 65:16, 65:22, 65:24, 66:8, 66:10, 66:16, 66:22, 67:3, 68:10, 68:13, 68:20, 68:23, 69:1, 69:5, 70:16, 72:11, 74:10, 74:12, 74:14, 75:2, 75:5, 75:15, 75:20, 76:4, 76:8, 76:24, 77:10, 77:13, 78:11, 78:15, 79:2, 79:5, 79:7, 79:9, 79:12, 79:14, 79:19, 80:16, 80:17, 81:6, 81:25, 83:9, 83:10, 84:9, 84:24, 85:3, 86:9, 86:19, 86:21, 87:15, 88:4, 88:25, 89:23, 92:20, 92:22, 94:12, 94:13, 94:15, 95:7, 96:3, 96:15, 97:13, 97:15, 97:24, 98:2, 98:10, 98:13, 99:21, 103:23, 103:24, 104:9, 105:17,

106:12, 107:13, 107:25, 110:9, 110:15, 110:18, 111:5, 111:11, 112:24, 115:4, 115:10, 115:11, 115:14, 115:15, 115:16, 115:17, 119:1, 119:3, 119:8, 121:25, 122:1, 122:3, 122:8, 122:9, 122:16, 122:25, 124:13, 215:8, 215:14
**Medicaid's** [1] - 79:15
**medical** [1] - 64:7
**Medicare** [4] - 34:22, 74:7, 121:19, 121:20
**meet** [9] - 65:2, 65:6, 77:24, 88:10, 111:19, 111:22, 127:15, 127:18, 259:9
**meeting** [6] - 124:18, 124:20, 124:22, 124:25, 125:9, 222:18
**meetings** [1] - 111:19
**meets** [1] - 77:17
**member** [4] - 18:14, 47:16, 116:16, 119:8
**members** [1] - 249:20
**membership** [1] - 38:24
**memo** [1] - 10:1
**memorandum** [1] - 221:8
**memorialized** [4] - 104:10, 104:15, 105:21, 106:16
**memorializing** [1] - 106:24
**memorize** [1] - 252:12
**memorized** [1] - 160:3
**memory** [6] - 37:16, 121:14, 178:3, 178:6, 181:3
**mention** [3] - 32:19, 158:13, 240:20
**mentioned** [6] - 63:10, 103:14, 191:11, 194:2, 195:12, 199:10
**mentioning** [1] - 41:15
**mentions** [2] - 158:10, 240:18
**MEQC** [1] - 109:15
**merit** [2] - 215:22, 240:7
**met** [3] - 45:21, 118:1,

123:21
**metadata** [1] - 91:25
**method** [1] - 242:8
**methods** [2] - 88:4, 95:25
**Michael** [1] - 6:12
**MICHAEL** [1] - 2:12
**michael.deleeuw@ friedfrank.com** [1] - 2:16
**Michelle** [3] - 8:4, 247:2, 247:14
**MICHELLE** [1] - 2:17
**MICHIELS** [2] - 5:17, 218:1
**Michiels** [11] - 217:25, 218:3, 218:5, 218:12, 221:2, 222:4, 226:4, 240:20, 241:13, 243:22, 243:24
**middle** [3] - 146:12, 159:10, 184:16
**might** [17] - 13:1, 13:9, 21:2, 23:11, 25:8, 28:13, 28:19, 41:20, 48:8, 73:7, 149:14, 189:4, 189:6, 192:21, 216:1, 216:7, 255:7
**mike** [2] - 22:17, 118:14
**MILAZZO** [1] - 1:18
**mill** [1] - 195:12
**million** [1] - 65:17
**mind** [4] - 45:23, 49:13, 64:23, 177:20
**minimal** [2] - 40:1, 125:5
**minute** [12] - 29:2, 36:10, 114:8, 137:24, 138:6, 138:11, 154:10, 183:13, 186:5, 204:1, 239:12, 258:2
**minutes** [6] - 18:8, 18:12, 150:12, 217:5, 258:3, 258:22
**mirror** [1] - 194:19
**misremembered** [1] - 37:15
**missing** [6] - 62:2, 62:4, 63:2, 153:9, 153:12, 154:6
**misspoken** [1] - 149:9
**mistaken** [1] - 217:17
**misunderstood** [1] - 216:3
**mixed** [1] - 9:7
**mobile** [2] - 95:5, 95:6

**mode** [1] - 73:21
**moment** [14] - 28:24,
37:18, 50:2, 50:24,
51:4, 52:6, 53:6,
58:2, 108:11, 113:1,
114:13, 231:12,
238:12, 251:5
**MONDAY** [1] - 6:1
**money** [1] - 75:3
**monitor** [3] - 47:9,
52:16, 189:3
**monitored** [1] -
240:23
**monitoring** [2] -
47:11, 47:12
**monitorship** [1] -
39:21
**month** [25] - 48:15,
75:10, 106:18,
109:4, 161:22,
161:25, 162:7,
162:11, 162:14,
162:20, 163:15,
177:1, 177:2, 177:6,
177:10, 178:15,
178:25, 179:9,
191:18, 200:15,
204:16, 204:17,
209:8, 235:25,
248:17
**monthly** [2] - 188:25
**months** [6] - 36:23,
50:10, 66:15,
157:14, 200:18,
221:24
**moodle** [8] - 147:16,
147:19, 148:2,
148:3, 195:1, 195:2,
195:3, 195:8
**moot** [1] - 14:9
**morning** [18] - 6:7,
6:9, 6:12, 6:14, 7:1,
7:2, 7:4, 7:11, 18:19,
45:16, 45:17, 63:19,
63:20, 128:19,
215:7, 259:2, 259:8,
259:15
**most** [22] - 31:25,
32:3, 32:15, 40:13,
66:1, 66:3, 74:13,
75:13, 79:21, 91:8,
92:4, 93:11, 96:21,
103:16, 131:25,
132:12, 189:22,
201:11, 205:8,
214:7, 214:8, 230:14
**mostly** [2] - 74:25,
195:16
**motion** [28] - 7:13,
8:5, 13:19, 14:2,

14:4, 14:5, 14:7,
14:9, 14:11, 14:13,
14:14, 14:15, 14:18,
14:21, 14:22, 14:24,
15:1, 15:5, 15:15,
16:22, 16:24, 17:1,
17:2, 18:3, 30:18,
258:11, 258:19
**Motions** [1] - 5:2
**motions** [4] - 7:11,
23:13, 240:5, 258:10
**Motor** [1] - 50:24,
51:9, 51:25
**motor** [3] - 49:21,
50:1, 103:4
**move** [41] - 24:2, 24:5,
36:13, 53:16, 107:6,
107:9, 110:24,
112:15, 113:17,
117:4, 118:14,
123:16, 136:1,
142:25, 152:15,
154:18, 156:4,
157:21, 167:4,
167:12, 167:22,
168:16, 169:2,
179:17, 179:19,
180:4, 182:5,
182:10, 182:25,
183:7, 183:17,
183:23, 202:18,
203:8, 208:4, 211:8,
225:21, 238:8,
238:9, 244:4, 254:5
**moved** [3] - 92:6,
111:3, 197:18
**moves** [1] - 164:11
**moving** [1] - 98:12
**MR** [237] - 6:7, 6:9,
6:12, 6:14, 6:21,
6:22, 6:24, 7:4, 7:6,
7:8, 8:4, 15:9, 15:12,
15:25, 17:5, 17:9,
17:16, 17:23, 18:9,
18:14, 18:22, 19:10,
19:20, 20:9, 20:13,
20:16, 20:19, 21:12,
21:14, 21:19, 22:1,
22:4, 22:6, 22:12,
23:8, 23:21, 24:10,
26:3, 26:16, 26:21,
26:24, 27:8, 27:10,
28:6, 28:8, 28:10,
28:24, 29:7, 29:10,
29:13, 29:18, 30:9,
30:17, 31:10, 31:22,
31:25, 40:19, 42:2,
42:9, 42:11, 42:12,
44:2, 44:9, 44:17,
44:24, 45:3, 45:7,

45:11, 45:15, 46:22,
46:24, 47:6, 49:6,
49:7, 49:10, 49:12,
50:3, 50:8, 50:12,
50:22, 51:6, 51:9,
51:13, 51:17, 51:20,
51:22, 51:24, 53:2,
53:4, 53:8, 53:9,
53:16, 53:19, 53:22,
54:4, 54:9, 55:2,
55:17, 55:25, 56:3,
56:14, 56:19, 57:19,
57:20, 57:23, 58:1,
58:4, 58:11, 58:13,
58:20, 58:23, 59:13,
59:15, 59:22, 60:9,
60:11, 60:13, 60:18,
60:20, 60:22, 61:2,
61:4, 62:9, 62:12,
62:13, 63:5, 63:9,
63:18, 64:3, 64:4,
64:6, 67:16, 70:17,
70:20, 72:1, 72:4,
72:6, 73:9, 78:18,
78:22, 80:13, 80:14,
83:4, 83:7, 87:21,
87:24, 89:22, 94:4,
94:6, 97:8, 97:11,
99:1, 99:4, 99:7,
99:10, 99:12, 99:16,
99:24, 100:1,
100:21, 100:22,
100:23, 100:25,
101:2, 101:5, 101:8,
101:12, 101:15,
101:21, 102:6,
102:11, 102:17,
102:18, 102:22,
104:12, 104:15,
104:18, 104:25,
105:15, 106:3,
106:5, 106:9,
106:11, 107:2,
107:3, 107:8,
107:10, 107:12,
107:15, 107:22,
108:7, 108:10,
109:12, 109:13,
110:23, 112:7,
112:8, 112:15,
112:17, 112:22,
113:4, 113:7,
113:17, 113:19,
113:21, 114:2,
114:12, 114:15,
115:22, 115:24,
116:4, 116:9, 117:8,
119:14, 122:20,
123:3, 124:4,
124:12, 127:3,
127:7, 168:3,

168:17, 169:4,
178:1, 178:4, 178:7,
178:25, 179:8,
179:11, 179:14,
217:15, 225:7,
225:9, 227:18,
232:11, 258:4, 258:8
mrupp@projectvote.
org [1] - 2:21
**MS** [395] - 6:11, 6:16,
6:17, 6:18, 6:19, 7:1,
7:2, 7:17, 8:7, 8:17,
8:19, 8:21, 8:23,
8:25, 9:1, 10:23,
11:19, 11:21, 12:3,
12:6, 13:6, 13:15,
14:1, 15:17, 15:19,
16:8, 18:19, 21:7,
21:10, 22:14, 22:18,
22:23, 22:24, 23:4,
24:8, 24:14, 24:25,
26:12, 28:11, 31:12,
41:25, 42:5, 43:9,
43:21, 44:8, 44:12,
45:9, 53:7, 116:12,
117:14, 117:24,
118:6, 118:17,
119:18, 120:7,
120:10, 120:12,
120:21, 121:9,
121:17, 121:18,
122:21, 122:24,
123:12, 123:15,
123:19, 124:7,
124:9, 124:17,
124:24, 125:16,
125:24, 126:5,
126:9, 126:10,
126:12, 126:15,
126:20, 127:1,
128:4, 128:10,
128:13, 128:18,
132:4, 132:6,
133:16, 133:17,
134:7, 134:9,
134:16, 134:19,
134:22, 135:25,
136:4, 136:7,
137:15, 137:20,
137:22, 137:24,
138:1, 138:7, 138:9,
138:20, 138:23,
138:25, 141:7,
141:9, 141:13,
141:18, 141:22,
142:3, 142:5, 142:7,
142:9, 142:12,
142:20, 143:2,
143:7, 143:9,
143:11, 143:16,
143:19, 143:21,

144:18, 144:20,
145:19, 145:23,
145:25, 146:3,
146:5, 147:25,
148:14, 148:16,
152:14, 152:18,
152:19, 152:20,
153:1, 153:4,
153:10, 153:11,
153:16, 153:23,
153:24, 154:3,
154:7, 154:13,
154:18, 154:21,
154:24, 156:20,
157:2, 157:6,
157:13, 157:15,
157:18, 157:23,
158:3, 158:5,
160:14, 164:24,
165:13, 165:16,
165:24, 166:3,
166:7, 166:11,
166:14, 166:16,
166:25, 167:3,
167:22, 167:25,
168:2, 168:6,
168:16, 168:18,
168:20, 169:2,
169:7, 174:4, 174:5,
174:8, 174:20,
175:3, 175:5,
175:18, 175:24,
176:2, 176:10,
177:21, 177:24,
178:11, 178:16,
178:19, 178:22,
179:3, 179:5,
179:10, 179:12,
179:16, 179:24,
180:5, 180:9,
180:11, 180:17,
180:24, 181:1,
181:5, 181:8,
181:11, 181:14,
182:5, 182:6, 182:9,
182:15, 182:25,
183:2, 183:5,
183:15, 183:22,
184:2, 184:9,
184:11, 185:8,
185:9, 186:2, 186:7,
186:17, 186:19,
187:14, 187:15,
190:6, 190:8,
190:10, 190:13,
196:7, 202:15,
202:19, 202:20,
203:6, 203:9,
203:11, 203:23,
203:25, 204:4,
204:6, 206:2, 206:5,

206:10, 206:13, 206:16, 206:20, 206:22, 207:1, 207:7, 207:9, 207:12, 207:14, 208:4, 208:10, 210:2, 210:5, 210:9, 210:19, 210:24, 211:5, 211:10, 211:13, 211:17, 212:1, 212:5, 212:12, 217:3, 217:7, 217:24, 218:8, 218:11, 220:14, 221:12, 221:14, 221:17, 222:11, 222:15, 222:24, 223:1, 223:8, 223:9, 223:24, 224:2, 224:3, 225:4, 225:6, 225:8, 225:10, 225:20, 226:6, 226:9, 226:10, 226:13, 226:17, 226:21, 226:25, 227:5, 227:13, 228:22, 228:24, 229:6, 229:9, 230:20, 230:22, 231:14, 231:17, 231:25, 232:16, 233:7, 237:1, 237:7, 237:10, 237:18, 237:21, 237:22, 237:24, 237:25, 238:3, 238:7, 238:9, 238:12, 238:14, 238:17, 239:5, 239:8, 239:14, 239:21, 239:22, 240:5, 240:11, 240:18, 240:24, 241:3, 241:6, 241:10, 241:12, 241:19, 242:4, 242:10, 242:23, 242:25, 243:1, 243:5, 243:10, 243:13, 243:14, 243:17, 243:21, 243:24, 244:1, 244:6, 244:9, 244:15, 245:12, 245:20, 245:24, 246:24, 246:25, 247:2, 247:11, 251:8, 251:13, 251:15, 251:17, 253:15, 253:18, 253:19, 253:23,

254:1, 254:6, 254:7, 254:20, 254:24, 255:3, 255:10, 255:14, 255:20, 255:24, 256:1, 256:4, 256:6, 256:12, 256:14, 256:22, 257:2, 257:22, 257:25, 258:19
**multiple** [3] - 24:20, 157:9, 254:25
**multiplicity** [1] - 30:12
**multitude** [1] - 25:3
**must** [8] - 10:12, 62:24, 155:16, 160:15, 161:5, 161:9, 174:19
**MV** [1] - 56:8

## N

**NAACP** [12] - 1:6, 2:4, 38:2, 38:3, 38:5, 38:12, 38:16, 38:20, 38:22, 43:22, 44:3
**NAACP's** [1] - 38:14
**name** [17] - 15:11, 44:21, 44:22, 45:20, 98:11, 117:19, 117:25, 128:8, 128:19, 156:10, 217:7, 218:3, 219:21, 229:3, 247:2, 247:6, 247:14
**named** [2] - 36:7, 38:13
**narrative** [1] - 104:11
**Natasha** [2] - 6:18, 117:25
**NATASHA** [1] - 2:3
**National** [5] - 32:5, 46:12, 68:7, 96:13, 98:3
**national** [2] - 69:24, 207:17
**nature** [1] - 24:20
**near** [2] - 54:2, 56:6
**necessarily** [1] - 81:10
**necessary** [5] - 10:2, 39:8, 122:14, 186:25, 258:17
**need** [72] - 12:25, 13:16, 16:13, 19:18, 28:16, 28:20, 28:21, 29:5, 43:16, 44:1, 44:14, 44:15, 48:7, 48:8, 52:21, 59:7, 59:8, 61:24, 62:5, 67:2, 74:9, 74:14,

