**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **LUTHER SCOTT, ET AL** | * | **CIVIL ACTION NO. 11-926** |
| **Plaintiffs** | * | |
| | * | **SECTION: H** |
| | * | **JUDGE JANE TRICHE MILAZZO** |
| **VERSUS** | * | |
| | * | |
| | * | **MAGISTRATE: 2** |
| **TOM SCHEDLER, ET AL** | * | **MAG. JOSEPH C. WILKINSON, JR.** |
| **Defendants** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter was tried before the Court, sitting without a jury, from October 15, 2012 through October 17, 2012.  The issues remaining before the Court are (1) whether the Plaintiffs have standing and (2) whether the Defendants violated and are in continuing violation of the National Voter Registration Act ("NVRA").

Having considered the testimony and evidence at trial, the arguments of counsel, and the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).

-1-

I.    *Background*

    A.    <u>Generally</u>

Plaintiffs Roy Ferrand, Luther Scott, Jr. and the Louisiana State Conference of the NAACP[1] ("Plaintiffs") brought this action on April 19, 2011, for themselves and on behalf of all other persons similarly situated against Defendants Tom Schedler, in his official capacity as Louisiana Secretary of State ("SOS"), Ruth Johnson, in her official capacity as Secretary of the Louisiana Department of Children and Family Services ("DCFS"), and Bruce D. Greenstein, in his official capacity as Secretary of the Louisiana Department of Health and Hospitals ("DHH").   In their Complaint, Plaintiffs allege that Defendants have engaged in systemic and ongoing violations of their obligations under Section 7 of the NVRA.[2]   At the time of trial, Plaintiff Roy Ferrand had been withdrawn as a Plaintiff.   (Doc. 126.)   Additionally, Suzy Sonnier, in her official capacity, was substituted for Ruth Johnson as Defendant.   (Doc. 363.)

    B.    <u>The Defendants</u>

Defendant Tom Schedler ("Schedler") is sued in his official capacity as the Louisiana Secretary of State. Schedler is designated as the chief state election official in Louisiana and is responsible for the coordination of state responsibilities under Section 10 of the NVRA.  42 U.S.C.

---

[1]National Association for the Advancement of Colored People

[2]Section 4 of the Act is codified at 42 U.S.C. § 1973gg-2; Section 7 of the Act is codified at 42 U.S.C. § 1973gg-5; Section 10 of the Act is codified at 42 U.S.C. § 1973gg-8.

§ 1973gg-8. Louisiana law provides that the Secretary of State shall "[c]oordinate the responsibilities of th[e] state under the National Voter Registration Act of 1993 (P.L. 103-31) as required by 42 U.S.C. Section 1973gg-8." La. Rev. Stat. Ann. § 18:18(A)(6). The Louisiana Secretary of State is generally responsible for prescribing uniform rules, regulations, forms, and instructions related to voter registration and voter education. La. Rev. Stat. Ann. § 18:18(A)(2), (3), (8).

Defendant Suzy Sonnier ("Sonnier") is sued in her official capacity as the Secretary of the Louisiana Department of Children and Family Services. DCFS is a mandatory voter registration agency under Louisiana law. La. Rev. Stat. Ann. § 18:18(A)(1)(a). DCFS administers public assistance programs including, but not limited to, the Supplemental Nutrition Assistance Program ("SNAP"), formerly food stamps, and Family Independence Temporary Assistance ("FITAP"). La. Rev. Stat. Ann. §§ 36:474(G); 46:231-231.2.

Defendant Bruce D. Greenstein ("Greenstein") is sued in his official capacity as the Secretary of the Louisiana Department of Health and Hospitals. Like DCFS, DHH is a mandatory voter registration agency under Louisiana law. La. Rev. Stat. Ann. § 18:18(A)(1)(a). DHH administers public assistance programs including Medicaid, the Woman, Infants and Children Program ("WIC"), and the Louisiana Children's Health Insurance Program ("LaCHIP"). La. Rev. Stat. Ann. §§ 36:251(B); 46:450.3; 46:976.

II.    *Standing*

    A.    <u>Generally</u>

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984).  As such, Article III requires a litigant to have "standing" to invoke the power of a federal court.  *Id.*  To determine if a party has standing, a court must assess "[w]hether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id.* at 750--51 (internal quotations and citation omitted).  The party invoking the court's authority must "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) (quoting *Allen*, 468 U.S. at 752).  Ultimately, "those who do not possess Article III standing may not litigate as suitors in the courts of the United States." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475--76 (1982).

"[T]he question of standing is one of degree and is 'not discernible by any precise test.'" *Roark & Hardee LP*, 522 F.3d at 542 (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 297 (1979)).  Nonetheless, a plaintiff must demonstrate that (1) it has suffered or imminently will suffer, a concrete and particularized injury-in-fact; (2) that the injury is fairly traceable to the defendant's conduct; and (3) that a favorable judgment will likely redress the injury.  *Houston Chronicle Pub. Co. v. City of League City, Tex.*, 488 F.3d 613, 617 (5th Cir. 2007).  The injury-in-fact

element requires that a plaintiff show that he "[h]as sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations and citations omitted).

 B. <u>Luther Scott</u>

  **1.** **Background**

 Plaintiff Luther Scott, Jr. ("Scott") is a recipient of benefits under SNAP.  Accordingly, Scott is a client of DCFS and was a client at the time suit was filed.  Scott has never applied for or received services or assistance from DHH. Scott has moved frequently, been intermittently homeless, and has had at least four different addresses since 2005.  Scott has been registered to vote in the State of Louisiana since June 10, 2008, in Orleans Parish, Louisiana.

