# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

————————————————

No. 13-30185

————————————————

D.C. Docket No. 2:11-CV-926

United States Court of Appeals
Fifth Circuit

**FILED**

November 5, 2014

Lyle W. Cayce
Clerk

LUTHER SCOTT, JR., for himself and all other persons similarly situated; LOUISIANA STATE CONFERENCE OF THE NAACP, for themselves and all other persons similarly situated,

      Plaintiffs - Appellees

v.

TOM SCHEDLER, in his official capacity as the Louisiana Secretary of State,

      Defendant - Appellant

Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before STEWART, Chief Judge, and JOLLY and SMITH, Circuit Judges.

### J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed in part, dismissed in part, vacated in part and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

STEWART, Chief Judge, concurring in part and dissenting in part.



**A True Copy**
**Certified order issued Feb 06, 2015**

*Tyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 5, 2014

Lyle W. Cayce
Clerk

———————

No. 13-30185

———————

LUTHER SCOTT, JR., for himself and all other persons similarly situated;
LOUISIANA STATE CONFERENCE OF THE NAACP, for themselves and
all other persons similarly situated,

Plaintiffs - Appellees

v.

TOM SCHEDLER, in his official capacity as the Louisiana Secretary of State,

Defendant - Appellant

———————————

Appeal from the United States District Court
for the Eastern District of Louisiana

———————————

Before STEWART, Chief Judge, and JOLLY and SMITH, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Luther Scott, Jr. and the Louisiana NAACP both sought to enjoin two state agencies and the Louisiana Secretary of State to comply with the National Voter Registration Act. Scott alleges he was not provided with a voter registration form when applying for food stamps, and the Louisiana NAACP alleges it had to divert resources to voter registration drives as a result of Louisiana's purported non-compliance. The district court enjoined all three defendants. The state agencies do not appeal. Thus the only question for us is the validity of the injunction against the Secretary of State.

No. 13-30185

Although the National Voter Registration Act is complex, today we are primarily concerned with the Secretary of State's challenge to the extent of its requirement that state welfare agencies provide benefits applicants with voter registration forms. The plaintiffs sought injunctive relief to (1) ensure the agencies provided voter registration forms to applicants transacting remotely over the internet, phone, or mail; (2) ensure the agencies provided voter registration forms to applicants checking neither box on the declination form; and (3) ensure the agencies complied with other miscellaneous provisions of the Act. The district court ruled in favor of the plaintiffs on all three sets of claims, issuing a broad injunction. The Secretary of State alone now appeals, asserting that he had no authority to enforce the Act. He also disputes the extent of the Act's obligations. Furthermore, he contends that neither Scott nor the Louisiana NAACP has satisfied Article III standing or the Act's notice requirement.

We dismiss Scott's claims on standing and notice grounds. We do, however, reach the merits of the case regarding the relief separately requested by the Louisiana NAACP. Accordingly, we vacate, in part, the injunction regarding the Secretary of State. The plain meaning of the declination form obliges us to vacate in part the relief that the district court granted to the Louisiana NAACP. But in affirming the injunction in part, we hold that the Act gives the Secretary of State enforcement authority, and that consequently he has an obligation to require the two state agencies to comply with the other miscellaneous portions of the Act.

I.

This appeal involves questions of fact and law, so we begin by setting out the facts in some detail. Plaintiff Luther Scott, Jr. visited an office of the Louisiana Department of Children and Family Services ("DCFS") to apply for food stamps in September 2009 and again in December 2009. On both of these

2

No. 13-30185

visits, Scott was handed a declination form reading, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?" The form contained a yes box and a no box which the applicant could check. The form further stated, "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME." On both occasions, Scott did not check either box and consequently did not receive a voter registration form. He signed his name on the declination form in September 2009 but left the December 2009 declination form completely blank.

Scott also visited the DCFS office to modify his address on November 15, 2010. During that visit, he was given neither a declination nor a voter registration form.[1]

Unbeknownst to Scott, he had in fact been registered to vote since June 10, 2008. But Scott was intermittently homeless during this time. Scott testified that because he never received word that he had been registered, he was unaware that he could vote.