76:25, 77:3, 77:25, 81:13, 83:20, 86:12, 86:20, 87:18, 89:18, 89:20, 91:11, 93:12, 93:13, 94:2, 102:20, 107:3, 114:7, 116:1, 117:19, 118:4, 118:13, 126:18, 126:23, 130:23, 139:3, 142:4, 143:4, 154:4, 189:5, 204:20, 210:22, 211:8, 216:1, 216:12, 218:3, 227:15, 229:3, 231:11, 243:1, 243:3, 243:8, 247:6, 251:16, 254:5, 256:18, 259:10, 259:11, 259:12, 259:13
**needed** [4] - 82:14, 94:1, 216:24, 253:4
**needs** [5] - 38:5, 54:14, 130:15, 130:19, 239:10
**needy** [1] - 129:16
**negative** [1] - 76:6
**neighborhood** [1] - 48:25
**neighborhoods** [1] - 38:18
**Nelson** [1] - 219:22
**never** [12] - 36:25, 37:17, 37:24, 69:3, 108:4, 126:5, 126:13, 206:17, 206:25, 237:24, 240:11, 255:5
**New** [8] - 1:23, 2:6, 2:10, 2:15, 2:15, 36:9, 43:13, 106:21
**NEW** [2] - 1:3, 6:1
**new** [15] - 11:13, 39:22, 40:2, 48:23, 49:2, 49:22, 91:5, 100:14, 119:4, 150:5, 150:18, 151:1, 151:5, 152:4, 204:21
**news** [1] - 41:10
**next** [20] - 34:23, 35:3, 43:19, 56:7, 86:5, 90:22, 95:21, 116:6, 121:1, 121:2, 128:3, 155:14, 155:15, 159:19, 182:12, 204:16, 209:5, 209:9, 217:8
**nice** [2] - 30:24, 45:18

**nilly** [1] - 25:18
**ninety** [1] - 158:12
**ninety-four** [1] - 158:12
**NIYATI** [1] - 2:22
**Niyati** [2] - 6:17, 217:7
**nobody** [1] - 125:22
**nobody's** [1] - 242:7
**non** [3] - 38:6, 38:24
**non-partisan** [1] - 38:6
**non-profit** [2] - 38:6, 38:24
**noncompliance** [1] - 50:13
**none** [4] - 142:15, 210:7, 216:2, 216:3
**noon** [1] - 127:19
**normal** [3] - 70:22, 136:24, 172:8
**normally** [1] - 245:14
**North** [1] - 3:13
**note** [1] - 244:6
**noted** [11] - 13:20, 20:15, 26:11, 36:15, 51:11, 51:15, 55:21, 56:17, 112:21, 113:25, 124:16
**notes** [2] - 14:9, 17:13
**nothing** [9] - 7:25, 107:12, 107:21, 201:7, 226:12, 226:25, 242:18, 246:25, 259:6
**notice** [25] - 7:14, 7:18, 7:22, 10:22, 13:25, 15:21, 17:3, 17:7, 17:14, 17:19, 18:1, 35:23, 85:9, 85:10, 85:11, 85:19, 85:22, 89:11, 90:10, 90:11, 90:12, 90:13, 116:2
**notices** [4] - 85:14, 85:16, 85:18
**notification** [2] - 31:2, 116:19
**notified** [1] - 185:20
**November** [9] - 37:3, 118:2, 156:21, 177:1, 177:2, 254:24, 255:8, 255:12
**nshah@projectvote. org** [1] - 2:25
**number** [62] - 9:22, 11:10, 16:8, 18:5, 18:24, 19:8, 20:19, 33:4, 34:15, 34:23, 35:6, 35:21, 39:13,

39:16, 47:22, 48:10, 51:2, 52:8, 52:18, 53:7, 54:9, 54:12, 55:9, 55:10, 57:17, 59:23, 83:20, 96:2, 103:24, 107:19, 124:6, 138:22, 161:21, 161:24, 162:7, 162:8, 162:10, 162:13, 162:19, 163:15, 174:4, 178:11, 178:13, 179:7, 179:18, 179:25, 180:1, 180:6, 180:7, 180:12, 180:15, 180:19, 181:18, 182:17, 183:5, 187:13, 188:25, 189:1, 189:2, 204:8, 226:8
**numbered** [1] - 138:18
**numbers** [41] - 8:13, 9:12, 9:13, 10:8, 10:10, 10:11, 10:12, 10:15, 11:7, 11:11, 12:13, 12:17, 12:19, 12:20, 12:21, 15:22, 16:17, 24:9, 34:22, 35:4, 35:6, 35:14, 35:18, 43:16, 48:1, 48:3, 49:25, 54:14, 54:15, 55:13, 102:1, 125:18, 139:2, 139:5, 148:20, 154:25, 176:12, 180:12, 180:21, 181:23, 189:15
**Nutrition** [5] - 88:24, 129:12, 169:9, 201:19, 201:22
**Nutritional** [1] - 34:16
**NVRA** [102] - 9:1, 9:4, 9:9, 11:6, 12:7, 12:9, 17:12, 17:18, 17:25, 19:23, 27:19, 33:11, 39:7, 39:13, 40:7, 46:13, 46:16, 46:19, 46:21, 46:23, 47:5, 47:9, 47:13, 47:14, 55:18, 68:8, 69:5, 70:10, 78:15, 97:13, 98:24, 104:16, 110:21, 111:8, 112:24, 119:8, 119:10, 119:16, 121:5, 123:1, 123:3, 125:2, 125:10, 155:1, 161:18, 171:24, 187:18,

188:15, 190:20,
191:14, 191:21,
192:7, 192:16,
192:23, 193:6,
193:8, 193:11,
193:23, 201:5,
202:21, 202:22,
203:5, 204:24,
205:19, 205:20,
205:25, 206:18,
207:23, 207:25,
209:11, 209:12,
210:14, 211:12,
221:24, 222:18,
223:5, 225:24,
226:2, 226:12,
226:14, 226:16,
226:18, 227:11,
227:15, 240:12,
240:14, 240:19,
240:23, 241:10,
241:11, 241:16,
242:19, 243:5,
243:19, 244:25,
245:1, 245:3, 245:4,
245:19

**NW** [1] - 2:19

**NY** [2] - 2:6, 2:15

# O

**o'clock** [1] - 258:25

**oath** [4] - 114:11,
133:13, 177:17,
250:23

**object** [42] - 20:20,
22:13, 24:17, 25:14,
31:15, 31:18, 46:22,
50:3, 50:6, 51:9,
51:20, 54:4, 56:15,
58:4, 58:23, 59:6,
62:9, 62:11, 102:17,
104:12, 106:5,
113:19, 119:14,
120:7, 141:13,
152:20, 156:21,
165:13, 183:7,
202:15, 203:6,
206:10, 210:19,
211:13, 212:1,
222:12, 223:24,
226:7, 237:1,
239:22, 245:24,
253:23

**objected** [2] - 25:7,
58:11

**objecting** [3] - 12:18,
112:17, 244:12

**objection** [85] - 13:20,
19:5, 19:15, 20:1,
20:7, 20:14, 20:15,

20:22, 21:16, 22:11,
23:5, 23:10, 24:4,
24:7, 26:9, 26:11,
26:21, 29:16, 29:23,
30:2, 30:3, 31:5,
47:1, 51:8, 51:11,
51:17, 51:23, 53:18,
53:19, 55:20, 55:21,
56:17, 60:9, 60:13,
63:10, 70:17, 78:18,
83:4, 99:1, 100:22,
100:23, 107:10,
107:11, 110:25,
112:20, 113:25,
117:4, 117:9,
117:13, 122:20,
124:4, 124:11,
124:16, 126:14,
134:18, 134:19,
136:3, 136:4,
141:15, 152:17,
154:20, 154:21,
157:16, 157:18,
167:24, 167:25,
168:3, 168:17,
169:4, 177:21,
178:4, 179:5, 182:6,
183:2, 183:17,
186:17, 203:10,
207:5, 208:7,
221:14, 244:3,
245:20, 254:4,
258:15

**objections** [5] - 13:3,
59:6, 59:9, 117:1,
240:4

**obligation** [4] - 32:13,
47:2, 104:20, 223:5

**obligations** [2] -
56:20, 146:14

**observe** [1] - 225:13

**obsolete** [9] - 49:22,
50:5, 50:9, 85:5,
103:5, 136:20,
136:22, 137:2,
137:10

**Obsolete** [1] - 136:18

**obsoleted** [2] -
136:25, 137:5

**obviate** [2] - 12:25,
13:16

**obviously** [2] - 19:8,
48:13

**occasion** [2] - 159:1,
234:8

**occasionally** [1] -
235:23

**occurred** [2] - 165:21,
165:22

**occurs** [1] - 129:23

**October** [6] - 1:9,
94:18, 98:6, 114:22,
115:7, 255:9

**OCTOBER** [1] - 6:1

**odds** [1] - 210:6

**OF** [3] - 1:2, 1:5, 1:17

**offer** [29] - 13:7, 13:9,
15:22, 15:23, 16:13,
19:4, 22:2, 32:8,
33:5, 37:19, 51:6,
53:16, 71:1, 71:5,
75:15, 79:17, 92:1,
93:18, 98:13, 98:15,
102:15, 103:1,
103:11, 107:9,
126:2, 134:17,
142:3, 185:24

**offered** [26] - 7:23,
8:2, 12:16, 13:7,
13:18, 15:19, 15:21,
17:22, 18:6, 21:6,
23:12, 23:13, 33:6,
37:20, 58:13, 58:18,
100:21, 104:9,
104:24, 105:20,
106:25, 129:11,
130:18, 149:22,
217:17

**offering** [6] - 7:20,
21:15, 98:17,
126:11, 177:21,
177:24

**offers** [1] - 107:17

**office** [46] - 34:1,
34:11, 43:10, 43:13,
53:14, 57:5, 58:3,
58:8, 58:25, 67:3,
67:18, 74:10, 74:11,
76:5, 76:6, 77:23,
79:19, 82:11, 82:19,
87:2, 87:12, 87:13,
91:9, 91:15, 94:15,
106:22, 110:2,
111:8, 111:12,
126:1, 137:8,
147:11, 155:4,
155:16, 186:15,
202:6, 202:7,
216:11, 216:13,
216:19, 228:8,
230:10, 233:20,
233:21, 236:3

**Office** [5] - 34:4,
123:23, 125:19,
126:11, 247:21

**offices** [23] - 32:6,
40:2, 54:13, 56:10,
57:7, 57:18, 67:6,
77:2, 92:5, 98:2,
98:10, 98:19, 98:20,

108:14, 108:16,
108:20, 108:22,
108:23, 110:11,
137:9, 215:11,
216:11, 226:1

**official** [7] - 1:9, 1:10,
1:12, 6:20, 31:17,
115:6, 233:16

**Official** [4] - 1:21,
53:24, 56:5, 259:20

**OFS** [1] - 197:16

**often** [4] - 39:17,
89:23, 92:2, 196:24

**oftentimes** [1] - 214:1

**old** [14] - 36:9, 49:21,
63:23, 70:22, 70:23,
84:25, 85:6, 85:23,
100:23, 101:23,
101:25, 102:14,
163:25

**older** [1] - 231:24

**on-run** [1] - 198:11

**once** [18] - 36:24,
37:1, 41:21, 65:24,
86:24, 87:10, 95:14,
115:25, 130:21,
164:11, 177:11,
196:20, 200:13,
204:9, 204:13,
211:21, 213:3,
234:15

**One** [2] - 1:10, 2:15

**one** [125] - 7:12, 9:19,
9:20, 12:3, 16:8,
17:9, 17:10, 18:14,
19:10, 19:21, 24:2,
25:4, 26:16, 27:10,
30:3, 30:13, 32:2,
36:2, 36:7, 54:17,
55:9, 55:14, 55:17,
56:5, 66:1, 71:24,
77:1, 79:1, 81:19,
83:23, 84:21, 84:24,
85:19, 88:2, 89:23,
92:5, 92:24, 95:20,
96:25, 98:11,
102:12, 102:23,
103:6, 108:23,
108:25, 109:4,
109:15, 112:4,
112:12, 113:12,
116:10, 116:16,
120:12, 121:1,
121:2, 123:12,
125:22, 127:14,
127:15, 130:22,
132:9, 134:13,
139:14, 139:16,
140:3, 140:13,
142:20, 145:19,

147:8, 151:8, 157:7,
157:10, 157:11,
157:19, 167:6,
168:18, 168:22,
169:11, 169:20,
171:16, 171:20,
171:21, 178:1,
189:14, 189:15,
189:16, 189:20,
192:10, 192:11,
194:8, 195:8, 201:5,
203:16, 209:2,
210:5, 210:7,
210:10, 213:24,
214:6, 214:7,
214:17, 216:23,
226:13, 227:24,
228:11, 231:12,
232:20, 232:21,
238:12, 240:21,
241:1, 241:11,
244:16, 255:6,
258:2, 258:4,
258:10, 258:20,
258:22

**one-week** [1] - 151:8

**ones** [5] - 24:20, 27:5,
57:13, 130:2, 215:20

**ongoing** [10] - 98:18,
150:7, 162:2, 193:8,
193:19, 193:22,
203:20, 205:1,
205:18, 205:21

**online** [56] - 73:21,
73:25, 74:1, 74:2,
75:17, 77:3, 78:14,
83:1, 89:12, 90:5,
90:6, 94:11, 94:17,
94:23, 95:1, 95:8,
96:4, 125:12,
163:20, 165:11,
165:17, 168:13,
168:25, 177:10,
177:12, 178:17,
184:19, 191:24,
192:22, 194:3,
194:5, 194:11,
194:13, 194:16,
194:20, 194:21,
195:11, 195:13,
196:2, 196:10,
200:8, 200:9,
200:10, 200:13,
200:20, 201:10,
201:12, 214:20,
215:17, 238:22,
238:24, 239:2,
246:21, 249:22,
250:2

**oodle** [1] - 148:1

**open** [2] - 32:19, 207:11
**opened** [2] - 15:20, 16:18
**opening** [4] - 29:14, 29:25, 42:1
**Opening** [1] - 5:4
**openings** [1] - 29:22
**operations** [1] - 221:8
**Operations** [1] - 46:8
**opinion** [2] - 17:22, 61:8
**opportunity** [23] - 7:15, 18:16, 30:14, 32:4, 32:8, 37:12, 40:10, 50:19, 69:7, 71:1, 71:13, 71:15, 72:22, 79:17, 91:16, 93:18, 98:17, 102:16, 103:2, 103:11, 104:10, 105:20, 107:18
**option** [1] - 95:20
**options** [3] - 87:10, 90:7, 95:16
**order** [10] - 15:15, 28:12, 29:14, 32:17, 42:18, 43:3, 43:5, 54:24, 115:12, 120:19
**ordered** [1] - 15:15
**organization** [3] - 38:25, 48:10
**orientation** [32] - 150:23, 151:4, 151:6, 151:10, 151:12, 151:15, 151:25, 155:11, 155:23, 156:1, 156:14, 156:21, 157:8, 158:6, 158:18, 158:23, 159:1, 159:25, 160:4, 161:16, 170:8, 170:24, 170:25, 171:19, 176:3, 188:10, 205:1, 205:2, 205:9, 205:10, 205:15
**original** [5] - 16:11, 86:14, 86:16, 213:5, 213:6
**Orleans** [5] - 1:23, 2:10, 36:10, 43:13, 106:21
**ORLEANS** [2] - 1:3, 6:1
**otherwise** [1] - 20:2
**ought** [1] - 25:21
**ourselves** [1] - 43:1

**outline** [1] - 258:18
**Outlook** [1] - 113:14
**outreach** [6] - 38:9, 38:17, 84:15, 84:20, 85:25, 216:9
**outside** [1] - 43:7
**overall** [1] - 248:5
**overly** [1] - 217:18
**overly-burdensome** [1] - 217:18
**overpaid** [1] - 227:3
**overpayment** [1] - 227:1
**overrule** [5] - 47:1, 55:20, 102:21, 117:1, 124:16
**overruled** [10] - 26:10, 50:21, 51:12, 55:21, 56:18, 70:19, 78:21, 106:10, 119:17, 120:20
**oversee** [7] - 46:6, 46:9, 47:11, 47:12, 68:10, 68:16, 251:3
**overseeing** [3] - 244:2, 250:16, 251:20
**oversees** [1] - 220:4
**oversight** [4] - 98:23, 218:22, 218:24, 249:3
**overview** [1] - 249:6
**own** [4] - 34:17, 35:6, 35:14, 172:9

**P**

**P.M** [1] - 128:2
**p.m** [1] - 259:16
**PA** [16] - 56:8, 56:11, 56:22, 57:1, 57:7, 57:14, 59:18, 59:24, 60:1, 61:5, 61:9, 233:18, 233:20, 233:22, 234:4, 234:18
**package** [1] - 86:5
**packet** [6] - 76:6, 93:6, 101:22, 103:6, 153:16, 153:23
**page** [67] - 10:15, 10:19, 49:25, 51:2, 53:23, 72:2, 73:10, 73:17, 81:21, 81:22, 88:2, 90:19, 90:22, 98:7, 110:1, 110:6, 120:22, 131:19, 138:2, 138:18, 139:1, 139:3, 139:5, 148:20, 157:19,