 In September 2009, Scott applied for benefits using an "OFS 4APP" Form, DCFS's main benefits application form.  Located within the form is a section entitled "Voter Registration."  The Voter Registration section advises that "[a]ny citizen in the State of Louisiana who has met the voter registration requirements and applies for public assistance must be provided the opportunity to register to vote."  It then requests the customer to check "Yes" or "No" in response to the following question: "If you are not registered to vote where you live now, would you like to apply to register to vote?"  Scott did not check either "Yes" or "No" box in response to this question. Scott did not receive a voter registration form with this benefits application.

In December 2009, Scott again applied for benefits using the "OFS 4APP" Form.  Scott did not check the "Yes" or "No" box in response to the Voter Registration question.  Scott did not sign this form.  Scott did not receive a voter registration form with this benefits application.

In November 2010, Scott renewed his benefits using an "OFS 4SR" Simplified Report Form, which is utilized to renew SNAP benefits.  The form is also used for changes of address.  This form did not contain question(s) regarding voter registration.  Scott did not receive a voter registration application with this form.

### 2.      NVRA: Requirements of Voter Registration Agencies

The United States Congress enacted the National Voter Registration Act in 1993.  The NVRA requires that all offices designated as a voter registration agency shall make the following services available at each voter registration agency: (1) distribution of voter registration application forms for voting in federal elections; (2) assistance to applicants in completing the voter registration application forms; and (3) acceptance of completed voter registration applications to transmit those applications to the appropriate state election official in a timely manner. 42 U.S.C. § 1973gg-5(a)(4)(A)(i)-(iii).  The NVRA further requires that a voter registration agency that provides service or assistance shall, in addition to conducting voter registration, distribute with each application for such service or assistance, and with each recertification, renewal or change of address form relating to such service or assistance, a mail voter registration application form described in Section 1973gg-7(a)(2). 42 U.S.C. § 1973gg-5(6)(A).  Additionally, the voter registration

agency must provide a form that includes the following:

> (i) the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";
>
> (ii) if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";
>
> (iii) boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.";
>
> (iv) the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and
>
> (v) the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _____.", the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed.

42 U.S.C. § 1973gg-5(6)(B)(i)-(v).  Lastly, the voter registration agency shall "provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance."  42 U.S.C. § 1973gg-5(6)(C).

### 3.    Statutory Standing

When a suit challenges the legality of government action or inaction, as in this case, and when the plaintiff is himself the object of the action or inaction, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the

action will redress it.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561--62 (1992).  Additionally,

"the actual or threatened injury required by Article III may exist solely by virtue of statutes creating

legal rights, the invasion of which creates standing."  *Warth v. Seldin*, 422 U.S. 490, 500 (1975)

(quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)) (internal quotations omitted).  Thus,

the deprivation of a statutory right or entitlement "[c]an confer standing to sue even where the

plaintiff would have suffered no judicially cognizable injury in the absence of statute."  *Warth*, 422

U.S. at 514 (citing *Linda R.S.*, 410 U.S. at 617 n. 3).  Ultimately, "when a person alleges a concrete,

particularized, and individual injury by virtue of the operation of a statute . . . Article III standing

to challenge that statute's execution usually obtains."  *Adar v. Smith*, 597 F.3d 697, 706 (5th Cir.

2010) (overruled on other grounds).

### 4.    Luther Scott Has Standing

Since April of 2011, the month the instant suit was filed, Scott has been offered voter

registration forms several times.  The standing inquiry, however, focuses on "[w]hether the party

invoking jurisdiction had the requisite stake in the outcome when the suit was filed."  *Nat'l Rifle

Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 191 (5th

Cir. 2012) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)) (internal quotations

omitted).  Thus, courts must look to the complaint to determine whether a litigant has standing.

*See In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 433, 435 (5th Cir. 1982) (internal quotations

and citations omitted).

Scott went in person to a DCFS office to sign up for SNAP benefits on September 1, 2009.

A DCFS employee "discussed voter registration" on this date.  Additionally, the "Voter Registration" section of the form that Scott filled out was in compliance with the NVRA.  Scott, however, did not receive a voter registration form.

On December 1, 2009 Scott again went in person to the DCFS office to obtain food stamps. The form contained the proper language under the NVRA.  Scott, however, did not sign the benefits form.  Scott also did not receive a voter registration form.  The notes of the DCFS employee do not indicate that she spoke with Scott about voter registration.

On November 15, 2010 Scott went to a DCFS office in New Orleans to change his address. Scott filled out a Simplified Report Form.  The form does not contain the voter registration language as required under the NVRA.  Scott was not given another form concerning voter registration.  Additionally, a DCFS employee did not discuss voter registration with Scott.

Prior to his interactions with DCFS, Scott registered to vote at a voter registration drive. Scott, however, did not believe that he was registered to vote because he did not receive a confirmation that this form had been processed or confirmation that he was registered to vote.

That Scott was a registered voter at the time of his transactions with DCFS is of no moment in determining whether Scott suffered an injury for the purposes of standing.[3]  "A plaintiff need not have the franchise wholly denied to suffer injury.  Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient."  *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408

---

[3]The validity of Scott's voter registration is of no import to whether or not Scott suffered an injury.

F.3d 1349, 1352 (11th Cir. 2005) (quoting *Warth*, 422 U.S. at 514).  Under the NVRA, DCFS has an affirmative obligation to offer services to Scott (and others similarly situated) and creates a legally protected interest which affords standing to  individuals who have been deprived of the information and opportunities enacted under the NVRA.  Irrespective of Scott's voter registration status, Scott suffered an actionable injury during his transactions with DCFS when they failed to meet their obligation to Scott.

Scott's injury is traceable to DCFS.  During all three transactions Scott was dealing with DCFS forms, DCFS employees, and DCFS personnel.  Additionally, insofar as the SOS is required to coordinate the state of Louisiana's responsibilities under the NVRA, Scott's injury is traceable to the SOS.  *See* La. Rev. Stat. Ann. § 18:18(A)(6); *see also* Stipulation 1, ¶1 (the SOS "has coordinated and continues to coordinate the State's responsibilities under the NVRA").