In addition to Scott, the other plaintiff here is the Louisiana State Conference of the NAACP ("the NAACP"). The NAACP's head of voter registration efforts is Edward Taylor. Taylor testified that on about six different occasions, he conducted voter registration drives outside benefits offices in Louisiana. Taylor conducted these drives by himself.

On January 12, 2011, the NAACP sent a letter to Tom Schedler, Louisiana's Secretary of State and chief elections official, stating that it believed the State was not in compliance with the National Voter Registration

---

[1] After filing suit, Scott again visited DCFS. He was given a declination form and checked the "no" box, and he was not given a voter registration form.

No. 13-30185

Act ("NVRA").[2]  The letter did not mention Scott, the NAACP's eventual co-plaintiff.

On April 19, 2011, the NAACP and Scott filed a complaint against the following state officials in their official capacities: Schedler, Ruth Johnson, who was the Secretary of the DCFS, and Bruce Greenstein, who was the Secretary of the Louisiana Department of Health and Hospitals ("the DHH").[3]   The complaint alleged systematic and ongoing violations of several provisions of Section 7[4] of the NVRA.   The defendants' answers denied most of the complaint's factual allegations.

The defendants eventually moved for partial summary judgment, requesting the court to rule that the NVRA did not apply to remote transactions, i.e., transactions conducted over the internet, phone, or mail. The plaintiffs filed cross-motions for summary judgment on the same issue.

The district court granted partial summary judgment in favor of the plaintiffs and partial summary judgment in favor of the defendants.  It held that voter registration agencies must provide the services listed in Section 7(a)(6) to applicants transacting remotely, but had the discretion to provide the services listed in Section 7(a)(4) to in-person applicants only. Section 7(a)(6), relating to the voter registration and declination forms, is central to this case on appeal.

Four main issues remained for trial: (1) whether the plaintiffs had satisfied the NVRA notice and Article III standing requirements; (2) whether the defendants were required to provide voter registration forms to applicants checking neither box on the declination form; (3) whether the defendants had

---

[2] 42 U.S.C. §§ 1973gg–1973gg-10.

[3] Roy Ferrand was also initially named as a plaintiff but withdrew from the suit before trial.  Additionally, Suzy Sonnier, who replaced Ruth Johnson as Secretary of DCFS, was subsequently substituted for Johnson as a defendant.

[4] 42 U.S.C. § 1973gg-5.

No. 13-30185

violated parts of Sections 7(a)(4) and 7(a)(6) in sundry other ways; and (4) whether the Secretary of State had the authority to enforce the NVRA.[5]

After a bench trial, the district court ruled that Scott and the NAACP had Article III standing and that the NVRA's notice requirement did not bar either plaintiff from bringing suit. On the merits, the district court also found that although the defendants had "already implemented new forms, policies, and procedures with regard to both in-person and remote transactions," each defendant had violated the NVRA in three distinct ways.[6] First, the defendants had failed to ensure that voter registration agencies provided voter registration forms to applicants who left both boxes unchecked on the declination form. Second, the defendants had failed to ensure that applicants applying for benefits remotely received voter registration forms. Third, the defendants had also violated Sections 7(a)(4) and 7(a)(6) in various additional ways.[7] The Secretary of State was liable along with the state agency officials because he had the authority to enforce the NVRA. The district court awarded a broad injunction requiring the defendants to comply with the NVRA.

---

[5] On appeal, we view the Secretary of State's authority to enforce the NVRA as part of the standing question related to redressability.

[6] On appeal, Schedler does not raise a mootness argument, and the record before us does not indicate that this controversy is moot.

[7] The district court found that prior to April 19, 2011, the date the suit was filed, the DHH: (1) did not provide voter registration services when applicants changed their addresses; and (2) certain application and renewal forms did not include the declination question and did not contain a disclaimer that registering to vote would not affect the amount of assistance received.

Additionally, prior to April 19, 2011, the DCFS: (1) did not provide a declination form at every change of address transaction; and (2) gave employees discretion regarding distribution of voter registration forms. Prior to October 31, 2010, the DCFS also did not provide voter registration services with every renewal of benefits transaction.