158:11, 158:17, 158:19, 158:21, 158:22, 158:23, 159:5, 159:9, 159:10, 159:15, 159:17, 159:19, 159:22, 159:24, 159:25, 160:5, 160:6, 160:9, 161:4, 161:17, 167:9, 169:19, 169:20, 169:21, 169:22, 172:24, 175:6, 176:13, 184:16, 199:20, 225:3, 225:7, 231:18, 231:19, 235:8, 236:19, 251:12
**pages** [18] - 10:18, 16:12, 16:13, 25:20, 49:13, 53:5, 81:20, 85:21, 86:4, 109:19, 113:1, 113:14, 153:8, 153:12, 153:17, 154:2, 158:16, 217:17
**paid** [1] - 74:16
**paper** [10] - 28:3, 102:8, 102:9, 136:24, 178:16, 178:19, 194:19, 194:22, 213:8, 215:18
**paragraph** [3] - 73:17, 125:1, 146:13
**paragraphs** [2] - 8:9, 8:10
**paraphrasing** [1] - 246:10
**parish** [6] - 155:6, 155:16, 181:19, 182:18, 216:11, 221:20
**parishes** [2] - 216:13, 218:19
**part** [41] - 8:19, 10:21, 11:18, 13:23, 17:15, 30:9, 47:3, 73:6, 83:8, 86:23, 95:13, 103:6, 103:7, 109:15, 119:20, 126:12, 149:3, 153:14, 153:22, 169:15, 173:9, 173:17, 173:18, 180:5, 187:10, 187:20, 188:3, 192:10, 196:5, 199:19, 200:5, 203:3, 205:1, 205:2,

205:9, 205:10, 205:14, 205:21, 227:5, 246:15, 257:14
**parte** [3] - 89:4, 89:9, 90:11
**partial** [1] - 152:21
**partiality** [1] - 246:9
**participants** [2] - 88:16, 131:2
**participate** [12] - 40:14, 130:15, 130:18, 130:22, 134:25, 144:4, 144:7, 147:8, 147:24, 150:18, 189:20, 205:24
**particular** [14] - 74:11, 141:22, 143:14, 151:10, 153:9, 153:22, 197:21, 237:7, 239:2, 246:20, 252:21, 256:8, 257:7, 257:9
**particularly** [3] - 10:3, 27:6, 30:21
**parties** [14] - 6:5, 16:2, 18:7, 18:22, 18:25, 21:24, 23:10, 25:9, 42:17, 43:25, 45:4, 63:7, 117:3, 212:24
**parties'** [1] - 116:16
**parties's** [1] - 32:17
**partisan** [1] - 38:6
**partner** [1] - 215:21
**partners** [17] - 66:25, 67:9, 82:15, 189:3, 202:24, 210:16, 211:18, 211:21, 215:9, 215:10, 215:13, 215:15, 215:19, 216:3, 216:7, 216:12, 227:2
**parts** [4] - 69:12, 73:16, 151:9, 193:18
**party** [7] - 23:25, 24:3, 26:3, 248:5, 248:9, 249:7, 258:2
**pass** [1] - 66:14
**past** [10] - 40:24, 50:5, 50:13, 50:15, 79:13, 102:13, 102:25, 103:10, 126:15, 158:16
**patience** [1] - 253:18
**Patsy** [1] - 7:1
**pause** [1] - 175:16
**Pause** [18] - 29:4, 29:8, 71:25, 106:1, 124:10, 126:25,

154:11, 160:13, 174:17, 176:8, 182:14, 204:2, 220:13, 231:13, 238:13, 239:13, 251:7, 253:17
**pay** [4] - 74:16, 75:12, 215:14, 215:15
**paying** [1] - 74:16
**PDF** [4] - 194:7, 194:14, 200:10, 200:20
**pending** [3] - 7:12, 47:19, 166:18
**people** [57] - 11:12, 15:10, 38:11, 40:6, 40:8, 40:13, 54:22, 65:16, 66:10, 67:1, 67:2, 67:5, 69:7, 70:16, 71:2, 71:13, 72:22, 74:8, 74:13, 74:21, 74:22, 75:16, 76:4, 78:11, 79:17, 79:19, 79:22, 85:23, 86:11, 86:18, 86:21, 89:17, 91:8, 93:2, 94:19, 94:21, 94:24, 97:1, 98:17, 110:13, 115:9, 121:22, 187:8, 198:21, 204:8, 207:11, 221:23, 222:7, 223:12, 223:14, 223:17, 223:18, 223:20, 224:4, 259:7
**per** [18] - 34:21, 35:1, 35:2, 35:10, 35:11, 35:18, 48:15, 48:17, 108:16, 109:2, 163:15, 177:1, 177:2, 177:6, 177:10, 235:25, 253:3
**percent** [21] - 65:21, 67:13, 73:23, 73:24, 73:25, 74:4, 75:6, 75:11, 86:3, 94:23, 98:19, 98:22, 108:15, 108:19, 108:23, 177:12, 178:18, 178:21, 178:23, 179:1
**percentage** [4] - 65:18, 73:20, 74:1, 75:9
**perfect** [1] - 37:16
**performance** [16] - 52:10, 219:18, 220:2, 220:3, 220:4, 220:6, 220:15,

220:18, 220:21, 220:24, 221:10, 222:4, 223:21, 224:12, 228:6, 239:23
**perhaps** [1] - 216:23
**period** [11] - 15:3, 30:20, 31:3, 34:19, 166:21, 191:18, 203:17, 213:18, 250:5, 250:7, 250:8
**periodic** [3] - 122:12, 122:14, 130:25
**periods** [1] - 131:7
**permitted** [3] - 15:16, 34:2, 61:9
**perseverative** [1] - 32:2
**person** [59] - 12:7, 12:8, 34:2, 54:22, 66:18, 66:19, 66:21, 67:2, 67:23, 69:8, 69:10, 69:15, 69:18, 73:14, 73:21, 73:24, 76:18, 76:19, 76:22, 77:17, 77:18, 77:19, 77:20, 81:9, 86:25, 87:1, 88:5, 89:6, 89:17, 92:7, 103:2, 103:3, 103:8, 107:13, 107:25, 122:3, 127:14, 130:15, 130:19, 144:7, 150:5, 164:16, 189:13, 194:21, 213:23, 214:25, 219:18, 219:25, 242:1, 242:2, 243:3, 256:8, 257:7, 257:17, 258:2, 258:22
**person's** [2] - 65:22, 84:3
**personal** [2] - 43:2, 259:6
**personally** [3] - 39:3, 234:7, 234:15
**personnel** [25] - 34:1, 56:22, 61:15, 61:18, 62:6, 74:20, 131:23, 132:15, 145:9, 145:14, 147:8, 149:14, 149:22, 150:2, 159:3, 170:23, 173:14, 173:20, 174:13, 175:13, 185:3, 185:13, 185:18, 185:23, 221:18
**persons** [3] - 1:6,

119:5, 184:19
**perspective** [1] - 147:7
**pertain** [2] - 19:11, 20:23
**pertains** [2] - 20:24, 27:15
**pertinent** [2] - 50:18, 194:18
**pharmacies** [2] - 84:17, 84:22
**phase** [4] - 114:23, 115:6, 209:8, 250:6
**phase-ins** [1] - 209:8
**phased** [1] - 200:15
**phases** [1] - 209:5
**phasing** [1] - 203:16
**PHELPS** [1] - 31:10
**phenomenon** [2] - 11:1, 11:5
**PHILIPS** [33] - 3:16, 4:9, 6:24, 18:9, 18:14, 22:6, 23:8, 26:21, 29:18, 30:9, 30:17, 40:19, 42:11, 63:9, 99:12, 115:24, 116:4, 117:8, 168:3, 168:17, 169:4, 178:1, 178:4, 178:7, 178:25, 179:8, 179:11, 179:14, 217:15, 225:7, 225:9, 227:18, 232:11
**Philips** [7] - 3:17, 4:10, 5:6, 6:24, 29:16, 33:8, 40:18
**phone** [19] - 43:15, 75:17, 78:8, 79:22, 80:4, 87:9, 87:17, 89:18, 92:8, 93:2, 93:14, 93:19, 93:24, 94:3, 95:1, 164:17, 164:18, 164:20, 195:25
**picked** [2] - 85:2, 92:24
**picking** [1] - 22:25
**piece** [4] - 84:20, 155:10, 253:5, 257:10
**pilot** [3] - 114:23, 115:6, 255:6
**place** [19] - 39:24, 43:6, 66:22, 116:18, 116:23, 117:2, 124:18, 158:14, 165:15, 165:17, 166:6, 193:6, 193:11, 194:6,

197:1, 204:24, 209:4, 212:24, 233:15
**placed** [5] - 116:23, 148:7, 148:8, 148:9, 221:2
**places** [3] - 10:1, 84:17, 215:21
**plain** [1] - 33:23
**plaintiff** [5] - 23:10, 28:12, 38:1, 233:11, 237:2
**plaintiff's** [92] - 20:19, 22:10, 26:18, 26:19, 30:18, 32:16, 49:10, 51:6, 53:3, 53:16, 99:24, 100:19, 105:23, 107:9, 109:9, 110:24, 112:6, 112:15, 112:25, 113:17, 114:12, 114:14, 123:24, 124:8, 131:15, 132:4, 133:5, 133:16, 134:8, 134:17, 135:17, 137:15, 137:17, 138:7, 138:23, 138:24, 139:22, 141:7, 143:18, 143:24, 144:17, 145:3, 145:17, 145:24, 148:11, 149:19, 152:5, 152:14, 154:15, 156:18, 157:24, 165:10, 167:23, 168:7, 168:19, 169:2, 172:5, 174:3, 174:25, 175:3, 175:20, 175:24, 181:11, 181:15, 182:5, 182:10, 182:25, 183:18, 183:19, 183:20, 183:23, 184:5, 184:9, 187:12, 187:14, 187:24, 194:4, 195:1, 196:15, 198:2, 206:3, 208:4, 210:11, 210:25, 221:4, 226:5, 226:7, 230:19, 230:20, 231:14, 231:15, 236:17
**plaintiffs** [51] - 5:5, 6:8, 6:10, 6:11, 6:13, 6:15, 6:16, 6:17,

6:18, 7:14, 12:12, 14:3, 14:13, 14:16, 14:23, 15:13, 18:23, 19:4, 20:21, 20:25, 21:6, 21:15, 22:19, 27:14, 29:21, 35:23, 35:25, 36:2, 36:6, 39:10, 42:12, 42:13, 45:20, 55:11, 55:14, 63:11, 70:4, 70:6, 79:1, 79:12, 84:8, 116:12, 118:1, 128:3, 153:12, 167:22, 182:25, 196:15, 217:10, 217:18, 247:3
**Plaintiffs** [2] - 1:7, 2:3
**plaintiffs'** [1] - 40:22
**plan** [4] - 75:13, 108:21, 113:11, 209:9
**planned** [1] - 209:7
**planning** [2] - 209:3, 221:10
**Plaza** [1] - 2:15
**plead** [1] - 55:15
**pleadings** [2] - 15:3, 27:2
**pled** [7] - 25:1, 25:7, 25:10, 25:25, 55:9
**plus** [2] - 49:2, 67:9
**PO** [7] - 3:4, 3:8, 3:13, 3:18, 4:5, 4:12, 4:17
**podium** [1] - 22:17
**point** [23] - 13:17, 13:19, 23:19, 31:1, 102:17, 123:1, 123:3, 129:23, 136:21, 155:14, 155:15, 156:4, 156:5, 159:10, 160:10, 168:22, 180:19, 184:17, 197:18, 216:17, 217:11, 248:11, 253:24
**points** [1] - 249:19
**policies** [32] - 33:9, 33:13, 39:22, 39:24, 39:25, 40:2, 46:18, 68:12, 70:5, 70:23, 72:18, 73:2, 73:19, 96:22, 117:1, 119:4, 119:6, 145:9, 186:24, 187:25, 190:15, 190:25, 192:20, 193:20, 203:2, 207:25, 227:23, 228:12, 238:21, 239:1,

243:8, 252:2
**policy** [85] - 16:4, 16:5, 16:7, 16:21, 33:16, 33:24, 36:3, 56:21, 56:22, 60:1, 62:14, 62:19, 62:24, 63:1, 63:4, 64:11, 66:16, 66:17, 96:15, 97:16, 119:5, 131:22, 132:1, 132:15, 132:18, 132:22, 132:23, 132:25, 133:9, 133:11, 133:22, 133:23, 134:1, 150:2, 150:15, 155:25, 172:8, 172:9, 172:11, 172:14, 173:11, 173:20, 175:7, 175:9, 175:12, 184:14, 184:24, 185:2, 185:10, 185:12, 185:18, 186:22, 187:20, 188:3, 188:7, 188:8, 188:11, 190:15, 190:17, 190:19, 190:20, 190:21, 191:8, 191:12, 191:19, 191:21, 191:23, 191:24, 191:25, 192:1, 192:4, 192:5, 192:14, 192:16, 192:18, 192:23, 193:4, 193:11, 193:16, 205:7, 228:19, 236:3, 239:3, 246:21
**Policy** [2] - 46:7, 119:1
**population** [2] - 65:18, 85:18
**portal** [5] - 165:3, 200:23, 249:18
**Porter** [2] - 3:17, 4:10
**portion** [5] - 14:9, 152:24, 153:21, 155:19, 160:4
**position** [24] - 16:12, 27:25, 40:23, 46:3, 46:5, 64:21, 68:23, 69:1, 118:18, 118:22, 118:25, 130:9, 130:12, 187:7, 193:5, 200:5, 204:25, 228:7, 229:15, 229:19, 230:15, 231:7, 232:15, 248:20

**positions** [3] - 48:11, 64:8, 228:9
**positive** [2] - 36:1, 41:16
**possibility** [2] - 84:12, 254:3
**possible** [9] - 67:25, 74:19, 79:21, 95:7, 110:3, 189:8, 189:15, 189:24, 253:21
**possibly** [2] - 12:19, 234:1
**post** [3] - 14:16, 41:21, 146:15
**post-hearing** [1] - 41:21
**post-litigation** [1] - 14:16
**postage** [1] - 75:25
**potentially** [1] - 16:3
**poverty** [2] - 75:6, 75:9
**Poydras** [2] - 1:22, 2:9
**PPR** [7] - 240:6, 240:7, 240:18, 241:7, 241:14, 242:17, 242:18
**PPRs** [4] - 239:23, 240:24, 241:9, 243:7
**practice** [2] - 33:19, 104:22
**preceding** [2] - 116:18, 157:8
**precise** [1] - 81:25
**precisely** [2] - 54:13, 258:13
**predated** [1] - 145:4
**predates** [1] - 31:6
**predecessor** [3] - 112:20, 141:16, 166:19
**preference** [10] - 17:11, 139:18, 140:6, 140:25, 141:2, 142:13, 145:5, 169:10, 199:6, 199:23
**pregnant** [2] - 75:5, 80:23
**premium** [1] - 75:12
**prepared** [3] - 8:3, 28:23, 120:18
**presentation** [1] - 147:11
**presented** [7] - 61:21, 95:15, 111:24, 112:3, 187:16, 190:14, 196:14
**presently** [1] - 187:17

**president** [1] - 38:3
**presidential** [2] - 10:20, 11:3
**pretrial** [4] - 32:17, 120:8, 120:9, 120:19
**pretty** [8] - 28:1, 66:16, 66:24, 70:14, 70:24, 90:2, 147:6, 194:19
**previous** [6] - 118:21, 118:22, 137:2, 137:4, 141:16, 200:16
**previously** [3] - 141:14, 197:15, 244:19
**primarily** [3] - 20:24, 38:12, 104:3
**primary** [1] - 198:17
**print** [3] - 95:18, 194:14, 195:12
**printing** [1] - 75:25
**private** [2] - 12:8, 12:10, 55:10
**probative** [1] - 104:21
**problem** [5] - 19:20, 39:18, 76:18, 125:17, 143:6
**problems** [2] - 87:14, 225:24
**procedural** [1] - 128:10
**procedure** [7] - 73:2, 96:13, 98:1, 112:12, 114:22, 173:13, 228:19
**procedures** [14] - 46:18, 68:12, 70:6, 70:23, 70:25, 71:1, 72:14, 72:16, 80:2, 96:22, 97:1, 116:18, 227:24, 228:12
**Procedures** [2] - 170:16, 172:1
**proceed** [3] - 23:20, 117:22, 218:9
**proceedings** [20] - 29:4, 29:8, 71:25, 106:1, 124:10, 126:25, 127:19, 160:13, 174:17, 175:16, 176:8, 204:2, 220:13, 226:11, 231:13, 238:13, 239:13, 251:7, 253:17, 259:16
**PROCEEDINGS** [1] - 1:17
**Proceedings** [8] -