Moreover,  it is likely that a favorable judgment will redress Scott's injuries.  Scott seeks an injunction from the Court requiring DCFS, a voter registration agency, to comply with the NVRA.  Additionally, the injunction seeks to require the SOS to properly coordinate and direct voter registration agencies to develop uniform rules, regulations, forms, and instructions related to voter registration and the NVRA.

In conclusion, the "[t]riad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement and the party invoking federal jurisdiction bears the burden of establishing its existence."  *Seel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-4 (1998).  Scott has met his burden of satisfying these three elements.  Over the past three years,

Scott has been in person to the DCFS office several times and did not receive the information required under the NVRA.  As such, Scott has standing to file suit against DCFS and the SOS.

  C.  <u>Louisiana State Conference of the NAACP</u>

    1.  **Organizational Standing**

   "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals."  *Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999).  Thus, an organization must demonstrate (1) injury-in-fact, (2) causation, and (3) redressability.  *See NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010). In determining whether an organization has standing the court must assess whether it has "[a]lleged such a personal stake in the outcome of the controversy [so] as to warrant [the] invocation of federal-court jurisdiction."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-379 (1982) (quoting *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 261 (1977)) (internal quotations omitted).  A concrete and demonstrable injury to the organization's activities and resources may constitute standing for an organization in its own right.  *See Havens Realty Corp.*, 455 U.S. at 379.  The injury, however, does not have to be significant.  *ACORN*, 278 F.3d at 358 (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14 (1973)) (internal quotations omitted).

    2.  **Organization: The Louisiana State Conference of the NAACP**

   The Louisiana State Conference of the NAACP ("LSC NAACP") is a part of the national NAACP ("NAACP") and bears charter number 6045.  The  NAACP was formed and incorporated in 1909,

with the mission to fight racial discrimination and prejudice.  Specifically, the organization focuses on disparities in education, politics, society and economics.  Individual membership in the NAACP is made through local branches, including adult, college, youth, and prison branches.  The LSC NAACP is the sole coordinating arm of the NAACP for the state of Louisiana.

The LSC NAACP is a 501(c)(3) organization.  The LSC NAACP has no individual members; rather membership in the LSC NAACP is comprised of the various branches located throughout Louisiana.  The LSC NAACP has  no executive director(s) or staff member(s).  The services performed by the organization, for the most part, are accomplished by volunteer labor provided by the branches.   The goals and proposed activities of the NAACP are communicated to the LSC NAACP for coordination within the state.  The LSC NAACP is responsible for all activities within the state of Louisiana.

A one page budget is presented each year to the LSC NAACP for approval.  There are no line items of expenses; rather there are general categories.  There is no accounts receivable category in the annual budget.  The budget is not amended during the course of the year to reflect expenses. The only record of expenses is through check stubs.  The budget is used solely to project what the LSC NAACP might generate in terms of activities and finances.

The LSC NAACP is funded through several means.  The first is by membership dues that are paid within the state of Louisiana.  The LSC NAACP receives fifteen percent of all dues paid by individuals to the branches.  Additionally, the LSC NAACP is funded by money received from the NAACP.  The  NAACP provides money for various projects such as voter registration and "Get Out

To Vote."  The LSC NAACP receives no funding from state or federal grants.  The primary source through which the LSC NAACP raises funds is its annual state convention ("convention").

At the convention, the LSC NAACP sponsors workshops that are geared toward its mission. One of the workshops is a political action workshop which focuses on increasing voter registration and voter participation.  Another workshop focuses on voter education.  Prior to the convention, the NAACP provides materials, including voter registration forms, to the LSC NAACP for distribution and training during the convention.

Although the LSC NAACP does not endorse candidates, the organization does get involved in elections.  Specifically, the LSC NAACP attempts to increase voter registration and increase voter participation in Louisiana.  The NAACP sends funds to the LSC NAACP to conduct voter registration and voter participation activities.  Dr. Ernest Johnson ("Johnson"), president of the LSC NAACP, testified that he received funds from the NAACP and appointed Reverend Edward Taylor, Jr. ("Reverend Taylor") to take charge of these activities.  This position is considered an official position within the LSC NAACP.

Among Reverend Taylor's responsibilities is to communicate with local churches to establish a relationship between the church and the LSC NAACP.  Through this connection, Reverend Taylor has succesfully coordinated voter registration activities at churches.  Additionally, Reverend Taylor is responsible, on behalf of the LSC NAACP, for the Get Out to Vote campaign ("GOTV").

GOTV is a three-pronged campaign that focuses on voter registration, voter education, and voter mobilization.  The LSC NAACP engages in GOTV because it feels that it is important that

citizens are registered to vote and actually vote.  The LSC NAACP has been engaged in GOTV since the year 2000.  Specifically, work has taken place in 2000, 2004, 2008, 2009, and 2010.

As part of the GOTV voter registration initiative, the LSC NAACP tries to register anyone who is not already registered to vote with a primary focus on the African-American community.  More specifically, the LSC NAACP concentrates on the lower-income community because these people are the least likely to be registered.  The LSC NAACP helps people register to vote via telemarketing, canvassing, and registration tables at different places or events.

As a part of its telemarketing efforts, the LSC NAACP utilizes the Van system.  The Van system is a computerized system which contains the names of people who are purportedly registered to vote, their addresses, and how often they vote.  The LSC NAACP representative ("telemarketer") will call and confirm that the resident is registered to vote at the address listed. If the resident is not registered, then the telemarketer asks if they would like to register.  If the resident agrees, the LSC NAACP will personally deliver a voter registration card to the resident, mail them a voter registration card, or advise them of a location at which they can register.  If they are registered to vote, the telemarketer will encourage them to get out and vote.