Finally, the Secretary of State: (1) did not engage in measures other than training and publishing materials to ensure public assistance offices were complying with the NVRA; (2) did not have any requirements regarding the number of annual trainings provided to DHH or DCFS; and (3) did not conduct any NVRA training for DCFS between early-2008 and mid-2011.

No. 13-30185

Schedler, the Louisiana Secretary of State, alone now appeals. He argues that (1) neither plaintiff complied with the NVRA's notice requirement; (2) neither plaintiff has Article III standing, in part because Schedler lacks enforcement powers; (3) Section 7(a)(6) does not apply to remote transactions; (4) Section 7(a)(6) does not mandate that an applicant leaving the declination form blank must receive a voter registration form.

II.

We first address whether the plaintiff-appellee Scott has complied with the NVRA's notice requirement, a question of law which we review de novo.[8] *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013).

An aggrieved party "may provide written notice of the violation to the chief election official of the state involved." NVRA § 11(b)(1).[9] Although notice is framed here as permissive rather than mandatory, other NVRA provisions indicate that notice is mandatory. For instance, the NVRA provides that "[i]f the violation is not corrected within 90 days after receipt of [the] notice . . . the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." *Id.* at § 11(b)(2). "No standing is therefore conferred if no proper notice is given, since the 90-day period never runs." *Ga. State Conference of NAACP v. Kemp,* 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012).

Scott admits that, although the NAACP provided Schedler with notice, he himself did not. But Scott maintains that notice is not necessary here because, as the NAACP had provided notice of the defendants' alleged non-compliance with the NVRA, no notice was required from him personally. Scott

---

[8] Scott's counsel conceded at oral argument that Scott lacks Article III standing on the remote transactions issue. Because all his transactions were in person, he suffered no injury relating to remote transactions.

[9] 42 U.S.C. § 1973gg-9(b)(1).

No. 13-30185

points to *Ass'n of Cmty. Orgs. for Reform Now ("ACORN") v. Miller*, 129 F.3d 833 (6th Cir. 1997), which held that because ACORN had provided Michigan with proper NVRA notice, the individuals in the suit were not required to provide notice themselves. *Miller* noted that the purpose of the notice requirement was to "provide states . . . an opportunity to attempt compliance before facing litigation." *Id.* at 838. Because Michigan already had "clearly indicate[d] that [it] would continue to refuse to comply with the Act until forced to do so by judicial intervention," notice from the individual plaintiffs would have been "unnecessary" and "futile." *Id.*

We hold that Scott's failure to provide notice is fatal to his suit. He cannot piggyback on the NAACP's notice for several reasons. Most importantly, *Miller*'s exception to the NVRA's notice requirement is wholly devoid of textual support in the statute. No subsequent cases following *Miller* have addressed *Miller*'s complete lack of statutory authority. *See, e.g., Judicial Watch, Inc. v. King*, No. 1:12-cv-800-WTL-TAB, 2012 WL 6114897, *3 (S.D. Ind. Dec. 10, 2012), *Kemp,* 841 F. Supp. 2d at 1335.

Additionally, *Miller* is distinguishable because it involved a state that refused to comply with the NVRA. In *Miller*, the Michigan Governor had issued an Executive Order for state agencies not to begin providing voter registration services until federal funds were available to fund such services. *Miller*, 129 F.3d at 835. By contrast, here, the district court found that all defendants were in substantial compliance with the NVRA, which is not challenged by the plaintiffs-appellees. Given the defendants' demonstrated desire to comply with the NVRA, notice here would not have been "futile" as it was in *Miller*. *Miller*, 129 F.3d at 838.