1:25, 18:13, 114:9, 154:11, 182:14, 183:14, 217:6, 258:24
**process** [31] - 10:5, 34:11, 40:10, 41:8, 46:10, 49:1, 52:17, 52:19, 66:2, 68:10, 68:15, 68:16, 72:18, 85:17, 92:23, 93:9, 93:12, 103:6, 103:8, 114:24, 147:13, 163:23, 164:21, 165:7, 194:11, 194:12, 195:11, 195:18, 216:8, 245:2, 253:11
**processed** [2] - 35:7, 180:1
**processes** [2] - 125:3, 125:5
**processing** [5] - 35:9, 35:17, 200:17, 230:7, 234:14
**produce** [1] - 45:12
**produced** [11] - 15:4, 19:25, 20:24, 54:11, 107:15, 107:20, 141:24, 153:2, 153:4, 153:6, 153:17
**product** [2] - 228:10
**production** [1] - 152:21
**professional** [1] - 66:14
**proffer** [1] - 244:8
**proficient** [1] - 66:16
**profit** [2] - 38:6, 38:24
**Program** [7] - 34:16, 80:25, 84:13, 88:24, 129:12, 169:9, 187:10
**program** [66] - 46:16, 64:12, 64:25, 65:1, 66:1, 66:3, 68:20, 84:18, 86:1, 118:10, 118:20, 118:21, 118:22, 118:25, 129:14, 129:18, 129:22, 130:4, 130:10, 130:15, 130:18, 134:5, 135:1, 135:5, 143:25, 144:5, 144:7, 151:10, 167:7, 168:10, 168:14, 187:19, 188:2, 189:20, 189:21, 190:4, 195:19, 197:12,

197:21, 198:7, 199:17, 200:14, 200:24, 201:25, 202:23, 203:12, 206:19, 207:20, 208:1, 208:11, 208:17, 208:21, 208:24, 209:10, 229:20, 229:21, 229:22, 229:24, 244:17, 244:21, 244:23, 244:25, 245:1, 245:2
**programmed** [1] - 253:21
**programmer** [1] - 249:12
**programming** [1] - 130:3
**Programs** [1] - 186:22
**programs** [45] - 65:15, 75:5, 75:14, 119:4, 129:3, 129:11, 129:14, 129:25, 130:3, 130:5, 130:7, 130:22, 131:2, 131:4, 131:5, 131:24, 150:24, 151:8, 166:5, 171:9, 171:12, 171:16, 172:17, 186:22, 188:25, 192:20, 192:21, 197:19, 198:15, 199:11, 201:18, 201:22, 202:12, 202:13, 203:3, 206:18, 208:22, 209:6, 219:2, 219:3, 219:8, 220:5, 220:7, 224:21
**progress** [1] - 23:15
**project** [7] - 97:22, 98:5, 108:12, 109:6, 109:15, 248:6, 249:5
**Project** [2] - 2:18, 2:23
**promote** [1] - 84:17
**prompted** [1] - 190:20
**proper** [2] - 14:17, 178:5
**proposed** [5] - 8:10, 17:4, 17:7, 26:6, 209:10
**protective** [1] - 15:15
**protocol** [1] - 239:4
**prove** [4] - 180:19, 243:1, 243:3, 243:14
**proves** [1] - 105:1
**provide** [33] - 32:23, 40:9, 69:7, 69:21, 71:13, 76:23, 77:12,

79:13, 82:3, 86:11, 96:2, 96:3, 104:20, 107:6, 111:14, 156:5, 160:19, 161:5, 161:8, 161:12, 161:13, 161:17, 173:5, 173:7, 173:13, 174:12, 202:9, 203:4, 214:15, 215:16, 216:7, 216:24, 237:22
**provided** [16] - 32:4, 33:21, 34:9, 37:12, 152:25, 153:5, 153:16, 153:18, 188:19, 188:20, 194:2, 198:23, 206:12, 222:16, 223:25, 240:24
**provides** [7] - 155:23, 159:7, 160:10, 160:20, 173:20, 175:13, 256:19
**providing** [6] - 33:18, 67:12, 78:4, 147:1, 191:6, 231:6
**public** [36] - 8:14, 32:5, 34:10, 38:11, 40:7, 54:13, 57:1, 57:18, 59:19, 59:21, 68:20, 74:2, 94:17, 125:4, 129:11, 129:25, 130:2, 130:5, 130:18, 130:22, 131:24, 164:15, 165:14, 171:9, 171:12, 171:15, 179:7, 179:18, 188:16, 197:2, 197:19, 205:7, 216:15, 234:5, 249:25, 250:2
**pull** [5] - 61:15, 124:5, 128:11, 200:19, 231:14
**pulling** [1] - 104:6
**purports** [1] - 31:16
**purpose** [28] - 7:20, 7:23, 8:1, 8:2, 8:7, 8:17, 8:21, 10:9, 11:23, 14:17, 24:15, 24:17, 24:21, 24:22, 24:25, 25:2, 26:5, 42:25, 139:12, 180:15, 199:2, 200:22, 200:23, 200:25, 240:7, 240:11, 240:14, 241:14

**purposes** [3] - 22:24, 120:11, 188:20
**pursuant** [1] - 185:12
**pursuing** [1] - 142:7
**purview** [1] - 253:5
**put** [22] - 9:21, 16:9, 16:10, 16:14, 16:15, 22:7, 29:24, 39:20, 76:23, 84:21, 84:22, 93:1, 96:25, 116:23, 117:5, 119:4, 121:7, 142:17, 142:23, 190:25

## Q

**QC** [2] - 226:22, 227:2
**QCs** [1] - 243:6
**qualify** [1] - 213:14
**Quality** [1] - 97:24
**quality** [5] - 98:1, 98:23, 226:11, 226:15, 226:19
**quarter** [13] - 34:18, 34:24, 35:1, 35:11, 35:16, 35:18, 35:20, 35:22, 98:19, 108:16, 108:23, 108:25, 109:2
**quarterly** [2] - 111:22, 122:19
**questioned** [1] - 239:2
**questioning** [6] - 128:24, 140:25, 142:16, 206:17, 222:12, 225:14
**questions** [64] - 9:16, 11:15, 11:16, 47:21, 50:4, 50:6, 52:4, 52:5, 54:5, 61:12, 63:5, 63:7, 64:2, 79:3, 95:5, 98:16, 99:5, 99:9, 99:11, 99:12, 99:20, 103:13, 111:6, 112:23, 113:4, 114:4, 115:5, 117:7, 119:5, 119:6, 121:16, 125:2, 127:2, 127:4, 127:7, 134:5, 184:3, 186:3, 186:8, 190:21, 194:17, 201:5, 202:3, 202:8, 203:23, 204:4, 206:23, 210:2, 212:13, 217:1, 217:2, 228:22, 230:15, 232:22, 235:11, 236:1,

244:16, 246:17, 246:22, 246:24, 247:14, 255:23, 256:23, 257:25
**queue** [1] - 195:14
**quick** [3] - 48:21, 99:20, 212:13
**quickly** [4] - 97:2, 114:25, 142:1, 144:11
**quite** [3] - 69:19, 125:3, 248:17

## R

**race** [1] - 246:8
**raise** [2] - 125:10, 241:23
**random** [2] - 89:17, 98:2
**range** [1] - 38:7
**rare** [4] - 66:24, 67:3, 67:5, 67:25
**RAs** [1] - 241:3
**rather** [5] - 17:18, 57:4, 60:2, 62:3, 95:1
**re** [2] - 49:4, 189:13
**re-apply** [1] - 189:13
**re-enrollment** [1] - 49:4
**reach** [3] - 74:19, 89:17, 183:15
**reached** [1] - 115:24
**reaching** [2] - 35:19, 35:22
**Read** [1] - 60:12
**read** [18] - 4:18, 11:15, 13:22, 20:16, 20:20, 20:21, 27:1, 27:4, 85:19, 121:12, 121:13, 125:6, 160:9, 172:24, 179:15, 188:18, 225:11
**reading** [2] - 30:25, 31:1
**readjust** [1] - 108:21
**reads** [1] - 233:3
**ready** [6] - 23:19, 49:15, 49:16, 105:24, 113:2, 250:6
**real** [2] - 31:16, 83:17
**really** [10] - 9:24, 25:23, 30:19, 30:24, 83:12, 97:14, 98:22, 126:6, 254:14
**reapply** [3] - 130:23, 204:16, 204:20
**reason** [17] - 20:3,

71:11, 73:10, 108:3, 116:20, 116:25, 120:14, 124:15, 135:4, 166:15, 180:5, 208:12, 208:20, 213:19, 232:2, 232:5, 240:3
**reasons** [2] - 52:8, 54:10
**Rebecca** [1] - 7:6
**REBECCA** [1] - 4:2
**rebecca.clement.la.gov** [1] - 4:7
**rebuttal** [1] - 206:4
**receipt** [2] - 195:19, 212:7
**receive** [28] - 34:12, 36:22, 37:2, 37:25, 54:23, 56:10, 56:22, 57:13, 61:17, 61:23, 68:11, 93:6, 110:15, 110:17, 110:19, 122:9, 122:12, 163:16, 173:14, 173:21, 174:13, 189:22, 191:2, 204:9, 208:5, 216:17, 234:12, 234:13
**received** [26] - 54:12, 54:21, 60:2, 61:5, 72:13, 82:17, 111:7, 162:10, 162:14, 162:20, 177:6, 177:10, 178:20, 194:23, 208:2, 210:12, 210:17, 210:25, 211:17, 215:11, 234:7, 234:9, 234:15, 234:19, 235:7, 237:24
**receivership** [1] - 39:21
**receives** [8] - 34:19, 47:22, 47:23, 111:11, 161:22, 161:25, 178:14, 198:22
**recent** [4] - 16:7, 36:3, 40:24, 132:1
**recently** [1] - 40:5
**receptionist** [3] - 67:19, 77:24, 91:10
**recertification** [1] - 37:8
**recess** [15] - 18:11, 18:13, 18:22, 27:8, 114:8, 114:9, 127:17, 183:9,

183:13, 183:14, 217:5, 217:6, 258:3, 258:22, 258:24
**recessed** [2] - 127:19, 259:16
**recipient** [8] - 36:14, 36:16, 124:3, 160:11, 161:13, 175:15, 185:14, 185:20
**recipients** [7] - 74:12, 131:12, 131:24, 139:13, 159:8, 185:24, 199:3
**recite** [2] - 170:21, 171:10
**recognition** [1] - 41:13
**recognize** [13] - 11:9, 49:17, 71:19, 80:15, 81:23, 87:25, 91:2, 94:8, 96:10, 97:21, 113:8, 230:23, 237:8
**recollection** [4] - 121:11, 149:13, 172:7, 236:14
**recommendations** [1] - 9:9
**record** [67] - 6:6, 12:5, 13:20, 13:22, 18:16, 20:15, 20:17, 22:3, 22:18, 26:11, 27:2, 27:5, 29:24, 49:10, 51:11, 53:2, 54:14, 55:22, 56:17, 64:5, 91:25, 96:7, 101:23, 112:21, 113:25, 114:3, 117:6, 120:8, 124:16, 128:20, 132:4, 132:20, 135:25, 137:15, 138:7, 139:9, 139:21, 139:23, 140:24, 142:1, 142:18, 142:24, 143:5, 143:11, 143:20, 144:19, 148:14, 150:10, 153:11, 154:14, 156:23, 158:3, 168:18, 175:9, 178:13, 178:24, 179:25, 181:11, 192:2, 199:19, 206:21, 207:2, 217:12, 221:13, 244:7, 258:5
**recorded** [1] - 96:5
**Recorded** [1] - 1:25
**recordkeeping** [1] -

40:1
**records** [2] - 38:23, 39:1
**red** [2] - 35:8, 35:12
**redetermination** [4] - 198:23, 199:3, 199:10, 209:15
**redeterminations** [9] - 161:24, 162:8, 162:10, 162:20, 182:18, 188:22, 189:1, 196:11, 198:25
**REDIRECT** [2] - 99:15, 204:5
**reduced** [1] - 74:17
**reductions** [1] - 74:25
**redundant** [1] - 102:3
**refer** [11] - 8:13, 29:22, 38:2, 128:23, 131:15, 172:19, 173:6, 192:11, 239:1, 246:19, 246:21
**reference** [6] - 17:21, 192:3, 192:15, 194:25, 200:8, 223:25
**referenced** [2] - 192:10, 205:5
**references** [1] - 173:9
**referred** [6] - 50:1, 50:23, 51:3, 110:10, 191:16, 191:24
**referring** [4] - 29:24, 121:24, 128:25, 225:4
**refers** [1] - 130:6
**refined** [1] - 27:13
**reflect** [1] - 96:15
**refresh** [8] - 121:11, 121:14, 149:13, 172:7, 178:3, 178:6, 181:3, 236:14
**refresher** [1] - 221:24
**regard** [11] - 8:7, 68:24, 71:17, 86:9, 97:16, 126:3, 141:15, 143:2, 177:23, 203:4, 241:13
**regarding** [27] - 13:22, 46:12, 46:19, 117:1, 124:25, 146:7, 172:13, 187:18, 188:15, 191:14, 192:20, 194:3, 196:1, 196:8, 196:21, 197:9, 203:13, 203:19,

206:7, 209:11,
209:12, 210:16,
211:20, 212:6,
221:10, 239:23,
246:17
**regardless** [1] - 83:14
**regards** [21] - 22:14,
153:5, 180:13,
187:17, 188:16,
189:8, 189:18,
191:6, 193:11,
198:1, 198:7, 201:9,
201:18, 202:3,
202:22, 203:12,
210:11, 219:7,
242:18, 245:2,
246:13
**Region** [2] - 218:16,
218:19
**region** [4] - 218:25,
219:8, 226:1, 228:8
**regional** [6] - 202:6,
202:7, 218:14,
218:16, 218:21,
241:7
**register** [37] - 32:9,
33:20, 36:21, 36:25,
37:7, 37:12, 37:24,
38:10, 39:4, 40:10,
69:7, 71:15, 72:22,
79:17, 80:4, 82:7,
82:13, 82:15, 82:16,
82:23, 91:16, 92:10,
92:16, 93:25, 95:16,
98:15, 102:16,
103:2, 104:10,
110:3, 115:3,
160:15, 173:3,
184:19, 233:4,
252:7, 257:17
**register's** [1] - 76:6
**registered** [6] - 82:6,
82:22, 180:14,
233:3, 246:4, 252:6
**registering** [1] - 40:11
**Registrar** [1] - 160:25
**registrar** [3] - 76:8,
155:6, 160:24
**registrar's** [6] - 76:5,
82:11, 87:2, 87:12,
87:13, 233:21
**registration** [231] -
8:14, 8:22, 11:2,
11:10, 14:6, 27:20,
32:23, 33:5, 33:6,
33:17, 33:21, 33:25,
34:2, 34:13, 35:6,
35:11, 35:17, 35:19,
36:18, 36:22, 37:1,
37:2, 37:10, 37:21,

37:25, 38:16, 38:21,
39:5, 49:23, 53:10,
54:12, 55:1, 55:4,
56:10, 57:8, 57:17,
59:18, 59:24, 60:2,
61:10, 62:7, 62:17,
62:25, 63:2, 68:19,
69:24, 71:5, 71:12,
75:15, 76:22, 76:25,
77:11, 78:5, 78:12,
79:3, 79:6, 79:10,
79:13, 80:9, 81:24,
82:3, 84:1, 84:4,
84:10, 85:8, 86:8,
89:25, 90:3, 90:7,
90:15, 90:21, 90:24,
92:20, 93:4, 93:17,
93:18, 93:23, 95:10,
95:15, 95:19, 96:6,
96:16, 97:2, 97:17,
100:9, 100:13,
100:14, 101:22,
104:20, 105:1,
106:16, 106:25,
107:21, 126:2,
130:13, 131:23,
135:13, 139:19,
140:16, 142:22,
143:15, 144:12,
144:25, 145:9,
145:14, 146:7,
146:14, 146:16,
146:20, 148:6,
148:17, 149:3,
150:5, 150:25,
151:16, 151:23,
152:7, 153:5, 153:3,
155:17, 155:18,
155:20, 156:6,
156:10, 158:10,
158:13, 159:12,
159:16, 160:1,
160:5, 160:11,
160:22, 160:24,
161:6, 161:9,
161:10, 161:14,
161:18, 169:13,
169:24, 170:9,
170:23, 171:3,
171:17, 172:23,
173:1, 173:4, 173:6,
173:8, 173:15,
173:21, 174:10,
174:14, 174:22,
175:14, 176:7,
176:16, 176:19,
176:21, 185:13,
185:20, 185:24,
190:14, 190:24,
192:6, 195:7, 195:8,
196:3, 196:9,

196:12, 196:18,
196:22, 196:23,
197:4, 197:9,
197:23, 198:4,
198:6, 199:4,
199:22, 200:1,
201:15, 203:2,
203:19, 207:17,
209:14, 209:23,
210:13, 211:2,
211:4, 212:8,
220:21, 220:25,
221:10, 222:9,
222:14, 222:16,
223:11, 223:22,
224:5, 224:8,
224:15, 225:14,
227:21, 227:24,
230:25, 231:3,
233:6, 233:11,
233:15, 234:7,
234:16, 236:1,
240:15, 240:20,
241:5, 242:2,
242:14, 245:14,
245:15, 245:22,
246:6, 246:13,
246:15, 246:17,
246:19, 252:11
**Registration** [8] -
32:5, 46:13, 68:7,
82:10, 83:13, 96:13,
98:3, 206:8
**regular** [4] - 188:3,
198:21, 198:22,
198:23
**regulation** [1] - 17:22
**regulations** [3] -
202:4, 202:9, 227:24
**reject** [2] - 62:2, 85:4
**rejected** [1] - 182:18
**relate** [1] - 73:11
**related** [4] - 15:5,
171:2, 225:24, 240:9
**relates** [2] - 159:6,
227:14
**relating** [1] - 180:12
**relation** [1] - 245:21
**relationship** [3] -
207:17, 215:9,
227:11
**relative** [1] - 32:15
**Release** [8] - 250:6,
252:17, 252:18,
252:19, 254:10,
254:11, 254:17
**released** [1] - 43:5
**releases** [2] - 203:15,
252:23
**relevance** [14] - 12:22,