The LSC NAACP also disseminates materials regarding the importance of registering to vote. This process is known as canvassing.  When the LSC NAACP canvases they go to large stores, such as Wal-Mart, and churches.  The locations on which they focus are low income communities.  While at these locations, the LSC NAACP provides information that has the date of the election on it, the cut-off date for registering to vote, lists information to encourage people to vote, and educational

information about voting.

Lastly, the LSC NAACP also sets up registration tables.  The LSC NAACP has set up tables at large events and in front of large stores in Louisiana, and other buildings such as the Louisiana State Department of Motor Vehicles, food stamp offices[4], and health benefit offices[5].  At the registration table there are registration cards along with signs encouraging people to register to vote.  Many times the LSC NAACP does not actually set up a table, but will send individuals to these places with a clipboard and registration cards.  A prime place to register is outside of the food stamp offices and health benefit offices because many of those individuals are not registered to vote.

LSC NAACP undertook efforts designed to counteract deficiencies with the Defendant's compliance with their NVRA obligations.   During the 2010 GOTV congressional (and other) campaigns in Louisiana, volunteers spent approximately two to four hours, once a month, for three months at the public assistance offices.

Additionally, for the  2010 election in Louisiana, the LSC NAACP participated in activities in accordance with the Civic Engagement Toolkit: Let's Do It Again - 11/2/10 ("Toolkit").  The Toolkit was provided to the LSC NAACP by Kirk Clay ("Clay"), the National Civic Engagement Director for the national NAACP.  As a part of this campaign, the LSC NAACP registered people to vote in and

---

[4]DCFS administers SNAP, formerly known as food stamps.  Accordingly, the "food stamp offices" are run by DCFS.

[5]The health benefits offices to which the testimony referred were those offices that administered WIC.  WIC is administered by DHH.  Accordingly, the "health benefit offices" are run by DHH.

conducted several voter registration civic engagement trainings.   During the LSC NAACP telemarketing campaign, they utilized the scripts provided in the Toolkit.   As a part of its telemarketing, the LSC NAACP representatives would ask whether the individual was registered to vote.

The Toolkit also recognizes a special subcommittee for voter registration and turnout.   The subcommittee is responsible for developing projects and strategies designed to get individuals registered and to the polls in Louisiana during elections.   The Toolkit advises that the basic techniques for registering people to vote are: (1) door-to-door canvassing; (2) telephoning; (3) direct mail; and (4) web 2.0 technology including text messaging.   The LSC NAACP engaged in the door-to-door canvassing and telephoning throughout Louisiana.   The budget was insufficient to allow for direct mail or technology use.   In addition to these activities, the LSC NAACP made public service announcements and organized community forums.

The LSC NAACP received approximately $10,000.00 from the national NAACP to perform voter activities for the 2010 election in Louisiana.   In order to receive these funds, the LSC NAACP had to fill out paperwork and submit it to the national NAACP.   The LSC NAACP requested approximately $30,000.00 in funding.   There were no reporting requirements in connection with this funding.   Reverend Turner, however, participated in webinars and telephone conversations on a weekly basis with Clay about the activities that were going on in the state of Louisiana.

### 3.      The Louisiana State Conference of the NAACP Has Standing

"Under *Havens Realty*, an organization has standing to sue on its own behalf where it

devotes resources to counteract a defendant's allegedly unlawful practices." *ACORN*, 178 F.3d at 360 (internal citations omitted).  In *ACORN,* the Fifth Circuit made clear that an organization that conducts voter registration activities at events it already attends is not sufficient to confer standing for that organization.  *ACORN*, 178 F.3d at 360.  The Fifth Circuit reasoned that standing could not be obtained because the activities were not related to a defendant's purported failures to comply with the NVRA.  *Id.*  On the other hand, the Fifth Circuit recognized that when the organization has expended definite resources to counteract the effects of Louisiana's alleged failures under the NVRA, this may afford the organization standing.  *Id.*  Ultimately, when an organization expends resources on voter registration drives that counteract Louisiana's alleged failure to implement the NVRA, it is these expenditures, which the Fifth Circuit has described as "wasted resources", that would not be necessary if the state complied with the NVRA, that provide that organization standing.  *Id.* at 361.

The legislative history of the NVRA specifically highlights the main tenents of agency-based voter registration.  "Agency-based voter registration provides a useful supplement to motor-voter registration systems, enables more low income and minority citizens to become registered, and is cost effective."  S. Rep. No. 103-6, at 14 (1993).  "[I]n communities where resources are limited, [mail registration] has been demonstrated to be ineffective in registering those who have historically been left out of the registration process."  *Id.* at 15.  Ultimately,

> If you couple placing the burden on community leaders to register people, and then you have the State affirmatively purging people, you have got them putting all their resources into getting something that is not getting them very far. They are having to marshal all their resources just to maintain the status quo ... [I]n a country which

> prides itself on a representative form of government, it is crucial that the government task affirmative steps to register its citizenry and that the burden not fall on communities, especially communities ... which lack resources.

*Id.*

The LSC NAACP has met its burden of showing that it sustained an injury. The evidentiary record before the Court clearly establishes just the sort of "Louisiana specific" evidence that the Fifth Circuit referred to in *ACORN*. The LSC NAACP's voter registration focus is on the low-income African-American community in Louisiana. Particularly, the LSC NAACP found that the low-income African-American community was largely not registered to vote. Accordingly, the LSC NAACP expended its limited resources, time, and money, to canvass and conduct registrations outside of Louisiana DCFS and DHH offices. While the LSC NAACP does not target public assistance applicants, the LSC NAACP was still forced to expend resources registering Louisiana voters who would have already been registered if the Defendants had complied with the NVRA. *See ACORN*, 178 F.3d at 361. As the legislative history of the NVRA highlights, this was exactly the type of burden that the NVRA was designed to eliminate. *See* S. Rep. No. 103-6, at 15. As such, the LSC NAACP undoubtedly sustained an injury due to the failure of Defendants to comply with the mandates of the NVRA.