It is also apparent to us that the NAACP's notice letter was too vague to provide Schedler with "an opportunity to attempt compliance" as to Scott "before facing litigation." *Id.* In the letter, the NAACP alleged NVRA

7

No. 13-30185

violations only in broad terms and certainly did not mention Scott by name. Specifically, the letter (1) alleged that Louisiana was not providing voter registration services at public assistance offices, citing a decline in the voter registration forms that the public assistance agencies had collected; (2) cited a survey illustrating that numerous people were not provided with a voter registration form in connection with their application for benefits, recertification, or change of address; (3) cited a survey suggesting agency personnel were not familiar with their voter registration obligations under the NVRA; and (4) stated that numerous agencies did not have hard copies of voter registration forms. The letter's surveys and statistics put Schedler on notice neither that the violations concerned the declination form nor that they involved Scott. Moreover, when Schedler finally received notice of the violations Scott alleged through Scott's complaint, the DCFS attempted to provide Scott with voter registration forms. Providing a potential plaintiff with a voter registration form is "exactly [the] sort of compliance attempt" that "pre-litigation notice was meant to encourage." *Kemp*, 841 F. Supp. 2d at 1336.

To the extent that Scott seeks relief for himself in this action, he has no basis for relief because he did not file notice. And consequently, he is not entitled to seek relief for others, either. Now we turn to the NAACP's claim that notwithstanding the merits of Scott's case, it has satisfied the standing and notice requirements to pursue the case in Scott's absence.

No. 13-30185

III.

A.

We first review the district court's ruling that the NAACP has Article III standing.  Article III standing "requires that the plaintiff demonstrate that he or she has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  *Ass'n of Cmty. Orgs. for Reform Now ("ACORN") v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999) (internal quotation marks omitted).  Schedler challenges the district court's findings regarding injury in fact and causation, which are mixed questions of fact and law which we review de novo.  *Adam J. v. Keller Independent School District*, 328 F.3d 804, 808 (5th Cir. 2003).  Schedler also challenges the district court's holding that it would be able to redress the NAACP's injury, which is a question of law that we review de novo.  *Kariuki*, 709 F.3d at 501.

The NAACP lacks standing to challenge Schedler's enforcement of the NRVA following remote transactions.  The NAACP sought an injunction based on resources it expended to counteract Schedler's allegedly illegal conduct.  But, the record demonstrates that the NAACP only expended resources to compensate for deficiencies related to *in-person* transactions; no evidence (or district court finding) supports a theory that the NAACP expended resources to register voters engaged in remote transactions.  Because there is no relationship between the NAACP's request for injunctive relief and Schedler's (or any defendant's) treatment of remote transactions, the NAACP lacks standing to challenge Scheler's handling of those remote transactions.

However, our analysis of whether the NAACP has standing to challenge the in-person transactions yields a different result.  As to those transactions, Schedler first argues that the NAACP lacks any injury in fact.  "[A]n organization has standing to sue on its own behalf where it devotes resources

9

No. 13-30185

to counteract a defendant's allegedly unlawful practices." *Fowler*, 178 F.3d at 360. Schedler argues that the six occasions on which Taylor registered voters outside public assistance offices do not constitute an injury in fact to the NAACP.[10] Schedler argues that the NAACP failed to prove that Taylor was acting on its behalf, noting that the NAACP president was unaware that Taylor was registering voters. Schedler also argues that no NAACP money was spent on Taylor's registration drives.

We nevertheless hold that the NAACP has suffered injury in fact. We think that the district court did not err in finding that the NAACP's head of voter registration was acting on behalf of the NAACP in conducting voter-registration drives, despite these drives' not being attended by other NAACP officials. Even if Taylor had spent none of the NAACP's money, the NAACP would have still devoted resources to counteract Schedler's allegedly unlawful practices because Taylor devoted his time to the drives. *Cf. id.* at 360–61 (holding that ACORN has standing because it conducted at least one voter registration drive a year in Louisiana). Although Taylor estimated but was not sure of the number of voter registration drives he conducted, injury in fact is "qualitative, not quantitative." *Id.* at 357–58.

B.

Schedler further argues that there is no causation between his alleged NVRA violations and the NAACP's conducting in-person, voter registration drives. We considered a similar question in *Fowler*, where we held that ACORN had standing to bring a Section 7 claim alleging that a state failed to provide the required voter registration opportunities at certain public assistance offices. *Id.* at 355. The basis for ACORN's standing was that it had

---

[10] Presumably these voters had not been registered inside these public assistance offices.