19:2, 20:5, 20:12,
117:9, 117:13,
178:8, 202:16,
203:7, 206:11,
239:24, 245:20,
254:20, 255:25
**relevancy** [4] - 8:11,
20:2, 31:5, 245:24
**relevant** [17] - 14:20,
14:25, 15:2, 16:3,
16:16, 30:13, 30:19,
31:3, 50:10, 50:12,
54:9, 54:10, 54:16,
70:18, 165:20,
166:10, 166:20
**relied** [1] - 33:3
**relief** [6] - 30:21, 36:2,
38:8, 116:21,
116:24, 256:16
**relies** [1] - 31:15
**relieve** [1] - 27:14
**religion** [1] - 246:9
**relitigate** [1] - 83:5
**rely** [3] - 9:24, 40:7,
225:22
**remain** [2] - 36:4,
195:3
**remains** [2] - 43:6,
89:7
**remedial** [1] - 14:16
**remedies** [3] - 39:9,
54:17, 116:22
**remedy** [1] - 255:2
**remember** [16] -
73:12, 98:5, 99:22,
103:25, 111:9,
116:16, 119:22,
119:25, 117:13,
178:12, 224:24,
232:4, 250:20,
252:8, 252:10,
254:14
**remind** [2] - 60:11,
114:11
**reminder** [1] - 207:24
**reminding** [2] -
210:12, 211:1
**remiss** [1] - 36:5
**remote** [21] - 27:15,
32:21, 32:24, 54:18,
54:23, 54:25, 57:11,
71:5, 71:6, 73:11,
73:15, 73:18, 74:6,
76:21, 78:12, 83:5,
125:10, 125:12,
125:17, 196:1, 196:8
**remotely** [8] - 71:2,
71:9, 71:14, 72:23,
77:3, 185:14,
185:21, 185:25

**remoteness** [1] -
193:18
**remotes** [3] - 125:22,
126:2, 126:3
**remove** [1] - 13:11
**render** [1] - 198:6
**renew** [6] - 71:2,
89:11, 89:14, 89:23,
90:14, 90:16
**renewal** [11] - 32:9,
46:10, 68:10, 68:16,
88:1, 88:3, 88:22,
89:5, 90:6, 90:10,
106:18
**renewals** [14] - 48:13,
49:1, 49:3, 52:7,
68:21, 79:8, 88:6,
88:8, 88:19, 89:10,
89:16, 90:1, 90:6,
90:8
**renewed** [2] - 72:23,
75:16
**renewing** [2] - 71:14,
88:4
**renews** [1] - 85:11
**repeat** [12] - 59:12,
62:21, 130:17,
139:25, 145:11,
185:15, 196:6,
232:17, 233:8,
236:21, 251:15,
251:16
**rephrase** [7] - 132:21,
133:10, 171:11,
177:3, 210:22,
224:1, 224:2
**replaced** [7] - 50:25,
51:3, 165:17,
165:19, 166:1, 200:9
**replicate** [1] - 189:15
**report** [41] - 8:21, 9:6,
10:15, 10:18, 10:19,
10:21, 11:8, 13:21,
16:12, 16:14, 17:23,
17:24, 42:20, 43:4,
79:18, 79:22, 80:3,
91:8, 91:11, 91:17,
94:12, 94:13, 131:2,
131:8, 131:9,
131:12, 139:13,
162:2, 162:10,
185:25, 189:3,
189:10, 189:11,
189:25, 198:11,
236:8, 236:10,
236:23, 243:7
**Report** [1] - 37:4
**reported** [2] - 8:15,
103:16
**Reporter** [2] - 1:21,

259:20
**reporter** [5] - 117:20, 128:9, 218:4, 229:4, 247:7
**reporting** [1] - 131:6
**reports** [27] - 8:18, 9:1, 9:14, 9:18, 9:22, 9:23, 10:2, 10:6, 10:14, 10:17, 11:18, 11:22, 13:23, 15:24, 16:1, 16:9, 65:20, 162:5, 162:6, 188:19, 188:20, 188:21, 188:24, 189:8, 254:16, 254:17
**represent** [3] - 41:6, 45:20, 118:1
**representative** [6] - 7:9, 42:9, 44:3, 77:22, 115:13, 189:7
**representatives** [1] - 37:21
**represented** [2] - 109:22, 187:12
**representing** [1] - 6:19
**request** [10] - 7:23, 19:5, 22:5, 24:18, 25:5, 25:21, 26:19, 33:17, 51:14, 116:21
**Requested** [1] - 60:12
**requested** [6] - 7:15, 17:10, 107:16, 156:6, 161:14, 173:5
**requesting** [1] - 24:23
**requests** [10] - 24:19, 25:15, 25:16, 25:17, 26:2, 70:4, 70:6, 70:24, 173:4, 240:19
**require** [10] - 8:1, 33:17, 38:25, 78:15, 126:14, 171:15, 213:25, 214:1, 214:2, 256:14
**required** [30] - 34:1, 39:25, 61:18, 62:7, 78:23, 97:1, 105:11, 112:1, 119:15, 120:13, 120:19, 122:17, 122:22, 131:8, 131:9, 131:13, 132:15, 132:17, 150:18, 150:22, 150:23, 185:13, 185:19, 185:23, 201:5, 201:8, 213:6, 221:23, 222:1
**requirement** [5] -

93:11, 193:24, 198:6, 222:12, 253:7
**requirements** [12] - 41:13, 98:24, 131:6, 190:22, 212:8, 252:20, 252:22, 252:24, 253:2, 253:3, 253:6, 257:9
**requires** [4] - 32:5, 88:14, 130:12, 188:15
**requiring** [1] - 205:23
**research** [1] - 140:17
**researching** [1] - 70:22
**reserve** [2] - 20:13, 25:8
**reserved** [1] - 16:14
**resolve** [1] - 20:6
**resource** [2] - 65:6, 81:13
**respect** [17] - 16:4, 21:5, 28:1, 30:12, 30:18, 31:6, 32:21, 33:3, 39:13, 40:12, 44:2, 51:21, 55:16, 96:16, 112:4, 113:22, 123:1
**respectfully** [1] - 20:13
**respects** [1] - 32:14
**respond** [4] - 7:25, 70:23, 79:4, 84:11
**responded** [1] - 108:1
**responding** [2] - 70:4, 70:6
**response** [7] - 15:14, 24:3, 36:4, 36:21, 40:22, 41:14, 110:6
**responses** [3] - 10:6, 24:6, 26:18
**responsibilities** [22] - 131:23, 150:6, 190:23, 192:6, 196:12, 197:10, 221:11, 222:18, 224:6, 229:19, 230:4, 230:6, 245:6, 245:10, 245:12, 245:18, 245:21, 245:25, 246:3, 246:7, 246:14, 246:16
**Responsibilities** [1] - 240:6
**responsibility** [2] - 125:2, 240:19
**responsible** [17] - 19:22, 39:22, 104:7, 159:2, 186:14,

187:2, 187:25, 218:21, 222:15, 241:8, 243:22, 244:1, 250:16, 251:19, 251:22, 251:25, 252:1
**responsive** [1] - 24:18
**rest** [2] - 44:1, 189:7
**restricted** [1] - 76:17
**result** [9] - 41:5, 47:18, 52:1, 70:25, 72:11, 72:14, 72:17, 191:2, 256:6
**retired** [1] - 247:18
**retrained** [1] - 122:14
**return** [4] - 155:20, 160:11, 160:21, 160:23
**returned** [5] - 155:4, 155:5, 233:20, 236:11, 236:24
**returns** [2] - 86:14, 155:15
**REV.06-11** [1] - 136:13
**Reverend** [2] - 38:13, 39:2
**reverse** [1] - 155:6
**review** [29] - 61:24, 62:25, 65:24, 65:25, 98:19, 104:4, 104:6, 105:3, 105:4, 106:4, 106:12, 112:1, 144:11, 152:23, 155:16, 159:1, 161:5, 174:19, 175:12, 191:13, 191:19, 192:18, 194:4, 206:6, 221:10, 225:14, 226:14, 239:23, 258:15
**reviewed** [2] - 201:12, 226:15
**reviewing** [3] - 164:19, 192:14, 226:18
**reviews** [5] - 98:2, 105:4, 105:16, 107:16, 107:17
**revise** [1] - 193:19
**revised** [4] - 133:11, 136:16, 136:25, 191:8
**Revised** [1] - 232:25
**revising** [1] - 203:17
**revision** [1] - 100:15
**revisions** [4] - 142:21, 187:21, 193:10, 203:13
**RG** [1] - 56:8

**right-hand** [2] - 149:7, 176:13
**rights** [11] - 245:6, 245:10, 245:12, 245:17, 245:21, 245:25, 246:2, 246:7, 246:13, 246:16
**rise** [1] - 68:19
**Rita** [1] - 198:14
**RMR** [1] - 1:21
**Roberts** [1] - 43:24
**Rogers** [1] - 42:10
**role** [3] - 69:6, 70:2, 230:4
**roll** [1] - 66:2
**roll-down** [1] - 66:2
**rolled** [4] - 200:13, 250:6, 253:10, 254:8
**RONALD** [1] - 2:8
**Ronald** [1] - 2:8
**room** [1] - 259:7
**Rose** [2] - 219:11, 241:7
**Rouge** [8] - 3:5, 3:14, 3:19, 4:6, 4:12, 4:17, 28:15, 44:6
**roughly** [4] - 65:16, 66:11, 73:20, 94:16
**rounds** [1] - 113:12
**routinely** [2] - 246:12, 246:15
**row** [2] - 36:8, 38:4
**ROY** [1] - 1:5
**Rule** [3] - 17:18, 19:13, 106:9
**rule** [8] - 7:11, 7:18, 25:8, 42:25, 120:17, 154:6, 178:2, 186:24
**ruled** [3] - 258:9, 258:19, 258:20
**rules** [3] - 7:17, 8:1, 24:13
**Rules** [2] - 241:19, 241:22
**ruling** [3] - 54:18, 54:24, 101:25
**rulings** [10] - 13:10, 18:10, 41:2, 41:5, 41:14, 193:25, 196:1, 196:8, 205:24, 243:7
**run** [9] - 63:13, 162:5, 162:6, 198:11, 198:15, 198:16, 239:16, 255:22, 257:3
**running** [3] - 78:13, 178:23, 254:18
**runs** [1] - 202:25

**Rupp** [4] - 5:23, 8:4, 247:2, 247:14
**RUPP** [26] - 2:17, 8:7, 8:19, 8:21, 8:25, 247:2, 247:11, 251:8, 251:15, 251:17, 253:15, 253:18, 253:19, 254:1, 254:6, 254:7, 254:24, 255:10, 255:20, 256:1, 256:4, 256:6, 256:12, 256:22, 257:2, 257:22
**RUTH** [1] - 1:10
**RYAN** [1] - 2:13

**S**

**Sammy** [3] - 7:8, 211:17, 212:6
**sampling** [1] - 104:6
**Samuel** [2] - 128:4, 128:15
**SAMUEL** [3] - 5:14, 128:6, 128:15
**Sandra** [2] - 14:14, 258:12
**SARAH** [1] - 2:18
**Sarah** [1] - 6:11
**sat** [1] - 236:4
**save** [3] - 18:25, 101:13, 258:15
**saw** [2] - 103:4, 236:14
**scan** [1] - 91:24
**scanned** [1] - 154:3
**SCHEDLER** [1] - 1:9
**Schedler** [1] - 3:3
**Schedler's** [2] - 24:14, 24:18
**schedule** [1] - 121:6
**scheduled** [5] - 119:10, 119:12, 119:13, 121:2, 122:18
**scheduling** [1] - 119:21
**Schriver** [1] - 2:14
**scope** [2] - 15:2, 41:12
**Scott** [13] - 14:5, 36:7, 36:9, 36:18, 37:11, 37:13, 37:14, 37:20, 37:23, 237:2, 237:4, 237:10, 237:12
**SCOTT** [1] - 1:5
**Scott's** [1] - 16:25
**scratch** [1] - 213:12
**screen** [5] - 56:7, 96:19, 147:11,

163:25, 206:6
**script** [2] - 80:2, 98:9
**scroll** [8] - 138:18,
139:1, 139:17,
159:9, 182:1,
231:25, 256:10
**SDA** [1] - 56:8
**se** [1] - 253:3
**SE** [1] - 2:23
**search** [1] - 193:2
**second** [17] - 12:4,
17:11, 26:19, 27:19,
38:1, 39:17, 71:24,
72:2, 125:1, 131:19,
138:2, 138:4,
146:13, 172:24,
175:6, 220:12, 239:7
**seconds** [1] - 227:18
**secretary** [13] - 64:9,
64:16, 71:22, 72:8,
129:2, 129:8,
186:11, 186:12,
186:13, 186:20,
186:21, 193:5
**Secretary** [75] - 1:10,
1:11, 1:12, 6:19,
6:21, 7:5, 7:14, 8:15,
13:4, 13:14, 14:2,
15:1, 16:1, 16:25,
17:3, 18:4, 19:2,
19:15, 19:17, 19:22,
20:5, 22:24, 24:5,
24:10, 24:12, 26:17,
27:12, 27:17, 27:24,
27:25, 28:2, 28:14,
28:21, 29:1, 33:1,
34:4, 35:5, 35:14,
41:25, 43:10, 43:23,
44:4, 50:14, 50:20,
54:11, 54:19, 55:3,
55:5, 57:5, 57:16,
57:20, 58:3, 58:8,
58:9, 58:12, 58:16,
58:17, 58:24, 60:7,
69:16, 69:20, 82:19,
92:18, 99:9, 111:8,
111:12, 123:23,
125:18, 125:19,
125:25, 126:10,
184:20, 185:4,
209:20, 247:21
**secretary's** [1] -
197:18
**Section** [2] - 9:3, 9:4
**section** [12] - 9:4,
32:5, 40:7, 46:6,
46:7, 109:21, 119:1,
147:15, 187:10,
192:12, 197:18
**sections** [1] - 46:6

**see** [68] - 10:18, 11:8,
35:9, 45:18, 48:6,
50:5, 53:25, 54:2,
56:8, 61:24, 63:13,
66:5, 67:18, 68:17,
69:22, 70:17, 71:3,
71:15, 74:5, 76:5,
78:1, 84:24, 85:24,
91:18, 95:22, 106:2,
106:18, 106:20,
107:1, 114:16,
114:24, 115:2,
115:4, 136:10,
138:18, 139:1,
140:17, 142:18,
146:12, 147:17,
148:20, 149:6,
158:15, 167:9,
174:18, 176:9,
176:11, 178:12,
180:2, 189:4, 189:5,
194:3, 206:11,
208:13, 208:21,
208:25, 210:7,
210:23, 224:21,
227:14, 231:19,
232:5, 239:24,
241:23, 243:2,
246:1, 255:12,
256:21
**seeing** [3] - 102:3,
132:9, 232:2
**seek** [6] - 17:2, 26:5,
36:2, 54:17, 74:9
**seeking** [2] - 7:14,
15:15
**seem** [2] - 73:17,
166:9
**select** [1] - 259:3
**send** [24] - 67:4,
76:10, 76:12, 85:4,
85:6, 87:11, 87:12,
87:15, 88:10, 88:22,
89:1, 89:10, 90:12,
93:6, 93:20, 155:5,
194:14, 213:8,
213:9, 233:21,
235:8, 253:21
**sender** [2] - 124:3,
242:24
**sends** [1] - 85:1
**sense** [1] - 65:18
**sent** [5] - 35:23, 35:25,
192:24, 233:6, 246:6
**sentence** [1] - 110:2
**separate** [6] - 33:6,
36:19, 166:5,
169:18, 169:19,
169:21
**September** [8] - 36:20,