The LSC NAACP's injury is traceable to DCFS, DHH, and the SOS. As noted previously, the LSC NAACP could have expended its volunteer and monetary resources on voter registration activities other than its activities outside of DHH and DCFS offices. Insofar as the SOS is required to coordinate the state of Louisiana's responsibilities under the NVRA, LSC NAACP's injury is

traceable to the SOS.  *See* La. Rev. Stat. Ann. § 18:18(A)(6); *see also* Stipulation 1, ¶1 (the SOS "has coordinated and continues to coordinate the State's responsibilities under the NVRA").

Moreover, it is likely that a favorable judgment will redress the LSC NAACP's injuries.  The LSC NAACP seeks an injunction from the Court requiring DCFS and DHH to comply with the NVRA. The injunction also requires that the SOS properly coordinate and direct voter registration agencies to develop uniform rules, regulations, forms, and instructions related to voter registration and the NVRA.

In conclusion, the LSC NAACP has met its burden of showing that the constitutional requirements of standing have been met.  Over the past decade, the LSC NAACP has spent substantial resources and engaged in significant activity to encourage voter registration in Louisiana that would have not been necessary had defendants properly fulfilled their NVRA obligations.  Specifically, in 2010, the LSC NAACP allocated its resources in the low-income African-American community - much of which is served through DCFS and DHH programs.  Had DCFS, DHH, and the SOS properly conducted their voter registration duties as required under the NVRA, the LSC NAACP could have spent its meager resources on other priorities.  As such, the LSC NAACP has standing to bring suit against DHH, DCFS, and the SOS.

III.    *Violations of the NVRA*

    A.    <u>Findings of Fact</u>

        **1.    Louisiana Department of Health and Hospitals**

### a.   Generally

DHH personnel who interact with individuals seeking to apply for, renew, or change their address concerning services or benefits first began receiving training on the provisions and requirements of the NVRA shortly after its enactment.  Through employee training, directives, and handbooks, DHH mandated and instructed that its Medicaid and WIC employees comply with the provisions of the NVRA since its enactment.  Since the enactment of the NVRA, DHH has made good faith efforts to comply with the NVRA.

On the other hand, prior to the instant suit being filed, DHH engaged in numerous NVRA violations.  Specifically: (1) DHH did not provide voter registration services with any remote transactions prior to July 2011; (2) DHH did not provide voter registration services with address changes; (3) DHH did not require staff to distribute voter registration forms unless the client checked the "yes" box; (4) DHH Medicaid application and renewal forms did not include a voter registration question; (5) DHH's "Motor Voter Form" lacked a disclaimer that registering to vote will not affect the "amount" of assistance received; (6) DHH's WIC program did not advise clients of the disclaimers required by the statute; and (7) while DHH checked benefits application forms and followed up for missing information, it did not do so with voter registration forms.

Since the filing of this suit, DHH has enacted, in good faith, new measures and procedures designed to address all instances and methods of non-compliance with the NVRA alleged by Plaintiffs.  Specific actions were taken in its Medicare and WIC sections.

### b.   Medicare

In the spring of 2011, DHH began to revisit its Medicaid policies and required NVRA compliance for all remote transactions.  The DHH Medicaid Eligibility section arranged for the SOS to provide updated NVRA training to all Medicaid Eligibility personnel of the state.  The training took place on April 13, 2011.  Any personnel who were sick or absent on that date received the same or equivalent updated training upon returning to work.

On May 26, 2011, DHH Secretary Bruce Greenstein disseminated a directive to all DHH Medicaid Eligibility employees and contractors mandating that each in-person applicant for service or assistance, recertification, renewal, or change of address be offered: (1) a mail voter registration application; (2) a voter preference/declaration form; and (3) assistance in completing the mail voter registration form equivalent to the assistance given to persons when completing DHH Medicaid's own forms.  The directive further mandated that Medicaid employees and contractors accept and remit to appropriate election officials, within the time limits provided by the NVRA, completed mail voter registration application forms.  Lastly, the directive stated that the mandates imposed were issued under penalty of disciplinary action or contract termination.

On July 27, 2011, DHH revised its Medicaid NVRA policy applicable to DHH Medicaid employees and contractors.  The revision expressly requires compliance with NVRA-related mandates for all applications, renewals, and changes of address, whether conducted in-person or remotely.  This revised policy was implemented beginning on August 15, 2011, and is followed by all DHH Medicaid employees and contractors.  The policy implemented the procedures that follow:

First, a mail-in voter registration application form and a preference/declaration form are

attached to and included with all Medicaid application and renewal forms.  This requirement applies to both hard-copies and online versions.

Second, for in-person transactions, individuals seeking to apply, renew, or change their address for Medicaid services receive a mail voter registration application form, a preference/declaration form, and assistance in completing the mail voter registration form, unless refused.  Completed mail voter registration forms are forwarded by DHH to the appropriate parish Registrar of Voters within two business days of receipt.

Third, for mail-in transactions, individuals seeking to apply for or renew Medicaid services utilize either (i) pre-printed applications that have mail voter registration application forms and preference/declaration forms attached or (ii) older pre-printed applications that do not have such forms attached.  For applications and renewals received by Medicaid on the older forms, a mail voter registration form and a preference/declaration form are mailed to the applicant with the applicant's decision notice.  Completed mail voter registration application forms are forwarded by DHH to the appropriate parish Registrar of Voters within two business days of receipt.  DHH does not offer or use a mail-in change of address form.

Fourth, for online transactions, individuals seeking to apply, renew, or change their address with respect to Medicaid services are presented with an on-screen version of the preference/declaration form and, upon checking the "yes" box the user has three options: (i) a link to register online at www.geauxvote.com; (ii) a link to download and print the mail voter registration application; and (iii) a link to request a copy of the mail voter registration application

from DHH by mail.