No. 13-30185

conducted voter registration drives focused on "registering people at welfare waiting rooms, unemployment offices, and on Food Stamp lines." *Id.* at 361 (internal quotation marks omitted).

The NAACP has established causation as to the in-person transactions. The causal nexus in *Fowler*, which centered on public assistance offices, is also present here. Taylor conducted his drives outside of public assistance agencies, and the NAACP alleges Schedler did not provide voter registration forms to applicants transacting with public assistance agencies.

C.

Schedler continues his standing argument by asserting that the NAACP's suit lacks redressability because neither the NVRA nor Louisiana law provides his office with the authority to enforce the NVRA.

The NVRA commands that each state "designate a State officer . . . as the chief State election official to be responsible for coordination of State responsibilities under this subchapter." NVRA § 10.[11] State law provides Schedler with authority that is co-extensive with the NVRA. La. Rev. Stat. Ann. § 18:18 ("The secretary of state shall administer the laws relating to custody of voting machines and voter registration, and . . . he shall . . . [c]oordinate the responsibilities of this state under the National Voter Registration Act . . . as required by 42 U.S.C. Section 1973gg-8.").

Thus the question is whether the power of "coordination" in Section 10 of the NVRA includes the power of enforcement. Two circuits have previously ruled on this question. In *Harkless v. Brunner*, 545 F.3d 445, 449 (6th Cir. 2008), the Sixth Circuit considered "whether Ohio's Secretary of State . . . has a role in ensuring Ohio's compliance with the NVRA." The court concluded that the Secretary, as Ohio's chief election official, was responsible for the

---

[11] 42 U.S.C. § 1973gg-9.

No. 13-30185

"implementation and enforcement" of the NVRA. *Id.* at 452. Similarly, *United States v. Missouri*, 535 F.3d 844 (8th Cir. 2008), considered whether the defendants, the State of Missouri and its Secretary of State, had the authority to enforce Section 8 of the NVRA.[12] The Eighth Circuit held that although the defendants "cannot be required to enforce the NVRA," both defendants were required to make a "reasonable effort" to ensure state agencies' compliance with Section 8. *Id.* at 851. The court then reversed the district court's judgment, which had held that Missouri and its Secretary of State were not proper parties because they lacked enforcement authority. *Id.* at 848. Consequently, although *Missouri* expresses itself in different language from *Harkless*, both the Eighth Circuit's and the Sixth Circuit's interpretations of the NVRA provide the chief election official with authority to enforce the NVRA with respect to state agencies.

Against that backdrop, we now consider Schedler's argument that we should interpret "coordination" to constitute only the one-time power to implement the NVRA, not an enforcement power.[13] In counter-argument, the NAACP urges us to follow the interpretation of *Missouri* and *Harkless*.

In considering these two contrasting interpretations, we hold that "coordination" includes enforcement power for two reasons. First, the NVRA's notice provision, which requires potential plaintiffs to provide notice to the chief election official before filing suit, only makes sense if Schedler has authority to enforce the Act. The purpose of the notice requirement is to give

---

[12] Section 8 deals with updating the list of registered voters.

[13] An example of a proper exercise of the "coordination" power, in Schedler's view, would be developing NVRA training manuals for state agencies. The district court did not allow Schedler to introduce the testimony of Elsie Cangelosi, his predecessor as Secretary of State, to demonstrate the Secretary of State's training programs. Schedler now appeals this evidentiary ruling. However, because he cites no authority in support of his argument and does not sufficiently brief it, he has waived it. *See Procter & Gamble*, 376 F.3d at 499 n.1.

No. 13-30185

the state the opportunity to remedy NVRA violations. *See Miller*, 129 F.3d at 838; *Harkless*, 545 F.3d at 453. Accordingly, "[r]equiring would-be plaintiffs to send notice to their chief election official about ongoing NVRA violations would hardly make sense if that official did not have the authority to remedy NVRA violations." *Harkless*, 545 F.3d at 453. Moreover, the NVRA's notice requirement shows that the chief election official's role must be ongoing. Such an ongoing role is at odds with Schedler's view that the chief election official can merely instruct state agencies on NVRA compliance and then disappear from the picture.