184:14, 222:8,
222:22, 223:10,
223:13, 224:5,
247:23
**sequester** [1] - 42:5
**sequestration** [2] -
42:18, 43:6
**serve** [2] - 217:9,
217:21
**served** [1] - 44:4
**service** [6] - 11:13,
67:12, 78:9, 221:19,
242:1, 242:5
**Service** [5] - 201:20,
201:23, 241:19,
241:22
**services** [13] - 12:16,
12:25, 32:23, 36:11,
79:14, 94:11,
104:20, 159:12,
173:2, 176:19,
215:2, 215:3, 229:17
**Services** [13] - 1:11,
3:12, 4:4, 4:15, 32:7,
128:22, 128:23,
197:17, 207:16,
207:23, 212:2,
229:12, 229:18
**session** [1] - 259:1
**SESSION** [1] - 128:1
**set** [6] - 26:6, 29:14,
32:17, 220:18,
220:21, 228:7
**setting** [1] - 216:19
**several** [9] - 32:14,
50:10, 65:10, 88:19,
158:16, 201:18,
201:21, 240:24,
249:2
**Shah** [7] - 5:18, 5:20,
6:17, 217:7, 218:8,
220:11, 243:15
**SHAH** [59] - 2:22,
6:17, 217:7, 217:24,
218:11, 220:14,
221:12, 221:17,
222:15, 222:24,
223:1, 223:8, 223:9,
224:2, 224:3, 225:6,
225:8, 225:10,
225:20, 226:9,
226:13, 226:17,
227:5, 228:24,
229:6, 229:9,
230:20, 230:22,
231:14, 231:17,
231:25, 232:16,
233:7, 237:7,
237:18, 237:22,
237:25, 238:3,

238:7, 238:9,
238:12, 238:14,
238:17, 239:5,
239:14, 239:21,
240:5, 240:18,
241:10, 242:25,
243:10, 243:17,
243:21, 244:1,
244:6, 244:9,
245:20, 245:24,
246:25
**shall** [1] - 173:5
**shape** [1] - 55:7
**Shawn** [1] - 43:11
**sheet** [1] - 147:23
**short** [4] - 8:12, 116:2,
116:7, 116:11
**shot** [1] - 74:4
**show** [27] - 10:10,
15:24, 16:19, 34:14,
34:23, 35:3, 35:13,
35:16, 39:6, 44:25,
50:12, 50:19, 55:5,
80:10, 87:19, 90:25,
94:7, 96:8, 97:20,
166:10, 179:18,
180:15, 183:9,
232:6, 240:21,
243:8, 257:6
**showed** [3] - 109:14,
179:7, 216:15
**showing** [4] - 8:13,
100:3, 181:18,
182:17
**shown** [2] - 10:10,
195:1
**shows** [5] - 34:10,
34:15, 34:18, 54:21,
125:25
**sick** [1] - 74:15
**side** [2] - 155:6,
163:22
**Sidebar** [12] - 60:10,
61:3, 101:18,
104:13, 108:9,
123:18, 143:1,
153:20, 154:12,
207:13, 227:16,
254:23
**sidebar** [16] - 102:10,
105:14, 123:6,
125:14, 126:22,
141:21, 157:5,
157:22, 181:7,
206:15, 226:24,
237:6, 238:11,
240:2, 244:5, 257:1
**sides** [1] - 41:18
**sign** [11] - 93:15,
93:19, 147:23,

161:9, 187:21,
188:5, 213:9,
213:10, 234:18,
235:4, 235:9
**sign-in** [1] - 147:23
**signature** [7] - 86:15,
89:20, 89:21, 93:11,
93:16, 213:8, 235:8
**signatures** [3] - 86:16,
213:6
**signed** [8] - 13:6,
13:7, 37:1, 86:13,
155:18, 161:10,
235:1
**significant** [2] - 23:15,
28:1
**similar** [5] - 34:22,
149:18, 183:5,
194:24, 242:11
**similarly** [1] - 1:6
**Simplified** [1] - 37:4
**simplified** [6] - 80:22,
80:23, 236:7,
236:10, 236:23,
241:12
**simply** [6] - 34:2,
39:21, 41:7, 117:9,
126:10, 126:15
**sit** [9] - 42:19, 43:7,
43:19, 67:21, 84:16,
95:4, 128:8, 235:21,
239:11
**site** [1] - 95:23
**sits** [1] - 235:24
**sitting** [2] - 36:8, 85:2
**situated** [1] - 1:6
**situation** [3] - 81:11,
88:12, 88:18
**six** [8] - 66:15, 81:20,
118:18, 118:23,
118:24, 130:6,
191:18, 221:24
**skill** [1] - 66:13
**skilled** [1] - 36:11
**Skip** [1] - 6:24
**slide** [1] - 35:12
**slim** [1] - 210:7
**slow** [2] - 71:8, 94:22
**slowly** [1] - 74:3
**small** [4] - 39:24,
116:15, 177:19,
190:4
**smart** [1] - 194:16
**SNAP** [98] - 34:15,
34:20, 35:5, 88:23,
88:25, 115:4,
129:12, 129:19,
129:20, 129:22,
129:23, 151:10,
151:12, 151:15,

151:22, 151:25,
155:10, 155:23,
156:14, 156:21,
157:8, 158:6,
158:17, 159:1,
159:25, 160:4,
161:16, 161:21,
161:24, 162:21,
163:15, 168:22,
168:25, 169:9,
169:15, 169:17,
169:20, 169:23,
170:8, 170:15,
171:25, 172:13,
172:17, 172:20,
176:25, 177:5,
177:9, 182:17,
187:18, 189:23,
189:25, 190:4,
190:5, 193:14,
198:1, 198:3, 198:7,
198:10, 198:11,
198:13, 198:19,
198:20, 198:21,
198:22, 199:12,
201:24, 201:25,
202:1, 202:24,
204:9, 205:2,
205:15, 215:21,
216:16, 219:2,
229:24, 230:5,
230:14, 230:16,
231:9, 232:8, 234:6,
234:22, 235:18,
235:25, 237:11,
237:19, 245:2,
250:1, 250:4, 250:9,
250:10
**social** [5] - 215:2,
215:3, 221:19,
229:17, 229:18
**Social** [1] - 197:17
**society's** [1] - 40:13
**software** [1] - 147:22
**sole** [2] - 8:17, 8:21
**solely** [2] - 144:8,
217:1
**sollie** [1] - 258:18
**Sollie** [1] - 6:16
**SOLLIE** [2] - 2:12,
6:16
**someone** [23] - 30:23,
55:4, 55:5, 80:3,
85:1, 86:14, 87:1,
89:11, 91:15, 92:9,
92:17, 94:11, 95:6,
103:2, 115:1,
115:21, 135:3,
164:2, 164:5,
194:13, 194:15,

212:14, 214:12
**sometimes** [15] -
131:12, 136:25,
189:19, 195:16,
203:1, 207:10,
215:25, 232:7,
235:4, 235:6,
235:11, 235:21,
238:2, 238:5
**Sonnier** [4] - 3:11,
6:25, 7:3, 22:24
**Sonnier's** [1] - 22:19
**soon** [2] - 22:8, 102:8
**sorry** [46] - 8:19,
15:12, 22:1, 22:18,
43:20, 44:8, 48:21,
55:24, 56:14, 59:14,
69:19, 79:24, 82:6,
94:20, 97:24,
101:16, 109:12,
109:17, 110:23,
111:10, 118:3,
121:9, 127:3, 133:5,
138:2, 141:7,
145:19, 158:22,
163:18, 174:5,
175:9, 175:23,
177:3, 177:4,
183:22, 185:8,
196:5, 208:15,
222:11, 226:6,
239:15, 244:22,
251:2, 251:5, 252:25
**sort** [5] - 50:13, 77:9,
81:5, 111:14, 119:7
**sought** [1] - 39:10
**sound** [1] - 248:18
**sounds** [3] - 125:7,
172:2, 172:3
**source** [1] - 129:16
**sources** [1] - 246:20
**spare** [1] - 45:12
**speaking** [4] - 59:5,
59:9, 124:21, 141:14
**special** [1] - 64:3
**specialist** [2] - 118:21,
118:23
**specific** [7] - 33:12,
82:24, 188:16,
235:14, 242:13,
254:13, 257:16
**specifically** [20] -
66:6, 68:23, 71:11,
75:20, 77:25, 82:20,
143:7, 170:22,
222:9, 225:5,
225:14, 227:25,
228:17, 240:5,
240:14, 240:18,
240:25, 251:18,

254:1, 258:11
**specified** [2] - 236:11,
236:24
**speculative** [1] -
253:24
**spell** [5] - 117:20,
128:8, 218:4, 229:4,
247:7
**spend** [2] - 70:22,
105:8
**spike** [1] - 39:23
**spit** [1] - 92:13
**spite** [2] - 33:11, 33:12
**spot** [1] - 97:18
**spreadsheet** [2] -
181:18, 182:17
**Springs** [1] - 3:9
**SR** [3] - 237:21,
237:23, 237:24
**SS** [1] - 56:8
**SSA** [3] - 229:16,
229:17, 244:19
**stability** [7] - 218:25,
219:2, 219:8,
219:15, 220:4,
220:8, 225:23
**Stability** [2] - 197:16,
221:19
**staff** [61] - 48:10,
49:21, 52:13, 68:11,
70:5, 71:23, 78:24,
84:15, 91:22, 97:7,
98:1, 111:20,
111:22, 112:1,
119:3, 122:16,
147:2, 147:8,
147:24, 150:7,
155:16, 161:5,
161:8, 161:12,
171:15, 172:14,
172:19, 174:21,
186:14, 186:15,
186:23, 188:3,
188:4, 188:10,
188:11, 188:17,
189:5, 190:22,
191:2, 191:7,
191:13, 192:6,
192:14, 192:18,
192:22, 192:23,
192:24, 193:1,
193:18, 201:1,
201:9, 221:20,
234:16, 240:8,
241:3, 241:6, 241:7,
245:15, 249:4,
249:8, 249:20
**staffing** [1] - 52:22
**stage** [2] - 252:16,
255:4

**stamp** [1] - 129:22
**stamped** [3] - 50:9,
157:16, 236:20
**stamps** [9] - 34:17,
36:16, 43:13, 98:14,
129:13, 181:19,
189:18, 189:25,
198:2
**stand** [5] - 15:11,
31:7, 42:14, 116:14,
128:5
**standard** [1] - 25:17
**standards** [1] - 248:8
**standing** [3] - 51:17,
51:22, 141:15
**stands** [4] - 57:1,
80:24, 229:21,
249:18
**start** [8] - 64:8, 66:3,
91:6, 98:5, 115:7,
124:21, 146:12,
167:5
**started** [10] - 35:21,
63:23, 64:9, 70:3,
70:12, 91:19, 94:22,
178:24, 205:7,
222:19
**starting** [2] - 23:19,
120:23
**starts** [3] - 29:18,
93:8, 184:17
**state** [41] - 8:18, 8:20,
8:23, 10:4, 10:16,
11:16, 38:7, 38:8,
40:5, 40:6, 41:3,
41:6, 41:22, 44:21,
66:25, 84:15, 92:25,
108:22, 110:2,
132:20, 137:8,
153:1, 186:25,
189:7, 208:1, 215:6,
215:22, 220:19,
220:22, 229:3,
229:11, 241:19,
241:20, 241:21,
249:4, 254:8, 254:9,
254:12
**STATE** [1] - 1:5
**State** [47] - 1:10, 3:12,
6:20, 6:21, 7:5, 7:14,
8:15, 13:14, 16:1,
16:25, 17:3, 18:4,
19:2, 19:15, 19:18,
19:22, 20:5, 22:25,
24:11, 24:12, 27:12,
27:17, 27:25, 28:2,
28:21, 29:1, 33:1,
38:2, 41:25, 43:23,
43:24, 44:4, 54:11,
54:19, 55:3, 57:17,

57:21, 58:9, 58:12,
58:16, 58:17, 69:17,
69:20, 92:18, 99:9,
111:12, 125:18
**State's** [26] - 13:4,
15:2, 24:5, 26:17,
27:24, 28:14, 34:4,
35:6, 35:14, 43:10,
55:6, 57:5, 58:3,
58:8, 58:24, 60:7,
82:19, 111:8,
123:23, 125:19,
125:25, 126:10,
184:20, 185:4,
209:21, 247:21
**state's** [1] - 14:3
**state-wide** [5] -
108:22, 215:6,
254:8, 254:9, 254:12
**statement** [7] - 26:6,
159:10, 173:3,
177:25, 178:2,
197:6, 217:20
**statements** [1] - 29:14
**Statements** [1] - 5:4
**states** [12] - 9:12,
9:13, 17:21, 17:24,
62:14, 62:16, 73:19,
136:12, 146:13,
150:12, 236:10
**STATES** [2] - 1:1, 1:19
**states'** [1] - 10:6
**stating** [2] - 153:11,
231:5
**stations** [1] - 84:23
**status** [1] - 14:6
**statute** [13] - 31:1,
33:12, 33:14, 33:23,
34:5, 34:6, 34:7,
39:16, 41:3, 56:21,
188:18, 193:18,
200:3
**stay** [5] - 42:13, 43:23,
43:25, 44:15, 44:17
**stayed** [1] - 195:5
**steady** [1] - 74:3
**Stenography** [1] -
1:25
**step** [2] - 115:23,
228:23
**STEP** [6] - 229:20,
244:17, 244:21,
244:23, 244:25,
245:1
**STEPAHANIE** [1] -
247:8
**Stephanie** [3] - 247:3,
247:8, 259:10
**STEPHANIE** [2] - 5:22,
247:4

steps [2] - 147:9, 191:5
still [20] - 27:16, 33:13, 39:15, 41:12, 62:11, 73:13, 88:11, 108:2, 112:2, 114:11, 126:7, 137:9, 195:9, 196:11, 196:12, 198:22, 216:17, 224:9, 242:17, 246:22
stipulate [4] - 12:24, 13:5, 142:14, 142:19
stipulated [5] - 27:24, 33:1, 34:5, 45:10, 101:14
stipulation [22] - 13:2, 13:8, 13:12, 13:15, 13:17, 27:11, 27:15, 27:20, 28:12, 101:19, 101:21, 102:4, 102:7, 102:19, 125:21, 125:25, 126:2, 126:5, 126:13, 142:23, 143:13, 183:11
Stipulation [1] - 28:6
stipulations [1] - 28:19
stock [1] - 137:1
stolen [1] - 94:13
stop [1] - 117:6
stored [1] - 96:6
stores [2] - 84:22, 84:23
storms [1] - 40:5
straight [1] - 87:13
Strategies [1] - 229:21
streamline [3] - 22:20, 85:17, 85:21
Street [11] - 1:22, 2:5, 2:9, 2:19, 2:23, 3:4, 3:13, 3:17, 4:5, 4:11, 4:16
stricken [1] - 64:4
strict [1] - 38:25
strike [1] - 61:15
Strom [1] - 198:12
stubs [2] - 214:10, 214:15
stuff [3] - 9:24, 28:15, 83:9
stumped [1] - 87:8
subject [3] - 30:2, 50:13, 77:8
subjective [1] - 257:8
submit [7] - 41:21, 74:17, 122:8, 135:3,

135:4, 194:16, 204:21
submits [2] - 137:10, 165:4
submitted [5] - 37:4, 38:20, 62:8, 185:14, 200:16
subordinates [1] - 228:11
subpoena [4] - 43:11, 44:4, 44:11, 44:12
subpoenaed [2] - 43:10, 217:9
subsequent [1] - 222:25
subsidy [2] - 168:10, 168:14
subsistance [1] - 129:14
successful [2] - 86:2, 89:16
sue [1] - 55:11
sufficient [3] - 31:8, 31:9, 135:10
suggested [1] - 217:18
suggestions [2] - 113:13, 113:15
suit [13] - 31:2, 102:5, 141:17, 142:21, 143:4, 156:25, 165:15, 165:20, 165:23, 166:2, 166:17, 166:21, 166:22
Suite [4] - 2:5, 2:9, 2:19, 3:5
sum [1] - 35:13
summarize [1] - 70:2
Sunday [1] - 31:14
supervise [8] - 186:23, 187:9, 219:5, 219:7, 222:7, 223:17, 223:20, 224:4
supervised [1] - 223:12
supervisor [3] - 235:19, 235:24, 246:23
supervisors [6] - 111:19, 112:2, 132:17, 148:3, 192:25, 221:20
supervisory [1] - 186:14
supplemental [1] - 88:23
Supplemental [3] - 34:16, 129:12, 169:9

Support [1] - 46:7
support [4] - 130:3, 209:7, 228:16, 228:17
supporting [1] - 221:20
supposed [19] - 56:11, 56:15, 69:5, 82:2, 82:4, 82:5, 104:10, 104:15, 105:20, 120:15, 126:8, 127:14, 151:5, 173:14, 173:21, 174:13, 175:13, 251:23, 252:20
supreme [1] - 32:1
surfaced [1] - 30:18
surge [2] - 11:1, 11:5
surgery [1] - 93:13
surprise [2] - 8:8, 26:7
survey [3] - 9:14, 10:2, 11:15
surveys [2] - 9:15, 11:14
SUSAN [2] - 1:21, 259:23
Susan [2] - 259:20, 259:24
susan_zielie@laed.uscourts.gov [1] - 1:23
suspect [1] - 259:12
sustain [1] - 244:3, 254:4
sustained [9] - 57:22, 83:6, 99:3, 102:9, 108:8, 203:10, 211:7, 211:22, 212:4
Suzy [1] - 6:25
switch [2] - 51:25, 138:6
sworn [8] - 44:19, 117:17, 119:25, 128:6, 218:1, 224:24, 229:1, 247:4
system [49] - 55:6, 70:5, 78:14, 88:9, 91:12, 91:24, 92:13, 103:19, 103:20, 103:21, 103:23, 111:25, 148:1, 162:9, 162:23, 162:25, 163:3, 163:5, 163:14, 163:18, 163:24, 164:11, 164:25, 166:3, 191:22, 191:23, 191:25, 193:2, 194:6, 194:22, 200:8,