Fifth, for telephone transactions, individuals seeking to apply for or renew Medicaid services are mailed a mail voter registration application form and preference/declaration form with their decision notices.  Individuals seeking to change their address are asked if they would like to register to vote, and those who indicate "yes" are offered the option of registering at www.geauxvote.com or having DHH mail a voter registration application form to them.

The policies established on July 27, 2011, and implemented by August 15, 2011, require all new employees to receive NVRA training within sixty days of employment.  As of February 27, 2012, the new employees receive NVRA training within thirty days of employment.  The policy also requires that all existing employees take the online NVRA training annually.  The training is conducted online via DHH's Medicaid Learning Management System ("MLMS").  The MLMS system allows tracking and reporting for employees' training.

c.    *WIC*

Applications and renewals for WIC services are conducted exclusively in-person.  Changes of address for WIC services are conducted almost exclusively in-person, however, such changes may be accomplished via telephone as well.  Since 2006, all WIC applications, renewals, and changes of address have been implemented via a paperless computer system -- The Public Health Automated Management Enabler System.

The DHH WIC Policy Manual enacted in 2004 requires the WIC program staff to offer and provide assistance to applicants in completing their voter registration for those applicants who are

eligible to vote.  Since 2009 all new WIC personnel have received training on WIC's required NVRA-related procedures as required under the 2004 Policy Manual.  On May 25,  2011 DHH Executive Counsel, on behalf of DHH Secretary Greenstein, disseminated to all DHH WIC employees and Contractors a memorandum mandating compliance with the 2004 Policy Manual.   The memorandum expressly mentions that the mandates imposed therein were issued under penalty of disciplinary action or contract termination.

Prior to August 1, 2011, WIC employees did not give or offer a voter registration form in connection with an application, renewal, or change of address unless the applicant responded "yes" to the question asking whether the applicant would like to register to vote.  On August 1, 2011, DHH Executive Counsel, on behalf of DHH Secretary Greenstein, disseminated an additional directive to all DHH WIC employees and contractors.  This directive mandated that each person who applies for WIC certification, recertification, or change of address must be asked to complete and sign a voter registration declaration statement and must be given or offered a voter registration form, regardless of their response, or lack thereof, on the voter registration declaration statement.  The directive expressly mentions that the mandates were issued under penalty of disciplinary action or contract termination.  Mandatory training concerning this directive was provided to all WIC personnel, employees, and contractors during the month of August, 2011. DHH WIC personnel, employees, and contractors have complied with the August 1, 2011 directive.

On April 23, 2012, DHH enacted a revised version of the DHH WIC Policy Manual pertaining to the NVRA.  The revised policy incorporates the mandates of the August 1, 2011 directive and is

consistent with and implements all relevant mandates of the NVRA.  Thus, pursuant to the policy, DHH WIC personnel, employees, and contractors must: (a) distribute or offer a mail voter registration application form and a preference/declaration form in connection with each application for service or assistance, and with each recertification, renewal, or change of address; (b) offer and provide the same level of assistance in completing the forms as is offered and provided to applicants when completing DHH WIC's own forms; and (c) mail received completed mail voter registration application forms to the appropriate parish Registrar of Voters within two business days of receipt.  DHH has continued to enforce this policy and its provisions.

> d.    *Conclusion*

Prior to August 15, 2011, DHH was not in full compliance with the mandates.  Since August 15, 2011, however, DHH Medicaid and WIC policies, practices, and procedures have been in substantial compliance with the mandates of the NVRA.

> ### 2.    Louisiana Department of Children and Family Services

DCFS was not in compliance with the NVRA as of April, 2011.  Specifically, (1) DCFS did not provide voter registration services with every remote transaction; (2) DCFS did not provide voter registration services with every renewal of benefits prior to October 31, 2010; (3) DCFS did not require its staff to distribute a voter preference form at every change of address transaction; (4) DCFS policy did not require that voter registration services be provided during any remote change of address transaction; (5) DCFS change of address forms, such as the CCAP 10 and the OFS 4SR, did not contain voter registration questions; (6) DCFS policy did not expressly require that voter

registration be provided with the CCAP, KCSP, and DSNAP programs; (7) DCFS policy gave employees discretion to give voter registration forms to clients, or to advise the client about the SOS's website; (8) DCFS did not require staff to distribute voter registration forms unless the client checked "yes."

On the other hand, DCFS's policies and protocols prior to April of 2011 were based on a good-faith interpretation of the NVRA.  DCFS provided and continues to provide NVRA training for its staff who are required to implement the NVRA.   The NVRA training is received through employee orientations, web-based training, staff meetings, and guidance manuals and policies made available via the DCFS intranet policy management system.  Additionally, DCFS employees such as Yolanda Ash and Shawn Banks did assist, and continue to assist, customers with voter registration.

In February, 2012 DCFS launched a front-end web-based state-wide computer system. This system is known as CAFÉ.  CAFÉ allows clients to conduct on-line transactions with DCFS.  The purpose of CAFÉ is to streamline the benefit management process and allow applicants easier access in applying for benefits.  As of December, 2012, the precise language on CAFÉ contains a voter registration section that is taken verbatim from the statute.  Additionally, DCFS remains committed to its ongoing efforts to continue to update and improve CAFÉ in order to comply with the NVRA.

Additionally, DCFS made substantial changes to its forms.  The 4APP hard-copy application for public assistance was revised.  The new 4APP includes the language verbatim from the NVRA

and is placed in one location on the application.  In the Simplified Report ("4SR"), voter registration was amended to be verbatim from the NVRA.  The C210 Voter Responsibility Policy ("C210") was changed.  Specifically, the C210 eliminated the language and link to the SOS website.  The C210 form further instructs DCFS employees to distribute the LR1M form.  Finally, the new C210 form adds language that advises DCFS employees that if the client fails to sign the LR1M form it needs to be returned to the client for signature.  All of these forms were effective in November, 2012. Prior to November, 2012, language from the NVRA had been added into the individual LaCAP, CCAP, and DSNAP policies, training materials, and applications.