Second, the NVRA's centralization of compliance responsibility also suggests that the chief elections officer has enforcement power. The NVRA centralizes responsibility in the state and in the chief elections officer, who is the state's stand-in. For example, each state *must* designate a chief elections officer, who will receive complaints about *all* violations of the NVRA. *See* NVRA §§ 10, 11. Additionally, the NVRA speaks in terms of the responsibilities of "each state." *See, e.g., id.* at §§ 7(a)(1), 4(a). This choice of words reflects a policy choice that responsibility should be centralized rather than fragmented. *Cf. Harkless*, 545 F.3d at 452 ("[T]he entire Act . . . speaks in terms of state responsibilities; what is noticeably missing is any mention of county, municipal, or other local authorities.").

The NAACP's interpretation of "coordinate" is more compatible than Schedler's with the NVRA's concern for centralization. Under Schedler's view, aggrieved parties could sue the state agencies, the DCFS and the DHH, but not the Secretary of State. But the NVRA's centralization of responsibility counsels against such buck passing. Furthermore, similar to providing for a private cause of action, *see* NVRA § 11, requiring states to assign enforcement power to a single person increases the likelihood of NVRA compliance. *See Harkless*, 545 F.3d at 452 (expressing concern that the state could escape

13

No. 13-30185

responsibility for NVRA violations if the chief elections officer lacked enforcement power); *see also Missouri*, 535 F.3d at 850 (Missouri and its Secretary of State "may not delegate the responsibility to conduct a general program to a local official and thereby avoid responsibility if such a program is not reasonably conducted.").

D.

We next consider whether the NAACP complied with the NVRA's notice requirements. Schedler argues that although the NAACP attached its notice letter to Schedler to its complaint, and it is now in the record, nonetheless we should not consider it because it was not introduced into evidence at trial. But because Schedler cites no authority for this argument, he has waived it. *See Procter & Gamble Co.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument"). Consequently we leave intact the district court's determination that the NAACP has complied with the notice requirement, and move on.

IV.

We now turn to the merits of the only claim properly before us and examine what obligations states have under Section 7(a)(6)(B) when an in-person-benefits applicant returns the declination form with neither box checked. We review this question of law de novo. *Kariuki*, 709 F.3d at 501.

Section 7(a)(6) requires voter registration agencies to provide each applicant with voter registration forms "unless the applicant, in writing, declines to register to vote." NVRA § 7(a)(6)(A). Section 7(a)(6) requires these voter registration agencies to provide all applicants with declination forms, which read:

14

No. 13-30185

- "If you are not registered to vote . . . would you like to apply to register to vote here today?"[14]

- [There are then two boxes to check: yes or no.][15]

- "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME."[16]

We hold that an applicant handing back a form with neither box checked has created documentation "in writing" showing that he did not wish to register.  We rely on the plain meaning of "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME."  *Id.* at § 7(a)(6)(B)(iii).   The capital letters mandated by the NVRA drive home the importance of the message: not checking either box equals a decision not to register to vote.  Requiring that a declination be "in writing," rather than oral, creates evidence showing that the state complied with the NVRA despite not distributing a voter registration form.  Schedler introduced Scott's two blank declination forms into the record below for this very purpose.

The NAACP argues that Section 7(a)(6)(B)(iii)'s command that "failure to check either box [is] deemed to constitute a declination to register for purposes of subparagraph (C)" constitutes an exclusive rather than illustrative list of the consequences of unchecked boxes.  But on its face, "for purposes of subparagraph (C)" does not specify if unchecked boxes relieve the state *only* from complying with Section 7(a)(6)(C), which deals with assisting applicants in filling out voter registration forms, or also relieve the state from complying with Section 7(a)(6)(A), which deals with distributing voter registration forms.