200:9, 203:14, 203:21, 209:4, 213:22, 214:14, 215:22, 250:2, 253:4, 253:5, 254:25, 255:12, 255:15, 256:19, 257:11, 257:15, 257:18
systems [6] - 89:5, 162:5, 163:4, 163:25, 216:4, 249:19

## T

tab [63] - 49:9, 53:1, 100:20, 101:2, 105:24, 109:10, 109:16, 109:17, 112:25, 120:3, 123:25, 131:16, 131:17, 131:18, 133:3, 133:4, 133:5, 133:14, 133:16, 134:4, 134:7, 135:16, 137:14, 138:15, 138:17, 138:23, 139:21, 141:5, 143:17, 144:16, 148:10, 152:4, 156:17, 157:24, 165:9, 167:4, 167:12, 168:7, 174:6, 175:1, 175:4, 175:21, 175:25, 181:10, 181:13, 181:15, 182:11, 182:12, 184:4, 184:6, 184:7, 184:10, 185:6, 221:3, 225:3, 226:4, 230:17, 233:11, 236:16, 239:18, 251:10
Tab [1] - 112:6
table [8] - 48:10, 127:16, 157:25, 158:9, 158:16, 160:2, 176:6, 258:23
take-one [3] - 84:21, 84:24, 92:24
talks [2] - 160:5, 173:10
TANF [12] - 129:15, 202:24, 206:11, 206:19, 207:17, 207:20, 208:1, 210:12, 210:16, 210:25, 211:18, 211:20

task [11] - 47:14, 47:16, 47:18, 72:24, 73:1, 73:3, 73:5, 112:24, 119:8, 242:12
Taylor [4] - 3:17, 4:10, 38:13, 39:2
team [2] - 18:15, 116:17
techie [1] - 147:20
technical [9] - 248:3, 248:4, 248:11, 248:25, 249:6, 253:5, 253:8, 253:11, 253:20
technically [1] - 255:12
Technologies [5] - 248:13, 248:16, 248:25, 250:16, 251:19
Technology [1] - 247:25
telephone [24] - 80:2, 89:10, 89:15, 92:4, 93:9, 93:10, 93:11, 93:23, 94:24, 94:25, 195:15, 195:16, 196:2, 196:10, 196:13, 201:10, 201:11, 212:17, 212:20, 212:21, 212:23, 216:20, 234:23
temporary [2] - 129:14, 129:16
ten [3] - 30:23, 50:17, 85:3
tend [1] - 108:5
tendered [1] - 30:1
tens [1] - 35:10
term [6] - 81:1, 158:10, 224:7, 227:21, 241:4, 256:1
terms [8] - 33:23, 41:11, 75:3, 78:2, 98:23, 221:18, 224:16, 226:25
test [2] - 66:14, 182:3
testified [30] - 42:24, 44:19, 52:7, 57:23, 58:2, 103:18, 107:16, 108:11, 110:21, 111:6, 112:13, 112:23, 117:17, 128:6, 140:24, 159:24, 198:3, 204:24, 205:11, 205:18, 206:16, 206:25,

218:2, 229:1,
238:18, 240:20,
247:4, 254:1, 254:3,
254:25
**testifies** [3] - 37:14,
43:1
**testify** [10] - 38:15,
39:2, 43:8, 44:5,
60:24, 186:25,
187:1, 255:8,
255:10, 256:7
**testifying** [2] - 102:14,
111:9
**Testimony** [1] - 5:8
**testimony** [29] - 14:14,
31:17, 32:18, 37:20,
38:13, 41:11, 42:20,
42:21, 42:23, 43:4,
43:5, 50:2, 52:9,
54:20, 58:5, 58:8,
63:12, 99:21,
103:24, 106:5,
110:10, 116:17,
117:11, 162:9,
177:22, 177:24,
179:4, 180:20,
258:12
**testimony-wise** [1] -
117:11
**testing** [1] - 114:23
**THE** [441] - 1:1, 1:2,
1:5, 1:18, 6:3, 6:5,
7:10, 8:3, 8:6, 8:20,
10:21, 11:17, 11:20,
12:2, 13:2, 13:13,
13:17, 14:2, 15:10,
15:18, 16:21, 17:6,
17:13, 18:1, 18:11,
18:18, 18:21, 19:19,
20:7, 20:10, 20:15,
20:18, 21:9, 21:13,
21:18, 21:23, 22:2,
22:16, 23:16, 23:19,
24:7, 24:23, 26:9,
26:14, 26:22, 27:7,
28:9, 28:23, 29:2,
29:5, 29:9, 29:11,
30:5, 30:16, 31:9,
31:20, 31:24, 40:17,
41:24, 42:7, 42:13,
43:18, 43:25, 44:16,
44:21, 44:22, 45:2,
45:6, 47:1, 47:5,
48:21, 48:24, 49:2,
49:4, 49:5, 50:16,
51:8, 51:11, 51:15,
53:18, 53:20, 54:8,
55:20, 55:24, 56:1,
56:17, 57:22, 57:24,
58:7, 58:15, 59:1,

59:12, 59:14, 59:20,
59:21, 60:15, 60:19,
60:24, 62:10, 62:11,
63:15, 63:25, 67:8,
67:10, 67:15, 67:17,
70:19, 71:24, 73:5,
73:7, 73:8, 78:20,
80:12, 83:6, 87:23,
88:14, 88:15, 88:16,
88:17, 97:10, 99:2,
99:6, 99:8, 99:11,
99:14, 101:1, 101:4,
101:6, 101:10,
101:14, 101:17,
101:19, 102:3,
102:7, 102:20,
104:14, 104:17,
105:7, 106:2, 106:7,
106:10, 107:5,
107:11, 108:5,
108:8, 110:25,
111:2, 112:19,
113:3, 113:6,
113:24, 114:6,
114:10, 114:14,
115:23, 116:3,
116:5, 116:10,
116:14, 117:16,
117:19, 117:21,
117:22, 118:4,
118:13, 118:15,
118:16, 119:17,
120:20, 121:8,
121:12, 121:13,
121:14, 121:15,
121:16, 122:23,
123:5, 123:7,
123:13, 123:16,
124:5, 124:8,
124:11, 124:14,
124:21, 124:22,
125:13, 125:15,
125:21, 126:7,
126:14, 126:17,
126:21, 126:23,
127:4, 127:9, 128:3,
128:8, 128:15,
133:15, 134:6,
134:18, 134:20,
136:3, 136:5,
137:19, 137:21,
138:22, 141:6,
141:20, 142:11,
142:23, 143:6,
143:13, 145:22,
147:18, 147:19,
147:21, 147:22,
152:17, 153:8,
153:14, 153:19,
153:21, 154:4,
154:9, 154:20,

154:22, 157:1,
157:4, 157:21,
163:18, 163:19,
163:21, 163:22,
164:1, 164:4, 164:5,
164:7, 164:13,
164:17, 164:18,
164:22, 164:23,
165:22, 166:6,
166:9, 166:13,
166:15, 167:1,
167:24, 168:1,
168:4, 169:5,
174:18, 175:2,
175:17, 175:23,
176:9, 178:3, 178:6,
178:15, 178:18,
178:20, 179:1,
179:13, 179:21,
180:22, 180:25,
181:3, 181:13,
182:7, 183:3, 183:8,
183:21, 183:25,
185:7, 186:4,
187:13, 190:2,
190:3, 190:10,
190:12, 196:5,
196:6, 202:18,
203:8, 203:10,
203:24, 204:3,
206:14, 207:3,
207:8, 207:10,
208:5, 208:6, 208:7,
210:3, 210:6,
210:21, 211:7,
211:15, 211:20,
211:22, 212:4,
212:13, 212:16,
212:17, 212:19,
212:20, 212:22,
212:23, 213:2,
213:3, 213:7,
213:10, 213:11,
213:12, 213:16,
213:21, 213:24,
214:3, 214:5, 214:7,
214:8, 214:17,
214:18, 214:19,
214:21, 214:22,
215:2, 215:3, 215:4,
215:7, 215:12,
215:19, 215:20,
216:2, 216:6, 216:7,
216:9, 216:14,
216:18, 216:19,
216:22, 216:23,
216:25, 217:1,
217:4, 217:13,
217:23, 218:3,
218:5, 218:7, 218:9,
220:11, 221:15,

222:19, 222:25,
223:4, 223:7, 224:1,
225:17, 225:18,
226:16, 226:23,
227:9, 227:14,
227:17, 227:19,
227:22, 228:1,
228:4, 228:5, 228:6,
228:21, 228:23,
229:3, 229:5, 229:7,
230:19, 231:16,
231:22, 231:23,
232:2, 232:6,
232:10, 232:13,
232:14, 232:19,
232:23, 232:24,
232:25, 237:5,
237:8, 237:14,
238:1, 238:5, 238:8,
238:10, 239:9,
239:20, 240:1,
240:3, 240:16,
240:25, 241:4,
241:15, 241:25,
242:7, 242:21,
243:15, 243:20,
244:3, 244:8,
244:10, 244:12,
245:11, 245:16,
245:17, 245:23,
246:1, 246:2, 247:1,
247:6, 247:8,
251:16, 253:16,
254:4, 254:21,
255:16, 256:2,
256:5, 256:11,
256:15, 256:24,
257:23, 258:1,
258:7, 258:20,
258:25
**theirs** [2] - 24:1, 24:2
**themselves** [13] - 1:6,
9:14, 9:23, 10:6,
11:14, 11:22, 12:21,
34:10, 81:10, 81:12,
113:22, 164:9,
220:18
**therefore** [4] - 10:12,
32:17, 50:10, 256:9
**therein** [1] - 188:1
**they've** [3] - 15:19,
15:20, 24:11, 34:5,
38:10, 84:3, 85:12,
92:6, 101:14,
122:12, 137:4,
166:23, 243:14
**think's** [1] - 59:1
**thinking** [1] - 28:19
**thinks** [2] - 28:20,
116:22

**third** [9] - 27:23,
35:22, 37:3, 49:25,
110:1, 169:21,
248:5, 248:9, 249:7
**third-party** [3] - 248:5,
248:9, 249:7
**thirteen** [1] - 80:21
**THIS** [1] - 87:25
**thousands** [3] - 34:11,
35:10, 188:24
**three** [16] - 28:1,
36:19, 37:11, 37:17,
49:14, 64:20, 86:2,
95:16, 109:2,
141:25, 198:16,
203:16, 209:5,
214:7, 214:8, 214:17
**threw** [1] - 209:8
**throughout** [4] - 16:5,
16:6, 66:25, 240:13
**time-consuming** [1] -
70:24
**title** [9] - 45:23, 118:9,
129:2, 186:10,
214:25, 220:1,
247:24, 248:2
**tjones@tomoneslaw
.com** [1] - 3:10
**TO** [2] - 48:7, 48:9
**today** [19] - 25:25,
28:22, 36:8, 38:4,
44:5, 46:13, 50:20,
82:8, 82:24, 128:24,
130:6, 170:1,
173:11, 200:19,
205:3, 205:16,
247:15, 255:4,
255:20
**today's** [1] - 255:9
**together** [2] - 22:7,
147:10
**token** [1] - 242:13
**toll** [2] - 76:23, 83:19
**toll-free** [2] - 76:23,
83:19
**TOM** [1] - 1:9
**tomorrow** [3] - 259:1,
259:8, 259:14
**tonight** [1] - 259:10
**took** [4] - 124:18,
191:5, 193:5, 204:25
**tool** [2] - 242:18,
242:19
**tools** [4] - 248:5,
248:7, 248:9, 249:7
**top** [7] - 138:19,
139:2, 139:5, 155:2,
155:19, 199:14,
233:2
**topic** [1] - 25:20

**topics** [2] - 25:3, 99:19
**total** [2] - 118:24, 152:22
**totally** [3] - 54:6, 226:21, 242:4
**toward** [1] - 74:6
**Townsend** [4] - 18:20, 227:17, 257:23, 257:24
**TOWNSEND** [15] - 3:11, 18:19, 222:11, 223:24, 225:4, 226:6, 226:10, 226:21, 226:25, 227:13, 228:22, 253:23, 255:3, 255:14, 257:25
**track** [8] - 57:17, 161:21, 161:24, 162:13, 162:19, 222:13, 256:8, 256:9
**tracked** [1] - 162:1
**tracking** [2] - 48:3, 257:19
**tracks** [3] - 48:1, 147:15, 147:22
**train** [9] - 47:3, 47:5, 78:11, 78:24, 86:22, 97:18, 113:20, 122:22, 123:8
**trained** [6] - 69:11, 69:18, 115:12, 123:1, 145:9, 145:14
**trainers** [1] - 188:13
**training** [142] - 46:21, 66:13, 66:15, 68:12, 69:21, 69:25, 78:13, 78:14, 78:16, 86:21, 97:2, 110:15, 110:17, 110:18, 110:21, 111:7, 111:11, 111:15, 111:20, 111:21, 111:22, 112:1, 112:3, 112:4, 112:5, 113:20, 115:8, 115:12, 115:14, 115:17, 115:19, 119:12, 119:13, 119:15, 119:20, 121:6, 121:7, 121:10, 122:10, 122:15, 123:4, 123:11, 124:13, 126:6, 126:13, 146:8, 146:15, 146:16, 146:20, 146:25, 147:1, 147:7, 147:14,

147:15, 147:23, 148:4, 148:6, 148:17, 149:4, 149:14, 149:18, 149:22, 150:3, 150:4, 150:7, 150:12, 150:19, 150:25, 151:1, 151:3, 151:4, 151:6, 151:9, 151:12, 151:15, 151:22, 151:23, 152:1, 152:7, 152:10, 152:25, 153:5, 153:17, 153:18, 153:23, 153:24, 159:2, 160:20, 161:4, 161:18, 170:8, 170:9, 170:12, 170:13, 171:2, 171:4, 171:5, 171:14, 171:23, 173:19, 174:9, 186:14, 187:3, 187:6, 187:8, 187:10, 187:18, 188:6, 188:9, 188:16, 190:14, 190:20, 191:2, 191:6, 191:9, 191:10, 192:8, 192:9, 193:15, 193:22, 193:23, 193:24, 194:1, 201:18, 204:24, 204:25, 205:4, 205:10, 205:11, 205:15, 205:19, 205:21, 205:23, 205:25, 221:24
**trainings** [9] - 119:10, 121:4, 122:13, 122:17, 122:19, 123:2, 147:23, 205:1, 205:9
**transaction** [10] - 32:24, 37:18, 67:23, 78:12, 196:2, 254:18, 255:22, 255:24, 257:4, 257:11
**transactional** [2] - 257:10, 257:14
**transactions** [28] - 27:16, 27:18, 32:22, 54:18, 54:23, 54:25, 68:18, 69:8, 71:7, 73:11, 73:14, 73:15, 73:18, 74:7, 76:18, 76:19, 76:21, 83:5, 101:20, 103:9,

125:11, 125:12, 125:17, 179:7, 179:18, 196:9, 257:6, 257:8
**transcript** [2] - 251:10, 259:21
**TRANSCRIPT** [1] - 1:17
**transcripts** [1] - 120:6
**transfer** [1] - 197:21
**transformation** [1] - 248:6
**travel** [2] - 74:17, 147:2
**trend** [2] - 35:13, 74:6
**trends** [1] - 189:4
**Trial** [1] - 1:9
**trial** [23] - 8:12, 13:11, 13:23, 16:5, 18:25, 24:16, 26:8, 26:9, 27:16, 30:6, 31:14, 35:15, 39:11, 49:10, 50:17, 53:3, 123:24, 181:15, 184:5, 185:8, 221:4, 236:17, 256:3
**TRICHE** [1] - 1:18
**tried** [4] - 89:15, 217:20, 217:21, 256:10
**Tropical** [1] - 198:12
**trouble** [1] - 210:21
**true** [51] - 18:9, 38:22, 47:23, 47:25, 51:20, 61:14, 61:16, 61:20, 62:1, 62:6, 115:9, 130:12, 130:16, 139:9, 170:1, 170:3, 185:12, 185:17, 185:23, 204:7, 204:8, 204:11, 204:12, 220:10, 221:18, 221:23, 222:8, 223:10, 224:9, 224:11, 224:14, 224:17, 225:22, 230:25, 231:2, 233:10, 233:14, 233:18, 233:22, 234:7, 234:22, 234:25, 235:24, 236:6, 236:10, 236:23, 238:21, 238:24, 239:1, 246:14, 255:8
**truth** [4] - 58:13, 58:18, 225:1, 250:25
**try** [11] - 22:6, 55:25, 62:5, 63:11, 84:17, 89:6, 98:16, 99:20,