As of October, 2012 DCFS had made sweeping changes to its forms, policies, and protocols. Suzy Sonnier, Secretary of DCFS, confirmed that DCFS had been moving forward with full and absolute compliance.  As of October, 2012 DCFS was almost in complete compliance with the NVRA, and planned to be in full compliance by the end of 2012.  Additionally, there are on-going efforts to continue to make sure the department remains within substantial compliance of the NVRA.

Prior to April, 2011 DCFS was not in full compliance with the mandates of the NVRA.  Since that time, however, DCFS has amended its policies, practices, procedures, and forms to be in substantial compliance with the mandates of the NVRA.  DCFS remains committed to being in compliance with the NVRA.

### 3.    The Secretary of State

The SOS, as the chief elections officer of the State of Louisiana, and its predecessor agency,

Louisiana State Commissioner of Elections, assists in the implementation and coordination of the NVRA among Louisiana agencies and entities involved in the voter registration process.  The coordination is done under the mandates of the NVRA.  At the inception of the implementation of the NVRA, the Commissioner of Elections attended conferences held by the Federal Elections Commission for the state, attended conferences held by the Federal Elections Commission, drafted state legislation, developed forms, created training and instruction manuals and materials, conferred with agency heads, conducted training, and designated and instructed voter registration agencies.

The training materials for the NVRA have been revised and updated periodically since the implementation of the NVRA.  Other than providing training and publishing materials, the SOS does not engage in any other measures to ensure that individual public assistance offices are complying with their responsibilities under the NVRA.

The SOS training provided to agencies, such as DHH and DCFS, has been inconsistent and inaccurate.  As of 2011, the SOS did not have any requirements as to the number of trainings provided to DHH or DCFS per year.  From the beginning of 2008 to the spring of 2011, the SOS did not conduct any NVRA training whatsoever for DCFS.  The trainings that the SOS conducted for DHH personnel in July 2009 and 2011 advised DHH personnel that DHH clients were only afforded an opportunity to register to vote only if DHH clients appeared in person at a DHH office.  Lastly, the SOS does not advise DCFS or DHH with regard to distributing voter registration application forms to clients who did not respond to the voter declaration question.

**4.      Conclusion**

Prior to April, 2011 the Defendants were in violation of the NVRA mandates.  Since the filing of this lawsuit, however, the Defendants have made substantial progress in complying with the NVRA.

B.      Conclusions of Law

1.      **Responsibilities of Voter Registration Agencies Under the NVRA**

Section 7 of the NVRA applies to voter registration agencies.  42 U.S.C. § 1973gg-5.  The NVRA requires each state to designate as voter registration agencies all offices in the state that provide public assistance as well as all offices in the state that have state-funded programs primarily engaged in providing services to persons with disabilities. 42 U.S.C. § 1973gg-5(a)(2)(A)-(B). These agencies are commonly referred to as "mandatory" voter registration agencies.  DCFS and DHH are mandatory voter registration agencies as defined under the NVRA.

The NVRA further demands that all offices designated as voter registration agencies shall make the following services available at each voter registration agency: (1) distribution of voter registration application forms for voting in federal elections; (2) assistance to applicants in completing the voter registration application forms; and (3) acceptance of completed voter registration applications to transmit those applications to the appropriate state election official in a timely manner. 42 U.S.C. § 1973gg-5(a)(4)(A)(i)-(iii).

A voter registration agency that is an office that provides service or assistance, in addition to conducting voter registration, shall (a) distribute with each application for such service or

assistance, and with each recertification, renewal or change of address form relating to such service or assistance, a mail voter registration application form described in Section 1973gg-7(a)(2); (b) provide a form that includes information and questions concerning registering to vote; and (c) provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.  42 U.S.C. § 1973-gg5(a)(6).

Ultimately, "[w]hen an applicant presents in person at a voter registration agency the agency must provide an application, assistance in completing such form unless refused, and acceptance of the applicant's form for transmittal."  *Ferrand v. Schedler*, Civ. A. No. 11-926, 2012 WL 1570094, at *12 (E.D. La. May 3, 2012) (citing 42 U.S.C. 1973gg-5(a)(4)).  Moreover, "[a] mandatory voter registration agency must distribute with each application, recertification, renewal, or change of address a voter registration form as required in Section 7(a)(6) of the NVRA regardless of whether the transaction is done in person or remotely."  *Ferrand*, 2012 WL 1570094, at *12 (citing 42 U.S.C. § 1973gg-5(a)(6)).  "Additionally, Section 7(a)(6)(C) requires that the agency and its staff provide the same degree of assistance to the applicant as it provides with their own forms and that this assistance must be provided during all transactions, including remote transactions."  *Ferrand*, 2012 WL 1570094 at *12.

2.        **Responsibilities of the Secretary of State Under the NVRA**

"Each state shall designate a State officer or employee as the chief State election official

to be responsible for coordination of State responsibilities" for the NVRA.  42 U.S.C. § 1973gg-8.

The legislative history suggests that this State official is responsible for implementing the State's

functions under the NVRA.  *See* S. Rep. 103-6, at 39.  As Chief Election Official, the Secretary of

State bears these responsibilities.  La. Rev. Stat. Ann. § 18:18(A)(6).