---

[14] NVRA § 7(a)(6)(B)(i).
[15] *Id.* at § 7(a)(6)(B)(iii).
[16] *Id.*

15

No. 13-30185

Faced with this ambiguity, we must interpret "for the purposes of subparagraph (C)" in a way that avoids introducing an inconsistency into the statute. *Cf. Gustafson*, 513 U.S. at 568 ("[W]e adopt the premise that [a] term should be construed, if possible, to give it a consistent meaning throughout the Act."). If we were to read "for the purposes of subparagraph (C)" as an exclusive list of the consequences of unchecked boxes, Section 7(a)(6)(b)(iii) would instruct the state that unchecked boxes *do not* equal a declination to register, as the state would still be required to provide the applicant with a voter registration form. But at the same time, "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME" would continue to instruct the applicants that unchecked boxes *do* equal to a declination to register. Because we generally attribute consistency to Congress, we read "for the purposes of subparagraph (C)" as illustrative rather than exclusive, and thus avoid creating an internal inconsistency within Section 7(a)(6)(B)(iii).[17]

We note that, in *Valdez*, the Tenth Circuit has reached a conclusion different from ours. *Valdez* reasoned that an applicant checking neither box could both not wish to register "at this time" and also want to register in the future. 676 F.3d at 946. Consequently, the Tenth Circuit held that a voter registration agency must provide such an applicant with a voting registration form. *Id.* at 947. But *Valdez* overlooks that an applicant checking the "no" box could also both not wish to register "at this time" and wish to register in the future. The logic of *Valdez* would compel the state to provide the "no" applicant

---

[17] At oral argument, both the NAACP and the Department of Justice suggested Section 7(a)(6)(B)(iii) provides inconsistent instructions to the applicant and to the state. They argued that we should follow the state's rather than the applicant's instructions. But neither the NAACP nor the Department of Justice explained, first, why Congress would provide inconsistent instructions, and second, why the instructions to the state should trump the instructions to the applicant.

16

No. 13-30185

with a voter registration form.  But Section 7(a)(6) clearly absolves the states of providing a voter registration form when the applicant checks "no."  Because we take issue with *Valdez*'s key reasoning, we decline to adopt its conclusion.

## V.

To recap, the plaintiffs requested an injunction for Schedler to (1) require state agencies to provide voter registration forms to applicants transacting for benefits remotely; (2) require state agencies to provide voter registration forms to applicants checking neither box on the declination form; and (3) require state agencies to comply with other miscellaneous provisions of the Act which they had previously violated.  The district court granted the plaintiffs an injunction on all three issues.

On appeal by the Secretary of State, we vacate the district court's injunction on two of the three issues.  We dismiss the NAACP's claims regarding the first two issues, remote transactions and the declination forms.  But we affirm the injunction insofar as it grants the NAACP relief on the third issue because Schedler had the authority to enforce the NVRA.  Scott's claims are dismissed for lack of standing and for failing to comply with the NVRA's notice requirement.

We do not consider Schedler's arguments regarding attorney's fees and the breadth of the district court's injunction.  On remand, the district court must modify the injunction and must consider whether, if at all, to alter the award of attorney's fees in a manner consistent with our opinion.

## VI.

For the reasons above, we DISMISS Scott's claims in their entirety, DISMISS the NAACP's claims as to the remote transactions, VACATE IN

No. 13-30185

PART and AFFIRM IN PART the injunction as to Schedler, and REMAND for
the district court to modify the injunction in accordance with this opinion.[18]

---

[18] We note again that the injunction against the DCFS and DHH is unaffected by this
opinion, as it has not been appealed.

No. 13-30185

STEWART, Chief Judge, concurring in part and dissenting in part:

I concur in the panel majority's conclusion that: 1) Scott failed to provide the required statutory notice and should therefore be dismissed from this case; 2) the Louisiana NAACP has standing only to challenge the in-person transactions; and 3) Schedler has enforcement authority under Section 10 of the NVRA, and the district court's injunction should be affirmed on this issue. However, I would affirm the district court's ruling that blank declination forms do not relieve voter registration agencies of the responsibility to distribute voter registration forms to applicants. I therefore respectfully dissent from the panel majority's decision to vacate that portion of the injunction.