179:3, 189:6, 227:9
**trying** [17] - 25:12, 59:1, 60:22, 70:23, 84:19, 85:17, 85:20, 89:17, 116:16, 122:21, 124:5, 178:11, 179:22, 180:19, 207:6, 223:2, 243:2
**turn** [45] - 48:19, 49:8, 52:25, 105:23, 110:1, 120:3, 120:22, 131:19, 133:3, 133:14, 134:4, 135:16, 137:14, 138:2, 139:3, 139:21, 143:17, 144:16, 145:17, 148:10, 148:23, 152:4, 155:1, 156:17, 157:24, 158:16, 159:19, 165:9, 172:4, 174:25, 175:20, 176:12, 177:19, 181:10, 184:4, 185:6, 221:3, 225:3, 226:4, 231:18, 236:16, 236:19, 239:18, 258:17
**turned** [1] - 94:17
**turning** [2] - 154:14, 174:3
**turnout** [1] - 11:3
**tweak** [2] - 194:1, 205:25
**Twenty** [1] - 129:7
**Twenty-five** [1] - 129:7
**two** [39] - 9:7, 9:8, 9:19, 9:20, 16:12, 16:13, 17:9, 23:22, 36:6, 39:15, 42:12, 42:13, 43:9, 43:15, 43:19, 53:5, 55:10, 70:8, 86:4, 86:5, 87:2, 89:10, 92:14, 95:21, 108:24, 108:25, 157:14, 166:4, 187:8, 198:16, 200:15, 203:16, 213:22, 214:17, 230:2, 244:16, 255:23, 256:23, 256:24
**type** [5] - 193:3, 195:4, 201:2, 202:8, 228:20
**types** [3] - 81:14, 147:23

**typically** [2] - 91:10, 198:15

**U**

**ultimately** [1] - 40:15
**um-hum** [2] - 109:23, 139:7
**unable** [1] - 217:9
**unanswered** [2] - 235:12, 235:15
**unavailable** [1] - 217:22
**under** [32] - 9:1, 9:3, 12:7, 19:13, 24:13, 43:3, 44:10, 55:10, 55:11, 56:20, 69:5, 103:1, 105:11, 106:7, 106:9, 114:11, 125:2, 133:13, 177:17, 201:19, 201:22, 201:25, 202:2, 216:14, 223:5, 231:3, 240:6, 240:23, 241:22, 250:23
**undergo** [1] - 142:20
**underneath** [1] - 136:18
**underpayment** [1] - 227:2
**understood** [4] - 69:6, 72:13, 111:23, 125:16
**undisclosed** [1] - 14:8
**unfortunately** [2] - 36:13, 237:22
**uninsured** [1] - 86:3
**unintended** [2] - 75:21, 76:2
**unit** [5] - 111:19, 146:15, 187:10, 187:11, 221:19
**UNITED** [2] - 1:1, 1:19
**units** [1] - 218:25
**unless** [7] - 33:22, 58:10, 67:20, 120:14, 198:18, 208:22, 241:16
**unofficial** [1] - 154:10
**unsigned** [1] - 235:7
**up** [63] - 9:7, 12:18, 15:11, 22:25, 25:9, 31:7, 32:22, 42:14, 52:5, 55:5, 59:8, 63:8, 73:19, 74:4, 75:23, 75:25, 76:11, 84:7, 85:2, 88:21, 89:4, 90:12, 92:24,

94:22, 99:19, 99:24,
111:17, 114:7,
114:12, 118:4,
121:7, 123:5, 124:5,
124:21, 138:10,
141:20, 153:19,
174:15, 178:22,
200:18, 200:19,
210:18, 212:6,
212:7, 216:15,
216:19, 217:2,
226:23, 229:22,
231:14, 231:25,
237:5, 240:1, 240:3,
244:13, 244:16,
250:14, 252:22,
254:21, 255:23,
256:23, 258:21
**up-dating** [1] - 73:19
**up-front** [1] - 90:12
**update** [8] - 68:12,
72:18, 92:10, 96:22,
119:4, 164:10,
203:20, 209:3
**updated** [1] - 164:8
**updates** [2] - 209:10,
255:7
**updating** [3] - 70:5,
72:16, 72:20
**upper** [2] - 136:10,
136:12
**ups** [1] - 256:24
**urgent** [1] - 93:12
**US** [3] - 38:9, 207:16,
207:22
**usage** [1] - 208:17
**useful** [4] - 48:3, 52:7,
52:8, 52:10
**user** [2] - 253:22,
257:8
**uses** [3] - 160:22,
184:24, 213:21
**utilized** [1] - 53:14

---
**V**
---

**vaguely** [1] - 236:9
**value** [1] - 11:7
**varies** [1] - 75:4
**variety** [1] - 88:2
**various** [6] - 10:5,
10:17, 116:23,
186:22, 188:24
**vary** [2] - 9:15, 11:15
**vast** [1] - 19:9
**verbally** [1] - 103:16
**verbiage** [1] - 232:3
**verification** [2] -
214:10, 215:25
**verify** [6] - 65:24, 89:6,

89:18, 155:17,
214:14
**verifying** [1] - 164:21
**versed** [1] - 253:7
**Version** [1] - 232:25
**version** [30] - 96:14,
96:19, 96:21, 96:23,
100:24, 132:1,
132:7, 132:12,
133:21, 140:10,
142:7, 142:17,
143:8, 143:11,
143:13, 144:21,
152:10, 156:22,
156:24, 157:7,
157:8, 157:13,
157:17, 165:14,
195:13, 196:17,
198:3, 200:17,
231:24
**versions** [10] - 100:17,
136:19, 142:2,
142:6, 142:15,
142:16, 143:9,
145:4, 157:9, 165:15
**veteran** [1] - 36:11
**via** [4] - 57:10, 201:10,
212:20, 234:13
**video** [1] - 147:2
**view** [3] - 36:1,
147:11, 147:12
**viewed** [3] - 148:3,
194:21, 198:2
**violate** [6] - 32:13,
33:14, 34:5, 123:3,
123:7, 243:2
**violated** [5] - 32:13,
39:16, 243:1, 243:2,
243:3
**violating** [1] - 84:9
**violation** [8] - 12:9,
12:10, 33:23, 34:7,
55:12, 243:4, 243:14
**violations** [3] - 19:23,
39:7
**virtually** [1] - 217:16
**volume** [1] - 52:20
**voluntarily** [1] -
116:23
**voluntary** [1] - 62:17
**Vote** [3] - 2:18, 2:23,
80:5
**vote** [44] - 32:2, 32:9,
33:21, 36:22, 36:25,
37:7, 37:12, 37:24,
38:10, 39:4, 40:10,
40:12, 69:7, 71:15,
72:22, 79:17, 80:5,
82:7, 82:13, 82:23,
82:24, 91:16, 92:10,

92:16, 93:25, 95:17,
98:15, 102:16,
103:2, 104:10,
105:20, 107:18,
110:3, 115:3, 173:3,
180:14, 184:19,
233:3, 233:4, 246:4,
252:6, 252:7, 257:18
**voter** [245] - 8:14,
8:22, 14:5, 27:20,
33:4, 33:5, 33:6,
33:7, 33:17, 33:19,
33:21, 33:25, 34:2,
34:12, 35:6, 35:11,
35:17, 35:19, 36:18,
36:22, 37:1, 37:2,
37:9, 37:10, 37:21,
37:25, 38:9, 38:16,
38:21, 39:4, 49:21,
49:22, 49:23, 50:1,
53:10, 54:12, 55:1,
56:10, 57:8, 57:17,
59:18, 59:23, 60:1,
61:10, 62:7, 62:17,
62:25, 63:2, 68:19,
69:24, 71:12, 75:15,
76:22, 76:25, 77:11,
78:4, 78:12, 79:3,
79:5, 79:6, 79:10,
79:13, 80:9, 81:24,
82:3, 84:1, 84:4,
84:10, 85:8, 86:8,
89:25, 90:2, 90:7,
90:15, 90:21, 90:24,
92:20, 93:4, 93:17,
93:18, 93:23, 95:10,
95:15, 95:18, 96:6,
96:16, 97:1, 97:17,
100:8, 100:9,
100:13, 100:14,
101:21, 103:5,
104:20, 105:1,
106:16, 106:25,
107:21, 126:2,
130:13, 131:22,
135:13, 139:18,
140:6, 140:15,
140:25, 141:2,
142:13, 142:22,
143:14, 144:11,
144:24, 145:2,
145:5, 145:9,
145:14, 146:7,
146:14, 146:15,
146:20, 148:6,
148:17, 149:3,
150:5, 150:24,
151:15, 151:23,
152:7, 153:5, 155:3,
155:16, 155:18,
155:19, 156:6,

156:10, 158:10,
158:13, 159:11,
159:15, 160:1,
160:5, 160:11,
160:22, 160:24,
161:5, 161:9,
161:10, 161:14,
161:17, 169:10,
169:13, 169:24,
170:9, 170:22,
171:2, 171:16,
172:23, 173:1,
173:4, 173:6, 173:7,
173:15, 173:21,
174:9, 174:14,
174:22, 175:14,
176:7, 176:15,
176:19, 176:21,
185:13, 185:19,
185:24, 190:14,
190:24, 192:6,
195:7, 195:8, 196:3,
196:9, 196:12,
196:18, 196:21,
196:23, 197:4,
197:6, 197:9,
197:23, 198:4,
198:6, 199:4, 199:6,
199:22, 199:23,
200:1, 201:15,
203:2, 203:19,
207:17, 209:14,
209:19, 209:23,
210:13, 211:1,
211:4, 212:8,
220:21, 220:25,
221:10, 222:9,
222:13, 222:16,
223:10, 223:22,
224:5, 224:7,
224:15, 225:14,
227:21, 227:24,
230:25, 231:3,
233:5, 233:10,
233:15, 234:7,
234:15, 236:1,
240:15, 241:4,
242:2, 242:14,
245:14, 245:15,
245:17, 245:21,
246:5, 246:13,
246:15, 246:17,
246:19, 252:10
**Voter** [11] - 32:5,
46:12, 50:24, 51:9,
51:25, 68:7, 82:9,
83:13, 96:13, 98:3,
206:7
**Voters** [1] - 160:25
**voters** [4] - 32:23,
155:6, 160:16,

246:12
**voting** [1] - 14:4
**vulnerable** [2] - 32:3,
40:13

---
**W**
---

**wait** [7] - 22:23, 29:18,
58:4, 101:1, 153:8,
168:1
**waive** [1] - 42:1
**walk** [4] - 67:19,
91:10, 93:25, 207:11
**walking** [1] - 45:12
**walks** [1] - 34:1
**Walmart** [1] - 84:17
**wants** [2] - 29:22,
237:11
**Washington** [2] -
2:20, 2:24
**waters** [1] - 114:23
**wavered** [1] - 37:17
**ways** [4] - 16:20, 34:5,
39:16, 226:13
**web** [2] - 163:3,
249:18
**web-based** [1] - 163:3
**webex** [23] - 146:16,
146:20, 146:22,
146:25, 147:7,
147:11, 147:14,
147:17, 148:4,
148:6, 149:3,
149:13, 150:19,
151:1, 151:3, 152:1,
161:18, 174:9,
191:9, 191:11,
191:16, 205:11
**website** [9] - 34:3,
80:5, 92:16, 92:17,
92:18, 184:21,
185:4, 200:19,
209:21
**Wednesday** [1] -
43:17
**week** [6] - 32:11,
32:19, 34:9, 76:15,
151:8, 214:13
**weeks** [2] - 198:16
**weight** [3] - 13:24,
14:19, 18:2
**welfare** [1] - 209:7
**Wendell** [1] - 217:10
**whatsoever** [1] - 37:9
**wheelhouse** [1] - 47:7
**whereas** [2] - 16:4,
126:2
**whichever** [1] - 66:1
**whole** [9] - 12:19,
16:13, 27:12, 40:20,

105:8, 159:9, 182:1,
217:16, 241:11
**wide** [6] - 38:7,
108:22, 215:6,
254:8, 254:9, 254:12
**Wilkerson** [1] - 15:7
**Wilkinson** [1] - 15:15
**WILLIAMS** [1] - 3:11
**WILLIAMS-
ALEXANDER** [1] -
3:11
**willing** [4] - 142:14,
142:18, 152:23,
157:17
**willy** [1] - 25:18
**willy-nilly** [1] - 25:18
**WILSON** [1] - 2:8
**Wilson** [3] - 2:8,
14:14, 258:12
**wise** [1] - 117:11
**wish** [2] - 173:2,
184:19
**withdraw** [9] - 26:21,
166:25, 168:2,
179:16, 180:2,
181:2, 181:5, 181:9,
208:15
**withdrawn** [4] - 14:10,
23:6, 62:12, 203:9
**WITNESS** [77] - 44:22,
47:5, 48:24, 49:4,
55:24, 59:12, 59:14,
59:21, 62:10, 67:10,
67:17, 73:7, 88:15,
88:17, 99:6, 106:2,
111:2, 113:6,
117:21, 118:15,
121:13, 121:15,
124:22, 128:15,
147:19, 147:22,
163:19, 163:22,
164:4, 164:7,
164:17, 164:22,
174:18, 175:17,
176:9, 181:13,
190:3, 196:6, 208:6,
211:20, 212:16,
212:19, 212:22,
213:2, 213:7,
213:11, 213:16,
213:24, 214:5,
214:8, 214:18,
214:21, 215:2,
215:4, 215:12,
215:20, 216:6,
216:9, 216:18,
216:22, 216:25,
218:5, 223:7,
225:18, 227:22,
228:4, 228:6, 229:5,

231:23, 232:2,
232:10, 232:13,
232:23, 232:25,
245:17, 246:2, 247:8
**witness** [31] - 7:8,
23:22, 27:1, 29:12,
29:14, 42:3, 42:21,
43:1, 59:7, 102:2,
115:25, 116:6,
117:14, 120:19,
121:10, 128:3,
128:14, 141:24,
145:21, 165:18,
178:12, 180:2,
180:20, 183:6,
206:2, 210:20,
217:8, 237:3, 258:16
**witness's** [1] - 175:25
**witnesses** [16] -
23:12, 28:13, 28:14,
28:20, 28:21, 29:1,
30:4, 42:6, 42:7,
42:16, 43:9, 63:11,
116:7, 116:11,
259:11
**woe** [1] - 125:13
**woman** [1] - 219:23
**women** [3] - 64:1,
75:5, 80:23
**wonder** [4] - 73:20,
81:4, 81:21, 90:18
**wondered** [2] - 98:7,
114:12
**wondering** [2] - 15:6,
259:10
**word** [7] - 83:2, 130:5,
160:22, 184:17,
184:24, 193:3, 239:8
**wordy** [1] - 85:18
**worker** [12] - 77:10,
77:25, 83:9, 83:11,
86:9, 163:22, 165:3,
173:5, 195:14,
200:22, 228:17,
237:12
**worker's** [1] - 105:4
**workers** [21] - 49:1,
89:5, 97:15, 104:18,
104:19, 122:9,
122:25, 123:4,
163:23, 214:25,
221:19, 224:18,
224:20, 224:21,
225:13, 225:19,
240:22, 243:12,
243:18, 243:21,
250:11
**workload** [2] - 48:6,
52:16
**works** [3] - 16:20,

89:13, 253:24
**world** [1] - 76:16
**worry** [1] - 56:2
**WPSK** [1] - 129:15
**write** [3] - 186:24,
187:21, 188:4
**writing** [7] - 37:7,
37:24, 161:19,
161:20, 176:22,
176:23, 214:16
**written** [10] - 14:18,
62:14, 62:19, 63:1,
111:14, 184:24,
185:2, 185:17,
188:14, 246:10
**wrote** [1] - 125:1

## Y

**ya'll** [1] - 16:12
**year** [42] - 9:14, 9:15,
9:16, 9:25, 10:3,
10:7, 10:8, 10:16,
11:15, 11:23, 34:12,
34:21, 35:2, 35:10,
37:3, 45:21, 48:17,
49:1, 66:15, 89:2,
89:24, 118:2, 163:9,
163:10, 177:2,
177:6, 179:9,
189:11, 189:13,
204:9, 204:13,
209:9, 228:12,
247:23
**years** [34] - 9:7, 9:8,
9:19, 9:20, 10:20,
10:25, 11:3, 11:4,
11:22, 15:24, 16:19,
16:20, 30:24, 35:19,
36:9, 50:17, 63:22,
70:8, 71:7, 84:25,
85:3, 118:18,
118:23, 118:24,
129:6, 129:7,
136:23, 142:4,
182:2, 182:22, 230:3
**Yellin** [2] - 6:14, 15:12
**YELLIN** [6] - 2:13,
6:14, 15:9, 15:12,
15:25, 17:16
**Yolanda** [1] - 43:11
**York** [3] - 2:6, 2:15,
2:15
**Young** [1] - 217:10
**yourself** [2] - 64:14,
124:19
**yourselves** [1] - 29:3

## Z

**Zielie** [2] - 259:20,
259:24
**ZIELIE** [2] - 1:21,
259:23
**zoom** [1] - 35:12