The NVRA prescribes that the administrator of voter registration for federal elections shall:

(1) ensure that any eligible applicant is registered to vote in an election; (2) require the appropriate

State election official to send notice to each applicant of the disposition of the application; (3)

provide that the name of a registrant may not be removed from the official list of eligible voters

except at the registrant's request, as provided by state law, or as provided in paragraph 4; (4)

conduct a general program that makes a reasonable effort to remove the names of ineligible voters

by reason of death or change in residence; (5) inform applicants under the NVRA of voter eligibility

requirements and penalties provided by law for submission of a false voter registration application;

and (6) ensure that the identity of the voter registration agency through which a voter registers is

not disclosed to the public.  42 U.S.C. § 1973gg-6.

Moreover, the NVRA requires that each state shall designate voter registration agencies and

ensure that the agency complete the required tasks.  *See Harkless v. Brunner*, 545 F.3d 445, 452

(6th Cir. 2008). Under the plain language of the NVRA, the Louisiana Secretary of State, as the

designated State election official, must coordinate these responsibilities for the state of Louisiana

under the NVRA.   Accordingly, the SOS, as Louisiana's chief election officer, is ultimately

responsible for the compliance for the State of Louisiana under the NVRA.  *See Harkless*, 545 F.3d

at 452; *see also United States v. Louisiana*, Civ. No. 11-470-JJB, 2011 WL 6012992, at *6 (M.D. La. Dec. 1, 2011).  Ultimately, the Louisiana SOS may not delegate its responsibilities under the NVRA thereby avoiding responsibility if the NVRA is not conducted reasonably.  *See United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008).

### 3.    Remedies Under the NVRA

It is undisputed that DHH and DCFS violated the NVRA prior to the filing of this lawsuit. Although this Court believes that DHH and DCFS did make good faith efforts to comply with the NVRA prior to April of 2011, this does not relieve them of their violations.  It is evident that the SOS has failed to enforce the NVRA in Louisiana.  Other than publishing a manual on NVRA compliance and conducting sporadic and faulty training sessions, the SOS has done nothing to ensure that the State comply with its NVRA obligations.

A party aggrieved by a violation of the NVRA "may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation."  42 U.S.C. § 1973gg-9(b)(2).   "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Id.*

"The court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (internal citations omitted).  On the other hand, "the moving party must satisfy the court that relief is [still] needed." *W.T. Grant Co.*, 345 U.S. at 633.  "A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 190 (2000) (citing *United States v. Concentrated Phosphate Exp. Assn.*, 393 U.S. 199, 203 (1968)).  Ultimately, a court must determine whether there exists some cognizable danger of recurrent and future violation.  *W.T. Grant Co.*, 345 U.S. at 633.

This Court finds that Scott and the LSC NAACP were irreparably injured by the failure of DCFS, DHH (as to LSC NAACP only), and the SOS to comply with the mandates of the NVRA.  *See infra* at (II)(B)(4), (II)(C)(2).  Moreover, the NVRA expressly provides that the remedies available for persons aggrieved under the act are declaratory or injunctive relief.  Since monetary damages are not available, an injunctive remedy is the appropriate mechanism to "compensate" the Plaintiffs.

After balancing the hardships, the Court finds that a remedy in equity is warranted.  Persons such as Luther Scott and organizations such as the LSC NAACP will suffer many hardships if there is a future violation of the NVRA by voter registration agencies and the Louisiana SOS.  Further, the hardship to the Defendants is little.  While Defendants disagree with the Court that they do not have to follow the mandates of the NVRA during remote transactions, they have already implemented new forms, policies, and procedures with regard to both in-person and remote

transactions.  Thus, the hardship that the Defendants will face will be minimal compared to the hardship that a similarly situated plaintiff may face.

The last factor requires a court to determine whether the granting of an injunction will not disserve the public interest.  It is without doubt that the public would be greatly served by ensuring that Louisiana voter registration agencies and SOS comply with the mandates of the NVRA.  *See* S. Rep. No. 103-6, at 14 ("Agency-based voter registration provides a method whereby citizens may easily register to vote and fulfills the requirement that government should do all it can to make registration widely and easily available.").  On the other hand, when these entities have voluntarily and in good faith completed changes to comply with the mandates of the NVRA, the Court questions whether the public interest would be served by issuing a permanent injunction.  *See Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010) ("[A]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course").  Ultimately, this Court finds that because Defendants are only in substantial compliance, and not in full compliance, there is some potential danger that future violations may occur.  As such, a permanent injunction that is minimal in breadth is warranted.

"[I]n a civil action under this section, the court may allow the prevailing party (other than the United States) reasonable attorney fees, including litigation expenses, and costs."  42 U.S.C. § 1973gg-9.  It is the Court's determination that the Defendants have committed multiple violations of the NVRA.  As such, the Plaintiffs, as the prevailing party, are granted the recovery of reasonable attorney fees, including litigation expenses, and costs.

**CONCLUSION**

Based on the above Findings of Fact and Conclusions of Law, this court finds that:

(a) Luther Scott and the Louisiana State Conference of the NAACP have standing;

(b) prior to April, 2011 Louisiana Department of Health & Hospitals, Louisiana Department

of Children and Family Services, and the Louisiana Secretary of State violated the National

Voter Registration Act, 42 U.S.C. § 1973gg, *et. seq.*

(c) the Louisiana Department of Health and Hospitals, Louisiana Department of Children

and Family Services, and the Louisiana Secretary of State are currently substantially in

compliance with the mandates of the National Voter Registration Act, 42 U.S.C. § 1973gg,

*et. seq.*

(d) a permanent injunction shall be entered;

(e) Plaintiffs are entitled to reasonable attorneys fees, litigation expenses, and costs.

Accordingly, Plaintiffs' shall file a Motion to set Attorneys Fees and Costs within the next

twenty-one days.

A judgment shall be entered in accordance with these findings of fact and conclusions of

law.

New Orleans, Louisiana on this 22nd day of January, 2013.

**JANE TRICHE MILAZZO**

**UNITED STATES DISTRICT COURT JUDGE**