## I.

I would affirm the district court's ruling that a blank declination form does not relieve a voter registration agency from providing an applicant with a voter registration form. Section 7(a)(6) requires a voter registration agency to provide an applicant with a voter registration form during a covered transaction "unless the applicant, *in writing*, declines to register to vote." *Id.* § 1973gg-5(a)(6)(A) (emphasis added). A blank declination form does not satisfy the "in writing" requirement.

As noted by the Tenth Circuit, failing to check a box on the declination form does not fall within the purview of the ordinary meaning of "in writing." *See Valdez v. Squier*, 676 F.3d 935, 945 (10th Cir. 2012) (noting that the ordinary meaning of "in writing" is "[t]he state or condition of having been written or penned; written form" (internal quotations and citation omitted)). Further, Congress chose to expressly note that the failure to check a box constitutes a declination for section 7(a)(6)(C), but it did not include a provision that the same reasoning applied to section 7(a)(6)(A). *See Nken v. Holder*, 556

19

No. 13-30185

U.S. 418, 430 (2009) (observing that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."(internal quotation marks and citation omitted)).   Finally, requiring states to give an applicant a form unless he unequivocally declines one in writing by checking the box marked "no" is consistent with Congress's intent to "increase the number of eligible citizens who register to vote in elections for Federal office."  § 1973gg(b)(1).

Schedler fails to offer any compelling arguments in support of his interpretation.  First, he contends that the "in writing" requirement is satisfied as soon as an applicant signs a declination form.  However, that interpretation renders section 7(a)(6)(B) superfluous.  Section 7(a)(6)(B) requires declination forms to include the question: "If you are not registered to vote where you live now, would you like to apply to register to vote here today?"  An applicant would have no need to check either box on the declination form in response to this question if the applicant could simply decline to vote by signing the form.  Second, he argues that an applicant declines to register to vote regardless of whether the applicant checks the "no" box or fails to check either box on the declination form.  He fails to recognize that the NVRA gives import to whether an applicant declines "in writing."  If the applicant declines in writing, the agency need not provide the applicant with a voter registration form.  *See* § 1973gg-5(a)(6).  However, the agency is not relieved of that duty if the applicant fails to check either box.  *See id.*  He also argues that applicants who check the "no" box may desire to receive a voter registration form later.  Even accepting that premise, he fails to explain why a failure to check either box on

No. 13-30185

the declination form should be interpreted as satisfying the "in writing" requirement of Section 7(a)(6)(A)(ii).[1]

The panel majority concludes that Section 7(a)(6)(B)(iii) is ambiguous. However, Section 7(a)(6)(B)(iii) clearly states that "failure to check either box . . . constitute[s] a declination to register *for purposes of subparagraph (C)*." (emphasis added). The panel majority further concludes that it would be inconsistent to interpret Section 7(a)(6)(B)(iii) as not applying to Section 7(a)(6)(A). However, reading Section 7(a)(6)(B)(iii) in accordance with its plain language would not create any inconsistency. To the contrary, if an applicant leaves the declination form blank, the agency would no longer have to assist the applicant with registering to vote, but the agency would remain responsible for providing the applicant with a voter registration form. As we have noted previously, "we do not inquire what Congress meant; we only ask what it said." *Guilzon v. Comm'r of Internal Revenue*, 985 F.2d 819, 823 n.11 (5th Cir. 1993).

Therefore, I would affirm the district court's holding that a voter registration agency must provide an applicant with a voter registration form during a covered transaction unless the applicant checks the "no" box on the declination form.

## II.

Accordingly, I would affirm the district court's injunction insofar as it held that the blank declination forms do not relieve a voter registration agency from distributing voter registration forms.

---

[1] Schedler makes additional arguments based on legislative history and language in a Federal Election Commission implementation manual; however, those arguments are equally unavailing because his interpretation is not supported by the language of Section 7(a). *See In re Ramba, Inc.*, 416 F.3d 394, 401 (5th Cir. 2005) ("Inferences drawn from a statute's legislative history, however, cannot justify an interpretation that departs from the plain language of the statute itself.").